No. 25-5248

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

VERA INSTITUTE OF JUSTICE ET AL.,
Plaintiffs-Appellants,

v.

DEPARTMENT OF JUSTICE, ET AL.,
Defendants-Appellees,

On Appeal from the United States District Court
for the District of Columbia
No. 25-cv-1643
The Hon. Amit P. Mehta, U.S. District Judge

## PLAINTIFFS-APPELLANTS' EMERGENCY MOTION FOR AN
## INJUNCTION PENDING APPEAL

Joshua Perry
Joshua Stanton
E. Danya Perry
Perry Law
445 Park Avenue, 7th Floor
New York, NY 10022
(212) 251-2619
jperry@danyaperrylaw.com

Lisa Newman
Jennifer Fountain Connolly
Cortney Robinson
Somil Trivedi
Brian Netter
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
lnewman@democracyforward.org

*Counsel for Plaintiffs-Appellants*

July 11, 2025

# TABLE OF CONTENTS

GLOSSARY OF ABBREVIATIONS.................................................. iii

INTRODUCTION ............................................................ 1

BACKGROUND ............................................................. 4

ARGUMENT ................................................................ 6

I.  Plaintiffs are likely to prevail. ................................. 6

    A.  This Court has jurisdiction to grant preliminary
        injunctive relief............................................. 6

    B.  The district court's contrary reasoning is erroneous. . 14

II. OJP's *en masse* grant terminations violate the APA. .......... 22

III. The remaining factors compel granting an injunction
     pending appeal. ................................................ 24

CONCLUSION ............................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.A.R.P. v. Trump*, 145 S. Ct. 1364 (2025) .............................................27

*Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314 (D.C. Cir. 2024) ...............27

*Am. Ass'n of Colls. v. McMahon*, No. 1:25-cv-00702, 2025 WL 833917
(D. Md. Mar. 17, 2025) ...............................................................24

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ......................10, 11, 12, 15

*California v. Education*, 769 F. Supp. 3d 72 (D. Mass. 2025) ...............17

*Crowley Gov. Servs. v. GSA*, 38 F.4th 1099 (D.C. Cir. 2022)....7, 9, 12, 13

*Dep't of Educ. v. California,* 145 S. Ct. 966 (2025)................................15

*Great-W. v. Knudson*, 534 U.S. 204 (2002) .................................14, 15, 17

*Ingersoll-Rand Co. v. U.S.*, 780 F.2d 74 (D.C. Cir. 1985) .......9, 18, 20, 21

*Kidwell v. Dep't of Army,* 56 F.3d 279 (D.C. Cir. 1995)........................11

*Lummi Tribe v. U.S.*, 870 F.3d 1313 (Fed. Cir. 2017)......................13, 17

*Maine Cmty. Health Options v. U.S.*, 590 U.S. 296 (2020) ...............11, 12

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982)..........................7

*MTA v. Duffy,* No. 1:25-cv-01413, 2025 WL 1513369
(S.D.N.Y. May 28, 2025).............................................................23

*Nat'l Air Traffic Controllers Ass'n v. U.S.*, 160 F.3d 714
(Fed. Cir. 1998) ........................................................................13

*Nat'l Ctr. for Mfg. Scis. v. U.S.*, 114 F.3d 192 (Fed. Cir. 1997) ........13, 14

*Population Inst. v. McPherson*, 797 F.2d 1062 (D.C. Cir. 1986)..............6

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ..................................6

*Spectrum Leasing v. U.S.*, 764 F.2d 891 (D.C. Cir. 1985)................17, 18

*St. Bernard Parish v. U.S.*, 134 Fed. Cl. 730 (2017) ..............................16

*Stone v. Powell*, 428 U.S. 465 (1976)......................................................16

*Tootle v. Sec'y of Navy*, 446 F.3d 167 (D.C. Cir. 2006) ............................7

i

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*U.S. Conf. of Catholic Bishops v. State*, No. 25-5066
 (D.C. Cir. Mar. 28, 2025) .........................................7, 9, 10

*U.S. v. King*, 395 U.S. 1 (1969) ................................................13

*United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017
 (9th Cir. 2023) ..................................................................19

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817
 (D.C. Cir. May 3, 2025)...................................................6, 12

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355
 (D.C. Cir. May 28, 2025) ........................................................7

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1556440
 (D.C. Cir. May 22, 2025) .......................................................7

## STATUTES

31 U.S.C. § 6305 ....................................................................16

## RULES AND REGULATIONS

2 C.F.R. § 200.340 ....................................................................4

2 C.F.R. § 200.344 ..................................................................11

2 C.F.R. § 2800.101 ..................................................................4

Fed. R. App. P. 8......................................................................3

*Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30,046
 (Apr. 22, 2024) ......................................................................4

## GLOSSARY OF ABBREVIATIONS

APA                    Administrative Procedure Act

CFC                    Court of Federal Claims

OJP                    Office of Justice Programs

## INTRODUCTION

In April 2025, DOJ's Office of Justice Programs abruptly and summarily terminated 376 multi-year grant and cooperative agreements awarding more than $820 million in essential funding for public safety. OJP sent identical form emails to Plaintiffs-Appellants and other grantees, offering the same unsupported explanation that Plaintiffs' awards no longer effectuated the program goals or OJP's priorities.

These arbitrary and unlawful grant terminations were devastating to Plaintiffs and vulnerable populations that rely on their services. Plaintiffs are organizations that use OJP funds for purposes such as protecting communities from violence and furnishing services to crime victims. They train and assist law enforcement, correctional facilities staff, prosecutors, and states and localities. They work with vulnerable populations who have been crime victims, including by providing free interpretation services that allow Deaf and disabled crime victims to communicate with law enforcement, and by training law enforcement to serve individuals with disabilities who are victims of sex or labor trafficking. They fund and work to successfully interrupt gun crime and gang violence for juveniles and adults, including those at the highest risk,

in cities across the country. They fund and work in hospitals to provide lifesaving assistance for violently injured victims and their families, while also mitigating retaliation that may arise. They provide resources and necessary care to AAPI victims of hate crimes and violence.

As a direct result of OJP's unlawful termination of these grants, critical services Plaintiffs provided in their communities have abruptly ceased and organizations have shuttered. Staff have been laid off, and many more will soon be laid off without a restoration of grant funding. In some places, community members Plaintiffs serve have already and will continue to lose their lives because of the disruption in critical, grant-funded services. Tragically, since this suit was filed, Plaintiffs such as FORCE Detroit were unable to intervene in active, known conflicts that they otherwise would have mediated but for their loss in funding. This void in services predictably resulted in the gun deaths of children and members of their community over the July 4 weekend. App.173a; App.120a. These senseless deaths will continue absent relief from this Court.

Plaintiffs moved for a preliminary injunction on behalf of themselves and similarly situated grantees whose grants were

terminated. The district court wrote that "there is no doubt in the court's mind that OJP's award terminations were unfair and indiscriminate," App.168a, and that OJP's "decision to terminate these awards was unquestionably arbitrary, at least in lay terms," App.136a. The court also stated that "Defendants' rescinding of these awards is shameful. It is likely to harm communities and individuals vulnerable to crime and violence." *Id*. Yet, the court denied relief, mistakenly believing it was powerless to "cure" this "injustice" and address OJP's unlawful termination of Plaintiffs' grants, App.169a, because the Tucker Act divested it of jurisdiction.

Plaintiffs respectfully move this Court for an emergency injunction pending appeal. Plaintiffs have demonstrated a likelihood of success that the grant terminations were unlawful, and absent an injunction pending appeal, Plaintiffs and the communities they serve will continue to suffer grave, life-altering harm.[1]

---

[1] Plaintiffs sought analogous relief from the district court under FRAP 8. The district court has not ruled on the motion. Plaintiffs will inform the Court when it does.

## BACKGROUND

1. Detailed regulations govern OJP's administration of federal grant funding and specify the grounds on which grants may be terminated. 2 C.F.R. § 200.340; *id.* § 2800.101 (adopting Uniform Administrative Requirements).

Relevant here, OJP may terminate grants only under certain circumstances and pursuant to specific procedures, including "pursuant to the terms and conditions of the … award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(4). If OJP wishes to terminate a grant based on its failure to effectuate agency priorities, it can do so only if that basis for termination is itself in the terms and conditions of the award. *Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024) (terminations based on an award "no longer effectuat[ing]" agency priorities are allowed "[p]rovided that the language is included in the terms and condition[s] of the award").

2. In late-April 2025, OJP terminated 376 grants worth more than $820 million without notice. App.2a. OJP sent identical form emails to Plaintiffs and other grantees, offering the same unsupported explanation

that Plaintiffs' "awards no longer effectuate[] the program goals or agency priorities." App.2a. OJP ordered the grantees to stop work immediately and informed them that they would be reimbursed for work completed before termination. *Id.*

Plaintiffs promptly filed a class-action lawsuit challenging OJP's *en masse* terminations, raising constitutional, ultra vires, and APA claims. Dkt. 11. Plaintiffs moved to provisionally certify a class of all grantees whose awards OJP terminated and requested a preliminary injunction. Dkt. 10.

On July 7, the district court denied Plaintiffs' motion for a preliminary injunction, granted Defendants' motion to dismiss, and denied as moot Plaintiffs' motion for class certification. App.135a. The court concluded that it lacked jurisdiction to adjudicate Plaintiffs' APA claims under the Tucker Act because Plaintiffs' claims were essentially contractual in nature. App.148a-161a. The court also concluded that Plaintiffs' constitutional claims failed and dismissed Plaintiffs' lawsuit. App.161a-168a.

**ARGUMENT**

An injunction pending appeal is appropriate if Plaintiffs are likely succeed on their appeal, will suffer irreparable harm without an injunction, and the equities and public interest favor an injunction. *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986). It is appropriate where Plaintiffs have presented a "serious legal question" on the merits, and the other factors weigh in Plaintiffs' favor. *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011).

## I. Plaintiffs are likely to prevail.

### A. This Court has jurisdiction to grant preliminary injunctive relief.

The APA generally authorizes judicial review of final agency actions like the grant terminations challenged here. The district court nonetheless concluded that it lacked jurisdiction on the theory that the Tucker Act supplants the APA in this context and vests exclusive jurisdiction in the Court of Federal Claims. But the APA is available for claims that turn primarily on "interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties." *Widakuswara v. Lake*, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting), *reconsideration en banc denied*, 2025 WL

1556440 (D.C. Cir. May 22, 2025), & *on reconsideration en banc*, 2025 WL 1521355 (D.C. Cir. May 28, 2025).

A claim is "within the Claims Court's exclusive Tucker Act jurisdiction" only if "*both*" (1) the "the source of the rights upon which the plaintiff bases its claims" are contractual, "and" (2) the relief sought is contractual. *Crowley Gov. Servs. v. GSA*, 38 F.4th 1099, 1106-07 & n.6 (D.C. Cir. 2022) (emphases added); *see also Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Further, this Court has "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006). All three considerations support district court jurisdiction over Plaintiffs' APA claims.

1. Plaintiffs have brought "traditional claims under the [APA], not contract law." Order at 2, *U.S. Conf. of Catholic Bishops v. State*, No. 25-5066 (D.C. Cir. Mar. 28, 2025) (Millett, J., dissenting) ("Millett Opinion") (Government's "sudden, unreasoned, and unjustified termination" of funding "violates federal law, not [the] contract"). Plaintiffs brought two APA claims: (1) OJP's unreasoned termination of Plaintiffs' grants is

arbitrary and capricious; and (2) OJP's interpretation of Section 200.340 as allowing termination of grants based on a post-award change in agency priorities is unlawful.[2]

The first claim—whether OJP engaged in reasoned decisionmaking before terminating 376 grants—requires no reference to the grant agreements; it merely requires that the Court look at OJP's identical and self-evidently deficient termination notices to determine whether they are arbitrary and capricious under the APA.

The second APA claim—whether OJP properly interpreted Section 200.340 as allowing an agency to terminate a contract based on a post-award change in agency priorities—also does not depend on the underlying grant agreements. To the contrary, whether an agency has properly interpreted a regulation is a bread-and-butter question under the APA that district courts confront every day and certainly have the jurisdiction and competency to resolve. "To decide this case, the court will have to interpret those federal laws and review the State

_____

[2] Plaintiffs have not sought an injunction pending appeal on their constitutional, *ultra vires*, or third APA claim (that OJP violated Section 200.340 by failing to include the basis for termination in Plaintiffs' grant agreements).

Department's administrative record. The court will have little, if any, need to analyze or interpret the Conference's contracts" with OJP. Millett Opinion at 2; *contra Ingersoll-Rand Co. v. U.S.*, 780 F.2d 74, 78 (D.C. Cir. 1985) (interpretation of a termination-for-convenience clause "within the unique expertise of the [CFC]").

It is thus statutory and regulatory provisions that the Court will have to reference to determine whether OJP's terminations were unlawful. Determining whether OJP "exceeded its authority" or "violated" these laws "requires primarily an examination of the statutes" and regulations it "has purportedly violated"; these are "not questions the district court" need "answer by examining a contractual promise." *Crowley*, 38 F.4th at 1108-09.

2. The relief inquiry "boils down to whether the plaintiff effectively seeks to attain monetary damages." *Id.* at 1107. Here, Plaintiffs seek classic remedies available in APA cases: an order preliminarily enjoining OJP's terminations because they are arbitrary and capricious, and contrary to law because they relied on an unlawful interpretation of Section 200.340(a)(4).

Plaintiffs asked the court to: "[p]reliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from terminating grants under [Section 200.340(a)(4)] on the basis of a 'change' in agency priorities." App.31a. It also asked the Court to "[d]eclare that OJP's terminations on the basis of Section 200.340(a)(4) are unlawful, including its interpretation that [it] allows OJP to terminate a grant based on a 'change' in agency priorities," App.30a. These are requests for "traditional equitable and declaratory relief—the mainstay of APA actions," which are "entirely different from monetary damages under the Contract." Millett Opinion at 3.

It is immaterial that one downstream effect of finding that the terminations were unlawful would be a requirement that OJP resume disbursing grant money to Plaintiffs. The Supreme Court has "long recognized" that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as money damages." *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). Rather, "money damages" are amounts "given to the plaintiff to substitute for a suffered loss," such as "injury to [the plaintiff's] person,

property, or reputation." *Id.* at 893, 895. "Money damages" are distinct from "specific remedies," which "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id.* at 895.

Plaintiffs do not seek ordinary contractual relief of money damages here, nor would such relief be "appropriate." Plaintiffs are not owed specific, calculated sums "designed to compensate for completed labors," *Maine Cmty. Health Options v. U.S.*, 590 U.S. 296, 327 (2020). Plaintiffs are entitled by regulation to receive payment for work they completed prior to termination and therefore did not need to seek backward-looking relief to compensate for their past work. 2 C.F.R. § 200.344.

In addition to reinstatement of funding, Plaintiffs' APA claims seek "non-monetary relief that has considerable value independent of any future potential for monetary relief," by seeking class-wide prospective declaratory and injunctive relief to invalidate and enjoin OJP's interpretation of Section 200.340 and prospective class-wide relief that would prevent OJP from terminating future grants on the threadbare basis present here. *Kidwell v. Dep't of Army,* 56 F.3d 279, 284 (D.C. Cir. 1995). This relief would allow Plaintiffs and the class of grantees to

continue to carry out their missions, including "the ability to provide services" and to "perform" their "contractual obligations," *Crowley*, 38 F.4th at 1111.

There is independent and crucial value to Plaintiffs in prospective relief making clear that OJP may not, consistent with the APA, terminate grants based on a vague change in agency priorities. This relief is all the more important given the government's unprecedented use of Section 200.340(a)(4) across many agencies to abruptly terminate grant funding for hundreds or thousands of grants with little to no reasoning and without providing grantees with any notice prior to doing so.

**3.** The CFC cannot provide the relief Plaintiffs seek in this lawsuit: "prospective relief." *Bowen*, 487 U.S. at 905. The Supreme Court "ha[s] stated categorically that the [CFC] has no power to grant equitable relief." *Id.*; *see Widakuswara*, 2025 WL 1288817, at *13 (Pillard, J., dissenting). The Tucker Act authorizes only backward-looking relief, not claims for prospective relief. *Maine Cmty.*, 590 U.S. at 325.

Thus, the CFC lacks authority to award the type of relief that would adequately remedy Plaintiffs' harms. The CFC is "not empower[ed]" to order declaratory or injunctive relief requiring the government to adopt

certain practices "with respect to the disposition of appropriated funds." *Nat'l Ctr. for Mfg. Scis. v. U.S.*, 114 F.3d 192, 202 (Fed. Cir. 1997). The Tucker Act instead gives the CFC jurisdiction only when a plaintiff has the right to recover past damages. *See Lummi Tribe v. U.S.*, 870 F.3d 1313, 1318 (Fed. Cir. 2017); *Crowley*, 38 F.4th at 1112-13 (CFC lacks jurisdiction where plaintiff sought declaratory and injunctive relief).

Thus, a suit like this one requesting "a strings-attached disbursement" subject to the terms and conditions of the grant agreements—as opposed to a "free and clear transfer of money"—is a suit for equitable relief, not money damages. *Lummi Tribe*, 870 F.3d at 1318-19. Because Plaintiffs seek to resume forward-looking cooperative agreements, which "includ[e] subsequent supervision and adjustment" by OJP, they bring a claim "for equitable relief" and "not for presently due money damages." *Id.* at 1319. The CFC cannot grant *any* relief absent "a claim for 'actual, presently due money damages,'" which Plaintiffs have not brought. *Nat'l Air Traffic Controllers Ass'n v. U.S.*, 160 F.3d 714, 716 (Fed. Cir. 1998) (quoting *U.S. v. King*, 395 U.S. 1, 3 (1969); *see King*, 395 U.S. at 4 ("[C]ases seeking relief other than money damages from the Court of Claims have never been within its jurisdiction.").

That strings-attached disbursement is exactly what Plaintiffs are seeking. They are asking that the Court reinstate their grant agreements so that they may continue providing critical services in their communities. And a damages remedy is particularly inapt given Plaintiffs' "cooperative, ongoing relationship" with the Government "in the allocation and use of the funds." *Nat'l Ctr.*, 114 F.3d at 201.

**B.    The district court's contrary reasoning is erroneous.**

1. The district court believed that the Supreme Court's stay order in *Department of Education v. California* "forecloses the exercise of jurisdiction over Plaintiffs' arbitrary and capricious claim." App.156a. That order determined that the government was likely to succeed in showing that the district court "lacked jurisdiction to order the payment of money under the APA." *Id.* The order acknowledged *Bowen*'s holding that courts retain jurisdiction under the APA to order equitable relief, even when that relief will result in payment of money. *Id.* But the Court concluded that the district court's jurisdiction did not extend to orders 'to enforce a contractual obligation to pay money *along the lines of* what the District Court ordered here," *id.* (quoting *Great-W. v. Knudson*, 534 U.S. 204, 212 (2002) (emphasis added)).

*California* does not support the district court's conclusion. In that case, the district court ordered the government "to pay out past-due grant obligations and to continue paying obligations as they accrue." *California,* 145 S. Ct. 966, 968 (2025). Thus framed, the Court distinguished between cases in which there is a "'possibility' that an order setting aside an agency's action may result in the disbursement of funds," where district court jurisdiction is proper, *id.* (quoting *Bowen*, 487 U.S. at 910), and "orders 'to enforce a contractual obligation to pay money,'" where district court jurisdiction is unavailable, *id.* (quoting *Great-W.*, 534 U.S. at 212). *California* found that the particular order entered below fit in the latter bucket.

In so finding, the Court plainly did not overrule *Bowen* or hold that grant claims will never fall into the first bucket. Appropriately, the vast majority of courts evaluating jurisdictional issues post-*California* have continued to follow *Bowen*, including for APA claims of the sort Plaintiffs have brought here. Dkt. 11-1 at 36; Dkt. 37 at 32.

Importantly, *California* had no occasion to consider whether the grant agreements there were the type of contract that can give rise to Tucker Act jurisdiction because no party presented that issue. The court

below nevertheless believed it "foolhardy to assume that the Supreme Court did not at least implicitly consider whether the grants at issue were contracts in the first place." App.153a. But it is well-settled that—even after full merits briefing—the Supreme Court will reach issues outside the scope of the petition for certiorari only in the "most exceptional cases." *Stone v. Powell*, 428 U.S. 465, 481 n.15 (1976). That principle applies with greater force when, far from full merits consideration, the Court provided a one-paragraph discussion after emergency briefing.

Plaintiffs' agreements are not "contracts" that give rise to Tucker Act jurisdiction: for the CFC to have jurisdiction, a "contract" claim must be based on a contract that creates a right to money damages—and Plaintiffs' agreements create no such right. *See* Dkt. 11-1 at 31-33. The cooperative agreements require Plaintiffs to use the awarded funds for a public purpose and subject to various conditions rather than being acquisition or service contracts "for the direct benefit or use" of the government. 31 U.S.C § 6305(1). With cooperative agreements, jurisdiction lies in the CFC if there is an affirmative indication that the agreement creates a right to money damages, which is absent here. *St. Bernard Parish v. U.S.*, 134 Fed. Cl. 730, 735 (2017). Presuming

Plaintiffs' agreements create a right to money damages would circumvent these restrictions, and Plaintiffs' agreements therefore do not create the "right to money damages" needed to fall within the Tucker Act's "jurisdictional reach," *Lummi Tribe*, 870 F.3d at 1317.

The *California* district court's order was about paying money—both for work already done and for work to be done in the future. *California v. Education*, 769 F. Supp. 3d 72, 78 (D. Mass. 2025). That dynamic—which is decidedly not featured by Plaintiffs' complaint here—explains the Court's reliance on *Great-West*, a case that distinguished *Bowen* because the claims "did not deal with specific performance of a *contractual* obligation to pay *past* due sums." 534 U.S. at 212. The lower court's conclusion to the contrary is erroneous.

2. The district court correctly concluded that *California* had no bearing on Plaintiffs' contrary-to-law claim because the Court "had no occasion to consider jurisdiction over a contrary to law claim because the district court did not reach it when granting a TRO." App.157a. The court nonetheless concluded that two "on par" cases required dismissal of Plaintiffs' APA claims for lack of jurisdiction. *Id.* (relying on *Spectrum Leasing v. U.S.*, 764 F.2d 891 (D.C. Cir. 1985); *Ingersoll-Rand*, 780 F.2d

74). That conclusion is erroneous. Both the source of the rights and relief sought in this case are distinct from *Spectrum* and *Ingersoll-Rand*.

*Spectrum* involved the development and delivery of a "data communications network" and "hardware systems" to the government. 764 F.2d at 892. After Spectrum was unable to provide a "software package in accordance with the contract requirement," the government "invoked the contract's liquidated damages clause" to collect nearly $2 million in damages. *Id.* Spectrum sued, requesting a declaration that it was "entitled to immediate payment of all hardware and maintenance payments illegally withheld," an "injunction requiring the government to pay monies owed for computer hardware," and a declaration that the government's collection of money violated the Debt Collection Act. *Id.* at 894-95. The Court concluded that the contract created the substantive right requiring the government to "pay monies owed for computer hardware." *Id.* at 894. The Court also concluded that "the relief sought is a typical contract remedy," that is "an order compelling the government to pay money owed in exchange for goods procured under an executory contract," which it likened to a "seller's action for the price of goods against a private buyer." *Id.* at 894-95.

Both the source of the rights and relief requested here differ from those in *Spectrum*. The source of Plaintiffs' rights are the APA and regulations governing grant termination. Plaintiffs have argued that the *regulations* independently forbid termination; the primary reason that this Court has to look at the grant agreement is because the government has argued that the terms of the grant permit termination. But the assertion of a contract-based defense does not transform a claim into a contract claim. *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023). And although the district court focused on one of Plaintiffs' contrary-to-law claims, it failed to mention or analyze Plaintiffs' second contrary-to-law claim: that OJP violated Section 200.340 by terminating grants based on a post-hoc change in agency priorities. Again, Section 200.340 supplies the source of the right (the conditions under which termination is appropriate), and the APA supplies the source of the remedy: prospective injunctive relief.

The relief also differs from *Spectrum*. Plaintiffs are not seeking an immediate lump-sum payment of money for goods procured under an executory contract, which is a classic contractual remedy. Rather, Plaintiffs are seeking reinstatement of their grant agreements so that

they may continue carrying out grant-funded work in their communities. Plaintiffs also ask that their grant terminations be set aside under the APA because OJP's rationale is arbitrary and capricious, and because OJP's interpretation of Section 200.340 is unlawful. Plaintiffs seek injunctive and declaratory relief that would govern OJP's interpretation of Section 200.340 as to the entire class of grantees.

*Ingersoll-Rand* is inapposite for similar reasons. There, the government terminated a contract for air compressors based on a "termination for convenience clause" in the contract and re-solicited bids. 780 F.2d at 78. The Court concluded that the source of the rights were based on the contract, deeming the "dispute" "entirely contained within the terms of the contract" because the question was "whether the contract forbids termination under these conditions," and therefore the Plaintiff could "challenge the termination based solely on contract principles." *Id.* In those circumstances, the Court reasonably concluded that allegations that the terminations violated certain other regulations did not change "the essential character of the action." *Id.* An interpretation of the termination-for-convenience clause was "within the unique expertise of the Court of Claims," and the "substance" of the claim was that there was

"was no good reason to terminate the contract and begin solicitation." *Id.*
The court also concluded that "the essence" of the relief was "specific performance of the contract." *Id.* at 79.

The same is not true here. Plaintiffs argue that a *regulation*, Section 200.340, forbids termination of the 376 grants, and that under the APA, OJP's terminations are arbitrary and capricious. This inquiry does not require any specialized knowledge of the government-contracting process, as was the case in *Spectrum* and *Ingersoll-Rand*, cases challenging the circumstances under which a single contract was terminated and which relied on the terms of the contracts.

This last point makes this case vastly different from *Spectrum* and *Ingersoll-Rand*: Plaintiffs have brought a class-action lawsuit, challenging OJP's identical termination of 376 grants, on the basis that OJP's terminations were arbitrary and capricious, and that OJP's interpretation of Section 200.340 as allowing an agency to effect a mass termination of 376 grants based on a post-award change in agency priorities is contrary to law. *See* Dkt. 37 at 8 (class actions seeking injunctive relief not permitted in CFC). Resolving the common questions of law requires no specialized knowledge of the government-contracting

process: the question presented and the relief sought are classic questions of law under the APA and seek classic APA remedies in a class action lawsuit. Jurisdiction is proper in this Court.

## II. OJP's *en masse* grant terminations violate the APA.

Plaintiffs are likely to succeed on the merits of at least one of their APA claims. The district court concluded that OJP's "decision to terminate these awards was unquestionably arbitrary, at least in lay terms." App.136a. The Court recognized that Plaintiffs were serving the "very purposes" articulated in OJP's terminations. *Id.* And "[w]hen asked at oral argument why these awards were no longer consistent with the agency's new priorities, Defendants' counsel had no answer. He simply shrugged his shoulders." *Id.* The Court decried that the "rescinding of these awards is shameful," and stated "[t]here is no doubt in the court's mind that OJP's award termination were unfair and indiscriminate." App.168a. "When a government agency, especially the [DOJ], agrees to fund private organizations to carry out a public purpose, such organizations expect regularity and respectful treatment. That is not what occurred here." App.168a-169a.

1. Plaintiffs are likely to succeed on their claim that OJP's identical, cursory, and unreasoned terminations of 376 grants represent nearly every hallmark of arbitrary and capricious agency action. Dkt. 37 at 16-19. OJP admits that each notice was identical, Dkt. 27-1 ¶ 20, and did not include any explanation specific to the terminated grantee or any discussion of the significant reliance interests at stake. OJP did not dispute that it entirely failed to consider reliance interests when terminating Plaintiffs' grants and that it failed to consider "responsible alternatives to its chosen policy" and failed "to give a reasoned explanation for its rejection of such alternatives," Dkt. 11-1 at 20-22. Every court to consider the merits of similar boilerplate terminations concluded that they were arbitrary and capricious. *Id.* at 20-21 (citing cases).

2. By terminating grants based on a post-award "change" in agency priorities, OJP violated Section 200.340. Dkt. 37 at 9-13. One court concluded that Section 200.340(a)(4) does not allow OJP to terminate a grant based on a "change" in agency priorities. *MTA v. Duffy,* 2025 WL 1513369, at *28 (S.D.N.Y. May 28, 2025). Rather, Section 200.340(a)(4) allows OJP to terminate a grant if "an award no longer effectuates the

program goals or agency priorities." A "change" in agency priorities does not trigger the boundless authority to cancel any and all grants; Section 200.340(a)(4) allows for terminations because of failures stemming from the grant recipient—such as where the recipient can no longer effectuate the goals and priorities that motivated the award in the first place. This reading comports with the text of the regulation, OMB's exemplars of specific instances in which termination would be appropriate under this provision in the 2020 Rule, OMB's explanation for changes to the termination provision in 2024, and the fact that no agency has previously interpreted Section 200.340 in this manner prior to 2025. *See Am. Ass'n of Colls. v. McMahon*, 2025 WL 833917, at *19 (D. Md. Mar. 17, 2025).

## III. The remaining factors compel granting an injunction pending appeal.

1. The difference in irreparable harm between the parties is stark. The court agreed that terminations are "likely to harm communities and individuals vulnerable to crime and violence." App.136a. It is central to Plaintiffs' organizational missions to provide grant-funded services to individuals in their communities. But in some places, individuals previously benefiting from Plaintiffs' services have already and will continue to lose their lives because of the disruption in Plaintiffs' critical,

grant-funded services. Tragically, since this suit was filed, Plaintiffs such as FORCE Detroit and HRiA were unable to intervene in active, known conflicts that they otherwise would have meditated but for their loss in funding. App.173a; App.178; App.186a; App.115a-134. This void tragically but predictably resulted in the gun deaths of children and members of their community over the July 4 weekend and will continue unless and until Plaintiffs' grant funding is reinstated. App.186a (FORCE Detroit would have funded an organization working in the zip code where shootings occurred but for its loss of grant funding).

In addition to this senseless loss of life, Plaintiffs submitted significant additional evidence of irreparable harm, including laying off of staff, eliminating critical and life-saving programming central to Plaintiffs' mission, reputational harms, and other harms that have had devastating impacts on the safety of individuals and communities across the country. Dkt. 11-1 at 7-11, 36-38; Dkt. 37 at 35-40.

Since this lawsuit was filed, multiple putative class members have been forced to shut down because of OJP's terminations. Dkt. 30 at 10; App.179a. All Plaintiffs have been forced to eliminate or severely restrict critical, often life-saving services in their communities that were funded

by terminated grants. App.84a, 80a-81a, 89a, 69a. This has had "devastating" impacts on those who rely on Plaintiffs' services. App.89a. "[I]n 23 hospitals across the country, individuals who directly benefitted from these intervention programs in the hospital are no longer going to have life-saving assistance, and in some cases, members in the community will lose their lives because of the disruption of services." App.84a.

Absent an injunction pending appeal, grant-funded organizations will continue to shutter their doors; staff will continue to be laid off; victims of crime, hate crimes, and sex trafficking will be unable to receive free trauma counseling and interpretation services; and Plaintiffs' hard-earned reputation will continue to be irreparably tarnished. *See* App.173a (describing harms since litigation has started).

Individuals of all ages, from children to adults will continue to die from gun violence because of the voids left by Plaintiffs and grantees who have had to shutter their doors and abruptly end or limit services. Receiving funding a year or more from now when this litigation ends is meaningless to Plaintiffs and the individuals who otherwise would be receiving the intended benefit of the grant agreements, but for OJP's

unlawful termination. The vast disparity in harms is reason enough to grant the injunction. *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1330 (D.C. Cir. 2024) (equity favors allowing a party to "fully litigate[]" its claims "without being throttled by a shutdown of its business").

2. The balance of equities and public interest also decidedly weigh in favor of granting an injunction pending appeal. For much the same reason that Plaintiffs have demonstrated irreparable harm, equity and the public interest weigh heavily in Plaintiffs' favor. *See* Dkt. 37 at 40-44. Additionally, amici detailed that "the magnitude of cuts cannot be overstated," and has greatly harmed the broader public interest. Dkt. 37 at 40-42.

3. This Court may issue a classwide preliminary injunction without deciding whether the class should be certified. *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1369 (2025) ("[B]ecause courts may issue temporary relief to a putative class, we need not decide whether a class should be certified"). In *A.A.R.P.*, the Supreme Court granted an appellate injunction for a class that the district court declined to certify.

## CONCLUSION

The Court should grant Plaintiffs' motion for an injunction pending

appeal.

Dated: July 11, 2025                    Respectfully submitted,

                                        */s/ Lisa Newman*
                                        Lisa Newman


Joshua Perry                    Lisa Newman
Joshua Stanton                  Jennifer Fountain Connolly
E. Danya Perry                  Cortney Robinson
Perry Law                       Somil Trivedi
445 Park Avenue, 7th Floor      Brian Netter
New York, NY 10022              Democracy Forward Foundation
(212) 251-2619                  P.O. Box 34553
jperry@danyaperrylaw.com        Washington, D.C. 20043
                                (202) 448-9090
                                lnewman@democracyforward.org

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface and type-volume limitations in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,186 words, excluding the accompanying documents authorized by Federal Rule of Appellate Procedure 27(a)(2)(B) and the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Cir. Rule 32(e)(1). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: July 11, 2025                    */s/ Lisa Newman*
                                        Lisa Newman

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, I state that no Plaintiffs have any parent company and that no publicly held company has a 10% or greater ownership interest in any Plaintiffs.

Dated: July 11, 2025

/s/ Lisa Newman
Lisa Newman

## CERTIFICATE OF SERVICE

I certify that on July 11, 2025, a true and correct copy of this Brief was filed with the Clerk for the United States Court of Appeals for the District of Columbia Circuit via the Court's electronic filing system, which will forward a copy to all counsel of record. I certify that I separately served Defendants' counsel of record via email.

Dated: July 11, 2025

/s/ Lisa Newman
Lisa Newman

# APPENDIX

# TABLE OF CONTENTS

Complaint, Dkt 8.................................................................1a

Declaration of Rachel Sottile, Dkt. 11-3 ...............................34a

Declaration of Cynthia Choi, Dkt. 11-4 ...............................47a

Declaration of Dujuan Kennedy, Dkt. 11-5 .........................65a

Declaration of Steven Ridini, Dkt. 11-6...............................75a

Declaration of Nicholas Turner, Dkt. 11-7 ..........................98a

Transcript of Motion Hearing Proceedings, June 26, 2025
(excerpts) .....................................................................115a

Memorandum Opinion, July 7, 2025, Dkt. 47 ...................135a

Order, July 7, 2025, Dkt. 48 ...............................................170a

Emergency Motion for Injunction Pending Appeal, Dkt. 52..............171a

Declaration of Nicholas Turner, Dkt. 52-1 .........................178a

Declaration of Steven Ridini, Dkt. 52-2...............................181a

Declaration of Dujuan Kennedy, Dkt. 52-3 .......................185a

Declaration of Cynthia Choi, Dkt. 52-4 ...............................189a

Declaration of Rachel Sottile, Dkt. 52-5 ...............................193a

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**VERA INSTITUTE OF JUSTICE**,
  34 35th Street, Suite 4-2A
  Brooklyn, NY 11232;

**CENTER FOR CHILDREN & YOUTH JUSTICE**,
  300 Elliott Avenue W, Suite 360
  Seattle, WA 98119;

**CHINESE FOR AFFIRMATIVE ACTION**,
  17 Walter U Lum Place, #19
  San Francisco, CA 94108;

**FORCE DETROIT**,
  1551 Rosa Parks Boulevard, Suite B,
  Detroit, MI 48216;

**HEALTH RESOURCES IN ACTION**,
  2 Boylston Street, 4th Floor
   Boston, MA 02116;

*Plaintiffs, on behalf of themselves and all others similarly situated,*

v.

**UNITED STATES DEPARTMENT OF JUSTICE**,
  950 Pennsylvania Avenue, NW
  Washington, DC 20530;

**PAMELA J. BONDI**, in her official capacity as
United States Attorney General,
  9950 Pennsylvania Avenue, NW
  Washington, DC 20530;

**OFFICE OF JUSTICE PROGRAMS**,
  810 7th St NW
  Washington, DC 20001;

**MAUREEN A. HENNEBERG**, in her official
capacity as Acting Head of the Office of Justice
Programs,
  810 7th St NW,
   Washington, DC 20001;

*Defendants.*

Case No. 1:25-cv-1643

---

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**1a**

Plaintiffs bring this class action against the U.S. Department of Justice (DOJ); Pamela J. Bondi, in her official capacity as Attorney General of the United States; the Office of Justice Programs (OJP); and Maureen A. Henneberg, in her official capacity as Deputy Assistant Attorney General for Operations and Management and as the Acting Head of the Office of Justice Programs.  Plaintiffs state and allege as follows:

## INTRODUCTION

1.      In April 2025, the Department of Justice's Office of Justice Programs abruptly and summarily terminated more than 370 multi-year cooperative agreements and grants awarding more than $820 million in essential funding.[1]

2.      With no prior notice, OJP sent a form email to Plaintiffs and other grantees, offering the same unsupported explanation that Plaintiffs' "awards no longer effectuate[] the program goals or agency priorities."  OJP ordered the grantees to stop work immediately and informed them that they would be reimbursed only up to the date of the termination letter.

3.      The terminated grants cut across a broad swath of critical programs and have a successful track record of making our communities safer.  These include grants addressing violence reduction and intervention, policing and prosecution, victims' services, juvenile justice and child protection, substance use and mental health treatment, corrections and reentry, justice system enhancements, research and evaluation, and other state- and local-level public safety functions.  *See* Council on Crim. Justice, *DOJ Funding Update: A Deeper Look at the Cuts* (May 2025), https://counciloncj.org/doj-funding-update-a-deeper-look-at-the-cuts/     [https://perma.cc/94DS-W7A4].

---

[1] For ease of reference, the agreements at issue will be referred to as "grants," unless otherwise noted.

1

**2a**

4.      Plaintiffs are non-profit organizations that were awarded federal grant funding. They work to train and assist law enforcement, correctional facilities staff, prosecutors, and states and localities. They work with vulnerable populations who have been victims of crime, including by providing free interpretation services that allow deaf and disabled victims of crime to communicate with law enforcement, and train law enforcement on identifying and serving individuals with disabilities who are victims of sex or labor trafficking. They fund and work at the community level to successfully interrupt gun crime and gang violence for juveniles and adults, including those at the highest risk for gun violence, in cities across the country. They fund and work in hospitals to provide lifesaving assistance for violently injured victims and their families, while also mitigating retaliation that may arise from the situation.

5.      As a direct result of OJP's unlawful termination of Plaintiffs' grants, services to many of these populations have abruptly ceased. Staff have been laid off without meaningful alternatives for employment, and many more staff will soon be laid off without funding.

6.      OJP's abrupt and unlawful termination of Plaintiffs' grants had an immediate and irreparable impact on Plaintiff organizations, their staff, and the individuals and communities that they serve. These terminations have led to an abrupt discontinuation of vital services to some of the most vulnerable in our communities, making individuals and the communities in which they live less safe.

7.      Absent a preliminary injunction, Plaintiffs will suffer irreparable harm—multi-year projects will terminate abruptly, specialized staff will be laid off, critical services will be withdrawn from communities facing some of the gravest safety concerns—all compounded by lasting damage to hard-earned reputational trust.

8.      OJP's termination of more than 370 multi-year grant awards with no notice and no reasoned explanation about why the grants were being terminated, is quintessential unlawful agency

2

**3a**

action that violates the APA. These terminations violate the Constitution and agency regulations, exceed OJP's lawful authority, and are arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A)–(C).

9.      OJP's abrupt termination of Plaintiffs' grants is unlawful and should be enjoined during the pendency of this litigation.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law including the U.S. Constitution and the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*

11.     The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers. The Administrative Procedure Act further authorizes the Court to grant temporary and permanent relief from agency action. 5 U.S.C. §§ 705–706.

12.     Venue is proper under 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Defendants are United States agencies and officers sued in their official capacities, and at least one Defendant resides in this district; and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

**PLAINTIFFS**

13.     The Children and Youth Justice Center d/b/a Center for Children & Youth Justice (CCYJ) is a Washington State based nonprofit funded in 2006 by Washington State Supreme Court

3

**4a**

Justice Bobbe J. Bridge (ret.) to create better lives for generations of children and youth by reforming the child welfare and juvenile justice systems.

14.     Chinese for Affirmative Action d/b/a Stop AAPI Hate is a U.S.-based non-partisan Civil Rights coalition dedicated to ending racism and discrimination against Asian Americans and Pacific Islanders (AAPIs).

15.     FORCE (Faithfully Organizing for Community Empowerment) Detroit is a community violence intervention (CVI) organization dedicated to building a safer, freer Detroit, Michigan.

16.     Health Resources in Action (HRiA) is a Massachusetts based non-profit organization working to improve and reimagine public health, with a vision of healthy people thriving in equitable and just communities.

17.     Vera Institute of Justice (Vera) is a New York based non-profit, with a national footprint, working to advance safety and justice.

**DEFENDANTS**

18.     Defendant DOJ is a federal agency headquartered in Washington, D.C.

19.     Defendant Pamela J. Bondi is the Attorney General of the United States.  She is sued in her official capacity.

20.     Defendant OJP is an agency of the federal government and a subordinate agency of DOJ headquartered in Washington, D.C.

21.     Defendant Maureen A. Henneberg is the Deputy Assistant Attorney General for Operations and Management and the Acting Head of the Office of Justice Programs.  She is sued in her official capacity.

4

**5a**

## REGULATIONS GOVERNING DOJ GRANTS

22.    Detailed regulations govern DOJ's administration of federal grant funding, including those grants administered by OJP, and specify the grounds on which such grants may be terminated. These regulations stem from Office of Management and Budget (OMB) Uniform Guidance for Federal Financial Assistance, codified at 2 C.F.R. part 200, which OMB promulgated pursuant to its authority to "establish government wide financial management policies for executive agencies," 31 U.S.C. §§ 503(a), 504.  The OMB Uniform Guidance generally requires federal agencies to "implement" OMB's guidance "in codified regulations."  2 C.F.R. § 200.106.  DOJ has followed that instruction by issuing its own regulation adopting the OMB Uniform Guidance.  2 C.F.R. § 2800.101.

23.    Under these regulations specific to grant termination, OJP may terminate grants only under certain circumstances and pursuant to specific procedures.  The regulations do not provide unfettered discretion for OJP to terminate grants; they instead allow for the termination of grants in three circumstances: (1) "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award"; (2) "with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions"; and (3) "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  *Id.* § 200.340(a).

24.    Under Section 200.340(a)(4), OJP may terminate a grant based on agency priorities only if the terms and conditions of the award clearly and unambiguously specify that a grant can be terminated on those grounds.  Additionally, a termination must be made on an award-by-award basis, and OJP must rely on "specific evidence" to demonstrate that "an award" no longer effectuates a program goal or agency priorities.  Section 200.340(a)(4) does not authorize OJP to base a termination on a post-award "change" in agency priorities.  Rather, OJP is allowed to terminate a grant under that

5

**6a**

provision only where specific evidence demonstrates that "an award" no longer serves the agency priorities or program goal, as articulated when the grant was awarded.

## FACTUAL ALLEGATIONS

### I.  OJP's Grants Awards Supporting Plaintiffs' Community Violence Intervention Programs

25.    OJP, established by the Justice Assistance Act of 1984, is the largest grantmaking component of DOJ.[2]  Among its activities is providing financial support through grant awards to organizations implementing crime control and prevention strategies, and crime victim services.[3]

26.    OJP's granted various awards to each of the Plaintiffs to fund Plaintiffs' work to create safer communities.  Plaintiffs' grant programs address a broad swath of community violence intervention and prevention projects, including initiatives designed to improve policing and prosecution, victims' services, juvenile justice and child protection, substance use and mental health treatment, corrections and reentry, justice system enhancements, research and evaluation, and other state- and local-level public safety functions.  Plaintiffs' OJP awards also helped provide financial support for partner programs, community organizations, subgrantees, local government agencies and municipalities, and contractors to also engage in violence reduction and intervention work.

### Center for Children & Youth Justice (CCYJ)

27.    As the only organization solely committed to reforming the juvenile justice and child welfare systems in Washington State, CCYJ's approach is rooted in listening to those most impacted—children, young adults, and families—by failures of these systems, leading to the development, coordination, and implementation of reforms designed to support children and youth, stabilize

---

[2] U.S. Dep't of Just., Org., Mission & Functions Manual, Office of Justice Programs, https://perma.cc/D8PK-T9KZ.
[3] Amy L. Solomon, *I worked for this office under the DOJ. Trump's cuts will make you less safe.*, USA Today (May 2, 2025), https://perma.cc/HV4S-VM7L.

families, and strengthen communities. CCYJ accomplishes its mission by partnering with local and state government, law enforcement, courts, schools, and coalitions with similar goals, and community-based organizations to test and implement reforms and by piloting best practices, facilitating collaboration among stakeholders, providing training and technical assistance, and advocating for data-driven and youth centered solutions.

28.     CCYJ was awarded $6 million dollars in grant funding from OJP pursuant to a grant agreement, 15PBJA-22-GG-04749-MUMU (CCYJ Award 1), and a cooperative agreement, 15PBJA-23-GK-05198-CVIP (CCYJ Award 2). Funding from both of CCYJ's awards were critical to advancing CCYJ's mission to reform child welfare and juvenile justice systems in Washington State.

29.     CCYJ Award 1 provided funding for CCYJ's "Enhancement of the Leadership, Intervention & Change (LINC) Group Violence Prevention and Intervention in King County, Washington" project. The project supported CCYJ's regional adaptation and implementation of the Office of Juvenile Justice and Delinquency Prevention, Comprehensive Gang Model (CGM) to address violence prevention and intervention in Washington state's most populous and diverse county. The LINC program serves youth and young adults who are involved with, or at risk of involvement with gangs and/or violence. Within the LINC program, CCYJ is a lead agency and plays a key role in implementing the CGM in King County, Washington, providing fiscal management, administrative support, direct service coordination, training and data collection and analysis. CCYJ, through the CCYJ Award 1 funding, directly supports up to 200 youth and young adults' participation in the LINC program.

30.     Under the CCYJ Award 2, CCYJ accepted a cooperative agreement award supporting capacity building and training for five community-based organizations (CBOs) in King County, Washington. These CBOs provide community violence intervention (CVI) services to youth and young adults at highest risk of victimization or perpetration of gun violence in King County,

7

**8a**

Washington.  CCYJ intended to provide significant developmental support to these CBOs to sustain and enhance their administration and operations and to support sustainability of their CVI strategies. CCYJ developed and granted subawards to these CBOs, hired staff dedicated to the project, and committed significant time and resources to develop comprehensive capacity building assessments and tools.

**Stop AAPI Hate**

31.    Stop AAPI Hate was founded in March 2020, in response to the alarming increase in acts of hate against the AAPI community during the COVID-19 pandemic, by three 501(c)(3) organizations: Chinese for Affirmative Action (CAA), AAPI Equity Alliance, and San Francisco State University (Asian American Studies Department), with CAA as the lead fiscal agency.  Since its founding, Stop AAPI Hate has become the nation's largest reporting center for tracking anti-AAPI hate acts, and also provides critical support to victims of hate around the country.  The organization's data and research center is also used by researchers, government agencies, and elected officials annually to help raise public awareness and advocate for policies that effectively address anti-AAPI hate.  It has been cited by the U.S. Commission on Civil Rights, the California Commission on the State of Hate, in testimony before Congress, and before the United Nations.  By helping government agencies, law enforcement, and community partners to understand where hate occurs, who is mostly commonly targeted, and what types of hate acts are most prevalent, Stop AAPI Hate improves public safety by allowing governments and communities to develop targeted strategies that protect people who need it most.

32.    Chinese for Affirmative Action, doing business as Stop AAPI Hate, was awarded $2 million dollars from OJP via a grant agreement, 15PBJA-24-GG-02840-ADVA (Stop AAPI Hate Award).  Stop AAPI's Hate's grant award supported its "Stop AAPI Hate Community-Based Approaches to Prevent and Address Hate Crimes and/or Hate Incidents" program.  The project

8

**9a**

would develop a holistic, multi-disciplinary, trauma-informed, community-based approach to documenting AAPI hate incidents and provide crisis response, care, and healing to victims of hate. The key areas for activities outlined in the grant proposal included data and research on AAPI hate incidents in partnership with AAPI communities; policy advocacy to educate, inform, and provide technical assistance to prevent anti-AAPI hate; community care to partner with communities to center healing and improve crisis response including further work on a landscape analysis of existing resources and models; and public education & digital media to sustain public education and conversations on anti-AAPI hate and scapegoating. Stop AAPI Hate anticipated grant funding would be used to form a multidisciplinary team to develop community-based strategies for impacted individuals, and would include partnerships with AAPI/Black, Indigenous, and People of Color organizations, the expansion of community healing pilots, and increased awareness of AAPI hate incidents.

**FORCE Detroit**

33.    Founded in 2015, FORCE Detroit is charged to steward, incubate, and provide financial support to grassroots organizations and activists committed to alternatives to community safety that minimize criminalization. FORCE Detroit's five organizational goals include: (1) building a system for peace by training and supporting CVI organizations—through grants, professional development, and mentoring, to strengthen community violence intervention statewide; (2) hosting events and actions that inform and engage the public around CVI strategies and identify solutions to gun violence; (3) building public-private partnerships to raise $150 million over 10 years to expand CVI and advocate for a Detroit Office of Neighborhood Safety; (4) growing public awareness of and engagement in violence interruption through targeted campaigns and events, such as CVI Advocacy Day, Get Out the Vote activities, and community listening sessions; and (5) strengthening infrastructure to support growth and position FORCE Detroit as a local and national CVI leader in

peacemaking. To reach those goals, FORCE Detroit's works to provide direct services to people impacted by violence; advocacy and public education, and training and technical assistance for emerging CVI leaders.

34. FORCE Detroit was awarded approximately $2 million dollars in grant funding from OJP pursuant to a grant agreement, 15PBJA-24-GG-03109-CVIP (FORCE Detroit Award). The award supported FORCE Detroit's "Keepers CVI" initiative, a program to expand and enhance evidence-based and innovative practices that reduce and prevent gun violence in Detroit's Warrendale-Cody Rouge neighborhood, with youth and young adults living in areas with high rates of gun and other forms of violence. FORCE Detroit designed the "Keepers CVI" program to, among other things reduce fatal and non-fatal shootings, enhance opportunities for violence-impacted people to secure employment or start small businesses, increase access to culturally appropriate social services, and improve organizational capacity to deliver impactful, evidence-based programs. As a part of this program and through a carefully crafted service delivery model, FORCE Detroit employs violence interruption staff who perform critical work—from intake coordination and community-based data collection to guiding participants through interviews or showing up to support people and families at funerals. Grant funding from FORCE Detroit's award supported the salaries of FORCE Detroit's violence interruption staff. Award funding was also budgeted to contract with community partners—local coaches, mentors, licensed therapist, and trainers—to fulfill the award's project.

**Health Resources in Action (HRiA)**

35. With over 300 staff across the country, HRiA partners with individuals, organizations, and communities to transform the practices, policies, and systems that improve health and advance racial equity. For over two decades, HRiA has worked in communities across the country to plan and launch CVI strategies that cultivate and strengthen a comprehensive and collaborative CVI ecosystem. HRiA approaches violence as a public health issue; helping communities understand that violence

10

**11a**

spreads like disease, violence is preventable, and community members have critical solutions to offer. Its staff, through partnerships with institutions and other organizations, work to strengthen the community violence intervention ecosystem.

36.    HRiA was awarded approximately $8.55 million dollars in grant funding from OJP pursuant to three grant agreements: 15PBJA-24-GK-04067-CVIP (HRiA Award 1), 15POVC-22-GK-00557-NONF (HRiA Award 2), and 15PBJA-23-GK-05187-CVIP (HRiA Award 3).  Each of the awards helped further HRiA's work to identify and engage people at the highest risk of violence, employ CVI workers who hold deep knowledge, credibility, and trust within communities, expand professional and educational opportunities for CVI workers and the organizations they work within, develop relationships with law enforcement and community, build partnerships between CVI organizations and cross-sector partners, and establish and strengthen hospital-based violence intervention programs.

37.    HRiA Award 1 provided funding for HRiA's efforts to expand professional and educational opportunities for community violence intervention workers and transform their work environments.  HRiA Award 2 funded tailored and comprehensive technical assistance (TA) and training for violence prevention professionals (VPPs) and hospital-based violence intervention programs.  VPPs reduce and mitigate retaliation after incidents of violence by serving as trusted individuals in hospitals who can speak and respond to victims of gun violence and community violence.  The TA project aimed to enhance services to victims by strengthening the infrastructure and quality of hospital-based programs, and VPP services.  HRiA Award 3 was intended to support small, grassroot CBOs engaged in CVI work.  HRiA selected five CBOs to receive subaward funding that would build their organizational capacities, and support training in intervention and outreach best practices.  Each of the five subrecipients are community-based violence prevention organizations that specifically serve youth and young adults.

38.     HRiA has managed $92 million in federal grant awards and expenditures over the past decade.  It has received direct federal awards under 10 programs from three federal agencies and has served as a pass-through recipient of dozens of other federal programs.  Until January 2025, HRiA has never had a federal grant terminated.

**Vera Institute of Justice (Vera)**

39.     Founded in 1961, for over sixty years, Vera has worked in partnership with community and government leaders—including in law enforcement and corrections—to address some of the most intractable problems in the criminal justice system.  Vera's mission is to pilot, test, and scale innovations that prevent crime and address its drivers, increase accountability, and rely less on incarceration and more on the programs and services that help individuals, families, and communities to thrive.  To support its work, Vera has been awarded and successfully fulfilled numerous cooperative agreements and grants with OJP, including its subsidiary agencies, the Bureau of Justice Assistance (BJA), National Institute of Justice (NIJ), Office of Juvenile Justice Delinquency and Prevention (OJJDP), and Office for Victims of Crime (OVC), as well as DOJ agencies Community Oriented Policing Services (COPS) and the Office on Violence against Women (OVW), during both Republican and Democratic administration.

40.     Vera was awarded $7.25 million in grant funding from OJP via five cooperative agreements: 15POVC-21-GK-01096-NONF (Vera Award 1), 15PBJA-24-GK-02981-JAGP (Vera Award 2), 15PBJA-23-GK-05353-MUMU (Vera Award 3), and 15PBJA-23-GK-05375-SCAX (Vera Award 4), and 15POVC-21-GK-03261-HT (Vera Award 5).  Each award furthered Vera's work to transform the criminal justice system.

41.     Vera Award 1 funded free sign language interpretation service to Deaf crime victims. Turner Decl. ¶ 19.  The interpretation services included specially trained, trauma-informed interpreters, allowing victim services providers to interact directly and effectively with Deaf survivors

12

**13a**

in their community and to provide Deaf survivors with both short and long-term assistance. Vera Award 2 provided funding for technical assistance to public safety agencies in the Community Service Departments in Albuquerque, New Mexico, and Richmond, California to improve response to behavioral and mental health-related 911 calls through subawards. Vera Award 3 was designed to assist prosecutors in Arizona, Colorado, Massachusetts, North Carolina, and Virginia in their efforts to develop effective policies, practices, and programs to expand safety diversion in their jurisdictions. Vera Award 4 provided funding for help three state departments of corrections implement new restorative justice policies, implement trainings on restorative practices for staff, physically improving building, and gaining support for new approaches to prison safety. Vera Award 5 supported assisting police agencies more effectively serve victims of sex and labor trafficking with disabilities through online training programs.

## II.    Plaintiffs' Grant Awards Were Suddenly Terminated without Specific or Individualized Explanations.

42.    On April 4, 2025, Plaintiff Vera Institute of Justice received an email from OJP immediately terminating five grants, totaling more than $7 million, that it held with the federal government.

43.    On April 22, 2025, Plaintiffs Stop AAPI Hate, CCYJ, FORCE Detroit, and HRiA received identical emails from OJP immediately terminating their grant funding, totaling more than $15 million dollars.

44.    OJP sent all Plaintiffs identical emails with the following boilerplate "explanation" as to why the grants were being immediately terminated:

> These awards are being terminated because they "no longer effectuate[] the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The Department has changed its priorities with respect to discretionary grant funding to focus on, among other things, more directly supporting certain law enforcement operations, combatting violent crime, protecting American children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts at all levels of

13

**14a**

government.  These awards [This award] demonstrate that they [it] no longer effectuate Department priorities.

45.      None of the Plaintiffs has previously had a federal grant terminated, and many Plaintiffs, like CCYJ, Vera, and HRiA have been recipients of grant funding for many years under both Democratic and Republican administrations.

46.      To Plaintiffs' knowledge, OJP has never previously terminated grants because of a "change in agency priority," and prior to April, termination of OJP grants was exceedingly rare.

47.      OJP has provided no further explanation for the justification to the Plaintiffs for these grant award terminations.

48.      DOGE staffer Tarak Makecha—a former Tesla employee—is reportedly listed as the author of the spreadsheet listing the grant awards targeted for termination. He reportedly created this list without consulting the OJP program managers, many of whom learned of the terminations only after they were communicated to grantees.[4]

49.      Plaintiffs received no advance notice, prior to receiving the termination notices, and they were afforded no opportunity to respond to the purported basis for the terminations prior to them going into effect.  Instead, OJP offered Plaintiffs a 30-day appeal window, after termination; according to a statement by a DOJ official, funds would supposedly be restored "if direct impact to victims can be thoroughly established" by the grantees.[5]

50.      Plaintiffs immediately stopped receiving funds pursuant to these grant awards. Plaintiff CCYJ was locked out of the federal grant payment system after receiving the termination notice.  At least one Plaintiff, Vera, was locked out of the federal grant payment system a few days *before* receiving their termination notices.  And collectively Plaintiffs are owed thousands of dollars in

---

[4] Sarah N. Lynch and Peter Eisler, *DOGE staffer advised on cuts to Justice Dept grants, document and source say*, Reuters (Apr. 29, 2025), https://perma.cc/JM7M-CKDR.
[5] Ken Dilanian and Laura Strickler, Justice Department cutting grants that help crime victims, NBC News (Apr. 24, 2025), https://perma.cc/SJR3-3MLE.

outstanding expenses incurred before termination that need to be reimbursed: CCYJ has approximately $211,000 in known, unreimbursed expenses incurred prior to termination. Stop AAPI Hate currently has $127,557.29 in pre-termination expenses not yet submitted for reimbursement. FORCE Detroit has $4,845 in unpaid reimbursements through the termination date. HRiA is owed $93,870 at the time of termination. Vera has approximately $381,476 in unreimbursed expenses.

III.     **OJP's *en masse* termination of grant awards has caused, and will continue to cause, immediate and irreparable harm to Plaintiffs**

51.     The abrupt termination of their grant awards caused immediate harm to each of the Plaintiffs' businesses and to the very programmatic operations prescribed by their awards. Frontline workers and dedicated employees have been terminated, laid off, and furloughed. And the hard-fought trust and reputation each Plaintiff has built within their community have been irreparably damaged as Plaintiffs are forced to cancel contracts, halt programs, terminate services, and turn away people who need support. Because all of the Plaintiffs' work focuses on some sort of community violence intervention, the Plaintiffs' absence in their communities and inability to provide services as a result of the loss of funding has dangerous, dire, and possibly deadly consequences.

**Center for Children & Youth Justice (CCYJ)**

52.     As a direct result of OJP's terminations, CCYJ has had to end a project to build organizational and administrative capacity of CBOs to support sustainability of their CVI strategies and to reduce funding for a critical program in King, County, Washington, which serves up to 200 youth annually who are involved with, or at risk of involvement with, gangs and/or violence. As result of this grant termination, as many as 65 young people may no longer be able to access these services, including 13- through 24-year olds who CCYJ knows are carrying guns or other weapons and self-identify as being in a gang.

53.    CCYJ also was forced to terminate all of the subawards and contracts it granted under CCYJ Awards 1 and 2.  For CCYJ Award 2, CCYJ completely halted any related project activities, and laid off the dedicated staff it had hired to fulfill the project.

**Stop AAPI Hate**

54.    Stop AAPI Hate funded staff salaries through the terminated grants and therefore will likely have to laying off 20% of its employees within a year if its funds are not reinstated.

55.    As a direct result of OJP's termination of its grant funding, at least 40 victims of hate crimes will lose the opportunity to participate in Stop AAPI Hate's healing support programs.

56.    Stop AAPI hate will no longer be able to substantially assist communities who are dealing with the aftermath of large-scale incidents of hate and violence (like mass shootings), which they have played a critical role in doing in the past.

57.    The organization has had to terminate planned partnerships within the community to care and provide services for victims of hate crimes, policy and advocacy work promoting safer public transit systems, and it renowned data collection and research on anti-AAPI hate and violence that has become a critical platform for victims and resource for policy makers, nationwide.

**FORCE Detroit**

58.    Three frontline FORCE Detroit employees, with significant expertise, meaningful ties to the community, and trusted relationships with high-risk program participants, were laid off; losing those roles meant losing critical functions like intake coordination, trauma support, community-based data collection, and those who have built trust with some of the highest risk individuals.

59.    As a direct result of OJP's terminations of its grant funding, FORCE Detroit has seen immediate breakdowns in a care ecosystem it painstakingly built, including crumbling of the backbone of its violence intervention work, which included daily, in-the-field support for youth and young adults ages 14 through 24 who are most at risk of gun violence.

16

**17a**

60.    The program funded by this grant has reduced fatal and non-fatal shootings, enhanced opportunities for violence-impacted people to secure employment or start small businesses, and provided critical communal support including showing up at funerals and coaching individuals through job interviews.  For individuals who rely on FORCE Detroit for safety planning, relocation assistance, employment support, or therapy referrals, this termination of funding is devasting.  This includes individuals like Carol, a single mother and dedicated nurse who, after offering temporary shelter to a friend, became the target of escalating violence, culminating in the tragic shooting of her stepdaughter.  FORCE Detroit was able to help Carol and her children by covering move-in expenses, helping her access therapy services, and ultimately helping Carol's family heal from the unimaginable tragedy they faced.  But without grant funds, FORCE Detroit cannot sustain or continue providing critical assistance to victims of violence in Detroit, as it did for Carol.

61.    The termination of these grants has eliminated the resources needed to maintain a consistent presence in communities most impacted by violence and weakens the infrastructure it built to interrupt cycles of harm, with no viable replacement in sight.  Without these funds, FORCE Detroit cannot sustain long-term programming, attract and retain qualified staff, or expand life-saving interventions that its communities urgently need.

**Health Resources in Action (HRiA)**

62.    HRiA funded staff salaries through the terminated grants and faces layoffs of up to 31 specialized staff members.

63.    As a direct result of the termination of HRiA's grant funding, HRiA is no longer able to provide critical, lifesaving assistance in 23 hospitals for violently injured individuals and their families, which could ultimately lead to loss of life.

64.    Numerous hospitals no longer have assistance for their violence prevention professionals who provide invaluable support to victims and their families and mitigate retaliation

17

**18a**

from victims of gun and community violence when they leave the hospital. These programs allowed the medical staff to care for their patients while the program-funded staff manage the aftermath and safety risks.

65.     Similarly, many of HRiA's subrecipients of grant funding are often the sole source of CVI work in their communities, and many have been forced to reduce or completely halt their community -based violence prevention work, which has had a devastating impact on the communities who rely on these organizations, including youth that are served by the subrecipients.

66.     At the individual level, the grant award termination has left those at the highest risk for gun violence unsupported and susceptible to the environment they are in; people who were mid-transformation can lose momentum or backslide; and people who were connecting with frontline workers may be difficult to reach with gaps in services and supports. This has resulted in immediate harm in neighborhoods that now lack grant-funded staff who could immediately intervene in active conflicts and retaliations, or to respond to flare ups in violence.

67.     At least 250 government, health care and philanthropy leaders, and frontline workers could lose the opportunity to attend HRiA's annual conference and learn best practices to respond to community violence because the grant funding supporting those individuals was terminated.

**Vera Institute of Justice (Vera)**

68.     As a direct result of OJP's termination of Vera's grant awards, Deaf and hard-of-hearing victims of crimes lost access to free sign language interpretation services to allow those victims to communicate with law enforcement and victim services. This program has served more than 4,000 individuals, and Vera has been forced to turn away individuals who needed access to these essential services.

69.     The needs of human trafficking survivors with disabilities will go unmet after Vera was forced to abruptly cancel a training for more than 486 individuals (more than half in law enforcement)

18

**19a**

and dozens of law enforcement agencies to help law enforcement identify and serve the unique needs of this population. Cancelling this training lessens law enforcement's ability to serve as a force multiplier for other officers in the future.

70.     The cities of Richmond, California and Albuquerque, New Mexico have lost more than $700,000 in subaward funding to modernize each city's 911 call systems and train civilian specialists to respond to mental and behavioral health crises and to prevent and intervene in violent crime, especially gun-related homicides and shootings.

71.     Prosecutors in Arizona, Colorado, Massachusetts, North Carolina, and Virginia can no longer benefit from Vera's expanding diversion programs, which were designed to help prosecutors address the underlying drivers of criminal conduct in their communities and instead focus on prosecuting the most violent crime plaguing a community.

72.     Because of termination of grant funding, two state Department of Correction facilities withdrew from Vera's project to support data collection, policy development, training and monitoring for correctional facilities to increase safety in prisons.

## CLASS ACTION ALLEGATIONS

73.     Plaintiffs bring this action under Federal Rule of Civil Procedure 23(a), Rule 23(b)(1), and 23(b)(2) on behalf of themselves and all other entities similarly situated.

74.     Plaintiffs seek to represent the following class (the "Proposed Class"):

> All entities in the United States issued awards by the U.S. Department of Justice (DOJ) Office of Justice Programs, whose grants DOJ terminated in April 2025 pursuant to 2 C.F.R. § 200.340(a)(4).

75.     The Proposed Class is so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). Defendants terminated over 370 OJP awards given to organizations across the country.

19

**20a**

76.     The Proposed Class's claims turn on common questions of fact or law that are capable of classwide resolution.  *See* Fed. R. Civ. P. 23(a)(2).  The legality of Defendants' mass terminations is a common question capable of resolution in one stroke.

77.     Plaintiffs' claims are typical of the claims of those of the Proposed Class as the whole.  *See* Fed. R. Civ. P. 23(a)(3).  Each class member's claim arises from the same course of events (Defendants' illegal award terminations) and each class member has experienced the same injury (the termination of their awards) if relief is denied.

78.     Plaintiffs will fairly and adequately represent the Proposed Class. *See* Fed. R. Civ. P. 23(a)(4).  They are committed to seeking a declaration and injunction that will benefit all members of the Proposed Class equally, declaring their award terminations illegal and restoring those awards as they existed before the terminations.  Plaintiffs are aware of their obligations as class representatives and willing to dedicate time and effort to pursue this matter on behalf of every member of the Proposed Class.

79.     Plaintiffs are represented by counsel with extensive experience in administrative law, constitutional law, and class actions and who are committed to zealously representing the Class.  *See* Fed. R. Civ. P. 23(a)(4), 23(g).

80.     Defendants have acted or refused to act on grounds that apply generally to the Proposed Class, violating the APA in the same way as to all class members and subjecting all class members to the same unlawful terminations.  Final injunctive relief and corresponding declaratory relief is therefore appropriate with respect to the Class as a whole.  *See* Fed. R. Civ. P. 23(b)(2).

81.     Alternatively, declaratory relief is appropriate under Rule 23(b)(1)(A) because Defendants have engaged in an ongoing course of conduct that is illegal as to all members of the Proposed Class, and separate actions by individual class members would create a risk of inconsistent results.  *See* Fed. R. Civ. P. 23(b)(1)(A).

20

**21a**

**CLAIMS FOR RELIEF**

<u>**Count I**</u>

**U.S. Constitution – Fifth Amendment Due Process Clause**
**(Against Defendants Bondi and Henneberg)**

82.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

83.     The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law.

84.     Plaintiffs have a constitutionally protected interest in the OJP funding they applied for, were awarded, and relied on.  Plaintiffs have expended significant resources to set up their programs in reliance on their grant awards.  Plaintiffs' interest in their grant awards is established and governed by the acceptance of their application by the federal government.  *See, e.g., Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub nom, City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).

85.     Because Plaintiffs have a protected property interest in their grant funding, they were entitled to reasonable notice and due process before OJP summarily terminated their grant funding.

86.     Plaintiffs did not receive prior notice before OJP summarily terminated its grant terminations and ceased disbursing funds owed on them.  Nor were Plaintiffs provided a hearing or other opportunity to challenge the termination of the grants before OJP terminated them, including allowing Plaintiffs to contest the purported basis for the terminations.

87.     The terminations deprive Plaintiffs of their interest in their funding without the procedural due process rights to which they are entitled.  Plaintiffs have had their operations disrupted as a result, including reduction in services provided, furloughs of staff, and damage to relationships with community beneficiaries, with ongoing risks to their very existence.

88.     OJP's terminations therefore violate the Fifth Amendment Due Process Clause.

89.     OJP's terminations without sufficient due process must be declared unlawful.

90.    The Court should enter prospective injunctive relief to enjoin OJP from terminating Plaintiffs' grants without notice and a reasonable opportunity to object prior to deprivation of their protected interests in grant funding.

## Count II

### U.S. Constitution – Fifth Amendment Due Process Clause—Void for Vagueness
### (Against Defendants Bondi and Henneberg)

91.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

92.    The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law.  A fundamental aspect of due process is that government-imposed obligations must be stated with sufficient clarity to provide fair notice and prevent arbitrary enforcement.

93.    Government regulatory enforcement is void for vagueness if it (1) does not provide a person of ordinary intelligence fair notice of what is prohibited or (2) if it risks arbitrary application. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 736 (D.C. Cir. 2016); *Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993).  Open-ended regulatory terminology that allows for "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" violate due process.  *United States v. Williams*, 553 U.S. 285, 306 (2008); *Coates v. City of Cincinnati*, 402 U.S. 611, 611–14 (1971); *Smith v. Goguen*, 415 U.S. 566, 573–77 (1974).

94.    Plaintiffs have a constitutionally protected interest in the OJP funding they applied for, were awarded, and relied on.

95.    OJP's application of 2 C.F.R. § 200.340(a)(4) to Plaintiffs is unconstitutionally vague and constitutes an arbitrary exercise of authority.  Plaintiffs' termination letters summarily assert that the relevant grant "no longer effectuates the program goals or agency priorities."  The words

22

**23a**

"effectuate," "goals," and "priorities," at least, are not defined in the letters, law, or regulations, and are unconstitutionally vague.

96.     The termination also "explain[s]" some of those new priorities, but these newly-announced priorities are also not contained in any guidance, law, or regulation and were not included defined within Plaintiffs' award grant documents.

97.     As a result, OJP's terminations are unconstitutionally vague, violate the Fifth Amendment's Due Process Clause.

98.     OJP's terminations must be declared unlawful.

### Count III

### Equitable *Ultra Vires* Claim
### (Against Defendants Bondi and Henneberg)

99.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

100.     The equitable power of federal courts to enjoin "violations of federal law by federal officials," *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326–27 (2015), includes cases in which a federal officer has acted unconstitutionally as well as cases in which the officer has acted "beyond th[e] limitations" set by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

101.     OJP, through its officials, may exercise only the authority conferred by statute.

102.     OJP lacked constitutional, statutory, and regulatory authority to issue or implement the *en masse* termination of the Plaintiffs' and putative class members' grant awards. As explained above, these terminations violate the Constitution's separation of powers, the Takings Clause, the Spending Appropriations Clauses; deprive Plaintiffs' and putative class members of their procedural Due Process rights; are void for vagueness; and have no basis in any law or other authority.

103.     OJP's terminations must be declared unlawful.

### Count IV

### Violation of Separation of Powers, Spending and Appropriations Clauses,

23

**24a**

**and the Take Care Clause**
**(Against Defendants Bondi and Henneberg)**

104.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs.

105.    Only Congress may appropriate federal money. U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).  And Congress passed laws forbidding the executive branch from interfering with its appropriations and spending powers.  The Impoundment Control Act commands that appropriated funds "shall be made available for obligation" absent congressional recission.  Pub. L. No. 93-344, 88 Stat. 297, 333 (July 12, 1974) (codified as amended at 2 U.S.C. §§ 682 *et seq.*).  The Anti-Deficiency Act Amendments of 1982 generally prohibit executive branch officers from holding appropriated funds in reserve.  Pub. L. No. 97-258, 96 Stat. 877, 929 (Sept. 13, 1982) (codified as amended in Title 31).

106.    Congress' exclusive power of the purse is "a bulwark of the Constitution's separation of powers among the three branches of the National Government."  *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.).  Where Congress has legislated on point under express and exclusive constitutional authority, Congress' power is at its apex—and the executive branch's "power is at its lowest ebb."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

107.    When Congress appropriates money, the President's only role is to spend it consistent with the congressional command and purpose.  The Constitution "grants the power of the purse to Congress, not the President."  *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  An appropriation is a law like any other, and the President must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *and see City & Cnty. of San Francisco*, 897 F.3d at 1234

("Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations.").

108.    The Executive Branch has no power to amend or rescind appropriations that conflict with its priorities. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). Whatever "policy reason" he may have "for wanting to spend less than the full amount appropriate by Congress for a particular project or program," the President "does not have unilateral authority to refuse to spend the funds." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).

109.    The federal government previously acknowledged that the President cannot withhold congressionally appropriated funding. William Rehnquist, before he took the bench, wrote in an Office of Legal Counsel opinion that "the suggestion that the President has a constitutional power to decline to spend appropriated funds … is supported by neither reason nor precedent." *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303, 309 (1969). As late Chief Justice Rehnquist explained, that "the President disagree[s] with spending priorities established by Congress" cannot "justify his refusal to spend." *Id.* at 311.

110.    Again and again, over the course of years, Congress repeatedly allocated, and commanded Defendants to expend grant funds in defined tranches to improve justice systems across the country. And it unequivocally instructed the Executive Branch that there was precious little play in the joints, allowing the Department of Justice to repurpose only five percent of each tranche before returning to Congress for new instructions. Pub. L. No. 118-42, § 205, 138 Stat. 25, 153 (Mar. 9, 2024). Congress wanted Defendants to spend as much money as Congress allocated, for the purposes Congress chose.

111.    Defendants simply refused. To cite just one example: Congress told Defendant Office of Justice Programs to spend $250 million on "a community violence intervention and prevention

25

**26a**

initiative." *See* Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313, 1339 (June 25, 2022). OJP followed the congressional command, contracting with—among other organizations— Plaintiff Health Resources in Action to help break the cycle of violence in Boston's streets. Then Defendants decided, simply because their own policy priorities changed, to stop spending the money that Congress appropriated—and terminated HRiA's grant funding without warning. But Congress' command did not change, and Congress' command left Defendants no leeway to simply pocket the money.

112.    In the end, Defendants withheld congressionally appropriated funding more than 370 times, to the tune of $820 million. This purposeful campaign of defiant refusal to spend congressional appropriations violates the constitutional separation of powers, which restrains the executive from interfering with Congress' exclusive powers; the Spending Clause and Appropriations Clause, which give Congress alone the power of the purse; and the Take Care Clause, which requires the President to follow the law. Federal courts have the equitable power to grant—and Plaintiffs have a non-statutory right of action to seek—injunctive relief for these "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

113.    As a result, OJP's refusal to spend funds that Congress has appropriated violates the separation of powers, the Take Care Clause, and the Appropriations and Spending Clauses.

114.    OJP's terminations must be declared unlawful and in excess of its authority.

115.    Defendants must be preliminarily and permanently enjoined from declining to spend the funds that Congress has appropriated for OJP grants.

### Count V

**Violation of the APA–Contrary to Law and Contrary to a Constitutional Right**
**(Against All Defendants)**

116.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

117.    An agency is "bound by its own regulations," *Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks omitted), and an agency's failure to follow them is "contrary to the law," *Fuller v. Winter*, 538 F. Supp. 2d 179, 191 (D.D.C. 2008).

118.    OJP's *en masse* termination of Plaintiffs' grant awards is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

119.    OJP's stated authority and basis for terminating Plaintiffs' awards is because they "no longer effectuate[] the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).   In the termination emails, OJP asserted that "the Department has changed its priorities" and that "these awards demonstrate that they no longer effectuate Department priorities."

120.    OJP's terminations were contrary to Section 200.340(a)(4) because OJP is permitted to terminate an award based on agency priorities only if that basis for termination was specifically permitted by the terms and conditions of the award.  OJP did not "clearly and unambiguously" state in Plaintiffs' award documents that it could terminate an award because an award no longer effectuates program goals or agency priorities.  Without an articulation of those priorities in the award and clear notice that the grant can be terminated on that basis, OJP was not permitted to terminate the grants on the basis of "agency priorities."

121.    OJP's terminations were further contrary to Section 200.340(a)(4) because a termination must be on an award-by-award basis, and OJP must rely on "specific evidence" to demonstrate that "an award" no longer serves a program goal or agency priorities.  OJP's terminations were predicated on a change in agency priorities, but Section 200.340(a)(4) does not allow OJP to terminate a grant based on a "change" to an agency's priorities.  Moreover, OJP did not provide or rely on specific evidence that Plaintiffs' awards should be terminated because they no longer effectuated the goals and priorities that motivated the award in the first place.

27

**28a**

122.    Because Section 200.340(a)(4) does not authorize OJP's terminations of Plaintiffs' grants, those terminations are "not in accordance with law," 5 U.S.C. § 706(2)(A).

123.    OJP's terminations on the basis of Section 200.340(a)(4) must be declared unlawful, including its interpretation that 2 C.F.R. § 200.340(a)(4) allows OJP to terminate a grant based on a "change" in agency priorities.

124.    OJP's terminations must be vacated and "set aside" under 5 U.S.C. § 706(2)(B).

125.    Plaintiffs' request that this Court enter preliminary and permanent injunctive relief enjoining OJP's from terminating grants on the basis of a "change" in agency priorities.

## Count VI

### APA –Arbitrary, Capricious, and an Abuse of Agency Discretion.
### (Against All Defendants)

126.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

127.    OJP's *en masse* termination of Plaintiffs' grant awards is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

128.    Under the APA, the Court shall "hold unlawful and set aside agency action" that is "arbitrary [and] capricious."  5 U.S.C. § 706(2)(A).

129.    "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action violates this requirement if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

130.    OJP's terminations are arbitrary and capricious because they are "not reasonable" nor "reasonably explained."  *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *Prometheus Radio Project*, 592

28

**29a**

U.S. at 423). The termination notices sent to all named Plaintiffs included identical, three-sentence boilerplate explanations for the basis of the termination. They included no discussion specific to an individual grant, nor did they explain why any individual grant no longer served the agency's changed priorities.

131. OJP's terminations also failed to take into consideration the reliance interests of Plaintiffs and other stakeholders, including the populations they serve.

132. OJP's termination of Plaintiffs' grants constitutes an "abuse of discretion," under the APA as applied to this class of Plaintiffs.

133. OJP's terminations must be declared arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

134. OJP's terminations must be vacated and "set aside" under 5 U.S.C. § 706(2)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(A) Declare unlawful, vacate, and set aside OJP's decision to conduct an *en masse* termination of the putative class members' grants;

(B) Declare unlawful, vacate, set aside Defendants' terminations of the putative class members' grants;

(C) Declare that OJP's terminations violate the Fifth Amendment's Due Process Clause;

(D) Declare that OJP's terminations violate the separation of powers, the Take Care Clause, and the Appropriations and Spending Clauses;

(E) Declare that OJP's terminations on the basis of Section 200.340(a)(4) are unlawful, including its interpretation that 2 C.F.R. § 200.340(a)(4) allows OJP to terminate a grant based on a "change" in agency priorities;

(F) Declare that OJP's terminations are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(G) Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from enforcing, implementing, maintaining, or giving effect to the terminations of putative class members' grants, including through the enforcement of closeout obligations;

(H) Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from re-obligating the funds used to support putative class members' terminated grants;

(I) Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation from terminating Plaintiffs' grants without notice and a reasonable opportunity to object prior to deprivation of their protected interests in grant funding;

(J) Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from declining to spend the funds that Congress has appropriated for OJP grants;

(K) Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from terminating grants under 2 C.F.R. § 200.340(a)(4) on the basis of a "change" in agency priorities;

(L) Stay the termination of the grants pursuant to 5 U.S.C. § 705;

(M) Enter judgment in favor of Plaintiffs;

(N) Enter an order in the exercise of the Court's equitable powers that directs Defendants to take all steps necessary to ensure that OJP disburses funds to Plaintiffs in the customary manner and in customary timeframes;

(O) Require Defendants to submit status reports every 30days after the date of the entry of the Court's order to ensure prompt and complete compliance with the Court's directive;

(P) Award Plaintiffs their costs, reasonable attorney fees, and other disbursements as appropriate; and

(Q) Grant such other and further relief as the Court may deem just and proper.

Dated: May 22, 2025                 Respectfully submitted,

*/s/ Jennifer Fountain Connolly*
JENNIFER FOUNTAIN CONNOLLY (D.C. BAR NO. 1019148)
LISA NEWMAN*
BRIAN NETTER (D.C. BAR NO. 979362)
CORTNEY ROBINSON (D.C. BAR NO. 1656074)
SOMIL TRIVEDI (D.C. BAR NO. 1617967)
SKYE L. PERRYMAN (D.C. BAR NO. 984573)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
jconnolly@democracyforward.org

*Counsel for Plaintiffs*

**Pro hac vice* motion pending

JOSHUA PERRY*
JOSHUA STANTON (D.C. BAR NO. 90010653)
E. DANYA PERRY*
PERRY LAW
445 Park Avenue, 7th Floor
New York, NY 10022
(212) 251-2619
jperry@danyaperrylaw.com

*Counsel for Plaintiffs*

*Request for admission pending

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VERA INSTITUTE OF JUSTICE, et al., <br><br> *Plaintiffs, on behalf of themselves and all others similarly situated,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE, <br><br> PAMELA J. BONDI, in her official capacity as United States Attorney General, <br><br> OFFICE OF JUSTICE PROGRAMS, <br><br> MAUREEN A. HENNEBERG, in her official capacity as Acting Head of the Office of Justice Programs, <br><br> *Defendants.* | Case No. _____ |

## DECLARATION OF RACHEL SOTTILE

I, Rachel Sottile, declare as follows:

1.      My name is Rachel Sottile.  I am a resident of King County in the State of Washington. I am over the age of eighteen.  This declaration is based upon my personal knowledge and the knowledge I have acquired in the course of my duties.  If called as a witness, I could and would testify competently to the matters set forth below.  I provide this declaration in support of Plaintiffs' motion for preliminary injunction.

2.      I serve as the President & CEO of the Children and Youth Justice Center, which does business as the Center for Children & Youth Justice (CCYJ).  In this role, I have overall strategic and operational responsibility for CCYJ's mission.  My role is to provide leadership and direction for CCYJ, mobilizing broad-base support for youth foster care and juvenile justice systems reform by

1

**34a**

convening experts and stakeholders who can identify gaps and effect systemic change, designing new pathways to achieve improved outcomes, independently evaluating these results, and advocating for long-term systemic change. My team and I serve as subject matter experts and resources for system leaders, incubating innovative research, policy, training, and projects that serve as models for reform. I began as President & CEO on December 5, 2018, and have served in the position for over six years.

3.     In my role as President & CEO, I oversee the two initiatives affected by the grant termination at issue in this litigation. I also serve as CCYJ's Entity Administrator, binding CCYJ in all awards and agreements, monitoring progress, and addressing barriers. I am accountable for the grant outcomes being fulfilled.

4.     Prior to this position, I served as the Vice President of the Pretrial Justice Institute (Baltimore, MD). I also previously served as the Director of Foster Care & Adoptions for Miami-Dade County (FL), Department of Children & Families, D-11, and the Chief Operating Officer of Charlee Homes for Children (Miami, FL). My professional roles and leadership span nearly thirty years, and include providing direct service to foster care youth, and championing state-based and national foster care and juvenile justice systems reform.

**CCYJ's Mission and Impacted Programs**

5.     The Center for Children & Youth Justice is a nonprofit, founded in 2006 by Washington State Supreme Court Justice Bobbe J. Bridge (ret.). CCYJ's Mission is to create better lives for generations of children and youth by reforming the child welfare and juvenile justice systems. As the only organization solely committed to reforming these systems in Washington State, CCYJ's approach is rooted in listening to those most impacted—children, young adults, and families—by failures of these systems, leading to the development, coordination, and implementation of reforms designed to support children and youth, stabilize families, and strengthen communities. To accomplish these reforms, CCYJ works in partnership with local and state government, law

2

**35a**

enforcement, courts, schools, coalitions with similar goals, and community-based organizations to test and implement reforms by piloting promising and best practices, facilitating coordination and collaboration among system stakeholders, providing training and ongoing technical assistance, and advocating for data-driven and youth-centered solutions.

6.     As part of this work, CCYJ oversees two initiatives directly impacted by the award terminations at issue in this litigation: the Leadership, Intervention, and Change ("LINC") Program and the Community Violence Intervention Capacity Building Project.

7.     CCYJ has been an active participant in the development of this lawsuit and has remained in regular communication with Plaintiffs' counsel about this case.  CCYJ is willing and able to take an active role in this litigation and to protect the interests of all members of the Class.

**CCYJ's Grant Process**

8.     In general, grant opportunities are evaluated thoroughly by me and the Executive Team to ensure the work prescribed by the grant advances our mission, aligns with how we do our work, and engages with community partners and systems involved youth and/or professionals.  We also evaluate the competencies and expertise needed programmatically, the core infrastructure and resources (administrative, technological, finance, compliance, etc.) that will be needed to fulfill the grant requirements, and if the organization is structured in a way to fulfill the work prescribed. CCYJ's programmatic leaders are engaged with the Executive Team at the early stages of consideration of a prospective grant, to ensure the organization is aligned with the opportunity, work required, and intended outcomes.  I may consult with CCYJ's Board of Directors as thought partners and advisors, prior to applying for grants.  I make the ultimate decision to apply for grants and, if the grant is awarded, bind the organization in the award agreement.

**Termination of Grant Funding Without Notice**

3

9.    On Tuesday, April 22, 2025 at about 2:30 PM Pacific Time, I received two emails from the Office of Justice Programs, OJP_COMMS@public.govdelivery.com, labeled "Notice of Termination" and purporting to immediately terminate two of CCYJ's awards—Award No. 15PBJA-22-GG-04749-MUMU (CCYJ Award 1) and Award No. 15PBJA-23-GK-05198-CVIP (CCYJ Award 2), attached here as Exhibits 1 and 3, respectively—pursuant to 2 C.F.R. § 200.340(a)(4) because the awards "no longer effectuate agency priorities."

10.    The termination emails went on to state that "The Department has changed its priorities with respect to discretionary grant funding to focus on, among other things, more directly supporting certain law enforcement operations, combatting violent crime, protecting American children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts at all levels of government. This award demonstrates that it no longer effectuates Department priorities."

11.    No other basis or explanation for the termination was provided. The termination email(s) did not claim CCYJ failed to comply with the terms or conditions of the awards, did not explain how Department priorities might have changed, and did not otherwise explain why the awards supposedly no longer effectuated Department priorities. These two awards together total $6 million dollars, with more than $4.1 million dollars of remaining award funding as of April 22, 2025. True and correct copies of the termination emails are attached as Exhibits 2 and 4.

12.    The termination email advised that "[c]onsistent with 2 C.F.R. § 200.342, [CCYJ] may appeal this termination in writing within 30 calendar days of the date of this notice."

13.    CCYJ was locked out of the federal grants payment system after receiving the termination notice. CCYJ has approximately $211,000 in known unreimbursed expenses incurred before the awards were terminated. A portion of the outstanding reimbursements—$79,600—should pass through to CBOs who have incurred expenses related to the grant awards. Additional invoices

4

**37a**

from CBOs for work performed prior to termination are still pending.  But because CCYJ cannot access the payment system, we cannot access funds owed to CCYJ or the CBOs.

14.     It was CCYJ's expectation and understanding based on the notice of award, federal law, and our past experience with federal awards that the funds awarded would be available throughout the award periods and that the DOJ could terminate the awards only if CCYJ failed to comply with the terms and conditions of the awards.  It was not CCYJ's understanding that the DOJ could terminate these awards based on that agency's unsupported assertion that the awards no longer effectuate agency priorities. CCYJ further understood that costs properly incurred prior to the termination of an award would be reimbursed by the DOJ.

**Harm Resulting from Awards Termination**

15.     The termination of CCYJ's awards created an immediate harm and impact to not only CCYJ's ability to maintain business and programmatic operations prescribed by these awards, but it also denied funds to be paid to four lower-tier contractors and three subrecipients, impacting their ability to have the financial resources to sustain their organizations.  As a result of the termination of CCYJ's award:

   a.  five members of CCYJ's staff were  terminated on April 25, 2025;

   b.  CCYJ has ended the project intended to build the capacity of organizations operating Community Violence Intervention (CVI) strategies in King County, Washington, leaving the county's youth without enhanced CVI services; and

   c.  an estimated 65 young people will be deprived of direct services from LINC, a program that serves youth who are involved with, or at risk of involvement with, gangs or violence.

16.     CCYJ relied and acted upon its expectation and understanding that the DOJ would fulfill its commitment to provide award funding. CCYJ specifically hired project staff, built the

5

**38a**

necessary technological, administrative and organizational structures, and executed lower tier subawards and vendor services contracts necessary to accomplish the awards' goals and objectives.

17.    DOJ's termination of these awards with no notice forced CCYJ to make cuts in its budget to offset the loss of $1.8 million dollars of budgeted funding for CCYJ's current fiscal year, representing a 32% decrease in annual revenue. This included reducing the budget of one program (including terminating three related contracts) and eliminating all together another project    tasked with carrying out the award goals and objectives, terminating four subawards and services contracts that assist CCYJ in carrying out its mission, cutting funding for other programs and support personnel, re-positioning staff into other positions, and laying off five members of our staff (24% of CCYJ's workforce) on April 25, 2025.

18.    DOJ's termination of these awards has created immense uncertainty for CCYJ as well as employees in several other organizations with terminated subawards and services contracts, and has required CCYJ employees to spend significant amounts of time working on responding to that disorder and confusion. I, along with many other leaders, have spent an enormous number of hours over the last few weeks attempting to quantify and mitigate the effects of these award terminations— time that could have been spent working to advance child welfare and juvenile justice systems reform, including making our community safer through group/gang violence intervention and prevention.

**Award 1: Enhancement of the Leadership, Intervention & Change (LINC) Group Violence Prevention and Intervention in King County, Washington**

19.    On September 29, 2022, CCYJ was notified that the Office of Justice Programs (OJP) had approved its application for a grant award under the funding opportunity entitled "2022 BJA FY 22 Office of Justice Programs Community Based Violence Intervention and Prevention Initiative." Shortly thereafter, CCYJ accepted the award.  The grant award provides $2,000,000 in funding from October 1, 2022, to September 30, 2025.  The statutory authority for this award is the Department of

6

**39a**

Justice Appropriations Act, 2022 (Pub. L. No. 117-103, 136 Stat. 49, 127); Bipartisan Safer Communities Supplemental Appropriations Act, 2022 (Pub. L. No. 117-159, 136 Stat. 1313, 1339); 28 U.S.C. § 530C.

20.     This grant award, titled "Enhancement of the Leadership, Intervention & Change (LINC) Group Violence Prevention and Intervention in King County, Washington" supports CCYJ's regional adaptation and implementation of the Office of Juvenile Justice and Delinquency Prevention, Comprehensive Gang Model (CGM) in Washington's most populous and diverse county. The LINC program, in operation since 2011, is a coordinated effort to prevent and reduce community and gun violence among youth and the involvement of young people in groups and gangs in King County, Washington.

21.     The LINC program serves all of King County, with a targeted focus on Seattle and the South King County communities that have historically accounted for more than 90% of firearm violence in the county. LINC's service area includes over twenty cities and spans several law enforcement jurisdictions and school districts, making it a comprehensive initiative aimed at addressing violence prevention and intervention across diverse communities. The LINC program fosters trust, mutual understanding, and collaboration between law enforcement and the community-historically, the LINC program has worked with up to 200 young people annually who are involved with, or at risk of involvement with, gangs and/or violence.[1] The LINC program serves youth that are typically 13-24 years old, carrying a gun or other weapons, self-identify as gang/group involved or,

---

[1] In 2024, 120 youth were served by LINC. Of these youth, 29 (24%) enrolled in school; 46 (38%) improved school attendance/performance/behavior; 1 (0.8%) was accepted to college; 4 (3%) graduated; 17 (14%) completed probation or court assigned activity; 69 (57.5%) decreased or replaced gang/group activity or association; 42 (35%) obtained employment; 31 (26%) maintained employment; 33 (27.5%) connected to support services; 16 (13%) connected to housing; 2 (1.6%) completed substance use or mental health services; 6 (5%) enrolled in substance use or mental health services; and 14 (11.6%) participated actively in mental health or substance use services.

at high-risk of becoming gang/group involved, juvenile justice impacted, community violence impacted, and disengaged from school.

22.    The CGM utilizes an "evidence-based framework for coordinating multiple anti-gang and violence-reduction strategies to address serious gang problems." National Gang Center, A Law Enforcement Official's Guide to the OJJDP Comprehensive Gang Model, https://nationalgangcenter.ojp.gov/comprehensive-gang-model. As described by the National Gang Center, the CGM is "a set of five core strategies—community mobilization, opportunities provision, social intervention, suppression, and organizational change and development—that offer a comprehensive, collaborative approach designed to prevent and reduce gang violence." *Id.* Within the LINC program, CCYJ functions as the Lead Agency and plays a key role in implementing the CGM in King County, Washington, providing fiscal management, administrative coordination and support, direct service coordination, training, and data collection, analysis, and reporting.

23.    Services provided to youth are coordinated through street outreach and geographically focused Multi-Disciplinary Intervention Teams (MDITs). LINC MDITs are facilitated by CCYJ and include street outreach workers, case managers, school representatives, probation counselors, behavioral health specialists, employment services providers, and law enforcement officers. Street outreach reaches youth in the community where they are at: physically, emotionally, and developmentally. LINC outreach workers are credible messengers- individuals directly impacted by community violence. They engage and mentor youth and use trauma-informed approaches to help youth set goals and change their lives. The MDITs use a team-based case management approach, reviewing each youth's plan and progress to determine what services can help them meet the goals the youth have identified for themselves.

24.    A cross-sector steering committee consisting of local leaders and decision makers oversees the planning, implementation, evaluation, and sustainability of the LINC program. CCYJ

staff have provided training and technical assistance and made professional development opportunities available to steering committee and MDIT members as well as community partners and stakeholders.  Training has been provided on a variety of topics related to the implementation of the CGM, including but not limited to universal screening for the commercial sexual exploitation of children, reducing the propensity for violence and victimization in young women, providing culturally appropriate services to diverse communities, the prosecuting attorney's office's safer schools strategy, and crisis response and violence interruption.

    25.    DOJ terminated this grant with approximately five months remaining and more than $684,100 of funds remaining, including significant funding for lower-tier direct services contracts supporting street outreach and case management services for young people involved with, or at risk of involvement with, violence or gangs.

    26.    As a result of being forced to terminate direct services contracts, CCYJ estimates that up to 65 young people will no longer be supported by the LINC program. Specifically, the LINC program currently uses a contracted services organization to serve 65 LINC clients through street outreach services.  If this organization stops participating, and its leadership has indicated that it will stop participating as a direct result of the loss of this funding, LINC will serve approximately 65 fewer clients.  Depending on the capacity of other organizations, there is no guarantee that these young people could be served by other, formerly contracted outreach service providers.

**Award 2: Community Violence Intervention Capacity Building Project**

    27.    On September 28, 2023, CCYJ was notified that OJP had approved its application for a cooperative agreement under the funding opportunity entitled "2023 BJA FY 23 Office of Justice Programs Community Based Violence Intervention and Prevention Initiative."  Shortly thereafter, CCYJ accepted the cooperative agreement award.  The cooperative agreement award provides $4,000,000 in funding from October 1, 2023, to September 30, 2026.  The statutory authority for this

cooperative agreement is the Department of Justice Appropriations Act, 2022 (Pub. L. No. 117-103, 136 Stat. 49, 127); Bipartisan Safer Communities Supplemental Appropriations Act, 2022 (Pub. L. No. 117-159, 136 Stat. 1313, 1339); 28 U.S.C. § 530C.

28.     Building on CCYJ's many years of experience administering the CGM in King County and providing training and technical assistance on a variety of topics, including addressing the commercial sexual exploitation of children, CCYJ's Community Violence Intervention Capacity Building Project was intended to support three to five community-based organizations (CBOs). These CBOs provide CVI services to young people ages 12-24 years at highest risk of victimization or perpetration of gun violence across King County, Washington.  In this work, CCYJ acts as an intermediary organization, providing targeted training and technical assistance and capacity building for implementing and sustaining the CBOs' CVI strategies.  The Giffords Center for Violence Intervention recognizes the support of an intermediary organization—like CCYJ—as an important component of building and sustaining effective local CVI initiatives.  *See* Leveraging Intermediaries to Strengthen the Community Violence Intervention Field report, The Giffords Center for Violence Intervention,   https://giffords.org/report/leveraging-intermediaries-to-strengthen-the-community-violence-intervention-field ("Intermediaries can help community-based organizations build capacity, access more resources, and reach self-sustainability").

29.     To select CBO subaward partners, CCYJ conducted a competitive process to engage grassroots and small organizations with annual budgets of less than $5,000,000 that were planning to initiate or were already operating a CVI strategy in King County, Washington.  The selection process also involved assessing the organization's readiness for change, cultural responsiveness, and ability to integrate training and technical assistance into their organization to sustain their CVI efforts long term.

30.     CCYJ developed a request for proposals, hosted a pre-application solicitation webinar, and ultimately selected three CBO subaward partners.  Throughout the process, CCYJ staff regularly

10

**43a**

consulted with DOJ Bureau of Justice Assistance (BJA) staff and incorporated their input. Notably, on September 25, 2024, at the invitation of BJA leadership, CCYJ was the national host site for an event in Seattle commemorating the two-year anniversary of the launch of OJP's Community-Based Violence Intervention and Prevention Initiative. Then-Acting Assistant Attorney General Brent J. Cohen and the Director of the National Institute of Justice, Dr. Nancy La Vigne, attended and the event occurred at the organizational home of one of CCYJ's selected subaward recipients. *See* News Release, "Readout of OJP and White House Community Violence Intervention Announcements, U.S. Department of Justice, Office of Justice Programs, September 30, 2024, https://www.ojp.gov/archives/pressreleases/2024/readout-ojp-and-white-house-community-violence-intervention-announcements.

31.     CCYJ's efforts to develop subawards with these CBOs required extensive work on the parts of CCYJ and each CBO. CCYJ reviewed and assessed dozens of documents, met with each CBO multiple times, and provided training and technical assistance on completing forms and creating subaward budgets. CCYJ staff developed a comprehensive capacity building assessment tool specifically focused on sustaining an effective CVI initiative and started building out an online resource library for knowledge products related to CVI training, technical assistance, and capacity building. After subaward agreements were finalized in February and March of 2025, CCYJ met regularly with the subrecipients and administered comprehensive capacity building needs assessments to each CBO. Prior to the termination of CCYJ's cooperative agreement by the DOJ, CCYJ was in the process of developing and finalizing capacity building plans for each of the subaward CBO partner organizations.

32.     CCYJ's CVI Capacity Building Project cooperative agreement was abruptly terminated with approximately 17 months and $3,420,000 of funds remaining. After this cooperative agreement was terminated, CCYJ was forced to terminate all three subawards as well as a services contract on April 23, 2025. CCYJ had dedicated staff to fulfill this cooperative agreement project. DOJ's

11

**44a**

termination of the grant seventeen months early and with no notice necessitated the abrupt cessation of project activities and forced immediate layoffs to occur.

33.    Activities related to this cooperative agreement award project have ceased.  This means that, despite CCYJ and the CBO's hard and dedicated work to build the sustainability of these organizations and their CVI strategies, none of the CBOs will be supported to enhance their administrative and operational capacity to deliver CVI services for youth at highest risk of victimization or perpetration of gun violence in King County, Washington.

Signature on following page.

12

**45a**

Date: May 21, 2025

_____
Rachel Sottile
President & CEO of the Children and Youth Justice
Center
Gainesville, Florida

**46a**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VERA INSTITUTE OF JUSTICE, et al., <br><br> *Plaintiffs, on behalf of themselves and all others similarly situated,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE, <br><br> PAMELA J. BONDI, in her official capacity as United States Attorney General, <br><br> OFFICE OF JUSTICE PROGRAMS, <br><br> MAUREEN A. HENNEBERG, in her official capacity as Acting Head of the Office of Justice Programs, <br><br> *Defendants.* | Case No. _____ |

## <u>DECLARATION OF CYNTHIA CHOI</u>

I, Cynthia Choi, declare as follows:

1.      My name is Cynthia Choi.  I am a resident of Los Angeles Country in the State of California.  I am over the age of eighteen.  This declaration is based upon my personal knowledge and the knowledge I have acquired in the course of my duties.  If called as a witness, I could and would testify competently to the matters set forth below.  I provide this declaration in support of Plaintiffs' motion for preliminary injunction.

2.      I am the Co-Founder of Stop AAPI Hate and the Co-Executive Director of Chinese for Affirmative Action, the fiscal sponsor for Stop AAPI Hate.  I have been the Co-Founder of Stop AAPI Hate for 5 years and Co-Executive Director of Chinese for Affirmative Action for 9 years and 4 months. I oversee Stop AAPI Hate's programming, communication, and fundraising, and directly

1

**47a**

supervise the Director of Development.  I am also responsible for setting the strategic direction of the coalition and ensuring that Stop AAPI Hate maintains its reputation as a national authority on hate against Asian American and Pacific Islander communities.

3.      In my role, I also oversee Stop AAPI Hate's funding streams, including government contracts and grants, and the Data & Research, Policy & Advocacy, Community Care, and Strategic Communications/Public Education initiatives affected by the grant termination.

4.      Prior to this position, I held senior roles at Asian Americans/Pacific Islanders in Philanthropy, Khmer Girls in Action, and The California Endowment. In September 2022, I was appointed to the California Commission on the State of Hate.  The Commission works with the California Department of Civil Rights to strengthen anti-hate initiatives across California. In 2023, I also served on The Coastside Victims Fund Oversight Committee which was established to support victims and their families affected by the mass shooting in Half Moon Bay, California.

**Stop AAPI Hate's Mission and Impacted Programs**

5.      Stop AAPI Hate is a U.S.-based non-partisan Civil Rights coalition dedicated to ending racism and discrimination against Asian Americans and Pacific Islanders (AAPIs).  In response to the alarming increase in acts of hate against the AAPI community during the COVID-19 pandemic, Stop AAPI Hate was founded in March 2020 by three 501(c)(3) organizations: Chinese for Affirmative Action (CAA), AAPI Equity Alliance, and San Francisco State University (Asian American Studies Department), with CAA as the lead fiscal agency.

6.      Over the course of five years, Stop AAPI Hate has become the nation's largest reporting center tracking anti-AAPI hate acts.  Stop AAPI Hate has given voice to nearly 12,800 AAPI community members who have experienced hate and amassed a following of nearly 400,000 supporters across email and social media platforms.  Stop AAPI Hate has also provided critical support to victims of hate around the country.

7.     Consistent with its mission, Stop AAPI Hate has addressed anti-AAPI Hate through four main strategic areas: Data and Research, Policy and Advocacy, Strategic Communications, and Community Care.  The organization has brought mainstream visibility to AAPI discrimination in a way that no other organization has before.

8.     Since its founding in 2020, Stop AAPI Hate has become nationally known as the primary source of data and research on acts of hate against the AAPI communities in the country. Our reporting center is widely recognized as the largest national reporting center[1] and fills a critical gap in knowledge about anti-AAPI hate, which research shows is chronically underreported to law enforcement and other government agencies.  Stop AAPI Hate also conducts the most comprehensive national survey on AAPI experiences of hate and discrimination.  To date, we have recorded nearly 12,800 hate acts across the country.

9.     Not only does our data and research center act as a resource for thousands of AAPIs, but our data is also used by researchers, government agencies, and elected officials annually to help raise public awareness and advocate for policies that effectively address anti-AAPI hate.  It has been cited by the U.S. Commission on Civil Rights, the California Commission on the State of Hate, in testimony before Congress, and before the United Nations.[2]  And when Stop AAPI Hate is mentioned in articles—nearly 430,000 times, and counting—most cite to the organization's data, making Stop AAPI one of the most widely known sources of information on anti-AAPI hate in the country.

10.     The national visibility that Stop AAPI Hate has brought to the issue of hate and discrimination against the AAPI community has shaped policy, prompted legislatures to make historic

---

[1] *Making sense of anti-AANHPI hate: A synthesis of evidence from 2020-2024*, AAPI Data (Jan. 17, 2025), https://aapidata.com/wp-content/uploads/2025/01/Hate-Synthesis-Report-Final.pdf.
[2] *Commission on the State of Hate Report 2022-2023* (California), AAPI Data (July 19, 2024), https://aapidata.com/data/commission-on-the-state-of-hate-report-2022-2023-california/?utm_source=chatgpt; *UN chief 'profoundly concerned' over rise in violence against Asians*, UN News (Mar. 22, 2021), https://news.un.org/en/story/2021/03/1088002;     *The Federal Response to Anti-Asian Racism in the United States*, U.S. Comm'n on C.R. (2023), https://www.usccr.gov/files/2023-10/fy-2023-se-report.pdf.

investments in the AAPI community, and fundamentally changed the way AAPIs are perceived in this country.

11.     Through its comprehensive data collection and analysis, Stop AAPI Hate is able to identify key trends in how hate is perpetrated against the AAPI community. By helping government agencies, law enforcement, and community partners to understand where hate occurs, who is mostly commonly targeted, and what types of hate acts are most prevalent, Stop AAPI Hate improves public safety by allowing governments and communities to develop targeted strategies that protect people who need it most.

12.     Stop AAPI Hate has been an active participant in the development of this lawsuit and has remained in regular communication with Plaintiffs' counsel about this case.  Stop AAPI Hate is willing and able to take an active role in this litigation and to protect the interests of all members of the Class.

**Termination of Grant Funding Without Notice**

13.     On September 23, 2024, Chinese for Affirmative Action d/b/a Stop AAPI Hate received its first federal grant award of $2,000,000 from the Bureau of Justice Assistance FY24 Community-based Approaches to Prevent and Address Hate Crime for the performance period of October 1, 2024 through September 30, 2027 (Award Number: 15PBJA-24-GG-02840-ADVA) (Stop AAPI Hate Award), attached here as Exhibit 1.  Stop AAPI Hate was one of two grantees awarded funding under the program's national Civil Rights organization category.

14.     Stop AAPI Hate proposed to implement "Stop AAPI Hate Community-Based Approaches to Prevent and Address Hate Crimes and/or Hate Incidents."  The purpose of the grant initiative is to develop a holistic, multi-disciplinary, trauma-informed, community-based approach to documenting AAPI hate incidents and provide crisis response, care, and healing to victims of hate.

4

**50a**

15.     The key areas for activities outlined in the grant proposal include: data and research on AAPI hate incidents in partnership with AAPI communities; policy advocacy to educate, inform, and provide technical assistance to prevent anti-AAPI hate; community care to partner with communities to center healing and improve crisis response including further work on a landscape analysis of existing resources and models; and public education & digital media to sustain public education and conversations on anti-AAPI hate and scapegoating.

16.     We anticipated the grant funding would result in the formation of a multidisciplinary team to develop and evaluate community-based strategies for affected individuals and communities including the establishment of partnerships with AAPI/Black, Indigenous, and People of Color organizations engaging in community care/healing work; the expansion of Community Healing Pilots; and increased awareness through media and social media engagement around AAPI hate incidents.

17.     After receiving its award, and once the grant budget was approved by the Bureau of Justice, Stop AAPI Hate began to fulfill deliverables in the first quarter of 2025.  To access funding, Stop AAPI Hate uses an advance payment model, which means funds are disbursed upfront from the Bureau of Justice Assistance grant award based on our approved budget or estimated cash needs.  As the grantee, we must account for the use of funds through quarterly financial reporting.

18.     Stop AAPI Hate withdrew $500,000 on January 27, 2025, for deliverables stated under our Data and Research, Community Care, and Public Education/Communication programs including the development of our annual report on the State of Hate, launching our healing circle for harmed individuals, and executing on digital content to raise awareness on the rise of anti-AAPI hate.

19.     On April 22, 2025, at 2:30 pm, Stop AAPI Hate received an email from the Bureau of Justice Assistance purporting to terminate Stop AAPI Hate grants because the award "no longer effectuates Department priorities."  The termination email went on to state that "the Department has changed its priorities with respect to discretionary grant funding to focus on, among other things,

more directly supporting certain law enforcement operations, combatting violent crime, protecting American children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts at all levels of government.  This award demonstrate that they no longer effectuate Department priorities."  No other basis or explanation for the termination was provided.  The termination email did not claim Stop AAPI Hate failed to comply with the terms or conditions of the award and did not otherwise explain why the award, with approximately $1,500,000 of funding outstanding, no longer effectuated Department priorities.  A true and correct copy of the termination email is attached as Exhibit 2.

20.    The termination email advised that Stop AAPI Hate could "appeal this termination in writing within 30 business days."

21.    The termination email also required Stop AAPI Hate to commence "closeout and other obligations in 2 C.F.R. § 200.340(d)," including an obligation that Stop AAPI Hate "promptly refund any unobligated funds," that have been paid out, and retaining grant records for at least three years.  The letter threatened that failure to meet these closeout obligations could include "appropriate enforcement actions," and "affect eligibility for future grants."

22.    The closeout obligations include preparing and submitting the grant reports; terminating agreements with vendors, consultants, and partners; and submitting any remaining reimbursement requests for project and closeout expenses.  Stop AAPI Hate currently has $127,557.29 in expenses incurred from April 1 to April 22, 2025, but not yet submitted for reimbursement.  Stop AAPI Hate will also need to submit a performance and financial report to the DOJ by July 30, 2025, showing how the withdrawn amounts have been spent towards programs.

23.    It was Stop AAPI Hate's understanding that the funds awarded by these grants would be available throughout the grant periods and that the DOJ could terminate the grants only if Stop AAPI Hate failed to comply with the terms and conditions of the award.  It was *not* Stop AAPI Hate's

understanding that the DOJ could terminate these grants based on that agency's assertion that the award no longer affects agency priorities.

**Reliance on Grant Funding and Termination Impact on Revenue, Operations and Employment**

24.    The termination of Stop AAPI Hate's award created an immediate harm and impact to not only Stop AAPI Hate's ability to maintain business and programmatic operations prescribed by the award but also denied funds to be paid to partners and contractors, impacting their ability to have the financial resources to sustain their work.  As a result of the termination of Stop AAPI Hate's grant:

    a.    As a result of the termination of Stop AAPI Hate's award:

    b.    20% of Stop AAPI Hate's staff can expect to be laid off within a year;

    c.    Community groups cannot rely on Stop AAPI Hate's partnership or support in response to large scale incidents of hate and violence (like mass shootings) as they have in the past;

    d.    Plans to establish partnerships with organizations focused on care, healing and mental health support for the AAPI community have been cancelled;

    e.    At least 40 victims of hate will lose the opportunity to participate in Stop AAPI Hate's healing support programs; and

    f.    Stop AAPI Hate cannot expand or sustain its community care programs for victims of hate crimes, policy and advocacy work promoting safer public transit systems, or renowned data collection and research on anti-AAPI hate and violence that has become a critical platform for victims and resource for policy makers, nationwide.

25.    Stop AAPI Hate relied and acted upon its expectation and understanding that the DOJ would fulfill its commitment to provide $2 million in grant funding through the end of 2027.  In reliance on that commitment, Stop AAPI Hate invested staff time and resources into major expansions

7

**53a**

of our data and research work, our community care program which offers culturally responsive healing to victims of hate, our policy and advocacy work focused on improving safety on public transit, and our strategic communications work which brings national visibility to the issue of anti-AAPI hate.

26.     DOJ's termination of this grant has created immense uncertainty for Stop AAPI Hate and has required Stop AAPI Hate employees to spend significant amounts of time working on responding to that chaos. Suddenly losing what we expected to be our single largest source of revenue just six months into the thirty-six-month grant commitment has now left us scrambling to fill the gap. Identifying, applying for, and securing additional funding requires months of dedicated effort—at a time when the philanthropic sector itself is under strain and demand for support far exceeds available resources. The sudden termination of the grant without any notice has given us little time to prepare a plan for dealing with steep and substantial shortfalls in revenue for the next two and a half years.

27.     For 2026 and 2027, we had projected that the federal grant would be the single largest source of revenue for Stop AAPI Hate and would account for nearly a third of our revenue. The grant cancellation has already forced us to curb the collection and analysis of data on anti-AAPI hate; pull back on engagement with policymakers, journalists, and researchers; shrink the size of our healing support programs and rapid response support for victims of hate; terminate plans to form partnerships with community groups, and cancel an initiative aimed at improving safety on public transit.

28.     The loss of funds deeply undermines our ability to combat racism and discrimination against Asian American and Pacific Islander communities. It jeopardizes essential services—such as such as culturally responsive care and healing for victims of hate, community-based documentation of incidents, partnerships that build local resilience, and national efforts to ensure AAPI voices are seen, heard, and protected.

29.     The termination will likely force us to lay off up to 20% of our staff within a year.

30.     I, along with many other leaders, have spent an enormous number of hours over the last few weeks attempting to quantify and mitigate the effects of these grant termination— time that could have been spent working to address and prevent hate and discrimination against AAPI communities

**Impact on Community Care**

31.     DOJ's termination of these grants with no notice will seriously undermine Stop AAPI Hate's ability to provide a crucial platform for AAPI to report incidents of hate acts, access vital resources, and engage in culturally relevant healing and support.  Stop AAPI Hate's commitment to community care is especially vital in times of tragedy and violence.  And the grant termination severely undermines our ability to provide this type of crisis response to victims of hate and local community organizations, who so often have limited capacity during large scale incidents of hate.

32.     Without federal funding, Stop AAPI Hate will be unable to provide the support that is needed by locally based AAPI organizations during large scale incidents of hate.

33.     For example, working alongside local communities, we have provided support and resources to AAPI victims of hate in some of the most tragic attacks on our community, including the Atlanta spa shootings which claimed the lives of eight people including six Asian women, and the knife attack on an Asian student in Bloomington, Indiana.  And in the aftermath of the devastating May 6, 2023, mass shooting at an outlet mall in North Texas—an act of far-right extremism that claimed the lives of eight people, including a three-year-old boy—Stop AAPI Hate mobilized swiftly to provide rapid response support to the local AAPI community.  In response, Stop AAPI Hate partnered with local AAPI organizations to provide immediate and ongoing support, including coordination around a vigil and press conference.

34.     We also facilitated connections between community leaders and a White House representative who joined the local vigil in a show of national solidarity.

35.    Lily Trieu, Interim Executive Director of Asian Texans for Justice, expressed deep gratitude, stating: "All of your support and coordination was instrumental in allowing our Dallas-based organizations and communities to come together for healing and solidarity."

36.    Stop AAPI Hate also relied on the DOJ grant to expand our culturally responsive healing support programs nationally.

37.    Stop AAPI Hate believes healing and community care are powerful responses to hate. As a national organization, we work alongside local community-based organizations in the face of unexpected and traumatic crises (e.g., the hate-driven stabbing of an Asian student at Indiana University, and mass shooting in Allen, Texas).  Our work, which centers victims of hate, focuses on developing culturally responsive approaches to healing, deepening research and understanding of approaches to healing across AAPI and other communities of color, and fostering community partnerships.

38.    One participant in our healing group program shared this after completing the six-week program and receiving support from Stop AAPI Hate:

> "The benefits of participating in Stop AAPI Hate have been immeasurable. Not only has it facilitated my personal growth and development, but it has also had a positive impact on my mental health and well-being. I have experienced a noticeable improvement in my overall sense of happiness and fulfillment, as well as a reduction in feelings of stress and anxiety. One of the most remarkable aspects of Stop AAPI Hate is the sense of community and support it fosters. Being part of a group of like-minded individuals who are on a similar journey has been incredibly empowering and uplifting. The group dynamic creates a supportive and nurturing environment where we can openly share our experiences, challenges, and triumphs, knowing that we are not alone in our journey. The effectiveness of the facilitators cannot be praised enough. Their expertise, guidance, and unwavering support have been instrumental in my growth and development. They possess a unique ability to create a safe and inclusive space where participants feel heard, valued, and supported every step of the way. Their genuine passion for helping others shines through in everything they do, making a meaningful difference in the lives of all who participate."

39.    With support from this grant, Stop AAPI Hate planned to expand its healing support program—which we have already successfully piloted in California—to Georgia and Texas.  We also hoped to build community capacity in parts of the country where there are rapidly growing AAPI populations, but fewer mental health resources and other social services for our communities.  As an organization that has documented nearly 12,800 acts of hate against the AAPI community, we understand the trauma that so many in our community live with.  Unfortunately, because of the cultural bias against mental health support and the lack of culturally responsive resources, Asian American adults are 50% less likely and Pacific Islander adults are 70% less likely to receive mental health services than white adults.  For our coalition, developing a successful national model for healing intervention that could be culturally responsive is central to our mission.

40.    The grant termination has forced Stop AAPI Hate to curb our plans for expansion.  Instead of developing programs in two states, our plans have been reduced to just one state.  As a result, at least 40 victims of hate will lose the opportunity to participate in our healing support programs.  We will also be unable to build capacity where mental health and other social services for AAPI communities are under resourced.

41.    Beyond not being able to expand the program widely, Stop AAPI Hate is unable to develop a training curriculum that would have allowed us to share this as a model for other AAPI community groups.  The grant cancellation has also forced us to cancel plans to establish partnerships with organizations that focus on healing in the AAPI community and other communities of color.  These partnerships are critical to Stop AAPI Hate's strategy of building community capacity to respond to acts of hate with effective and culturally responsive strategies for healing.  The loss of these partnerships not only hurts Stop AAPI Hate but also harms the AAPI community, which lacks investment in healing and mental health support.

11

**57a**

42.    By preventing us from expanding a culturally responsive healing program, this grant termination will ultimately hurt victims of AAPI hate the most, who so often struggle with the trauma alone.

**Impact on Data and Research**

43.    The grant termination undermines Stop AAPI Hate's ability to collect information about acts of hate, uplift trends and hate act reports in real time, and significantly curbs our ability to provide information to researchers, community partners, government agencies, and journalists.  The termination also undercuts our ability to collect information and produce research about the experiences of Pacific Islander communities–a group that is often overlooked when lumped together with Asian Americans in research studies.  Specifically, the termination undercuts our data and research in three ways:

44.    First, the termination undermines our ability to sustain the Stop AAPI Hate Reporting Center, which is currently the largest reporting center in the country on anti-AAPI hate acts.  Research shows that just one-third of Asian hate crime victims report the incident to the police.[3]  The result is that most AAPI experiences of hate are not accurately reflected in the FBI Hate Crimes Report.  As a trusted community reporting center, Stop AAPI Hate fills a critical gap—receiving stories of AAPIs who experience traumatic hate acts through our reporting center, and bringing visibility to the stories of the thousands of Asian Americans and Pacific Islanders who don't feel comfortable reporting to government agencies.

45.    For example, one parent of a Central Asian, school-aged girl reported the following: "My daughter has been a victim of systematic and continuous racist bullying, discrimination, and

---

[3] Brendan Lantz1 & Marin R. Wenger, *Are Asian Victims Less Likely to Report Hate Crime Victimization to the Police? Implications for Research and Policy in the Wake of the COVID-19 Pandemic,* 68 Crime & Delinq. 1292 (2022), https://journals.sagepub.com/doi/pdf/10.1177/00111287211041521.

harassment between 2023-2024. The school's principal covered up for the bully … My child … became suicidal. The school intentionally withheld information that it was racist bullying." Another Indian woman in Virginia reported that "the neighbor below us has been targeting us in ways that have made us feel unsafe … She has verbally harassed us multiple times … She called both the police and animal control on us. She is also taking photos of us and our home without our permission. On top of that, she's using her position on the community board to intimidate us. It's been incredibly stressful and scary for us."

46.     Stop AAPI Hate has long served as a crucial platform for reporting these incidents. But without federal funding, we are no longer able to provide the level of support our community members deserve and have come to rely on.

47.     The grant termination limits staffing capacity to collect, analyze, and amplify acts of hate in real time, which is key to protecting public safety. At a time when hate against our community remains alarmingly high, the need for real time reporting on trends is critical for fortifying community safety. It allows Stop AAPI Hate to provide actionable data to communities that empowers them to respond to emerging threats and protect people where they are most vulnerable. But the production of real-time monitoring and analysis is labor intensive. This must be done on a near daily basis, and each report submitted to the Stop AAPI Hate reporting center requires painstaking analysis including coding, review by multiple analysts, and sometimes supplemental interviews. Because of how labor intensive the reporting center analysis is, providing real-time monitoring and analysis has been cost prohibitive. Stop AAPI Hate had planned to use grant funding to increase staff capacity necessary for this work.

48.     The cancellation also undermines our ability to provide research and analysis that researchers, community partners, government agencies, and journalists across the nation who rely on us for insights and policy making. In 2024, we worked with 19 researchers, 17 government agencies,

13

**59a**

and 16 elected officials.  But without federal funding, our ability to distribute and disseminate findings, to provide briefings, and to offer individualized technical assistance will be seriously undermined.

49.     Second, the loss of the federal grant undermines Stop AAPI Hate's annual survey efforts.  The Stop AAPI Hate annual survey is the most comprehensive annual national survey conducted on anti-AAPI hate.  It is conducted on a calendar year basis to be able to provide year-to-year trends that can be compared with other annual measures. It is a go-to number for policymakers trying to understand the extent of anti-AAPI hate.

50.     We hoped to produce the survey and annual report for three successive years–in 2025, 2026 and 2027.  But now that the grant has been abruptly terminated, our ability to devote staff time to collect, analyze, produce, and distribute comprehensive annual surveys and reports in 2026 and 2027 is undermined.

51.     The loss of funding specifically affects our ability to conduct comprehensive annual surveys, which are meant to include a large battery of questions not just on the experience of hate but on the support needed by communities, on barriers to reporting, and on the actions individuals have taken in response to hate.  For example, through the annual survey, Stop AAPI Hate was able to determine that only around one-third of AAPI respondents who experienced hate in 2024 reported it to a formal agency or authority.  That is a crucial insight for policymakers who are struggling to understand the size and scope of the problem, and who are interested in learning how to make government agencies more accessible to AAPI communities.

52.     The grant termination also impedes our ability to disaggregate survey data in a meaningful way.  This is crucial in the AAPI community which is composed of more than 95 distinct ethnic groups with unique cultural experiences and needs.  The funding would have allowed us to oversample smaller ethnic groups that are often overshadowed by larger ethnic groups.  This type of oversampling has allowed us to uncover the fact that Pacific Islanders experienced more physical harm

14

**60a**

than East Asian, South Asian, and Southeast Asian groups.  The funding loss undermines our ability to conduct oversamples and glean crucial insights that could help to inform policy that addresses the unique needs of smaller ethnic groups.

53.    Third, the termination undercuts our ability to collect information and produce research about the experiences of Pacific Islander communities–a group that has is often overlooked when lumped together with Asian Americans in research studies

54.    We had planned to design and execute a large-scale qualitative study of how Pacific Islander communities experience hate in partnership with community groups.  Through community engagement, Stop AAPI Hate has learned that Pacific Islander experiences of hate differ from those of Asian Americans and planned to conduct a major study to fully understand these differences.  Unless we can find other funding, this large-scale study will likely have to be cancelled or significantly scaled back.

55.    In concert with this study, we had planned to provide data to researchers, community partners, government agencies and journalists to bring visibility to how hate affects Pacific Islander communities.  Without this funding, Stop AAPI Hate will not be able to conduct the outreach and engagement necessary to bring this data to life for people who study hate, support directly impacted people, and formulate policy.  This is a disservice to the Pacific Islander community whose experiences are so often overlooked.

**Impact on Public Transit Safety**

56.    The termination of the federal grant undermines our ability to create a Public Transit Safety Toolkit that would improve safety on public transit.  About 12% of the anti-AAPI hate reports to Stop AAPI Hate describe a hate act on public transit, and the reports, particularly those from AAPI women, describe verbal harassment while waiting for public transit or riding a bus or train.  Through

15

**61a**

Stop AAPI Hate's nationally representative survey with NORC, the data is more alarming with close to 20% of AAPIs reporting experiencing hate on public transit.

57.    Given the prevalence of hate on public transit, Stop AAPI Hate developed the idea for a Public Transit Safety Toolkit to share nationwide, so that individuals can make efforts to increase safety on their own local transit systems.  This toolkit would include: (1) a first of its kind survey for public transit systems to measure street harassment on their systems, created by the Mineta Transportation Institute at San Jose State University; (2) model legislation that requires a public transit system to measure street harassment at their stations/stops and vehicles, and develop and implement a plan to reduce it; and (3) Know Your Rights resources on rider rights, including equal access to public transit and available complaint processes.  We also developed ideas for distributing the Public Transit Safety Toolkit, including partner briefings with AAPI partner organizations and transit advocacy organizations across the country.

58.    Without the grant, Stop AAPI Hate is unable to implement the Public Transit Safety Toolkit because we have limited staff capacity to develop and produce the toolkit, conduct community outreach, and distribute and promote the toolkit.  As a result, we will not be able to provide this useful resource to AAPI communities, who we know are experiencing hate as they ride buses or trains to work, school, hospitals, and go about their daily lives.

**Impact on Reputation**

59.    Stop AAPI Hate will also sustain reputation harm because of this grant termination, which will undermine our ability to attract future funding.  Data and research are core to our mission. The sudden termination of what was expected to be a three-year grant undermines our ability to maintain Stop AAPI Hate as the premier national clearinghouse on hate against our community.

60.    This hit to Stop AAPI Hate's reputation threatens to diminish us in the eyes of other funders and individual donors who are worried about investing in an organization that has lost a

16

**62a**

significant portion of its revenue.  As a young organization, founded just 5 years ago, this was Stop AAPI Hate's first federal grant.  We had counted on the grant to build credibility and secure additional support from state and local governments and philanthropic organizations.   Stop AAPI Hate anticipated sustaining the work through the three-year grant period, and planned to apply for future federal funding, but those Request for Proposal opportunities have now been cancelled.

Signature on following page.

**63a**

Date: May 21, 2025

_____

Cynthia Choi
Co-Founder of Stop AAPI Hate & Co-Executive Director
of Chinese for Affirmative Action
Los Angeles, California

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VERA INSTITUTE OF JUSTICE, et al., *Plaintiffs, on behalf of themselves and all others similarly situated,* v. UNITED STATES DEPARTMENT OF JUSTICE, PAMELA J. BONDI, in her official capacity as United States Attorney General, OFFICE OF JUSTICE PROGRAMS, MAUREEN A. HENNEBERG, in her official capacity as Acting Head of the Office of Justice Programs, *Defendants.* | Case No. _____ |

**<u>DECLARATION OF DUJUAN KENNEDY</u>**

I, Dujuan Kennedy, declare as follows:

1.      My name is Dujuan Kennedy.  I am a resident of Detroit, Michigan.  I am over the age of eighteen.  This declaration is based upon my personal knowledge and the knowledge I have acquired in the course of my duties.  If called as a witness, I could and would testify competently to the matters set forth below.  I provide this declaration in support of Plaintiffs' motion for preliminary injunction.

2.      I am the executive director of FORCE Detroit.  In this role, I oversee FORCE Detroit's finance and operations, and supervise the organization's grant writer, program directors, and grant manager.  I am also accountable for FORCE Detroit's grant implementation.  Before I was the Executive Director, I served as FORCE Detroit's deputy executive director of programs.  As a result of having that role, I am intimately familiar with grant writing, finance and reporting processes.

1

**65a**

**FORCE Detroit and Its Mission**

3.      FORCE (Faithfully Organizing for Community Empowerment) Detroit is a community violence intervention (CVI) organization dedicated to building a safer, freer Detroit. Founded in 2015, FORCE Detroit is charged to steward, incubate, and provide financial support to grassroots organizations and activists committed to alternatives to community safety that minimize criminalization.  FORCE Detroit's five organizational goals include: (1) building a system for peace by training and supporting CVI organizations—through grants, professional development, and mentoring, we strengthen community violence intervention statewide; (2) hosting events and actions that inform and engage the public around CVI strategies and identify solutions to gun violence; (3) building public-private partnerships to raise $150 million over 10 years to expand CVI and advocate for a Detroit Office of Neighborhood Safety; (4) growing public awareness of and engagement in violence interruption through targeted campaigns and events, such as CVI Advocacy Day, Get Out the Vote activities, and community listening sessions; and (5) strengthening our infrastructure to support growth and position FORCE Detroit as a local and national CVI leader in peacemaking.

4.      As part of this work, FORCE Detroit's approach includes three core components: direct services to people impacted by violence; advocacy and public education, and training and technical assistance for emerging CVI leaders.

5.      FORCE Detroit has been an active participant in the development of this lawsuit and has remained in regular communication with Plaintiffs' counsel about this case.  FORCE Detroit is willing and able to take an active role in this litigation and to protect the interests of all members of the Class.

**The Awarded Grants and the Termination of Grant Funding Without Notice**

6.       On September 26, 2024, FORCE Detroit received its first federal grant award of $1,999,998 million from the Bureau of Justice Administration FY24 Office of Justice Programs

2

**66a**

Community Based Violence Intervention and Prevention Initiative Site-Based for the performance period of October 1, 2024 through September 30, 2027 (Award Number: 15PBJA-24-GG-03109-CVIP)(FORCE Detroit Award 1), attached here as Exhibit 1.

7.      FORCE Detroit proposed to implement the "Keepers CVI" program.  The purpose of the program was to expand and enhance evidence-based and innovative practices that reduce and prevent gun violence in Detroit's Warrendale-Cody Rouge neighborhood, with youth and young adults (aged 14-24) living in the catchment area (a zone targeted for CVI efforts to combat high rates of gun violence and other forms of violence) as the project's intended beneficiaries.  The key areas for activities outlined in the grant proposal included delivering culturally competent wraparound services designed to help individuals and families overcome challenges, creating safe spaces for programming and transitional housing, offering workforce development and entrepreneurial training, meeting the needs of girls and women, and diversifying outreach tactics to serve high-risk individuals.

8.      FORCE Detroit designed the "Keepers CVI" program to, among other things reduce fatal and non-fatal shootings, enhance opportunities for violence-impacted people to secure employment or start small businesses, increase access to culturally appropriate social services, and improve organizational capacity to deliver impactful, evidence-based programs.

9.      On April 22, 2025, at 5:30 PM, FORCE Detroit received an email from the Office of Justice Programs purporting to immediately terminate FORCE Detroit's grant because the award "no longer effectuate[s] agency priorities."  The termination email went on to state that "the Department has changed its priorities with respect to discretionary grant funding to focus on, among other things, more directly supporting certain law enforcement operations, combatting violent crime, protecting American children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts at all levels of government.  This award demonstrates that it no longer effectuate Department priorities."  No other basis or explanation for the termination was

provided.  The termination email did not claim FORCE Detroit failed to comply with the terms or conditions of the awards and did not otherwise explain why the awards no longer effectuated Department priorities.  The award totaled approximately $2 million dollars, with $1,945,998 of funding outstanding.  A true and correct copy of the termination email is attached as Exhibit 2.

10.    The termination email advised that FORCE Detroit could "appeal this termination in writing within 30 calendar days."

11.    The termination email also required FORCE Detroit to commence "closeout and other obligations in 2 C.F.R. § 200.340(d)," including an obligation that FORCE Detroit "promptly refund any unobligated funds," that have been paid out, and retaining grant records for at least three years.  The letter threatened that failure to meet these closeout obligations could include "appropriate enforcement actions," and "affect eligibility for future grants."  FORCE Detroit has $4,845 in unpaid reimbursements through the termination date.

12.    The closeout obligations include an estimated $15,000 to $25,000 in costs for administrative expenses for the audit and financial reporting required under the closeout obligation. We also must raise unrestricted funds and reallocate other existing unrestricted dollars to cover some expenses related to the grant.  Unrestricted funds are the most difficult to raise because funders prefer supporting specific projects.

13.    It was FORCE Detroit's understanding that the funds awarded through its grant would be available throughout the grant period and that DOJ could terminate the grant only if FORCE Detroit failed to comply with the terms and conditions of the award.  It was not FORCE Detroit's understanding that DOJ could terminate the grant just because the agency said that the award no longer effectuates agency priorities.

**Reliance, Employee Lay Offs, and Impact on Operations**

14.    The termination of FORCE Detroit's awards created an immediate harm and impact to not only FORCE Detroit's ability to maintain business and programmatic operations prescribed by the award, but it also denied funds to be paid to partners and contractors, impacting their ability to to sustain their organizations and businesses.  As a result of the termination of FORCE Detroit's award:

    a.    three frontline FORCE Detroit employees, with significant expertise, meaningful ties to the community, and trusted relationships with high-risk program participants, were laid off;

    b.    contractors, partners and even young people can no longer rely on FORCE Detroit's for funding, support or services, hurting the organization's reputation, trust, and relationships in the community;

    c.    community events and trauma support activities have been cancelled;

    d.    program participants cannot access wraparound services from FORCE Detroit's care management and mentorship teams; and

    e.    FORCE Detroit's ability to sustain long-term programming, retain staff, and expand on the organization's critical and lifesaving violence intervention work has been eliminated.

15.    FORCE Detroit relied and acted upon its expectation and understanding that DOJ would fulfill its commitment to provide grant funding.  FORCE Detroit's mission centers on building community-driven responses to violence that prioritize healing, prevention, and structural change. The loss of this federal investment undercuts our ability to fulfill that mission, at scale.  It eliminates the resources needed to maintain a consistent presence in communities most impacted by violence and weakens the infrastructure we built to interrupt cycles of harm, with no viable replacement in sight.  Without these funds, we cannot sustain long-term programming, attract and retain qualified staff, or expand life-saving interventions that our communities urgently need.

**69a**

16.     The harm caused by the termination of FORCE Detroit's grant funding is not theoretical: it is real.  We have seen immediate breakdowns in a care ecosystem we built with intention.

17.     For example, the grant funded the very backbone of our violence intervention (VI) work, which included daily, in-the-field support for individuals most at risk of gun violence.  Our VI staff do more than de-escalate conflicts.  They guide people through job interviews.  They show up at funerals.  They help people process trauma that others have ignored.

18.     At least nine FORCE Detroit positions were fully or partially paid using grant funding.  When the grant was suddenly terminated, we were forced to strategically lay off three of those employees.  The laid off employees were each Violence Interrupters.  These positions were more than just job descriptions—they were part of a carefully planned service delivery model.  Losing those roles meant losing critical functions like intake coordination, trauma support, and community-based data collection.  And the laid off employees had deep community ties, were trauma-informed, and had built trust with high-risk participants.

19.     Dismissing these employees so suddenly created a logistical, ethical, and emotional burden that derailed our staff's focus from violence interruption work.  As a result of the terminations and layoffs, we have seen staff burnout escalate as their caseloads increased and support decreased, and field-based programming interrupted (e.g., outreach follow-ups dropped, safe space meetups canceled).

**Reputational Harm and Impact on Community Contractors**

20.     In addition to seriously harming FORCE Detroit's organizational stability and staff morale, we have suffered reputational harm as a result of the grant termination.  We have lost creditability with partners and community members who relied on us to follow through on commitments funded through the grant.

6

**70a**

21.    Over the grant term, FORCE Detroit budgeted $149,660 for contractors.    A significant amount of the budget funding would go to entrepreneurs who anticipated having three-year assignments.    We identified several contractors with the skills and credibility to provide participants with quality program experiences that align with our goals and objectives.    These independent business owners counted on the income they would receive from working with us.    It became part of their annual earnings forecast, which means they may have turned down other projects based on their commitments to FORCE Detroit.

22.    The sudden and abrupt termination of our grant forced staff to call our contracted partners—local coaches, mentors, licensed therapists, and trainers—to tell them that the income they had been counting on would not materialize.    These calls eroded the multi-year relationships FORCE Detroit had in the works with these contractors.    For example, a member of our staff had to inform a licensed trauma counselor who cleared space in their practice specifically for our participants that FORCE Detroit's funding had been terminated.    Now that counselor faces a financial shortfall and a waiting list of participants they are unable help.

**Impact on Community**

23.    The sudden termination of the grant forced FORCE Detroit to halt key components of our violence intervention strategy midstream.    We were unable to fulfill hiring plans and contracts, had to scale back programming, and paused active interventions that directly support individuals at risk of gun violence.    We have had to pivot to alternative funding options to ensure we did not have to lay off any additional staff essential to maintaining community trust and continuity of care, including trained outreach workers and program coordinators.    We have had to cancel community events and trauma support activities that were part of our violence reduction strategy.    Additionally, program participants receiving intensive wraparound services from our care management and mentorship teams now lack support.

24.     The communities we serve are already disproportionately impacted by violence, systemic disinvestment, and trauma.  The most damaging impact of this termination is that it abruptly removed trusted support systems for individuals at the highest risk of involvement in violence.  Our VI team had actively engaged these young people in healing trauma or transitional efforts.  Many had begun to rely on us for safety planning, relocation assistance, employment support, or therapy referrals.  The loss of service continuity threatens to undo that progress, destabilize individuals and families, and erode trust in community-based approaches.  Worse, it communicates to our participants that their lives and communities are not a sustained priority for our government.

25.     For example, Ruth, a devoted mother of five, endured a life-changing ordeal when violence erupted outside her home.  In June 2023, gunfire from an unidentified vehicle left her and a neighbor injured, and subsequent threats forced her into homelessness.  Despite holding a Section 8 voucher and a steady job, housing instability continued to haunt her.  Ruth was referred to FORCE Detroit's Keeper program in October 2023 and began the challenging journey to rebuild her life.  She actively participated in therapy sessions and worked with the Keepers team to find stable housing.  Ruth's unwavering faith and the support of the Keepers have given her hope, reminding us that recovery is possible with the right resources and community support.  But without grant funding, FORCE Detroit will be unable to support or expand the Keeper's program to continue to help community members like Ruth.

26.     Another example of FORCE Detroit's impact—and the harm that results from the termination of its grant award—is Carol's story.  Carol, a single mother and dedicated nurse, faced unimaginable trauma when an act of kindness turned into a nightmare.  After offering temporary shelter to a friend, Carol and her children became targets of escalating violence, culminating in the tragic shooting of her stepdaughter.  Forced to flee their home, the family relied on FORCE Detroit for emergency housing and relocation support.  Despite ongoing threats and setbacks, including acts

8

**72a**

of arson and harassment, Carol secured a new home in January 2024.  With move-in expenses covered by FORCE Detroit and access to therapy services, her family began to heal.  FORCE Detroit cannot sustain or continue providing critical assistance to victims of violence in Detroit, as it did for Carol, as a result of the award termination.

Signature on following page.

9

**73a**

Date: May 21, 2025

Dujuan Kennedy
_____
Dujuan Kennedy
Executive Director of FORCE Detroit
Detroit, Michigan

**74a**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTR31ICT OF COLUMBIA**

| | |
|---|---|
| VERA INSTITUTE OF JUSTICE, et al., <br><br> *Plaintiffs, on behalf of themselves and all others similarly situated,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE, <br><br> PAMELA J. BONDI, in her official capacity as United States Attorney General, <br><br> OFFICE OF JUSTICE PROGRAMS, <br><br> MAUREEN A. HENNEBERG, in her official capacity as Acting Head of the Office of Justice Programs, <br><br> *Defendants.* | Case No. _____ |

**DECLARATION OF STEVEN RIDINI**

I, Steven Ridini, declare as follows:

1.      My name is Steven Ridini.  I am a resident of Suffolk County in the State of Massachusetts.  I am over the age of eighteen.  This declaration is based upon my personal knowledge and the knowledge I have acquired in the course of my duties.  If called as a witness, I could and would testify competently to the matters set forth below.  I provide this declaration in support of Plaintiffs' motion for preliminary injunction.

2.      I am the President and CEO of Health Resources in Action (HRiA).  In this role, I lead the organization and partner with the HRiA Board and staff to develop a vision and strategic direction rooted in addressing critical public health issues through a health and racial equity framework. This includes building strategic partnerships with key individuals and organizations to

1

advance HRiA's mission and maximize our community impact.  I started as President and CEO on March 1, 2016, and have served in the position for nine years.

3.      In my role as CEO, I oversee and hold programmatic and fiduciary responsibility across the programs affected by the grant terminations. I work with the appropriate staff to ensure that all programmatic deliverables are effectively met, fiscal management is sound, and the organization is in compliance with the terms as outlined in the grant awards.

4.      In addition to my role as CEO, I serve as a Board member or contributing member to numerous public health organizations, such as, the American Public Health Association, the Massachusetts Public Health Alliance (past Board Chair), and the National Network of Public Health Institutes (Board member).  Prior to my current position, I served as Vice President of Programs at HRiA for 18 years, overseeing community health initiatives.  Prior to HRiA, I worked for local, national, and international non-profits focused on alcohol, tobacco, and other drug prevention efforts. I am also a former faculty member of Harvard University's Graduate School of Education.

**Health Resources in Action's Mission and Impacted Programs**

5.      Health Resources in Action is a national public health organization with a vision of healthy people thriving in equitable and just communities.  Founded in 1957 with over 300 staff across the country, HRiA partners with individuals, organizations, and communities to transform the practices, policies, and systems that improve health and advance racial equity. For decades, HRiA has worked in communities across the country to plan and launch community violence intervention (CVI) strategies that cultivate and strengthen a comprehensive and collaborative CVI ecosystem.  This includes identifying and engaging people at the highest risk of violence, employing CVI workers who hold deep knowledge, credibility, and trust within communities, expanding professional and educational opportunities for CVI workers and the organizations they work within, developing relationships with law enforcement and community, building partnerships between CVI organizations

2

**76a**

and cross-sector partners, and establishing and strengthening hospital-based violence intervention programs. Approaching violence as a public health issue, HRiA staff help communities understand that violence spreads like disease, violence is preventable, and community members have critical solutions to offer. HRiA partners with institutions and organizations to strengthen the community violence intervention ecosystem.

6.      As part of this work, Health Resources in Action oversees three Department of Justice (DOJ) initiatives directly impacted by the grant terminations: Building Trauma Informed Practices and Workforce Development for the CVI Field (Award No. 15PBJA-24-GK-04067-CVIP) (HRiA Award 1), attached here as Exhibit 1; Advancing Hospital-based Victim Services (AHVS) (Award No. 15POVC-22-GK-00557-NONF) (HRiA Award 2), attached here as Exhibit 3; and Boosting Organizational Capacity for Community Violence Intervention (BoostCVI) (Award No. 15PBJA-23-GK-05187-CVIP) (HRiA Award 3), attached here as Exhibit 5. HRiA also receives two sub-grants on two partnered DOJ-funded awards that have also been impacted by terminations.

7.      HRiA has been an active participant in the development of this lawsuit and has remained in regular communication with Plaintiffs' counsel about this case. HRiA is willing and able to take an active role in this litigation and to protect the interests of all members of the Class.

**HRiA's Grant Process, in General**

8.      HRiA was founded in 1957 as a biomedical grantmaking institution and expanded our work to focus on community health grantmaking. HRiA's grantmaking approach directs funds where they are most needed, recognizing that organizations most impactful in reducing community violence often may not have resources or experience in applying for or securing grant opportunities.

9.      HRiA's BoostCVI Grant Program under HRiA Award 3 is an example of HRiA's grantmaking approach that opens opportunities for a broad array of potential applicants. The program aimed to build and strengthen the community violence intervention (CVI) ecosystem by breaking

down barriers for small, community-based organizations (CBOs) doing CVI work, allowing those groups to access funding. Such CBOs who possess deep roots in the community and make a powerful impact can lack the infrastructure or support to take in large federal or statewide grants. Via key informant interviews with CVI CBO leaders, we identified that there was an urgent need for funding directed toward organizational development and capacity building. Therefore, BoostCVI's goals were to: 1) Support organizations building or strengthening their ability to offer the full spectrum of services of violence prevention and intervention, and 2) Build organizational capacity, deepen and expand reach, and support infrastructure that strengthens organizational operations and broader field sustainability.

10.     The BoostCVI grant program process aligns with a typical grantmaking process for HRiA. HRiA conducted a non-binding Letter of Intent (LOI) process prior to releasing a Request for Proposals (RFP). The LOI served as an opportunity for organizations to submit a brief overview of their proposed project. The purpose of the LOI was to solicit interest, assess the desire for pre-application supports via listening sessions, office hours, workshops on concepts, tutorials on SAM sign-ups, etc., and ensure that outreach in the target communities reached organizations that needed capacity building. The LOI itself was designed to be a low barrier to ensure organizations would not need to hire a grant writer, and HRiA provided LOI development support throughout. Once LOIs were submitted, HRiA's project team reached out to each organization to provide personalized feedback on eligibility, with guidance on how to strengthen their application for the next round. The LOI served as an opportunity for organizations to strengthen their proposed ideas and see if their program was a fit without needing to go through the entire RFP submission process. Following the LOI, HRiA released an RFP, accompanied with active outreach to CVI organizations, a bidder's conference, finance-specific webinars with a financial consultant to support organizations to prepare their organizational infrastructure for federal grants and budgeting, and office hours to support

4

applicants through every stage of the RFP process. Ultimately, 33 organizations submitted full grant proposals, with five organizations each being awarded a $250,000 grant over the course of 24 months.

**Termination of HRiA's Grant Funding Without Notice**

11.     On the evening of April 22, 2025, HRiA received emails from the Office of Justice Programs purporting to immediately terminate HRiA's three grants because the awards "no longer effectuate the program goals or agency priorities 2 C.F.R. § 200.340(a)(4)."  The termination email went on to state that: "The Department has changed its priorities with respect to discretionary grant funding to focus on, among other things, more directly supporting certain law enforcement operations, combatting violent crime, protecting American children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts at all levels of government.  This award demonstrates that it no longer effectuates Department priorities." No other basis or explanation for the terminations were provided.  The termination email did not claim HRiA failed to comply with the terms or conditions of the awards and did not otherwise explain why the awards no longer effectuated Department priorities. True and correct copies of each termination email are attached as Exhibit 2, 4, and 6.

12.     The terminated direct awards with DOJ totaled $8,550,000, with $1,694,397 drawn down to date, and $93,870 due to HRiA at the time of termination. $6,761,733 remains in the terminated contracts.

13.     The termination emails advised that HRiA could "appeal this termination in writing within 30 calendar days of the date of this notice."

14.     The termination email also required HRiA to commence "closeout and other obligations in 2 C.F.R. § 200.340(d)," including an obligation that HRiA "promptly refund any unobligated funds," that have been paid out but "are not authorized to be retained," and retaining grant records for at least three years after the submission of a final financial report.  The letter

5

**79a**

threatened that failure to meet these closeout obligations could include "appropriate enforcement actions," and "affect eligibility for future grants."

15.     The closeout obligations include preparing and submitting the grant reports; terminating agreements with vendors, consultants, and partners; and submitting remaining reimbursement requests for project and closeout expenses.

16.     It was HRiA's understanding that the funds awarded by these grants would be available throughout the grant periods and that DOJ could terminate the grants only if HRiA failed to comply with the terms and conditions of the awards. It was not HRiA's understanding that DOJ could terminate these grants based on that agency's blithe assertion that the awards no longer affect agency priorities.

17.     Until January 2025, HRiA has never had a federal award terminated before; there is no precedent for this in our history. HRiA has managed $92 million in federal award expenditures over the past 10 years. Throughout HRiA's history, the organization has received direct federal awards from 10 programs of 3 federal agencies and has served as a pass-through recipient of dozens of other federal programs.

**Harms Across HRiA and the CVI Ecosystem**

18.     The termination of HRiA's awards created an immediate harm and impact to not only HRiA's ability to maintain business and programmatic operations prescribed by the awards, but it also denied funds to be paid to subrecipients, impacting their ability to have the financial resources to sustain their organizations. As a result of the termination of HRiA's awards:

    a.   critical, lifesaving technical assistance is unavailable for 23 hospital-based violence intervention programs, which may ultimately result in the loss of life for violently injured people looking for help from the programs;

6

**80a**

b.  numerous hospitals are without training and technical assistance for their violence prevention professionals, who provide invaluable support and mitigate retaliation for victims of community violence;

c.  Subaward recipients—who serve youth and young adults, are often the sole source of CVI work in their communities, and relied on this funding to expand their operations—have halted their programs, terminated employees, lost the trust of their community and partners, and been deprived of the training and resources needed to support their organizations

d.  CVI outreach workers, violence interrupters, case managers, and hospital-based violence intervention program professionals, and frontline workers at CBOs and programs who were awarded subgrants through HRiA face layoffs, diminished hours, reassignment, and termination, without meaningful alternatives for employment;

e.  at least 250 government, health care and philanthropy leaders, and frontline workers could lose the opportunity to attend a HRiA-hosted annual conference and learn best practices to respond to community violence; and

f.  31 members of HRiA staff, who support this work and are funded through the grants, could lose their jobs.

19.    Organizationally, HRiA relied and acted upon its expectation and understanding that DOJ would fulfill its commitment to provide grant funding.  HRiA relied on this by hiring new staff and assigning existing staff to design and implement effective programming aligned with these awards, building partnerships and executing sub-contracts with community-based organizations and consultants to carry out the work, engaging trusted messengers and organizations to publicize widely the community investment opportunities afforded by this funding, and building HRiA's internal

7

**81a**

infrastructure to manage large federal grants and support CBOs to do the same. The Department of Justice's termination of these grants with no notice will force HRiA to make cuts in its budget to offset the loss of funding, which includes cutting the budgets of programs tasked with carrying out the grant awards, cutting subawards that assist HRiA in carrying out the mission of this work, and cutting funding for other programs and staff.

20.     Beyond the direct financial losses, DOJ's termination of these grants creates immense uncertainty for HRiA organizationally and has required HRiA employees directly working on these initiatives, as well as HRiA's executive leadership and administration and finance staff, to spend significant amounts of time working on responding to that disruption.  My team and I have spent substantial time attempting to quantify and mitigate the effects of these grant terminations— time that could have been spent working to address improving the public's health and wellbeing and reducing community violence.  This is very difficult to do without the terminated resources; yet, not doing so can have damaging impacts on HRiA's reputation and credibility, since as a funder and capacity builder for small, grassroots community-based organizations, trust can easily be broken when HRiA fails to deliver on financial or capacity building commitments.

21.     The termination of all three direct awards creates uncertainty for the 31 members of HRiA's staff working directly on these initiatives.  All three awards covered 100% of three HRiA staff person's salaries, and varying percentages from 5% to 50% of the other 28 HRiA employees.  This has created extreme stress among staff about the possibility of losing their jobs in a specialized, underfunded CVI field that already has lost $811 million in federal funding and has seen a reduction in the workforce given the abrupt federal award terminations.

22.     Beyond the organizational instability that these terminations have precipitated, the termination of all awards exacerbates financial insecurity for our CVI community partners and frontline workers (including CVI outreach workers, violence interrupters, case managers, hospital-

based violence intervention program, Violence Prevention Professionals (VPPs), and other individuals providing essential services). CVI programs are not only a means of contributing to public safety; they are a vital source of economic stability. Grant awards were designed to provide direct financial compensation to frontline workers, many of whom work for low wages and without benefits or life insurance. For CBOs and programs who no longer have access to grants or funding through our initiatives, staff are facing layoffs, diminished hours, reassignment, and terminations. This disproportionately impacts a workforce that typically has few alternative pathways to employment. Many staff are forced to find ways to continue their commitment to CVI work without financial support or stability, often needing to work other jobs to make ends meet. CVI workers are already at high risk for burnout given the inherent risks of this work, difficulty recruiting new generations of frontline workers, and the high turnover rates in the field; these terminations undermine the stability of this critical and essential workforce. Frontline workers prevent violence and save lives every day.

23.     The termination of the grant funding also endangers critical workforce development and educational opportunities to build capacity for the CVI field. HRiA is a national training and technical assistance provider and a cross-sector convener, but the field has lost access to our services, including HRiA's annual field-wide conferences, both nationally and locally.

24.     For example, HRiA's field-wide conference brings together a national group of approximately 1,000 frontline workers and leaders from government, health care, philanthropy, and CVI to share innovative and best practices, lessons from the field, research, and community partnerships. Funding from our terminated Awards 1 and 2 provided funding for 250 participants to travel to the national 3-day conference; yet, termination of the funding imperils this opportunity for their individual professional development, as well as for broader resource sharing across the field that streamlines responses to violence. At this time, it is unclear whether we can feasibly hold the conference, and if we do, we anticipate low turnout with the funding uncertainty. Because of this

termination, participants may ultimately be deprived of the opportunity to share innovative and best practices, lessons from the field, research, and community partnerships, making communities across the country less safe.

25.    As another example, HRiA provides best practice guidance to hospital-based violence intervention programs (HVIP) and community partners in the CVI ecosystem.  Yet, the terminations forced us to cease work with 23 HVIPs across the US in cities with high rates of violence.  This disruption of capacity building assistance, coupled with sites that lost their own DOJ funding, means that there are fewer programs with adequate resources to meet the needs of people violently injured who present to hospitals and CBOs for critical, life-saving assistance.  This means that, in 23 hospitals across the country, individuals who directly benefitted from these intervention programs in the hospital are no longer going to have life-saving assistance, and in some cases, members in the community will lose their lives because of the disruption of services.

26.    The economic insecurity and loss of professional development and field building opportunities for frontline workers and CVI CBOs not only has economic and CVI workforce retention impacts; this disinvestment and loss of frontline staff and community-based CVI infrastructure destabilizes the communities these programs were designed to support and undermines public safety.  Prematurely ending our CVI work and funding to our partners has dire and dangerous consequences.

27.    The five direct-service programs funded through the Award 3 (BoostCVI) grant served individuals at highest risk or proven risk of involvement in violence. At the individual level, people who were in the contemplation stages of change and are at the most risk for gun violence are left unsupported and susceptible to the environment they are in; people who were mid-transformation can lose momentum or backslide; and, people who were connecting with frontline workers may be more difficult to reach with gaps in services and supports.  At the neighborhood level, with the halt

in work due to terminations, CVI communities are harmed by the lack of immediate intervention with active conflicts and retaliations, as well as the lack of response to flare ups in violence. Additionally, because building credibility and trust is so critical for effective CVI work, the lapse in contact with known CVI workers and organizations can breach this trust, causing momentum built over these last years of work to halt or regress.

**Award 1: BJA FY24 OJP Community Based Violence Intervention and Prevention Initiative Training and Technical Assistance Program**

28.  HRiA received $2,500,000 in grant funding for the Building Trauma Informed Practices and Workforce Development for the CVI Field project, starting October 1, 2024, through September 30, 2026. HRiA received this grant to expand professional and educational opportunities for CVI workers and transform their work environments – just as CVI workers do for violently injured individuals and the communities that they support.

29.  The project aimed to engage trusted workers in CVI as partners and subject matter experts (SME) in the creation of competencies and resources for developing the workforce, addressing vicarious trauma, and instituting organizational practices that promote collective care and wellness. Strategies included: tailored technical assistance to individual CVI Prevention Initiative (CVIPI) - funded and other interested sites; cohort-based, peer-to-peer learning on topics related to equitable staff development, vicarious trauma, and trauma-informed practices; trainings, conferences, and convenings; development and dissemination of training materials and knowledge products; and continuous evaluation, self-assessment, and quality improvement.

30.  The termination of Award 1 also halts capacity building work. Staff funded through this grant were engaged in a needs assessment and outreach to CVI organizations nationally; however, the terminations forced us to abruptly cease all communications with stakeholders. Also, in March 2025, the program hosted a forum in Milwaukee to address the mental health consequences of

violence and trauma. Frontline workers served as subject matter experts along with HRiA staff. The team worked with a professional videography company to create an educational video as part of a national toolkit for the field.  With the termination of funding, the program cannot complete this project.  The time and resources invested were wasted.  The harm ripples to others: Frontline workers will not receive the benefits of the grant program in terms of workforce development opportunities, learning, and compensation for their subject matter expertise.  Half of the grant was allocated toward direct compensation for frontline workers as subject matter experts and collaborators on the project. Terminating the scope of work with the videography company means that they lost the work and income that they were expecting from HRiA.

**Award 2: OVC FY24 Advancing Hospital-based Victim Services Technical Assistance Project**

31.     HRiA received a $2,050,000 grant, beginning October 1, 2024, through September 30, 2026, to provide tailored and comprehensive technical assistance (TA) and training to grantee sites that advance hospital-based victim services.  Hospitals rely on Violence Prevention Professionals (VPPs) and HVIPs to manage safety onsite at the hospitals.  VPPs serve as trusted individuals in hospitals who, respond  to victims of violence, and reduce and mitigate the risks of retaliation and further violence. VPPs also address the needs of loved ones of the injured person, and coordinate with law enforcement.

32.     The TA provider would facilitate peer learning communities across the sites and provide training to VPPs to increase their skills and capacity to respond to the complex needs of victims, and to supervisors of VPPs to promote the professional development and advancement of frontline staff.  Hospital-based victims services would also receive expert consultation to develop sustainability plans.  The aim of this initiative ultimately included: generating model policies, recommendations, and guidance documents; disseminating information about best practices; and

fostering cross-sector collaboration and sharing innovative learning from this project to bolster and expand the field of victim services.

33.    This specialized partnership with hospital providers is an invaluable and irreplaceable resource that allows the medical staff to care for their patients while the HVIP staff manage the aftermath and safety risks.  The project's technical assistance helps HVIPs understand their role in building bridges with community partners and systems including public health, law enforcement, basic needs services, and other community resources that help victims on their healing journey.  The TA project aimed to enhance services to victims by strengthening the infrastructure and quality of hospital-based programs.

34.    The termination of Award 2 halts this program's important work, which in turn, reduces the effectiveness of VPPs and HVIP staff to intervene and reduce violence in hospitals. As a result of the termination of the grant, hospitals will have diminished capacity to address the comprehensive needs of victims of crime, thereby leading to less coordinated, more fragmented victim services and increased risks at hospital emergency departments. As of April 22, 2025, programs were in the process of completing needs assessments and developing individualized technical assistance plans.  In addition, the AHVS grant provided support to programs to standardize their operations to the Standards and Indicators for HVIPs framework and align to HVIP model fidelity. The sustainability of these programs is uncertain.

35.    The termination of Award 2 also diminishes staff development for violence prevention professionals in HVIPs.  The project's technical assistance elevates and professionalizes the role of the VPP in their hospitals by building their confidence and skills to engage with multidisciplinary teams to promote coordination that wraps services around victims seeking care.  The programs lose an irreplaceable pipeline to promote and amplify the role and leadership of VPPs.  This impacts their ability to respond to victims of violent crimes when they present to hospital and community settings.

**Award 3: MA Community Violence Intervention Capacity Building Initiative (BoostCVI)**

36.     HRiA received this $4,000,000 award to build capacity among organizations in the Massachusetts CVI ecosystem. The grant was intended to support CBOs engaged in CVI work; small, grassroots organizations were strongly encouraged to apply.  Often, grassroots CVI organizations led by leaders with the closest ties to community do effective work interrupting and preventing violence on the ground; yet these same organizations often lack the financial, administrative, and organizational capacity to apply for large federal grants.

37.     Five sub-recipient organizations were selected for this award through a competitive RFP process and were awarded $250,000 over the course of 24 months to address capacity needs. Organizations were awarded funds to achieve specific capacity building goals with support from HRiA,  examples of which include standing up a new CVI program in an underserved area of the state, expanding existing CVI work to a nearby community in need, and developing organizational infrastructure to serve new populations.  HRiA also planned extensive training and technical assistance for a cohort of organizations, including financial capacity building, developing organizational leadership, and training in intervention and outreach best practices.

38.     In addition to capacity building around each sub-recipient's specific objectives, the program aimed to develop each organization's capacity to apply for state and federal grants and thus strengthen the sustainability of the CVI ecosystem in Massachusetts.

39.     HRiA relied on funding from this award to fund two new roles, created in 2024, and to hire two new staff to work full-time on this project.

40.     HRiA was also in the process of completing capacity assessments for each of the BoostCVI sub-recipients and implementing technical assistance plans to meet their needs.  In addition to individualized technical assistance, HRiA had five cohort-specific trainings scheduled between late April and early July covering supervision, financial planning, organizational culture and CVI best

practices, and development and diversifying funding streams. HRiA secured internal and external consultants to lead each of these trainings. In addition to sub-recipients not receiving the training they were promised, the abrupt cancellation of these trainings due to the withdrawal of funding means that these consultants also lost income and wasted time preparing to lead these trainings.

41.     In addition to capacity building efforts, as part of this award, HRiA was in the process of developing a web-based resource compendium, highlighting local and national CVI resources, implementation guides, and research. This website was intended to serve as a resource for both BoostCVI sub-recipients and the field at-large. The website was close to launch when the award was terminated, with many hours of work by the web and program team already completed.

**Harms to Sub-Recipients at the Community Level**

42.     The termination of BoostCVI (Award #3) has completely deprived certain Massachusetts communities of any CVI resources or CVI focused organizations. Because termination interrupted HRiA's capacity and infrastructure building, many of the subrecipients were forced to reduce or completely halt their community-based violence intervention and prevention work. The result has, and will continue to have, a devastating impact on the communities who relied on these organizations, particularly the youth and young adults that four out of the five subrecipients served. Several frontline workers funded through the grant have already been laid off. Halting programs and services damage the reputation of HRiA and the subrecipients and erodes years of trust built between these organizations and their communities.

**BoostCVI Sub-Recipient 1: Reducing Gun Violence through Direct Intervention Strategies**

43.     Through the BoostCVI award, HRiA awarded $250,000, beginning October 1, 2024 to September 30, 2026, to a CBO serving a violence-impacted population primarily consisting of Latino/a/x individuals aged 14-35 in a Massachusetts city where many residents face socioeconomic challenges (e.g., limited access to education, healthcare, and stable employment) and reside in

neighborhoods where community resources are insufficient. The organization collaborates with a coalition of community organizations to assist at-risk individuals in navigating the maze of available resources and participate in juvenile justice reform efforts to ensure appropriate placement for youth based on their needs. Though this community faces a higher rate of gun violence than Massachusetts as a whole, they do not yet have a community violence intervention and prevention outreach program.

44.    The BoostCVI award aimed to stand up a CVI program run by this organization within the city to deepen engagement with proven-risk priority populations and reduce gun violence through direct intervention strategies. To achieve the goals of this award, this organization hired a program manager tasked with starting their new violence intervention program. The organization made a promise to the community to start developing CVI programming and outreach efforts and hired this program manager based on his extensive history of doing this type of work within the community and accompanying ties to individuals involved in community violence.

45.    After a program manager was hired and started his role, the HRiA team immediately conducted a technical assistance session on site and had several more planned, including a multi-day, individualized shadowing session at a partner program. This program manager immediately began forging relationships with law enforcement and the new police chief in the city, drawing on his existing connections to develop strong working relationships to further CVI efforts. The organization was also in the process of bringing on three peer mediators – individuals in the community who would be trained by the program manager to conduct outreach and prevent violence. The program manager additionally brought on teachers, coaches, and other school-based staff to assist with school violence prevention efforts.

46.    Unfortunately, because of the Award 3 termination, the organization had to lay off the program manager and halt all of it CVI efforts. Without a program manager, the team has lost both the financial resources and direct subject matter expertise to create a CVI program. And because there

are no other organizations doing CVI work in this city, violence intervention and prevention efforts simply do not exist there as a consequence of the grant termination. Though HRiA was poised to provide this organization with additional training and support, it can no longer deliver that assistance. Consequently, this community—which agreed that violence was impacting individuals at all levels within the city, from directly involved individuals to children and the elderly who faced fear of exposure to violence when out in the community—will certainly face more violence as a result.

**BoostCVI Sub-Recipient 2: Strengthening Organizational Infrastructure to Interrupt Community Violence**

47.    Through the BoostCVI award, HRiA awarded $250,000, beginning October 1, 2024 to September 30, 2026, to an organization that focuses on young adult men who have experienced community violence involvement or incarceration. This organization aimed to build infrastructure to address emerging needs more effectively, improve organizational efficiency, and increase impact within the community via innovative programs. This sub-recipient specifically hoped to hire new and reorganize existing staff to build capacity. They were also in the process of hiring a development consultant to assist with fundraising to sustain their efforts.

48.    The termination of this grant has caused a massive ecosystem disruption to the organization's services, and resultingly, to the city's CVI efforts. A core part of this sub-recipient's approach was to build partnerships across the CVI ecosystem and to work toward a comprehensive, integrated model for CVI, including building a strong relationship with their local police department. However, the loss of funding exacerbates tension between CBOs and police departments and communicates to the larger community that CVI work and law enforcement priorities are incompatible. This undermines the holistic and collaborative approach that both parties are working toward and will ultimately have the effect of reducing violence intervention in their community.

49.    Further, without grant funding, the organization no longer has access to training and capacity building on youth development, restorative justice, community building, and other topics through this grant from HRiA and their training partners.  The organization could not hire a development consultant, was forced to cancel an existing contract with an operations consultant, and ended their evaluation plans for future improvement and expansion.

**BoostCVI Sub-Recipient 3: Empowering High- and Proven-risk Youth to Reach a Positive Purpose**

50.    BoostCVI's third $250,000 grant went to an organization that aims to empower and motivate youth through outreach, community involvement, life skills programs, and technical assistance in navigating the juvenile court system, beginning October 1, 2024 to September 30, 2026. This organization prioritizes youth ages 12-24 who are at highest risk or proven risk of being presently involved in community violence, drug addiction, and/or court involvement. This awardee hired Outreach Advocates to conduct outreach throughout their city and via court referrals, and upon request by a District Attorney's office, planned to expand the work to another neighboring city.

51.    With the termination in funding, the organization had to immediately reduce serving young people in that city, and they have already had to furlough one staff member tasked with leading this work.  This staff member had strong relationships with young people at highest risk, and the immediate withdrawal of her support has impacted their trust in programs.  The organization describes a sense of uncertainty among the young people as to whether they will be able to continue receiving services.  The organization describes that post-termination, there is great stress and a strong sense of uncertainty as to whether work in this city can continue at all.

52.    Further, termination has impacted their relationship with other programs and entities (including their relationship with correctional facilities and the Department of Youth Services) because the organization has been forced to turn young people away from their services or refer them to other

18

**92a**

youth-serving organizations who may not have the specialized skills that they do. Similar to the other sub-recipients, this organization was in the process of receiving training from HRiA on a variety of topics and made great strides in financial and organizational infrastructure improvements (e.g., moving from paper forms to an online system for data entry, developing strong financial systems, etc.). However, now they are experiencing a lack of support while these changes are still in process, which puts them in a precarious position. This grant is the largest they have received in their history; while it was a huge milestone for them to receive these funds to be able to take on the aforementioned efforts and further their mission, the loss of this funding has devastated their work and the individuals they serve.

**BoostCVI Sub-Recipient 4: Breaking the Cycle of Violence and Recidivism for Justice-Involved Youth and Young Adults**

53.      Under the BoostCVI award, HRiA granted $250,000, beginning October 1, 2024 to September 30, 2026, to a sub-recipient located in cities across the state of Massachusetts. The subrecipient employs a variety of holistic and coordinated CVI interventions attending to the multiple needs of individuals at high risk of gang and gun violence. Recognizing that the profile for those who are at the highest risk for violence and recidivism varies, this CBO's intervention strategies address substance use, lack of education or employment, housing instability, and deficient coping behaviors to address the accumulation of risk factors that increase the risk for violence. Before termination, funds were being planned for new programming and expansion, as well as for piloting a Credible Messenger Mentoring program where staff were being trained to mitigate violence as it is happening or prior to violence breaking out. All of these efforts have now come to a halt due to the termination.

54.      At the time of termination, this sub-recipient was building connections in a Massachusetts city that is badly in need of robust violence interruption services. Prior to this funding, the organization did not operate in this city. This funding allowed them to have a designated staff

person in this city to devote time to this work.  Young people who were at high risk have had very positive results from engaging with the dedicated staff member, including reduced recidivism and adherence to program requirements.  Unfortunately, the loss of dedicated funding forced the sub-recipient to reassign staff, interrupting the progress made and hard-won trust built with young people and the broader community.  When communities see growth that is abruptly halted, the impact is significant because young people rely on that trust and consistency.

55.    As with all other sub-recipients, this organization was receiving training and TA on a variety of prioritized and customized topics from HRiA to further develop their project.  While their team has strong professional and lived experience, the sudden loss of supervision resources, professional development, and access to trainings interrupts their staff's ability to do high quality work.  HRiA was also providing access to data collection and case management software, and though that access helped them to get positive traction around clean data reporting, the halt in this funding means that access will end abruptly instead of continuing until Fall 2026 as promised.  In addition, they were in the process of acquiring physical space to better serve young people.  However, without funding, staff supported by this initiative are unable to do their work and lack the TA support to reach their capacity building and programmatic goals.  They are unlikely to be able to acquire the physical space that they were exploring.

56.    Finally, the termination of this funding impacts cohesion between the organization and other partners.  In addition to the formal learning they participated in together, frequently convening with other sub-recipients and benefitting from access to each other's networks were very impactful for this organization, and loss of access has hindered their ability to effectively and seamlessly partner.

**BoostCVI Sub-Recipient 5: Building Organizational Capacity to Work with Court Involved, Incarcerated, and Returning Citizens**

**94a**

57.     Finally, HRiA granted $250,000, beginning October 1, 2024 through September 2026, to a sub-recipient that serves youth and adults who have been inordinately impacted by violence and are currently incarcerated or formerly incarcerated and returning to the community. The need for their services keeps increasing, so for this grant, they aimed to focus on organizational capacity building to keep up with the demand for this work and support additional work inside jails and prisons. This organization's capacity building goals under the grant aimed to focus on program evaluation and data collection, organizational development and strategic planning, and fundraising.

58.     The termination of this grant halts the training and technical assistance from HRiA and other external consultants that would strengthen organizational capacity to meet the demand for their services. The organization had committed a significant amount of funding towards consultants to assist with general strategic planning, organizational development, and financial planning, and are scrambling to find replacement funding to meet these commitments.  HRiA was working closely with them on financial planning and abruptly had to cease support.  Without this funding and support from HRiA, it is unlikely that this organization can reach its goal and meet the increasing needs across the state.

59.     The consequences of this funding termination has rippled far beyond the direct impact: the organization shares that their fiscal sponsor has become very cautious based on funding uncertainties, and the organization has had to cut the budget by 25 percent.  While they were poised to hire seven additional staff this year through both HRiA funding and other funding sources, they are now only able to hire one, due to both funding impacts and the sense of fear within the field and increased competitiveness around any available funding. As a smaller organization, they are concerned that they will not be competitive for other funding sources, especially without HRiA support.

60.     Organizational leadership for this sub-recipient includes individuals with positive and impactful relationships with leadership in jails and prisons across Massachusetts, as well as staff with

expertise serving "youthful offenders," which is especially needed given the new Massachusetts law allowing individuals who were sent to prison as juveniles to be eligible for parole.  Unfortunately, the termination of this grant directly imperils staff from the very communities the organization seeks to serve.  The organization anticipates hundreds of young people, who have never spent a day outside of prison as adults, coming home within the next two years and needing to re-integrate into the community.  This time is critical, because people are almost always at the highest risk of recidivism and harm when they return home from prison.  This organization currently serves 100 young people and was poised to double their reach to 200 within the next year; however, this is no longer possible with the funding termination.

61.     The organization was also poised to grow their partnership with the Department of Youth Services (DYS) to serve more justice-involved young people.  DYS was eager to further engage this organization due to the impact they have already seen previously.  This organization is an important part of the ecosystem and is well-prepared to engage with these individuals to prevent future violence and crime; however, without this funding, they are no longer positioned to do so.

Date: May 21, 2025

_____

Steven Ridini
President and CEO of HRiA
Suffolk County, Massachusetts

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VERA INSTITUTE OF JUSTICE, et al., | |
| *Plaintiffs, on behalf of themselves and all others similarly situated,* | |
| v. | |
| UNITED STATES DEPARTMENT OF JUSTICE, | Case No. _____ |
| PAMELA J. BONDI, in her official capacity as United States Attorney General, | |
| OFFICE OF JUSTICE PROGRAMS, | |
| MAUREEN A. HENNEBERG, in her official capacity as Acting Head of the Office of Justice Programs, | |
| *Defendants.* | |

<u>**DECLARATION OF NICHOLAS TURNER**</u>

I, Nicholas Turner, declare as follows:

      1.      My name is Nicholas Turner.  I am a resident of Kings County in the state of New York.  I am over the age of eighteen.  This declaration is based upon my personal knowledge and the knowledge I have acquired in the course of my duties.  If called as a witness, I could and would testify competently to the matters set forth below.  I provide this declaration in support of the motion for preliminary injunction.

      2.      I am the President and Director of the Vera Institute of Justice. In this role, I am Vera's chief executive.  I started in this role in August of 2013 and have served in the position for over eleven years.  In my role as President and Director, I oversee all the programs funded by the terminated awards, and the initiatives affected by the terminations.

1

**98a**

3.      Prior to this position, I served as a Managing Director at the Rockefeller Foundation. I also previously served in other roles at Vera from 1998 to 2007, leading the expansion of Vera's national programs and rising to the position of Vice President, Chief Program Officer.  I also previously practiced law at Paul, Weiss, Rifkind, Wharton & Garrison and clerked for the late Honorable Jack B. Weinstein of the Eastern District of New York.

**Vera's Mission and Impacted Programs**

4.      Vera Institute of Justice, founded in 1961, is the oldest and one of the largest organizations in the country working to advance safety and justice.  For over sixty years, Vera has worked in partnership with community and government leaders—including in law enforcement and corrections—to address some of the most intractable problems in the criminal justice system.  Our mission is to pilot, test, and scale innovations that prevent crime and address its drivers, increase accountability, and rely less on incarceration and more on the programs and services that help individuals, families, and communities to thrive.

5.      As part of this work, Vera oversees three initiatives directly impacted by the terminations: Redefining Public Safety, Restoring Promise, and Reshaping Prosecution.  Vera also remains responsible for two additional programs affected by terminated awards.  Vera initially commenced these programs, and they are being completed by our spinoff organization, Activating Change.  Vera is a member of Activating Change, and I sit on Activating Change's board of directors.

6.      Vera has been an active participant in the development of this lawsuit and has remained in regular communication with Plaintiffs' counsel about this case.  Vera is willing and able to take an active role in this litigation and to protect the interests of all members of the Class.

**Vera's Grant Process, in general**

7.      Vera's budget reflects a mix of philanthropic, individual, and government grant and cooperative agreement funding. Vera regularly responds to Requests for Proposals (RFPs) issued by

the Department of Justice (DOJ) Office of Justice Programs (OJP), including its subsidiary agencies, the Bureau of Justice Assistance (BJA), National Institute of Justice (NIJ), Office of Juvenile Justice Delinquency and Prevention (OJJDP), and Office for Victims of Crime (OVC), as well as DOJ agencies Office of Community Oriented Policing Services (COPS) and the Office on Violence against Women (OVW). As part of an application for a grant or a cooperative agreement, Vera proposes a scope of work addressing the RFP's programmatic goals, along with a cost-recovery budget and supporting documentation that demonstrates organizational preparedness to perform the work (e.g., resumes of key personnel for a project; letters of support from potential collaborators, subrecipients, or others whose cooperation will be necessary or helpful in performing the proposed work; required organizational policies; etc.). Applications are generally due in the spring, and awards are typically announced in September, as the federal fiscal year draws to a close. Over our history, Vera has been awarded and successfully fulfilled cooperative agreements or grants with each of these DOJ agencies, in both Democratic and Republican administrations.

**Termination of Cooperative Agreement Funding Without Notice**

8.      On April 4, 2025, at 3:12 p.m., Vera received an email from the Office of Justice Programs purporting to immediately terminate five of Vera's cooperative agreements: 15POVC-21-GK-01096-NONF (Vera Award 1), attached as Exhibit 1; 15PBJA-24-GK-02981-JAGP (Vera Award 2), attached as Exhibit 2; 15PBJA-23-GK-05353-MUMU (Vera Award 3), attached as Exhibit 3; and 15PBJA-23-GK-05375-SCAX (Vera Award 4), attached as Exhibit 4; 15POVC-21-GK-03261-HT (Vera Award 5), attached as Exhibit 5.

9.      The termination email stated that the awards were being terminated because they "no longer effectuate agency priorities." The termination email went on to state that "the Department has changed its priorities with respect to discretionary grant funding to focus on, among other things, more directly supporting certain law enforcement operations, combatting violent crime, protecting

3

**100a**

American children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts at all levels of government. These awards demonstrate that they no longer effectuate Department priorities." No other basis or explanation for the termination was provided. The termination email did not claim Vera failed to comply with the terms or conditions of the awards and did not otherwise explain why the awards no longer effectuated Department priorities. These awards total $7.25 million dollars, with approximately $5.4 million dollars of funding outstanding. A true and correct copy of the termination email is attached as Exhibit 6.

10. The termination email advised that Vera could "appeal this termination in writing within 30 business days."

11. The termination email also required Vera to commence "closeout and other obligations in 2 C.F.R. § 200.340(d)," including an obligation that Vera "promptly refund any unobligated funds," that have been paid out, and retain award records for at least three years. The letter threatened that failure to meet these closeout obligations could include "appropriate enforcement actions," and "affect eligibility for future grants."

12. The closeout obligations include preparing and submitting the required reports; terminating agreements with vendors, consultants, and partners; and submitting Vera's remaining reimbursement requests for project and closeout expenses.

13. Vera was locked out of the federal grants payment system a few days before receiving the termination notice. As a result, Vera has incurred approximately $381,476 of expenses in performing the awards that have not yet been reimbursed.

14. It was Vera's understanding that the funds awarded through these cooperative agreements would be available throughout the agreement periods and that DOJ could terminate the agreements only if Vera failed to comply with the terms and conditions of the awards. It was not

**101a**

Vera's understanding that DOJ could terminate these awards based on that agency's assertion that the awards no longer effectuate agency priorities.

**Termination of Awards Creates Real Harm**

15.     The termination of Vera's awards created an immediate harm and impact to not only Vera's ability to maintain business and programmatic operations prescribed by the awards but also denied funds to be paid to partners and contractors, impacting their ability to have the financial resources to sustain their organizational work.  As a result of the termination of Vera's awards:

    a.  hard-of-hearing and Deaf victims of crimes cannot use interpretive services provided by Vera's National Sign Language Interpreter Bank for Victim Services to communicate with law enforcement and victim services;

    b.  the cities of Richmond, California and Albuquerque, New Mexico, have lost subaward funding that would have supported modernizing each city's 911 call systems and training civilian specialists to respond to mental and behavioral health crises;

    c.  prosecutors in Arizona, Colorado, Massachusetts, North Carolina, and Virginia will have greater difficulty in launching or expanding diversion programs, designed to help prosecutors address the underlying drivers of criminal conduct in their communities;

    d.  state departments of correction facilities have withdrawn from Vera's project to support data collection, policy development, training, and monitoring for correctional facilities to increase safety in prisons, and Vera was forced to dissolve a 15-person advisory board already assembled to support the program;

    e.  the needs of human trafficking survivors with disabilities will go unmet as at least 50 law enforcement officers and dozens of law enforcement agencies around the nation are deprived of training opportunities to help law enforcement develop resources; and

**102a**

      f.   Vera staff members working full or part time on programs funded by Vera's awards are now severely limited in their ability to carry out the violence intervention, research, technical assistance, and program development work and face the real possibility of unemployment in the near future.

16.     Vera relied and acted upon its expectation and understanding that DOJ would fulfill its commitment to provide award funding.  Vera relied on this by recruiting partners from local government, corrections and law enforcement agencies to launch or expand programs across the country, including in Oklahoma, New Mexico, California, and Colorado; dedicating more than 10 staff members to work full or part-time on these programs; and incurring costs related to program assistance, training, travel, research, and data analysis.

17.     DOJ's termination of these awards with no notice will force Vera to make cuts in its budget to offset the loss of funding, including by cutting the budgets of programs tasked with carrying out the awards, cutting subawards that assist Vera in carrying out its mission, cutting funding for other programs, and making cuts to staff.

18.     DOJ's termination of these awards has created immense uncertainty for Vera and has required Vera employees, as well as partners in government and at other organizations, to spend significant amounts of time working on responding to that chaos.  I, along with many other leaders within Vera, have spent an enormous number of hours over the last few weeks attempting to quantify and mitigate the effects of these award terminations—time that could have been spent advancing our mission to make communities safer and to deliver more justice to people impacted by the criminal justice system—both victims and defendants.

**Award 1: Sign Language Services for Deaf Victims of Crime**

19.     On September 21, 2021, Defendants awarded Vera $1 million in funding, beginning October 1, 2021 and ending June 30, 2025 for the Advancing the Use of Technology to Assist Victims

**103a**

of Crime: National Sign Language Interpreter Bank for Victim Services cooperative agreement to Vera. The award provides $1 million in funding from October 1, 2021, to June 30, 2025. *See* Exhibit 1.

20.     This award was intended to assist crime victims who are hard of hearing or Deaf and specifically awarded Vera $1 million to provide free sign language interpretation services to Deaf crime victims. These services were offered entirely remotely, by specially trained victim services providers, to facilitate effective communication between Deaf victims of crimes and law enforcement. These interpretation services included specially trained, trauma-informed interpreters, allowing victim services providers to interact directly and effectively with Deaf survivors in their community and to provide Deaf survivors with both short and long-term assistance.

21.     This award was terminated with less than three months and $161,003 of undisbursed funds remaining.

22.     Prior to termination, this program (which used technology developed with the award funding) had connected with 4,209 victim services providers and others. But the program was halted in its tracks: after this award was terminated, Vera was forced to turn away Deaf victims of crime who were seeking interpretive services to help them communicate with law enforcement and victims' services. And Vera has no ability to further support the 872 victim services participants who completed language access training, and 119 people who received one-on-one technical assistance on how to provide language access in their organizations for Deaf victims of crime.

23.     Additionally, this award funded a dedicated staff to fulfill the program's mission. DOJ's termination of the agreement three months early and with no notice made the wind down chaotic, painful, and potentially costly. Because the award was due to end on June 30, a conscientious wind-down, including severance for staff whose positions would be eliminated, was being planned. But instead of being able to provide a comprehensive accounting within the

7

**104a**

agreement period, management is now burdened with a more complicated, post-hoc wind-down, increasing the difficulty of adhering to the allowability and allocability cost principles set forth in 2 C.F.R. Part 200.

**Award 2: Supporting Local Government to Build a Comprehensive Public Safety Ecosystem**

24.    On October 1, 2024, Defendants awarded the BJA FY24 Reimagining Justice: Testing a New Model of Community Safety: Municipal Safety Hubs cooperative agreement to Vera.  The award provides $2 million in funding from October 1, 2024, to September 30, 2027.  *See* Exhibit 2.

25.    This award supported local government partners to build the infrastructure needed for a more comprehensive approach to public safety to prevent crime, respond to crisis, and stop violence.  Specifically, the agreement awarded Vera $2 million to provide technical assistance to public safety agencies in the Community Service Departments in Albuquerque, New Mexico, and Richmond, California through subawards.  The pass-through amounts contemplated across fiscal years totaled $700,000: $62,500 by end of Vera's 2025 fiscal year (June 30, 2025), $313,000 in our FY26, $225,000 in our FY27, and $100,000 in our FY27.  Through subawards, Vera facilitated these cities' efforts to create and sustain an innovative and scalable approach for advancing community safety without solely or overly relying on traditional law enforcement responses.

26.    In communities across the country, police have long been the only first responders available to provide timely responses to behavioral health–related 911 calls.  Research shows that approximately one out of five calls to 911 are for a mental health or substance use-related crisis that can be more effectively handled by a civilian trained responder.  In Albuquerque and Richmond, Vera partnered with government leaders from several departments across each city to conduct the research, budget the resources, and launch or expand programs that deploy trained civilian specialists to respond to mental health and other behavioral health crises, and to prevent and intervene in violent crime, especially gun-related homicides and shootings.  These are situations in which a civilian-based

8

**105a**

approach takes the burden off traditional law enforcement to be the only response to a crisis and, importantly, provides local governments with a comprehensive range of options to address disorder, crime, and violence in cases where police are unable, unwilling, or lack the training to intercede.

27.    The award termination resulted in Vera abruptly stopping the subaward process with Richmond and Albuquerque. The sudden halt in funding harmed Vera and the cities who were relying on the award. Each city had already dedicated significant staff time toward execution and expected the subaward to cover the costs of the new or expanded programs and the technology required to update their 911 and data collection systems for this more comprehensive approach. Specifically, each city was planning to use the subaward to analyze their 911 data to identify which cases could benefit from a civilian response and where law enforcement resources could be better managed or deployed. Each city planned to modernize their 911 call systems to allow, for example, a trained mental health expert or other specialized response, to be selected in appropriate and necessary circumstances. As a result of the termination, these two cities must find another way to fund these initiatives, or they will not be able to build out this necessary infrastructure to address pressing problems of disorder, crime, and violence—all of which undermine community safety.

28.    The award termination also impacted funding for nine program, policy, and research staff dedicated to the project. To fill the gap due to the loss of funding, Vera has had to draw down funding from other sources, limit the staff capacity on this important project, and greatly curb the amount of assistance, especially in-person, that can be provided to the partner agencies and leaders in both Richmond and Albuquerque. Without the opportunity to meaningfully build relationships with key government staff tasked with building or expanding these interventions, the overall success of this program is likely to be negatively impacted.

29.    Another loss as a result of the award termination is the opportunity for peer learning among the public safety leaders in Richmond and Albuquerque. Peer learning is an integral tool for

**106a**

government officials to spur innovation, troubleshoot challenges, and workshop with others who are similarly situated.  Losing that aspect of this program is an intangible but significant loss for the local government leaders who benefit from peer support, encouragement, and knowledge exchange.

30.     This award was terminated with 30 months remaining and $1,977,389 of undisbursed funds remaining.

**Award 3: Advancing Safety through Prosecutor-Led Diversion**

31.     On October 1, 2023, Defendants awarded the BJA FY 23 Field Initiated: Encouraging Innovation cooperative agreement to Vera for the project Motion for Justice: Partnering with Prosecutors and Impacted Communities to Remove Barriers and Expand Access to Community-Led Diversion Programming.  The award provides $1 million in funding from October 1, 2023, to September 30, 2026. *See* Exhibit 3.

32.     This award was designed to assist prosecutors in their efforts to ensure the safety of the American public by using all the tools within their discretion, including community-based programming, to reduce crime and prevent recidivism.  These programs are conventionally known as "diversion."  Specifically, the award granted Vera $1 million to assist prosecutors and community-based organizations in six jurisdictions in Arizona, Colorado, Massachusetts, North Carolina, and Virginia to develop effective policies, practices, and programs to safely expand diversion programs in their jurisdictions.  The award was designed to reduce recidivism and advance public safety, as well as build trust in the legal system among local community members by demonstrating that community-based programs are a legitimate and viable alternative to incarceration in some cases.

33.     Vera planned to build a cohort that supported the six jurisdictions in launching and expanding diversion programs.  Through the six-jurisdiction cohort, the intention was to create a blueprint for building and expanding community-based diversion programs and, importantly, addressing the racial disparities that result in more severe outcomes for Black and brown individuals

charged with an offense compared to their white counterparts.  These disparities are not only unjust but also undermine trust in law enforcement and the legal system.  By launching and expanding community-based diversion, local prosecutor's offices could direct attention away from low-level and relatively minor offenses and deploy those limited resources toward the most serious and violent cases.  This program would have also conducted much-needed research for the criminal justice and public safety field into whether community-based diversion is in fact successful in reducing recidivism and promoting community safety.  Ultimately, Vera intended to disseminate these research findings to help officials across the country build more effective diversion programs.

34.    Because of the termination and the reduction in assistance it compels, dozens of individuals in six jurisdictions will not benefit from local, community-based services that would address the underlying drivers of criminal conduct, like substance abuse, a lack of employment and housing, and unmet mental health needs.  Due to the loss of funding, employees staffed on this award have been forced to reduce the level of assistance to the cohort of six jurisdictions, including less travel to sites and abandoning plans to bring the cohort together for ongoing training, peer learning, and ideas exchange.  The reduction in site visits has an especially negative impact, as being on-site allowed us to convene local stakeholders for critical conversations, review data analysis and policies, observe success and challenges with setting up or expanding the diversion programs, and otherwise troubleshooting and overcoming any obstacles that arise.

35.    Additionally, the award termination will negatively impact the local community-based organizations in each of the six jurisdictions. Vera had intended to use other funding to provide grants to each community-based organization to support planning and staff time for launching or expanding the diversion program.  The termination of this OJP award has instead required Vera to repurpose money from other sources for this work and, to compensate, reduce the subaward amount to the community-based organizations partnering with us in the six jurisdictions.

11

**108a**

36.    This award was terminated with eighteen months remaining and $677,948 of funds remaining.

**Award 4: Making Prisons Safer for Staff and Incarcerated People**

37.    On October 1, 2023, Defendants awarded the BJA FY 23 Transforming Prison Cultures, Climates, and Spaces: Designed for Dignity cooperative agreement to Vera.  The award provides $1.5 million in funding from October 1, 2023 to September 30, 2026, followed on October 1, 2024 by a supplemental award of an additional $1.25 million in funding from October 1, 2024 to September 30, 2027 (for a total of $2.75 million).  *See* Exhibit 4.

38.    This award was designed to improve safety in prisons for both correctional staff and people incarcerated.  Specifically, Vera was granted $1.5 million to help three state departments of corrections make units within their prison system safer by implementing new restorative justice policies with respect to prison operations and culture, implementing trainings on restorative practices for staff, making physical improvements to the built environment and unit design, and winning buy-in for a new approach to prison safety from correctional leadership to line staff.  BJA's enthusiasm for the potential impact of this program was so evident that OJP approved a supplemental award with an additional $1.25 million (for a total of $2.75 million), well before the first award was fully performed or spent down.

39.    Three partner departments of corrections were carefully vetted and selected in early 2025 and plans were already underway with each agency to dedicate correctional staff to the project, schedule trainings and times for site visits, gather data and other needed information to assist Vera in launching the project, and socialize the partnership across both correctional leadership and line corrections staff.  The three departments of corrections had, based on reliance that the project was moving forward, dedicated hours of leadership and staff time to preparing for the partnership.  This program was built on the results of a DOJ National Institute of Justice-funded randomized-control

study that found that implementing restorative practices reduces violence in prisons, improves the morale and well-being of corrections staff, and incentivizes better behavior and engagement from incarcerated people.

40.     Under this award, twelve Vera staff members were tasked with providing training and technical assistance to support three state departments of corrections with data collection; policy development; and to facilitate training and monitoring for correctional facilities to increase safety in prisons. These staff would also provide implementation monitoring and sustainability planning to ensure that changes in policies and practices will last beyond the time of the engagement, thus extending the effect of the federal grant money.

41.     Eight days prior to the award termination, one department of corrections heralded the partnership and shared a video with its staff announcing the work and explaining how Vera would partner with corrections staff and incarcerated people.

42.     As a result of termination of this award, two of the three state departments of corrections withdrew from the project and Vera was forced to dissolve the recently-assembled advisory board of 15 experts from across the corrections and criminal justice fields who could provide the project with the most current knowledge about prison conditions.  The termination of funding and withdrawal of two departments of corrections from this program will make these prisons less safe for both staff and incarcerated people who will not benefit from the changes in operations, culture, training, and oversight in these facilities.

43.     Additionally, after the award was terminated, a DOJ Bureau of Prisons employee reached out to Vera, expressing interest in working with Vera under the award, specifically because it supported the Bureau's role "as an agency dedicated to the progress and advancement of safe, healthy and secure environment[s]."  The Bureau of Prisons is known to be an especially challenging correctional environment, facing overcrowding, longstanding problems with violence behind bars,

and staffing reductions.  However, because this award was terminated Vera will not be able to pursue this work with the Bureau of Prisons and increase safety within the federal correctional environment.

44.    This award was terminated with 30 months remaining and $2,458,945 of funds remaining.

**Award 5: Assistance for Victims of Human Trafficking with Disabilities**

45.    On October 1, 2021, Defendants awarded the 2021 OVC FY 2021 Field-Generated Human Trafficking Training and Technical Assistance for Law Enforcement: Responding to Human Trafficking of People with Disabilities cooperative agreement to Vera. The award provides $500,000 in funding from October 1, 2021, to June 30, 2025. *See* Exhibit 5.

46.    This award, titled "Training and Technical Assistance for Law Enforcement for Responding to Human Trafficking of People with Disabilities," helps police agencies across the country more effectively identify victims of sex and labor trafficking and provide the necessary services to address the unique needs of this population.  Specifically, research in the field suggests that people with disabilities are victims of sex and labor trafficking at disproportionately higher rates than others, but law enforcement often lacks the training necessary to identify these victims, build trust with them, and investigate their cases.  This award provided $500,000 in funding to Vera and the International Organization of Adolescents to design a comprehensive online training program to better educate and equip law enforcement to handle the unique challenges facing human trafficking victims with disabilities.

47.    DOJ terminated this award with less than three months and more than $167,274 of undisbursed funds remaining.

48.    The termination deprives dozens of law enforcement agencies around the country of the training and skills to better serve human trafficking survivors with disabilities.  Before the award termination, Vera had been regularly training law enforcement officers and helping agencies to develop

resources, such as counseling, language access, referrals, and policy directives, to meet the needs of this vulnerable population. For example: an event that is now canceled because of the award termination was a scheduled, national webinar on how to effectively respond to and investigate human trafficking cases involving survivors with disabilities. Approximately 486 people registered for the webinar, half of whom were law enforcement. Additionally, Vera had plans to host two more learning cohorts of up to 25 law enforcement officers in the final months of the agreement period. The additional cohorts were intended to help sustain impact of Vera's work beyond the end of the funding period by building a network of trained law enforcement officers who could in turn train and assist other law enforcement personnel investigating cases of human trafficking involving disabilities. The loss of funding resulted in the abrupt termination of those cohorts and ultimately a loss of resources to law enforcement and their ability to serve as a force multiplier for other officers in the future.

49. In the final months of the award, Vera planned to complete an online training series targeted to better educate and equip law enforcement to handle the unique challenges facing human trafficking victims with disabilities. As a result of the termination, Vera halted all work on the training series. Now the law enforcement audience will no longer benefit from the final four courses of the training as well as the aforementioned webinar.

50. Not only will these abruptly canceled online trainings and webinars prevent law enforcement from benefiting from the information and insights provided, but it wastes the federal dollars invested in the development of the trainings to date if the officers do not complete the full series.

Signature on following page.

15

**112a**

16

**113a**

Date: May 21, 2025

_____
Nicholas Turner
President and Director of Vera Institute of Justice
Kings County, New York

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

VERA INSTITUTE OF JUSTICE, ET AL., )
                                   )
          Plaintiffs,              )
                                   )      CV No. 25-01643
        vs.                        )      Washington, D.C.
                                   )      June 26, 2025
U.D. DEPT OF JUSTICE, ET AL.,      )      2:03 p.m.
                                   )
          Defendants.              )
_____)


TRANSCRIPT OF MOTION HEARING PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:               Jennifer Fountain Connolly
Lisa Newman
Somil Trivedi
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
Email:
jconnolly@democracyforward.org
Email:
lnewman@democracyforward.org
Email:
strivedi@democracyforward.org

Joshua Stanton
E. DANYA PERRY PLLC
DBA Perry Law
445 Park Avenue, 7th Floor
New York, NY 10022
(212) 213-3070
Email:
jstanton@danyaperrylaw.com


For Defendant
Dept of Justice:               John Bailey
DOJ-Civ
Civil
950 Pennsylvania Ave NW
Ste 3618
Washington, D.C. 20530
(202) 514-6993
Email: john.bailey@usdoj.gov

APPEARANCES CONTINUED

Court Reporter:                    William P. Zaremba
                                   Registered Merit Reporter
                                   Certified Realtime Reporter
                                   Official Court Reporter
                                   E. Barrett Prettyman CH
                                   333 Constitution Avenue, NW
                                   Washington, D.C. 20001
                                   (202) 354-3249

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

                    P R O C E E D I N G S

1

2          COURTROOM DEPUTY:  All rise.  The Honorable Amit

3   P. Mehta presiding.  Please be seated and come to order.

4          THE COURT:  Good afternoon, everyone.  Please be

5   seated.

6          COURTROOM DEPUTY:  Your Honor, we're now on the

7   record for Civil Action 25-1643, Vera Institute of Justice,

8   et al., versus the U.S. Department of Justice, et al.

9          Present for plaintiffs is Jennifer Connolly,

10  Lisa Newman, Joshua Stanton, and Somil Trivedi.

11         For the Department of Justice, John Bailey.

12         THE COURT:  All right.  Good afternoon, everyone.

13  Welcome.  It's good to be with-you.

14         Okay.  So we're here on the plaintiffs' motion for

15  a preliminary injunction and the defendants motion to

16  dismiss.

17         So why don't we begin with plaintiffs' counsel.

18         MS. NEWMAN:  Good afternoon, Your Honor.

19  Lisa Newman on behalf of plaintiffs.

20         Jennifer Connolly will be handling the

21  class-certification motion.  I will largely be handling the

22  argument on the preliminary injunction and motion to

23  dismiss, and my co-counsel, Josh Stanton, will be handling

24  the constitutional claims on those motions.

25         We're open to proceeding in any order that you

1  you've framed it.

2          MS. NEWMAN:  Yes.

3          THE COURT:  And I agree with you that, you know,

4  you don't necessarily need to rely on the contract to

5  determine whether reliance interests have been considered,

6  whether there's been a sufficient explanation, but it seems

7  to me that what you've then suggested is that every contract

8  claim can somehow then become an APA claim.

9          MS. NEWMAN:  We're certainly not suggesting that,

10  Your Honor.

11          THE COURT:  But why not?

12          In other words, anybody who's on the bad end of a

13  breach, why couldn't they also say, look, you also didn't

14  consider our reliance interest, you also didn't consider

15  our -- you know, even give us a sufficient explanation.

16          And isn't that the whole point of channeling these

17  claims into the Court of Claims as opposed to bringing them

18  in the District Court under the APA?

19          MS. NEWMAN:  I think it comes back to what the

20  Court in *Megapulse* said, which is, District Courts still --

21  and courts still retain their rationality in assessing

22  whether or not the relief sought from that type of claim is

23  actually one that is contractual in nature, that is, seeking

24  money damages, and that really has to be assessed on a

25  claim-by-claim basis.

1 the class, do I need to make a finding that the entire

2 class, all class members would be irreparably harmed or are

3 being irreparably harmed?

4         MS. NEWMAN:  That would be a question that my

5 co-counsel, Jennifer, will be able to answer.  I don't know

6 the answer to that question.

7         THE COURT:  All right.  I will ask your colleague

8 when she's up.

9         MS. NEWMAN:  Apologies.

10         THE COURT:  That's okay.

11         MS. NEWMAN:  So I guess, one, I'll end with one

12 final thing.

13         July 4th is one of the most active days for

14 shootings in many communities.  Violence interrupters know

15 this and would normally be, as we are discussing, out in

16 their communities on that day working to mediate active

17 conflicts.

18         The work that they do might include taking

19 individuals for whom July 4th is an anniversary of a gun

20 death to physically do other activities to ensure that they

21 don't act out on their grief and their trauma by turning to

22 gun violence.

23         This is not going to be the case in a lot of

24 communities in the country because of the termination of

25 this grant funding absent an injunction.

**120a**

     1          And there has been a predictable spike in
     2    homicides and shootings in these communities in the months
     3    since these grants have been terminated.  And so we believe
     4    that we have certainly established a likelihood of success
     5    on the merits, shown irreparable harm that the balance of
     6    equities strongly weigh in plaintiffs' favor.
     7          And if there are any other questions on these
     8    points, I will turn it over to my co-counsel.
     9          THE COURT:  No.  Thank you, counsel.
    10          MS. NEWMAN:  Thank you, Your Honor.
    11          MR. STANTON:  Good afternoon, Your Honor.
    12    Josh Stanton on behalf of the plaintiffs.
    13          THE COURT:  Mr. Stanton, welcome.
    14          MR. STANTON:  So before I delve into sort of the
    15    merits of the constitutional argument, I think it might be
    16    helpful to sort of disentangle what we're talking about with
    17    respect to those claims in terms of the motion to dismiss
    18    and the motion for preliminary injunction.
    19          So the only argument that defendants make in favor
    20    of their motion to dismiss, at least as it pertains to
    21    Rule 12(b)(6), specifically, in terms of any particular
    22    claim that plaintiffs have made in arguing the plaintiffs
    23    have failed to state a claim in their motion to dismiss
    24    actually relates to the procedural due process argument.
    25          So we noted this in our opposition joint sort of

```
 1              THE COURT:  Please be seated.  Thank you,
 2    everyone.
 3              All right.  Ready for government counsel.
 4              MR. BAILEY:  Yes, Your Honor.  Good afternoon.
 5              THE COURT:  Good afternoon.
 6              MR. BAILEY:  John Bailey with the
 7    Department of Justice for the defendants.
 8              THE COURT:  Mr. Bailey.
 9              MR. BAILEY:  May it please the Court.
10              Neither the facts nor the law support plaintiffs'
11    requested relief.
12              Starting with the facts, this case does not
13    involve an agency's mass termination of grants in an effort
14    to refuse spending congressionally obligated funds.
15    Instead, the Department of Justice has terminated a tiny
16    fraction of its open discretionary grant awards after
17    examining each of those awards individually and carefully
18    and determining that they no longer advance agency
19    priorities, those priorities being combating violent crime,
20    protecting American children, and supporting victims of
21    trafficking and sexual assault.
22              THE COURT:  Can I ask a -- sorry to interrupt.
23              I usually don't try to interrupt this early, but
24    can you just help explain to me how that is so -- I mean,
25    let's use the Detroit organization.  I mean, you just
```

**122a**

1    identified, for example, combating violence as one of the

2    priorities, right?

3              MR. BAILEY:  Yes.

4              THE COURT:  So how does an organization that

5    has -- whose sole purpose is to intercede before violence

6    happened inconsistent with a priority of combating violence?

7              MR. BAILEY:  Well, I mean, frankly, Your Honor,

8    I don't have an insight into how each grant was weighed

9    against other grants, but I mean, we're balancing --

10             THE COURT:  Shouldn't you?

11             I mean, if you're terminating these grants as

12   inconsistent with your priorities, shouldn't you know why

13   each of the grants has been terminated for that reason?

14             MR. BAILEY:  I mean, at this stage, without an

15   administrative record, I don't have an insight into,

16   you know, why any one particular grant was terminated.

17             But I mean, I guess the way that I look at it --

18             THE COURT:  Isn't that then sort of the hallmark

19   of arbitrary and capricious decision-making if you can't

20   identify for me why a particular decision was made?

21             MR. BAILEY:  Well, Your Honor, I think, taking a

22   step back here, I mean, it's a finite amount of resources.

23             And this case is not about disparaging the

24   plaintiff organizations' missions, but --

25             THE COURT:  What's a finite amount of resources?

**123a**

1    Not the grant money.  The grant money is the grant money.

2         MR. BAILEY:  Well, I think the question is, can

3    this better be -- can this money be used to better serve the

4    administration's priorities.

5         THE COURT:  But help me out here.

6         You'll forgive me.

7         And I know I'm going -- sort of painting outside

8    the lines here a little bit, but you've just said, and all

9    of the notices said, for example, that one of the agency's

10   priorities -- the Department of Justice priority is to

11   prevent violence, right?

12        MR. BAILEY:  Yes, Your Honor.

13        THE COURT:  Each of these organizations, in some

14   way, shape or form, at least I think the five that I have

15   before me, are trying to prevent violence.  That is the very

16   reason they got the grants in the first place.  Would you

17   agree with that?

18        MR. BAILEY:  Yes, that's the agency's mission.

19        THE COURT:  Right.

20        So that's what they're doing.

21        And now the Department of Justice, the

22   Department of Justice is saying that an organization that is

23   devoted to fighting violence and preventing violence, that

24   their execution of the grant is inconsistent with the

25   Department of Justice's priorities and you can't tell me why

1    that is.

2          MR. BAILEY:  Well, Your Honor, I mean, the

3    Department doesn't just have one -- a single priority.

4          And, you know, I perhaps could have quoted the

5    termination letter in full, but it's, you know, focused,

6    among other things, more directly supporting certain law

7    enforcement operations, combating violent crime,

8    protecting --

9          THE COURT:  At least one of these institutes --

10   Vera, for example, one of their missions is -- one use of

11   the grant, if I remember, was to support and train law

12   enforcement.

13         MR. BAILEY:  Yes, Your Honor.

14         THE COURT:  Right?

15         So that's inconsistent with the Department's

16   priorities?

17         MR. BAILEY:  Your Honor, frankly, I don't have

18   more of an insight into how each individual grant --

19         THE COURT:  Isn't that the problem at the end of

20   the day?

21         I mean, let's just put aside for the moment all

22   this song and dance about, you know, Court of Federal

23   Claims.  Isn't that the fundamental problem, that the

24   United States Government backed by the Department of Justice

25   has no idea why it's terminating these grants in the amount

**125a**

1  of $800 million?

2          I mean, you are representing the United States of

3  America and you can't tell me why even one of these

4  plaintiffs, their grant was terminated, not one.

5          MR. BAILEY:  Your Honor, I can tell you that

6  Department leadership, in an iterative process with OJP,

7  examined the project descriptions of each grant and

8  determined --

9          THE COURT:  Let's start with FORCE Detroit.

10          Mr. Kennedy has explained that one of the things

11  they do is they go out into one of the rougher neighborhoods

12  in Detroit and they have people on the ground who are there

13  to serve as intervention.

14          You know, people are in a bad situation, they

15  are -- there's a conflict, these folks get called and try

16  and calm things down.

17          That prevents violence.  I think you'd agree with

18  that, right?

19          MR. BAILEY:  That evidence, yes.

20          THE COURT:  So why did the Department of Justice

21  terminate that loan -- or, excuse me, that grant, not loan,

22  grant, as inconsistent with the new priorities?

23          MR. BAILEY:  Your Honor, at this stage without a

24  developed administrative record, I can't speak to what's

25  beyond the Office of Justice Programs declaration which

1  discusses how this was an iterative process with Department

2  leadership.  I can't speak to how any one individual grant

3  was weighed but --

4         THE COURT:  So shouldn't I then enter a

5  preliminary injunction until we have an administrative

6  record in this case that you can actually explain and

7  justify for me why you've done what you've done?

8         MR. BAILEY:  Well, Your Honor, I think this is the

9  improper forum for that for the legal reasons I hope we get

10  into regarding --

11        THE COURT:  We will, I promise you.  I just am

12  curious.

13        MR. BAILEY:  -- why an arbitrary and capricious

14  claim is just inappropriate here to evaluate an agency's

15  discretionary decision in contracting with the government,

16  and so I can't speak in more detail.

17        THE COURT:  I just -- I know you can't, because

18  I am confident that there are no individualized reasons, and

19  I think you know there are no individualized reasons.

20        And -- okay.

21        And now the Department of Justice, understandably,

22  these are your legal positions and you get to advance them,

23  and ultimately I'm bound by these legal principles, so let's

24  get all that out in the open.

25        But fundamentally, that's what you're doing, which

1    is that, you're not making individualized assessments.

2         Yes, you've winnowed the number of grant

3    recipients down by some percentage, and, yes, there was some

4    process, but you can't stand here in a court of law and

5    explain why FORCE Detroit is no longer consistent with the

6    agency's priorities.  You can't do that.  You maybe didn't

7    even ask before you walked into this courtroom.

8         MR. BAILEY:  Well, Your Honor, I think part of the

9    problem is that none of these plaintiffs took advantage of

10   the appeals process.

11        And if I may, I mean, I believe over 200 did.

12        THE COURT:  So -- but why -- why did you -- you

13   should be able to articulate why you did it in the first

14   place, right?

15        In other words, you've asked them to appeal a

16   decision that you can't even articulate the basis for here

17   today.  You can't tell a federal judge why you terminated

18   this grant.

19        MR. BAILEY:  Your Honor, my point being there is

20   that the Department has restored funding in, I believe, two

21   appeals, denied funding in another as of the time that we

22   filed our opposition to the preliminary injunction.

23   So I think that just belies the notion that this is some

24   sort of arbitrary, they just don't care, they're all --

25   there's no reasons here.

1        I mean, the agency -- that's why the agency put

2   its priorities in these notices.  The grant recipients were

3   free to file an appeal and say -- express their reasons.

4        I can't speak in any more detail as to any one

5   individual grant.

6        THE COURT:  I mean, it's just very odd.

7        You mean, for example, if they were noncompliant,

8   right -- and that's not the basis for the termination as

9   I understand it, nobody's alleging that any of these groups

10  have been noncompliant.  But if they had been noncompliant,

11  you would have had an obligation to go to them, right, and

12  say, hey, you're noncompliant, you need to cure your

13  noncompliance, right?

14       MR. BAILEY:  I believe so, or I can't --

15       THE COURT:  But now the Department of Justice is

16  saying, even if you are compliant, even if you've been

17  compliant, we have a unilateral right, almost near absolute,

18  it seems, to just terminate the grants, because we think

19  it's inconsistent with our new priorities, although they

20  sound a lot like the priorities that they're carrying out.

21  And they can do that and we have to wait for this appeals

22  process to figure out what, whether the department got it

23  right in the first place?

24       MR. BAILEY:  I don't mean to suggest that the

25  appeals process needs to peal out for that to be shown to be

**129a**

1    true.  I think that, as I said, I understand this was an

2    individualized and iterative process.  I can't speak to any

3    one decision, Your Honor.

4           THE COURT:  So say you were standing in front of a

5    Court of Claims judge today and not a Federal District Court

6    Article III Judge, what would you say to that judge as to

7    why you were justified in terminating the grant, consistent

8    with the terms of the application?

9           MR. BAILEY:  Well, I mean --

10          THE COURT:  Consistent with the terms of the

11   regulation and the contract?

12          MR. BAILEY:  If we were in the Court of Claims, we

13   would be dealing with -- it would be a contract action.

14          THE COURT:  Right.

15          So what would your argument be as to why you were

16   justified in terminating the contract if you were standing

17   before a Court of Claims judge?

18          MR. BAILEY:  I mean, truthfully, Your Honor,

19   I haven't developed -- we haven't developed contract

20   defenses because plaintiffs have brought an arbitrary and

21   capricious claim and a number of others.

22          I can't speak to what our position would be

23   exactly in the Court of Claims.

24          THE COURT:  But presumably, you should be able to

25   because you terminated the grant.

**130a**

```
 1              I don't get it.

 2              I mean, if you terminated the grant, presumably

 3    the Department of Justice doesn't act unlawfully.  Would you

 4    agree with that?

 5              MR. BAILEY:  Yes.

 6              THE COURT:  Right.  You don't act unlawfully.

 7              So presumably somebody at the

 8    Department of Justice decided that we have a basis for

 9    termination of this grant, correct?

10              MR. BAILEY:  Yes, absolutely.

11              THE COURT:  And you haven't yet developed what

12    that defense is?

13              MR. BAILEY:  Your Honor, those are contract

14    defenses for the Court of Federal Claims.

15              I mean -- and plaintiffs are free to try to prove

16    that there was a breach and they are entitled to damages.

17    We're not saying that that's -- our position is not that

18    that's foreclosed.

19              THE COURT:  What damages would they be entitled to

20    in the Court of Claims?

21              MR. BAILEY:  Again, I didn't -- this would be an

22    issue for the expertise of the Claims Court.

23              But, I mean, it is not our position that they're

24    necessarily limited to compensation for work already

25    performed.
```

**131a**

1        THE COURT:  Could they recover the full amount of

2   the grant?

3        MR. BAILEY:  I mean, we think that's unlikely.

4        We think that it's unlikely that the full measure

5   of their damages would be the full amount of the grants

6   when, because specific performance is not a remedy there,

7   they would not have any of the obligations to do anything

8   with the money.  They could just pocket it.

9        So I mean, it might be some sort of reliance --

10  reliance damages, shutdown cost, some other expectation,

11  measure of expectation damages, and I'm not exactly sure

12  what these are.

13       But plaintiffs are free to seek damages in the

14  Court of Claims.

15       And I mean, Congress has specifically limited the

16  contract remedies against the government; they've made that

17  decision to make specific performance to preclude specific

18  performance there.

19       And, you know, I'll just note, Your Honor, that in

20  procurement contracts, termination for convenience clauses

21  are read into procurement contracts if they weren't already

22  universally used, and that just gives the government broad

23  discretion to say, in our convenience, we're shutting off

24  here.

25       So I think in the space of government contracting,

**132a**

1    required by the contract and that was their contract

2    argument, their breach argument, sure.

3         Like I said, I haven't developed contract

4    defenses, and I'm not sure what the contract arguments would

5    be in the Court of Claims.

6         THE COURT:  But in other words, they could not

7    make sort of a traditional APA claim of the kind that

8    they're making here; for example, the Department of Justice

9    did not consider reliance interests, for example?  That's

10   not an argument they could make in a Court of Claims?

11        MR. BAILEY:  No, Your Honor, I don't believe so.

12        I think that question would be a matter of

13   contract interpretation, how do we, within the four corners

14   of the contract, you know, reasonably interpret this phrase,

15   what does it encompass, what does it require.  You know, was

16   it within the expectations of the parties that there be a

17   reasoned explanation.

18        But I think that those are questions for the

19   Claims Court.  And they're the experts in government

20   contracting.  I'm truthfully not.

21        But I think that just shows their claims, they

22   certainly -- they can make them there in some form.

23        THE COURT:  But your view is that there's no court

24   that could grant them the relief that they're seeking, which

25   is reinstatement of the contract -- or reinstatement of the

1 grant?

2    MR. BAILEY:  Yes, Your Honor.

3    I mean, that's the whole point of -- or a large

4 part of the point of the Tucker Act is, Congress wanted to

5 limit the remedies for breach of contract against a

6 government.

7    And we may disagree with Congress about that and

8 think that that's unfair to government contractors, but it

9 was very intentional, the specific performance.

10    The limited waiver of sovereign immunity that's

11 been waived is not eroded further in specific performance;

12 and I think our papers allude to this, that it raises

13 separation-of-powers concerns when you have a court

14 requiring the Executive to continue an ongoing relationship

15 with a private party that carries, you know, conditions for

16 both sides, and, you know -- it's invasive.  And so that's

17 one of, I think, many reasons why specific performance isn't

18 an available remedy.

19    And it's -- it seems to me to be why plaintiffs

20 want to be in this forum, because that's the remedy that

21 they seek.  They seek the full amount of their grant funds

22 and the continued ongoing relationship.  But Congress has

23 decided that that is just not the remedy that's available

24 when you contract with the government.

25    THE COURT:  Is it your view that their

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|                                              |     |                          |
|----------------------------------------------|-----|--------------------------|
| **VERA INSTITUTE OF JUSTICE, et al.,**       | )   |                          |
|                                              | )   |                          |
|                                              | )   |                          |
| **Plaintiffs,**                              | )   |                          |
|                                              | )   |                          |
| **v.**                                       | )   | **Case No. 25-cv-1643 (APM)** |
|                                              | )   |                          |
| **U.S. DEPARTMENT OF JUSTICE, et al.,**      | )   |                          |
|                                              | )   |                          |
| **Defendants.**                              | )   |                          |
| _____        | )   |                          |

**MEMORANDUM OPINION**

**I.      INTRODUCTION**

In April 2025, the Department of Justice's Office of Justice Programs, without warning, terminated more than 370 multi-year cooperative agreements and grants totaling more than $820 million.  In identical notices issued to the affected organizations, the Office of Justice Programs vaguely explained that the reason for the terminations was that the "awards no longer effectuate[] the program goals or agency priorities."  The notices instructed the grantees to stop work immediately and informed them that they would be reimbursed only up to the date of termination.

Plaintiffs are five organizations that had their awards terminated.  Asserting both constitutional and statutory claims, Plaintiffs seek a preliminary injunction that reverses the terminations and restores their awards.  They assert that their operational health and ability to fulfill their missions depend on the funds promised.  Plaintiffs also seek to certify a class comprised of the hundreds of other grantees whose awards were terminated and ask that their funding be reinstated, too.

The Office of Justice Programs' decision to terminate these awards was unquestionably arbitrary, at least in lay terms.  The agency advised the grantees that it had "changed its priorities" to focus on, among other things, "more directly supporting certain law enforcement operations," "combatting violent crime," and "supporting American victims of trafficking and sexual assault."  The monies awarded to these Plaintiffs, however, were for those very purposes.  Lead Plaintiff Vera Institute for Justice used one of its awards to train law enforcement on investigating human trafficking of persons with disabilities.  Plaintiff Children and Youth Justice Center received funds to prevent and reduce gun violence against youth in King County, Washington.  Plaintiff FORCE Detroit put its grant towards community violence intervention in Detroit's Warrendale-Cody Rouge neighborhood.  Plaintiff Heath Resources in Action used its funding to support violence prevention professionals and programs.  And Plaintiff Chinese for Affirmative Action, which does business as Stop AAPI Hate, dedicated its grant towards, among other things, increasing safety on public transit systems.  When asked at oral argument why these awards were no longer consistent with the agency's new priorities, Defendants' counsel had no answer.  He simply shrugged his shoulders.

Defendants' rescinding of these awards is shameful.  It is likely to harm communities and individuals vulnerable to crime and violence.  No federal agency, especially the Department of Justice, should conduct itself in such manner.

But displeasure and sympathy are not enough in a court of law.  The court's powers are limited.  It cannot act without jurisdiction or in the absence of a valid cause of action.  That is the nub here.  The court cannot grant Plaintiffs relief because it lacks the power to hear their claims under the Administrative Procedure Act, and because Plaintiffs have failed to demonstrate a violation of any constitutional right or protection.

2

**136a**

For those reasons, the court denies preliminary injunctive relief and grants Defendants'

pending motion to dismiss.  As the court denies preliminary relief and dismisses this action, it also

denies the pending motion for class certification as moot.

## II.     BACKGROUND

### A.     Statutory and Regulatory Background

The Office of Justice Programs ("OJP") is the Department of Justice's ("DOJ's") largest

grantmaking component and "advances DOJ's mission in part by making thousands of

discretionary grant agreements to state and local law enforcement agencies, as well as to

community-based and other non-governmental entities."  *See* Defs.' Mot. to Dismiss & Opp'n to

Pls.' Mot. for Prelim. Inj., ECF No. 27 [hereinafter Defs.' Mot. to Dismiss], Decl. of Maureen A.

Henneberg, ECF No. 27-1 [hereinafter Henneberg Decl.], ¶ 4.  According to Defendants, the

funding for the vast majority of OJP awards is "no year" monies from Congress, meaning that they

do not need to be spent within the fiscal year for which they are appropriated and they remain

available until expended.  *Id.* ¶ 17; *see, e.g.,* Consolidated Appropriations Act, 2022, Pub. L. No.

117-103, 136 Stat. 49, 123–24; Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat.

1313, 1338–39 (2022); *see also* 34 U.S.C. §§ 20101(c), 20103(c)(1)(A) (congressionally created

Crime Victims Fund which is permanent and available for grants "without fiscal year limitation").

Congress earmarked these funds for certain broad purposes, but it did not mandate that the

funds be awarded to any specific organization.  *See, e.g.,* Consolidated Appropriations Act, 2024,

Pub. L. No. 118-42, 138 Stat. 25, 149 (appropriating "$50,000,000 for a community violence

intervention and prevention initiative"); Consolidated Appropriations Act, 2022, 136 Stat. at 125

(appropriating "$184,707,000 . . . for discretionary grants to improve the functioning of the

criminal justice system, to prevent or combat juvenile delinquency, and to assist victims of crime"). OJP makes discretionary awards from these appropriations.  Henneberg Decl. ¶¶ 4–5.

OJP grants are subject to the Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Uniform Guidance").  *See* 2 C.F.R. § 2800.101 (DOJ adopting the Uniform Guidance).  Part of the Uniform Guidance addresses when a federal award may be terminated.  *See* 2 C.F.R. § 200.340.  It identifies four such circumstances, three of which are not at issue here: (1) "the recipient or subrecipient fails to comply with the terms and conditions" of the award; (2) the parties consent to termination; or (3) the recipient voluntarily terminates the award.  *Id.* § 200.340(a)(1)–(3).  The fourth, which is at the heart of this case, allows a federal agency to terminate a grant unilaterally "pursuant to the terms and conditions of the [] award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  *Id.* § 200.340(a)(4).

Importantly, any basis for termination must be spelled out in the award itself.  The regulations provide that the agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."  *Id.* § 200.340(b).  An agency therefore must have a textual hook to terminate.  Thus, if OJP wishes to end an award under § 200.340(a)(4) based on its failure to effectuate agency priorities, it can do so only if that basis for termination is itself in the terms and conditions of the award.  *See Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024) (clarifying that terminations based on an award "no longer effectuat[ing]" agency priorities are allowed "[p]rovided that the language is included in the terms and conditions of the award").

**B.    Grant Terminations**

At the start of the new Trump administration, there were roughly 11,000 open OJP grant awards.  Henneberg Decl. ¶ 18.  In February 2025, DOJ leadership began a review of those awards, "focusing on the possibility of termination of particular OJP awards, grounded in consideration of whether (based on their individual project descriptions) they effectuated [DOJ's] priorities."  *Id.*  Defendants say that they conducted an "individualized review of open grant awards," which within weeks reduced "the number of awards under active focus . . . to approximately 2,200."  *Id.*  Then throughout April 2025, "OJP was directed to terminate 376 individual, specifically identified discretionary grant awards (to 219 recipients), on the basis of the Department determination that they 'no longer effectuate[d] Department priorities.'"  *Id.* ¶ 19.  Beyond this, Defendants have offered zero insight into what criteria they used to evaluate the project descriptions, reduce the number of awards under "active focus," and determine which of them would ultimately be terminated.

The record includes the termination notices that OJP delivered to the five Plaintiff-organizations, all of which are identical.  *See* Pls.' Mot. for Prelim. Inj., ECF No. 3 [hereinafter Prelim. Inj. Mot.], Decl. of Rachel Sottile, ECF No. 3-3 [hereinafter Sottile Decl.,], Exs. 2, 4 (Center for Children & Youth Justice's termination letters); Prelim. Inj. Mot., Decl. of Cynthia Choi, ECF No. 3-4 [hereinafter Choi Decl.], Ex. 2 (Stop AAPI Hate's termination letter); Prelim. Inj. Mot., Decl. of Dujuan Kennedy, ECF No. 3-5 [hereinafter Kennedy Decl.], Ex. 2 (FORCE Detroit's termination letter); Prelim. Inj. Mot., Decl. of Steven Ridini, ECF No. 3-6 [hereinafter Ridini Decl.], Exs. 2, 4, 6 (Health Resources in Action's termination letters); Prelim. Inj. Mot., Decl. of Nicholas Turner, ECF No. 3-7 [hereinafter Turner Decl.], Ex. 6 (Vera Institute of Justice's

termination letter). Sent via email, the notices immediately ceased future funding. OJP offered the same boilerplate explanation to each grant recipient:

> This award is being terminated because it "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The Department has changed its priorities with respect to discretionary grant funding to focus on, among other things, more directly supporting certain law enforcement operations, combatting violent crime, protecting American children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts at all levels of government. This award demonstrates that it no longer effectuates Department priorities.

*See, e.g.,* Sottile Decl., Ex. 2. The notices offered no explanation as to *why* the grantees' awards no longer effectuated agency priorities. *See generally id.*

The notices alerted recipients to an appeals process to dispute their terminations. *Id.* Consistent with 2 C.F.R. § 200.342, grant recipients had 30 days to submit a written appeal to the Assistant Attorney General for OJP. *Id.*

### C.    Procedural Background

Plaintiffs are five grantees who had their awards terminated in April 2025. *See* Compl., ECF No. 1 [hereinafter Compl.], ¶¶ 42–43.

- Vera Institute of Justice ("Vera") is a New York-based nonprofit that seeks "to pilot, test, and scale innovations that prevent crime and address its drivers, increase accountability, and rely less on incarceration and more on the programs and services that help individuals, families, and communities to thrive." Compl. ¶¶ 17, 39. OJP made five awards to Vera totaling $7.25 million running through September 30, 2027. *Id.* ¶ 40; Turner Decl. ¶¶ 19, 24, 31, 37, 45. OJP terminated the awards on April 4, 2025, with approximately $5.4 million in funds remaining. Turner Decl. ¶¶ 8–9.

- The Center for Children & Youth Justice ("CCYJ") is a Washington state-based nonprofit seeking "to create better lives for generations of children and youth by reforming the child welfare and juvenile justice systems." Compl. ¶ 13. OJP made two awards to CCYJ totaling $6 million for the fiscal years

ending September 30, 2025, and September 30, 2026. *Id.* ¶ 28; Sottile Decl. ¶¶ 19, 27. OJP terminated both awards on April 22, 2025, with roughly $4.1 million in funds remaining. *See* Sottile Decl., ¶¶ 9, 11.

- Chinese for Affirmative Action, doing business as Stop AAPI Hate, "is a U.S.-based non-partisan Civil Rights coalition dedicated to ending racism and discrimination against Asian Americans and Pacific Islanders (AAPIs)." Compl. ¶ 14. OJP made a $2 million grant to Stop AAPI Hate to run from October 1, 2024, through September 30, 2027. *Id.* ¶ 32; Choi Decl. ¶ 13. The agency terminated the award on April 22, 2025, after Stop AAPI Hate had withdrawn only $500,000. Choi Decl. ¶¶ 18–19.

- "FORCE (Faithfully Organizing for Community Empowerment) Detroit is a community violence intervention . . . organization dedicated to building a safer, freer Detroit, Michigan." Compl. ¶ 15. OJP awarded FORCE Detroit $1,999,998 for the period of October 1, 2024, through September 30, 2027. Kennedy Decl. ¶ 6. OJP terminated the award on April 22, 2025, with $1,945,998 in funds remaining. *Id.* ¶ 9.

- "Health Resources in Action ('HRiA') is a Massachusetts based non-profit organization working to improve and reimagine public health, with a vision of healthy people thriving in equitable and just communities." Compl. ¶ 16. OJP made three grant awards to HRiA totaling approximately $8.55 million to run through September 30, 2027. *Id.* ¶ 36; *see also* Ridini Decl., ¶¶ 28, 31; *id.*, Exs. 1, 3, 5. OJP terminated all three awards on April 22, 2025, with over $6.75 million in funds remaining. Ridini Decl. ¶¶ 11–12.

Plaintiffs filed suit on May 21, 2025, challenging the grant terminations. *See generally* Compl. They assert both statutory and constitutional claims. They allege that the grant terminations (1) were arbitrary and capricious, contrary to law, and contrary to a constitutional right under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706(2)(A) (Counts V and VI); (2) violated their right to due process under the Fifth Amendment, and were based on an unconstitutionally vague regulation (Counts I and II); and (3) violated the doctrine of the separation of powers, the Spending and Appropriations Clauses, and the Take Care Clause

(Count IV).  *See id.* ¶¶ 82–98, 104–34.  They also assert an equitable *ultra vires* claim against the individual Defendants, the Attorney General and the acting head of OJP (Count III).  *Id.* ¶¶ 99–103.

Plaintiffs also seek to proceed as representatives of a class.  They request certification of a class as follows:

> All entities in the United States issued awards by the U.S. Department of Justice (DOJ) Office of Justice Programs, whose grants DOJ terminated in April 2025 pursuant to 2 C.F.R. § 200.340(a)(4).

Compl. ¶ 74.

Plaintiffs demand various forms of relief.[1]  In sum, they ask the court (1) to declare unlawful, vacate, and set aside OJP's *en masse* terminations of the putative class members' grants; (2) to declare that the terminations violate the Fifth Amendment, the separation of powers, the Take Care Clause, and the Appropriations and Spending Clauses; (3) to declare that the terminations based on 2 C.F.R. § 200.340(a), and OJP's interpretation of that regulation, are unlawful; (4) to preliminarily and permanently enjoin Defendants from giving effect to the terminations and re-obligating those funds to other organizations; and (5) to "[e]nter an order in the exercise of the court's equitable powers that directs Defendants to take all steps necessary to ensure that OJP disburses funds to Plaintiffs in the customary manner and in customary timeframes[.]"  *Id.* at 29–31.

Plaintiffs simultaneously moved for preliminary injunctive relief and class certification. *See* Class Cert. Mot., ECF No. 2; Prelim. Inj. Mot.  Defendants opposed such relief and moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim.  *See* Defs.' Mot. to Dismiss.  The court held a hearing on the pending motions on June 26, 2025.

---

[1] The Complaint lists 17 separate forms of relief.  Compl. at 29–31.  The court has distilled them to five.

III.    **LEGAL STANDARDS**

    A.    **Preliminary Injunction**

    Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal quotation marks and citations omitted). A court may grant the "extraordinary remedy . . . [only] upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). The preliminary injunction factors are well established: plaintiffs must show that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Id.* at 20 (citations omitted). Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

    Prior to the Supreme Court's decision in *Winter*, the D.C. Circuit "allowed . . . a strong showing on one factor" to "make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The D.C. Circuit has since repeatedly suggested that this "sliding scale" approach does not remain good law after *Winter*, but it has not squarely said so. *See, e.g., id.* at 392–93; *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009); *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014); *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022); *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1235–36 (D.C. Cir. 2025). It has emphasized that "the first and most important" of these four factors is whether the movant "ha[s] established a likelihood of success on the merits." *Aamer*, 742 F.3d at 1038. If a plaintiff cannot show a likelihood of success on the merits, "there

is no need to consider the remaining factors." *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011). "[T]he 'merits' on which [a] plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015).

**B.      Motion to Dismiss**

*1.      Rule 12(b)(1)*

The court must dismiss a claim as to which it lacks subject matter jurisdiction. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); *see* Fed. R. Civ. P. 12(b)(1), 12(h)(3). The plaintiff bears the burden of establishing the court's subject-matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The court must accept all well-pleaded factual allegations in the complaint as true. *See Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005) (citation omitted). "[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts" when resolving a motion under Rule 12(b)(1). *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

*2.      Rule 12(b)(6)*

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 344–45 (D.C. Cir. 2018) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim satisfies the plausibility standard "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

## IV.    JURISDICTION

Defendants first argue that Plaintiffs' claims—all of them—must be dismissed because they "stem from grant agreements with the government and seek relief that is quintessentially contractual." Defs.' Mot. to Dismiss at 1.  "[T]his suit belongs in the Court of Federal Claims," they say.  *Id.*  In so arguing, Defendants require this court to wade into the ongoing controversy over whether federal grant termination cases belong in federal district courts or in the Court of Federal Claims.  *See, e.g., Harris Cnty. v. Kennedy*, --- F. Supp. 3d ---, 2025 WL 1707665, at *14 (D.D.C. 2025) (citing cases with various approaches to the issue in this District).

"The United States and its agencies are generally immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022) (citing *Kalodner v. Abraham*, 310 F.3d 767, 769 (D.C. Cir. 2002)).  Under the APA, Congress has waived sovereign immunity on a limited basis for lawsuits by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, . . . [and] seeking relief other than money damages." 5 U.S.C. § 702; *see Crowley*, 38 F.4th at 1105–06.  The waiver does not apply, however, "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  *Crowley*, 38 F.4th at 1106 (quoting *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618 (D.C. Cir. 2017) (quoting 5 U.S.C. § 702)).

According to Defendants, the "other statute" that forecloses this court's jurisdiction in this case is the Tucker Act.  That law "confer[s] exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the Court of Federal Claims."

*Id.* at 1106 (quoting *Hammer v. Untied States*, 589 F.3d 1, 2 (D.C. Cir. 2021) (citations omitted)). The D.C. Circuit has interpreted the Tucker Act as "impliedly forbid[ding] contract claims against the Government from being brought in district court under the waiver in the APA." *Id.* (internal quotation marks omitted) (quoting *Perry Cap.*, 84 F.3d at 618–19).

### A.    Constitutional and *Ultra Vires* Claims

Subject matter jurisdiction cannot be evaluated on a case-wide basis. "To resolve the sovereign immunity and jurisdiction questions, [the court] must consider [Plaintiffs'] claims individually[.]" *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992). Though Defendants in their opposition brief failed to appreciate this nuance, their counsel acknowledged at argument that jurisdiction may lie for certain claims and not for others. *See* Hr'g Tr. 6/26/25, ECF No. 46 [hereinafter Tr.], 74:2-4 ("[I]nsofar as they have truly independent constitutional claims, this [c]ourt has jurisdiction.").

That concession was wise. Where the "source of the rights upon which the plaintiff bases its claims," *Megapulse v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982), is constitutional or statutory, the D.C. Circuit has said that such claims belong in federal district court, *see Transohio*, 967 F.2d at 609–10 ("[L]itigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government."). Further, the fact that a favorable outcome might require the payment of money is no impediment to jurisdiction. "[A] federal district court may accept jurisdiction over a statutory or constitutional claim for injunctive relief even where the relief sought is an order forcing the government to obey the terms of a contract—that is, specific performance." *Id.* at 610.

The D.C. Circuit's decisions in *Transohio* and *Sharp v. Weinberger* are illustrative. In both cases, the court held that the APA waived sovereign immunity for the plaintiffs' due process claims,

where they had asserted that government "contracts gave them a property interest, the denial of which the Constitution prohibits." *Transohio*, 967 F.2d at 610; *see Sharp v. Weinberger*, 798 F.2d 1521, 1523–24 (D.C. Cir. 1986). The plaintiffs in both cases also sought injunctive and declaratory relief. *See Transohio*, 967 F.2d at 610; *Sharp*, 798 F.2d at 1523.

*Transohio* and *Sharp* establish this court's jurisdiction to hear Plaintiffs' due process claims (Counts I and II). Like those cases, Plaintiffs here contend that their grant awards gave them "a protected property interest," which OJP stripped "without the procedural due process rights to which they are entitled." Compl. ¶¶ 85, 87. Plaintiffs further assert that OJP deprived them of their property rights based on an unconstitutionally vague application of § 200.340(a)(4). *Id.* ¶¶ 94–95. They seek injunctive and declaratory relief that would compel OJP to pay in full the remaining grant funds. The APA therefore waives the United States' sovereign immunity as to these claims. *See Transohio*, 967 F.2d at 610.

The same result obtains for Plaintiffs' other constitutional claims. "The core principle underlying" Plaintiffs' separation of powers, Spending and Appropriation Clauses, and Take Care Clause claims (Count IV) "is that the Constitution gives Congress, not the Executive Branch, exclusive power over spending." *Harris Cnty.*, 2025 WL 1707665, at *4 (citing *Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012)); *see also In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (stating that the Executive Branch must follow statutory mandates where appropriated funds remain available). The source of these claimed rights is thus the Constitution, not any grant award. The court therefore can hear those claims. *See Harris Cnty.*, 2025 WL 1707665, at *4–6.

So, too, as to Plaintiffs' equitable *ultra vires* cause of action (Count III). The rights sought to be vindicated through that claim are those same constitutional and statutory principles regarding

Congress's power of the purse.  *See, e.g., Harris Cnty.*, 2025 WL 1707655, at *16; *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *10 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting) [hereinafter *Widakuswara I*], *on reconsideration en banc*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (vacating the panel's decision for "substantially . . . the reasons explained by Judge Pillard").  Plaintiffs' position as to the *ultra vires* claim "is ultimately based, not on breach of contract, but on an alleged governmental . . . violation of" constitutional principles and the relevant appropriations statutes.  *Megapulse*, 672 F.2d at 969.

**B.    APA Claims**

Whether the court has jurisdiction over the APA claims (Counts V and VI) is more complicated.  The D.C. Circuit has "interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government, at least *vis a vis* the APA."  *Transohio*, 967 F.2d at 609.  "[A]n action against the United States which is *at its essence* a contract claim lies within the Tucker Act and . . . a district court has no power to grant injunctive relief."  *Megapulse*, 672 F.2d at 967 (emphasis added).  The "longstanding test" in this Circuit "for determining whether a claim falls within the exclusive jurisdiction of the Claims Court pursuant to the Tucker Act" turns on two factors: "the source of the rights upon which the plaintiff bases its claims," and "the type of relief sought (or appropriate)."  *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 968).  In assessing those factors, the court must be careful to guard against "a disguised contract action," *Megapulse*, 672 F.2d at 968, that seeks to avoid the Tucker Act "merely by alleging violations of regulatory or statutory provisions rather than breach of contract," *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985).

Plaintiffs make two APA claims.  First, they assert that "OJP's *en masse* termination of an estimated 373 grants, on the same day, using the same cursory and unspecific rationale" was

14

**148a**

arbitrary and capricious agency action.  Prelim. Inj. Mot., Mem. in Supp., ECF No. 3-1 [hereinafter Prelim Inj. Mem.], at 19; *see* 5 U.S.C. § 706(2)(A).  Second, Plaintiffs contend that the terminations violated § 200.340(a)(4), and are thus contrary to law, insofar as none of their award documents contained a provision that would permit OJP to terminate awards based on changed agency priorities.  Compl. ¶ 120; *see* 5 U.S.C. § 706(2)(A).

The court holds that both APA claims are essentially contractual in nature and belong in the Court of Federal Claims.

### 1.    Department of Education v. California

The Supreme Court's recent decision in *Department of Education v. California* frames the jurisdictional inquiry.  145 S. Ct. 966, 968 (2025) [hereinafter *California III*].  Some detail about the lower court proceedings is helpful to put the Supreme Court's decision in context.

Various states filed suit against the Secretary of Education for terminating "all grants previously awarded" under congressionally funded programs that provided grants to help teachers in underserved areas.  *California v. Dep't of Educ.*, 769 F. Supp. 3d 72, 75 (D. Mass. 2025) [hereinafter *California I*].  The plaintiffs asserted that the terminations were both arbitrary and capricious and contrary to law under the APA; they did not, however, assert any constitutional or *ultra vires* claims.  *See* Compl., ECF No. 1, ¶¶ 161–86, *California v. Dep't of Educ.*, No. 25-cv-10548-AK (D. Mass.).

Their APA claims were identical to those asserted here.  The plaintiffs in *California I* insisted that the grant terminations were arbitrary and capricious because the defendants did not engage in reasoned decisionmaking, did not conduct an individual analysis of each termination, and failed to consider the reliance interests of the grant recipients.  *Id.* ¶ 13.  As to the contrary-to-law claim, the plaintiffs maintained that "because the authority on which Defendants rely," 2 C.F.R.

15

**149a**

§ 200.340(a)(4), "does not authorize termination on the independent grounds of 'Department priorities,'" the agency had to "'clearly and unambiguously specify all termination provisions in the terms and conditions of the federal award.'" *Id.* ¶ 14 (quoting 2 C.F.R. § 200.340(b)). Because "the terms and conditions of the . . . grant awards [did] not authorize termination on these grounds," the terminations were not "authorized by law." *Id.* As relief, the plaintiffs requested that the court "vacate and set aside [the defendants'] termination of all previously-awarded" grants and "restore recipients . . . to the pre-existing status quo prior to the termination." *See id.* at 51–52.

The district court granted the requested temporary restraining order ("TRO"). *See California I*, 769 F. Supp. 3d at 75. In doing so, it rejected the same jurisdictional argument Defendants make here. The court ruled that the case did not belong in the Court of Federal Claims because "the 'essence' of the action was not contractual in nature," as the plaintiffs did not allege "claims for past pecuniary harms" and "the dispute [did] not hinge on the terms of a contract between the parties, but rather 'federal statute and regulations put in place by Congress and the [Department of Education].'" *Id.* at 76 (quoting *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 293 (D. Mass. 2025)). On the merits, the court held that the grant terminations were arbitrary and capricious because the Department of Education had failed to conduct individualized analysis or offer a reasoned explanation for its *en masse* terminations. *Id.* at 76–78. The court did not reach the contrary-to-law claim. *Id.* at 78 n.3. As relief, the district court ordered the defendants to "immediately restore Plaintiff States to the pre-existing status quo prior to the termination under all previously awarded . . . grants for recipients in Plaintiff States," among others. *Id.* at 80.

The defendants appealed and moved for a stay, which the First Circuit denied. *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96–97 (1st Cir. 2025) [hereinafter *California II*]. The appellate

court held that jurisdiction was proper because, "although the terms and conditions of each individual grant award are at issue, the 'essence' . . . of the claims is not contractual" as "the States challenge the Department's actions as insufficiently explained, insufficiently reasoned, and otherwise contrary to law—arguments derived from the [APA]." *Id.* at 96–97. "Simply put, if the Department breached any contract, it did so by violating the APA." *Id.* at 97. The court further reasoned that, because the plaintiffs sought equitable relief by requiring the Department to continue paying out appropriated funds, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988)).

The Supreme Court reversed and granted the defendants a stay. *California III*, 145 S. Ct. at 968–69. It held that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* at 968. The Court recognized that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds," *id.* (quoting *Bowen*, 487 U.S. at 910), but distinguished *Bowen* insofar as "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here," *id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

The Supreme Court's sparse reasoning in *California III* has sown confusion in this jurisdiction. Several judges on the D.C. Circuit "appear to have suggested that [*California III*] forecloses district-court jurisdiction in grant-termination cases altogether." *Harris Cnty.*, 2025 WL 1707665, at *14 (citing *Widakuswara v. Lake*, No. 25-5150, 2025 WL 1521355, at *2 (D.C. Cir. May 28, 2025) (Katsas, J., dissenting, joined by Henderson, Rao, and Walker, JJ.) [hereinafter

*Widakuswara II*]).  Another D.C. Circuit judge did not go as far.  She instead distinguished between "entities created by statute and designated by Congress to receive specified sums" and entities whose "only claim was to sums awarded to them in previously awarded discretionary grants," with jurisdiction proper in federal district court in the former but not the latter.  *Widakuswara I*, 2025 WL 1288817, at *13 (Pillard, J., dissenting); *see also Widakuswara II*, 2025 WL 1521355, at *1 (granting motion for *en banc* reconsideration and vacatur of government's stay pending appeal for "substantially" the same "reasons explained by Judge Pillard").

Nor have judges in this District been uniform in their application of *California III*. *See Harris Cnty.*, 2025 WL 1707665, at *4–6, 14–15 (allowing constitutional claims to proceed, declining to rule on APA contrary-to-statute and contrary-to-regulation claims, and finding that an APA arbitrary-and-capricious claim is subject to *California III*'s bar); *S. Educ. Found. v. U.S. Dep't of Educ.*, --- F. Supp. 3d ---, 2025 WL 1453047, at *6–11 (D.D.C. 2025) (allowing an APA arbitrary-and-capricious claim to proceed, reasoning that *California III* "does not displace governing law"); *Am. Ctr. for Int'l Labor Solidarity v. Chavez-Deremer*, No. 25-cv-1128 (BAH), 2025 WL 1795090, at *12–20 (D.D.C. June 30, 2025) (explaining that exclusive Tucker Act jurisdiction does not apply to claims that "seek[] relief based only on an alleged statutory or constitutional violation," and finding jurisdiction because the cooperative agreements at issue did not resemble contracts); *Climate United Fund v. Citibank, N.A.*, --- F. Supp. 3d ---, 2025 WL 1131412, at *9–12 (D.D.C. 2025) (allowing APA, statutory, and constitutional claims to proceed); *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025) (holding that APA-styled claims belonged in the Court of Federal Claims where the plaintiff wanted the court "to order the Government to stop withholding the money due under the Cooperative Agreements").

2.    *Application*

a.    <u>Arbitrary and capricious</u>

Against this unsettled terrain, this court agrees with *Harris County*'s approach and finds that it lacks jurisdiction over Plaintiffs' arbitrary-and-capricious claim under *California III*.  As in *Harris County*, the arbitrary-and-capricious claim here "appears in all material respects identical" to that of *California III*.  *Harris Cnty.*, 2025 WL 1707665, at *15.  That is: (1) Plaintiffs' challenge "involve[s] a statute that required the Executive Branch to issue grants . . . for specified purposes"; (2) "the Executive Branch terminated [the] grants en masse with a boilerplate, one-paragraph explanation"; and (3) "the plaintiffs challenged that explanation under the APA on the ground that one paragraph does not cut it."  *Id.* (citing *California III*, 145 S. Ct. at 970–71, 975); *see also* Prelim. Inj. Mem. at 18–22.

Plaintiffs respond that *California III* does not control because (1) the grants and cooperative agreements at issue are not the type of contract that can give rise to Tucker Act jurisdiction, *see* Prelim. Inj. Mem. at 31–33, and (2) *California III*'s precedential value is questionable, *see id.* at 36.  Plaintiffs, however, fail to explain how the grant agreements in this case differ from those in *California III*, which the Supreme Court treated as contracts implicating Tucker Act jurisdiction.  *See California III*, 145 S. Ct. at 968.  Plaintiffs instead argue that the Supreme Court "had no occasion whether to consider the grant agreements there were the type of contract that can give rise to Tucker Act jurisdiction because no party raised that issue."  Prelim. Inj. Mem. at 36.  That is doubtful.  After all, the Court held that the plaintiff's arbitrary-and-capricious claim was essentially contractual.  It would be foolhardy to assume that the Supreme Court did not at least implicitly consider whether the grants at issue were contracts in the first place.

In any event, Plaintiffs' position is at odds with authorities from the Federal Circuit, which has developed robust caselaw as to what constitutes a contract for purposes of the Tucker Act. Where there is "(1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States," there is an enforceable contract for purposes of the Tucker Act. *Columbus Reg'l Hosp. v. United* States, 990 F.3d 1330, 1339 (Fed. Cir. 2021). The Federal Circuit "treat[s] federal grant agreements as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound." *Id.* at 1338.

Plaintiffs argue that the grant and cooperative agreements at issue "are not contracts at all" because they lack consideration, that is, a "'direct, tangible'" benefit to the government. Prelim. Inj. Mem. at 31 (quoting *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 133 (D.D.C. 2023)). But the Federal Circuit has ruled otherwise. In *Columbus Regional*, the court held that there was consideration in a disaster grant agreement, where the grant recipient "agreed to comply with an array of requirements attached to the receipt, use, and distribution of the grant money." *Columbus Reg'l*, 990 F.3d at 1340; *see id.* ("[C]onsideraton may consist of performance or a return promise to perform, and performance 'may be a specified act of forbearance, or any one of several specified acts or forbearances of which the offeree is given the choice, or such conduct as will produce a specified result.'") (quoting Restatement (Second of Contracts) § 71 cmt. d (1981)). And further "at least some of the conditions imposed on [the recipient] confer[red] a benefit on the government, such as [the recipient's] promises to serve as a collector or reimburser of funds procured by fraud and to report employees who have committed drug offenses." *Id.* Similarly, in *State of Texas v. United States*, the predecessor Court of Claims concluded that "defendant's valid execution of a document, which it prepared and titled 'Federal-

State Disaster Assistance Agreement,' specifying that 'Federal assistance will be made available in accordance with (various specified laws, Executive Orders and regulations)' obligates defendant to provide such assistance as called for by the parties' agreement."  537 F.2d 466, 468–69 (Ct. Cl. 1976).

As in those cases, Plaintiffs here "agreed to comply with an array of requirements attached to the receipt, use, and distribution of the grant money."  *Columbus Reg'l*, 990 F.3d at 1340; *see also Henneberg* Decl. ¶¶ 11–12.  The grantees accepted the awards from OJP subject to dozens of "Conditions."  *See, e.g.,* Defs.' Mot. to Dismiss, Exs. 2, 3, ECF Nos. 27-2 [hereinafter CYJC Award], 26-3 (CYJC award containing 52 conditions).  The government also received some direct benefit from the agreements, such as a promise by the recipient to collect, maintain, and provide data to OJP about program performance and effectiveness, *see* CYJC Award at 10 (Condition 13), and to report any fraud, waste, and abuse, *id.* at 15 (Condition 29).

Plaintiffs also argue that "even if the grant agreements here qualified as contracts, they are not the type of contract over which the Court of Federal Claims has jurisdiction" because they contain no "affirmative indication that the agreement[s] create[] a right to money damages."  Prelim. Inj. Mem. at 31, 32; *see Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (holding that a cooperative agreement did "not provide a substantive right to recover money-damages").  But "[n]ormally contracts do not contain provisions specifying the basis for the award of damages in case of breach," and "[t]he fact that this contract covers government financial grants does not warrant a different standard"—"[i]f the government has breached the Agreement, [Plaintiffs are] entitled to seek whatever damages [they are] entitled to receive."  *San Juan City Coll. v. United States*, 391 F.3d 1357, 1361 (Fed. Cir. 2004).

Plaintiffs acknowledge this principle but point to the Court of Federal Claims' decision in *St. Bernard Parish Government v. United States* for the proposition that money damages are not available under a cooperative agreement where "no 'specific provision in the agreement contemplate[s] money damages for breach'" by the federal agency.  *See* Prelim. Inj. Mem. at 33 (quoting 134 Fed. Cl. 730, 735 (2017)).  But this position is at odds with the Federal Circuit's decision in *San Juan City College*, which, as here, involved a federal grant agreement that did not contain a specific provision for money damages.  *See also San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 462–63 (2019) (disagreeing with *St. Bernard Parish* that cooperative agreements are not afforded a presumption of monetary damages).  The trial-level decision in *St. Bernard Parish* therefore is not persuasive.

Ultimately, the Supreme Court's ruling in *California III* forecloses the exercise of jurisdiction over Plaintiffs' arbitrary-and-capricious claim.  Although *California III* does not displace other Supreme Court and D.C. Circuit precedent, *see Am. Ctr. for Int'l Labor Solidarity*, 2025 WL 1795090, at *20; *S. Educ. Found.*, 2025 WL 1453047, at *9, the Court has spoken in a case substantially the same as this one.  This court must listen.  *See Harris Cnty.*, 2025 WL 1707665, at *15; *cf. Trump v. CASA, Inc.*, --- S. Ct. ---, 2025 WL 1773631, at *22 (June 27, 2025) (Kavanaugh, J., concurring) ("[W]hen this Court makes a decision on the interim legal status of a major new federal statute or executive action—that decision will often constitute a form of precedent (*de jure* or *de facto*) that provides guidance throughout the United States during the years-long interim period until a final decision on the merits.").

The court holds that Plaintiffs have not established this court's jurisdiction over their arbitrary-and-capricious APA claim, and therefore both denies injunctive relief and grants dismissal as to that claim.  *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 895 (D.C.

Cir. 1985) (affirming dismissal where the matter was determined to be within the Court of Federal Claims' jurisdiction).

b.    Contrary to law

Though the arbitrary-and-capricious claim is governed by *California III*, Plaintiffs' contrary-to-law claim arguably stands on a different footing.[2]    Recall, the Supreme Court in *California III* had no occasion to consider jurisdiction over a contrary-to-law claim, because the district court did not reach it when granting the TRO.  *See California I*, 769 F. Supp. 3d at 78 n.3. Still, Plaintiffs' contrary-to-law claim runs aground for a different reason: D.C. Circuit precedent requires dismissal for lack of jurisdiction.  *See Spectrum Leasing Corp.*, 764 F.2d 891; *Ingersoll-Rand*, 780 F.2d 74.

At issue in *Spectrum Leasing* was a contract awarded to Spectrum by the General Services Administration ("GSA") to develop a data communications network.  764 F.2d at 892.  The government eventually terminated the contract by invoking its liquidated damages clause, after which Spectrum sued, claiming that GSA violated the procedures set forth in the Debt Collection Act, 31 U.S.C. §§ 3701 *et seq. Id.*  Spectrum sought (1) a declaration that GSA violated Spectrum's rights under the Debt Collection Act and (2) "an injunction compelling the GSA to cease withholding hardware and maintenance payments under the contract." *Id.*  The D.C. Circuit found that Spectrum's suit belonged in the Court of Federal Claims because it sought "an injunction requiring the government to pay monies owed for computer hardware," and "[t]he right to these payments is created in the first instance by the contract, not by the Debt Collection Act."  *Id.* at 894.  That is, "[t]he [Debt Collection Act], even if it applied, confers no such right in the absence

---

[2] Plaintiffs also assert an APA claim that Defendants' terminations are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B); *see* Prelim. Inj. Mem. at 18; Compl. at 26 (Count V).  The court allows this portion of the APA claim to proceed for the same reasons described in Section III.A, *supra*.

of the contract itself"—though the Act "might impose procedural requirements on the government having some impact on the contract, the Act in no way creates the substantive right to the remedy Spectrum seeks." *Id.* The Circuit also looked to the type of relief sought, noting that "Spectrum seeks an order compelling the government to pay money owed in exchange for goods procured under an executory contract," which it likened to "the classic contractual remedy of specific performance." *Id.* Based on "the source of the rights" and "the type of relief sought," the D.C. Circuit concluded that Spectrum's claims were not properly in the jurisdiction of the federal district court. *Spectrum Leasing*, 764 F.2d at 893, 895 (quoting *Megapulse*, 672 F.2d at 968).

Then there is *Ingersoll-Rand*. In that case, the plaintiff challenged the Air Force's decision to terminate its contract for convenience pursuant to Federal Acquisition Regulation 52.249-2(a), which was incorporated into the contract. 780 F.2d at 75. The essence of Ingersoll-Rand's argument was that the termination of the contract violated two other federal regulations and thus was arbitrary and capricious under the APA. *Id.* at 77. Applying the *Megapulse* test, the D.C. Circuit found that "the essential rights at stake . . . are contractual" and that "the essence of [Ingersoll-Rand's] claim is a request for specific performance of the original contract." *Id.* at 77, 79. As to the source of the rights, the court found that it was "possible to conceive of this dispute as entirely contained within the terms of the contract" since the issue was really whether the text of the contract forbids termination under the challenged conditions. *Id.* at 78. "That the termination also arguably violates certain other regulations does not transform the action into one based solely on those regulations. Nor does plaintiff's decision to allege only a violation of the regulations change the essential character of the action." *Id.* And, as to the remedy, since Ingersoll-Rand "requested an order reinstating the original award of the contract," it in essence requested

specific performance, and it could not sidestep Tucker Act jurisdictional limitations merely by seeking "a declaratory and injunctive order." *Id.* at 79–80.

Plaintiffs' contrary-to-law claim is on par with *Spectrum Leasing* and *Ingersoll-Rand*. First, as to the source of the right, "it is possible to conceive of this dispute as entirely contained within the terms of the contract." *Ingersoll-Rand*, 780 F.2d at 78. The regulation that Defendants allegedly violated requires that the basis for termination be spelled out in "the terms and conditions of the Federal award." 2 C.F.R. § 200.340(a)(4); *see also id.* § 200.340(b). Thus, to determine whether OJP violated § 200.340(a)(4), the court must look back to the awards themselves. It must ask: Do the agreements contain a term permitting OJP to terminate the award for no longer effectuating agency priorities, or is such provision absent? That is a classic contract question. Although § 200.340(a) "might impose procedural requirements on the government having some impact on the contract," it "in no way creates the substantive right to the remedy [Plaintiffs] seek[]." *Spectrum Leasing*, 764 F.2d at 895. Put differently, Plaintiffs "right to the [ ] payments arose only upon creation and satisfaction of its [grant award from] the government; in no sense did it exist independently of that [award]." *Id.* at 894.

The remedy sought also marks the claim as essentially contractual. Plaintiffs seek continued payment of the grants—in other words, specific performance. "A request for specific performance must be resolved by the Claims Court" when, as here, the source of right is contractual. *Ingersoll-Rand*, 780 F.2d at 80; *Spectrum Leasing*, 764 F.2d at 894 ("Spectrum seeks the classic contractual remedy of specific performance."); *see also Transohio*, 967 F.2d at 613 (explaining that the Supreme Court's decision in *Bowen* did not overrule the D.C. Circuit's "very specific holdings that the APA does *not* waive sovereign immunity for contract claims seeking specific relief"); *U.S. Conf. of Catholic Bishops*, 770 F. Supp. 3d at 162–64 (holding that claims

belonged in the Court of Federal Claims where the plaintiffs asked "to cancel the termination, pay money due, and reinstate the contracts").

Plaintiffs fail to grapple with *Spectrum Leasing* and *Ingersoll-Rand*. *See, e.g.,* Tr. at 12:4–17:5. Indeed, their papers nowhere cite, let alone seek to distinguish, those cases. Their leading argument goes to the remedy prong of the inquiry, which is that they seek additional "non-monetary relief that has 'considerable value' independent of any future potential for monetary relief." Pls.' Reply in Supp. of Prelim. Inj. Mot. and Opp'n to Defs.' Mot. to Dismiss, ECF No. 37 [hereinafter Pls.' Reply & Opp'n], at 30 (quoting *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995) and citing *Crowley*, 38 F.4th at 1107–08). But this case bears no resemblance to *Crowley* and fails the *Kidwell* "considerable value" test.

*Crowley* involved audits by GSA of a contract between the plaintiff and the Department of Defense, which resulted in notices of overcharge. *Crowley*, 38 F.4th at 1102–03. Crowley sought a judgment (1) declaring GSA did not have statutory audit authority over the contract, (2) declaring that the notices of overcharge were contrary to statute, and (3) enjoining GSA from additional audits and issuing further notices. *Id.* at 1104. The D.C. Circuit found that there was considerable independent value in preventing GSA from interfering with the contract. *Id.* at 1111. Furthermore, it did not matter that money might flow from the government fisc from such a judgment. "Any monetary recovery Crowley might be entitled to in the future, including in Claims Court, would be entirely separate from the district court's exercise of jurisdiction and award of the requested declaratory and injunctive relief." *Id.* (internal quotation marks and alterations omitted).

The same cannot be said here. The non-monetary relief that Plaintiffs seek does not have "considerable value" apart from the "future potential for monetary gain." *Kidwell*, 56 F.3d at 284 (internal quotation marks omitted). Plaintiffs ask the court (1) to "[d]eclare that OJP's terminations

on the basis of Section 200.340(a)(4) are unlawful, including its interpretation that 2 C.F.R. § 200.340(a)(4) allows OJP to terminate a grant based on a 'change' in agency priorities," and (2) to "[p]reliminarily and permanently enjoin Defendants . . . from terminating grants under 2 C.F.R. § 200.340(a)(4) on the basis of a 'change' in agency priorities." Compl. at 29–30. But that non-monetary relief has little, if any, independent value from the future potential of monetary recovery. Plaintiffs conceded as much at oral argument. They acknowledged that the value of the non-monetary relief was the avoidance of future grant terminations that violate § 200.340(a)(4). Tr. at 13:8-11 (stating that declaratory relief is necessary because if "the grants are reinstated and the government does the exact same thing as it did before and terminates the grants, we're back in the same position moving forward"). That is not "considerable value" independent of the monetary relief sought; it merely ensures that the monetary relief will continue.

In sum, because the source of the right and the relief requested for Plaintiffs' contrary-to-law APA claim is "at its essence" contractual, Plaintiffs have failed to establish this court's jurisdiction over this claim. Denial of preliminary injunctive relief and dismissal must follow.

## V.    THE MERITS

The court turns now to the merits of those claims over which it does have jurisdiction, namely, Plaintiffs' constitutional and ultra vires claims. To secure preliminary injunctive relief, Plaintiffs must establish a "likelihood of success on the merits." *Aamer*, 742 F.3d at 1038. To defeat a motion to dismiss, the burden is lower. Plaintiffs need only state a claim for relief that is "plausible on its face." *Sickle*, 884 F.3d at 344–45 (quoting *Iqbal*, 556 U.S. at 678). The court

27

**161a**

keeps these different standards in mind when evaluating the pending motions.  *Cf. Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).[3]

### A.    Fifth Amendment Claims

Plaintiffs assert two Fifth Amendment claims.  First, they contend that they "have a constitutionally protected property interest in the funding they applied for, were awarded, and currently rely on," entitling them to due process before Defendants summarily terminated their grants.  Prelim. Inj. Mem. at 23; Compl. ¶¶ 84–85.  To assert a claim pursuant to the Fifth Amendment's Due Process Clause, "a plaintiff must show (i) deprivation of a protected liberty or property interest; (ii) by the government; (iii) without the process that is 'due' under the Fifth Amendment."  *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) (internal citations omitted).  Second, they contend that Defendants "violated the Due Process Clause by terminating [their] grants in an unconstitutionally vague manner."  Prelim. Inj. Mem. at 24.  They argue that "OJP's use of Section 20.340(a)(4) to allow for the termination anytime it 'changes' agency priorities invites the very sort of arbitrary terminations that are at issue in this case."  *Id.* at 25.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property,'" so the court begins there.  *See NB ex rel. Peacock*, 794 F.3d at 41 (quoting *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010)).  "[T]he range of interests protected by procedural due process is not infinite."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 (1972).  As the D.C. Circuit has explained:

> Whether a given statutory scheme gives rise to a protected interest depends on whether the authority promulgating the statute or

---

[3] The court rejects Plaintiffs' assertion that Defendants have somehow forfeited Rule 12(b)(6) arguments as to any claim.  *See* Pls.' Reply & Opp'n at 28 n.6.  Defendants' Rule 12(b)(6) arguments in opposition to injunctive relief are the same as those supporting dismissal.  *See* Defs.' Mot. to Dismiss at 2 (arguing that "each claim fails on its own terms and should be dismissed.").

regulation has placed *substantive* limits on official discretion. Addressing the limitations necessary to support such an entitlement, the Court has stated that 'the regulations [must] contain 'explicitly mandatory language,' *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow."

*Tarpeh-Doe v. United States*, 904 F.2d 719, 722–23 (D.C. Cir. 1990) (quoting *Ky. Dep't of Corrections v. Thompson*, 490 U.S. 454, 463 (1989)) (internal citation omitted).

Within the government contracting space, the D.C. Circuit has found that total debarment from government contracting implicates a protected *liberty* interest, but it has never held that a contractor has a property interest in expected payments. *See, e.g., Conset Corp. v. Cmty. Servs. Admin.*, 655 F.2d 1291, 1296 (D.C. Cir. 1981); *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993); *Com. Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 6 (D.C. Cir. 1998); *see also Loc. 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL-CIO v. Town Bd. of Town of Huntington*, 31 F.3d 1191, 1195 (2d Cir. 1994) (holding there is no protected property interest where there is "nothing more than a simple contractual right to receive . . . payments"). Indeed, "[o]utside of the employment context, courts have resisted application of due-process principles to government contracts because with scores of millions of government contracts in effect at any point in time, it is unimaginable that all government agencies would be required to provide a hearing before they take any action that is arguably inconsistent with a contract." *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) (internal quotation marks, alteration, and citation omitted).

The crux of Plaintiffs' claimed property interest is that federal regulations "place substantive limitations on" Defendants' ability to terminate the grant funds, thereby affording Plaintiffs "a legitimate claim of entitlement, as to which the Due Process Clause affords protection." Prelim. Inj. Mem. at 23 (quoting *NB ex rel. Peacock*, 794 F.3d at 41–42); *see also*

Pls.' Reply & Opp'n at 20.  More specifically, they say that "2 C.F.R. § 200.340(a)—the governing regulation specific to grant terminations—places substantive limitations on OJP's discretion to terminate the grants at issue."  Pls.' Reply & Opp'n at 20.

But the regulation does no such thing.  Section 200.340(a) simply lists four circumstances in which a government agency "may" terminate a federal award.  The regulation's text is thus permissive; it does not contain "explicitly mandatory language" that dictates an outcome if "substantive predicates are present."  *Tarpeh-Doe*, 904 F.2d at 722–23 (quoting *Ky. Dep't of Corrections*, 490 U.S. at 463).  Further, the regulation itself is inert unless the agreement contains the relevant termination provision.  2 C.F.R. § 200.340(b) ("The Federal agency . . . must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.").  To the extent OJP was restricted in its ability to terminate grants, the source of such constraint is the grant agreements themselves, not § 200.340(a).  In that sense, Plaintiffs' due process claim "is substantively indistinguishable from a breach of contract claim."  *Suburban Mortg. Assocs. v. Dep't of Housing & Urban Dev.*, 480 F.3d 1116, 1128 (Fed. Cir. 2007) ("[A] claim that a government agency has violated a party's right to due process by refusing performance under a contract is substantively indistinguishable from a breach of contract claim.").

Finally, the court agrees with the conclusion of another judge in this District who found no property interest in a grant termination case because "Plaintiffs offer[ed] no reason to think their contracts and grants . . . are different from the 'millions of government contracts in effect at any point in time' to which courts seldom apply 'due-process principles.'"  *Nat'l Urban League v.*

*Trump*, --- F. Supp. 3d ----, 2025 WL 1275613, at *18 (D.D.C. 2025) (quoting *New Vision Photography*, 54 F. Supp. 3d at 29 (citation omitted)).[4]

Having failed to establish even a plausible property interest in the grant awards, Plaintiffs' Fifth Amendment claims must be dismissed.  *See Hettinga v. United States*, 677 F.3d 471, 479–80 (D.C. Cir. 2012) (identifying a "cognizable liberty or property interest" as "the threshold requirement of a due process claim"); *Nat'l Urban League*, 2025 WL 1275613, at *17 (observing that "[a] void for vagueness challenge is, at bottom, a due-process claim, so Plaintiffs must show that they were deprived of a constitutionally-protected property or liberty interest") (internal quotation marks and citation omitted).

### B.     Other Constitutional Claims

Plaintiffs' remaining constitutional claim rests on "Congress's 'exclusive power over the federal purse.'"  *Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d at 1346 (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)).  According to Plaintiffs, the grant terminations violated the separation of powers, the Spending and Appropriations Clauses, and the Take Care Clause.[5]  Compl. ¶¶ 104–15.

"Under Article II of the Constitution . . . , the President must follow statutory *mandates* so long as there is appropriated money available and the President has no constitutional objection to

---

[4] The court respectfully disagrees with the few cases that have found that federal grantees "have a legitimate property interest in federal funds that Congress has already appropriated and that the [grantees] have accepted."  *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub. nom. City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018); *see also Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 280 n. 10 (D. Md. 2025).  In both cases, the courts relied on summary citations to *Roth* and other foundational Supreme Court precedent.  Indeed, *National Association of Diversity Officers* made this observation in a footnote and merely accepted the plaintiffs' arguments.  *See* 767 F. Supp. 3d at 280 n.10.  The order in that case was subsequently stayed by the Fourth Circuit.  *See* Order, Doc. No. 29, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. March 14, 2025).

[5] At argument, Plaintiffs represented that its Spending and Appropriations Clauses and Take Care Clause claims are co-extensive with its separation of powers claim.  *See* Tr. 47:11-23.  The court thus considers these claims together.  *See* Prelim. Inj. Mem. at 26–28.

the statute." *In re Aiken Cnty.*, 725 F.3d at 259; *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb[.]"). Thus, when Congress appropriates sums of money for certain purposes, the Executive must spend it. *See Train v. City of New York*, 420 U.S. 35, 42–44 (1975); Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 929 (1982) (codified at 31 U.S.C. § 1512) (prohibiting executive officers from holding appropriated funds in reserve except in certain circumstances). The President cannot refuse to spend appropriated funds based on policy reasons alone, unless Congress explicitly approves their recission. *In re Aiken Cnty.*, 725 F.3d at 259, 261 n.1; *see also* Impoundment Control Act, Pub. L. No. 93-344, 88 Stat. 297 (1974) (appropriated funds "shall be made available for obligation" absent congressional recission).

According to Plaintiffs, Defendants' termination of hundreds of grants to the tune of $820 million constituted a "blanket refusal to spend appropriations." *See* Prelim. Inj. Mem. at 26; Compl. ¶¶ 110–15. But that is not the evidence before the court. Defendants are not refusing to spend the $820 million in terminated grant awards; rather, they intend to re-obligate those funds to other grantees. *See* Henneberg Decl. ¶ 26. Further, the awards are sourced to "no year" appropriations, meaning Defendants are not required to expend the funds by the end of a fiscal year. *Id.* ¶ 17; Consolidated Appropriations Act, 2024, 138 Stat. at 145; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4534 (2023); Bipartisan Safer Communities Act, 136 Stat. at 1338–39; Consolidated Appropriations Act, 2022, 136 Stat. at 123–24; *see also* 34 U.S.C. §§ 20101(c), 20103(c)(1)(A) (congressionally created Crime Victims Fund which is permanent and available for grants "without fiscal year limitation"). Defendants therefore face no congressionally mandated deadline to identify and pay new grantees.

Plaintiffs push back against none of this. *See* Tr. at 32:8-21 (conceding the grant monies are "no year" funds). For that reason alone, they have failed to establish a likelihood of success on their separation-of-powers and related claims. *See Harris Cnty.*, 2025 WL 1707665, at *9–10 (holding that the plaintiffs had failed to establish a likelihood of success on their separation of powers claim where the congressional appropriation did not "limit agency discretion over how to spend appropriated funds" and "plaintiffs have presented no evidence that this administration (or for that matter, a future administration)" will not re-obligate the terminated grant funds).

Whether to dismiss these claims is trickier. Defendants rightly concede that they cannot rely on the Henneberg Declaration on their Rule 12(b)(6) motion. Tr. at 82:22-24. So, OJP's stated intention to re-obligate the funds cannot be the basis for dismissal. That said, Plaintiffs still bear the burden of pleading a plausible claim. And, in this context, the court thinks it is important that, to survive a motion to dismiss, Plaintiffs must plead some *facts* that plausibly establish that OJP will *not* reissue the awards to new grantees or that they will do so in a way inconsistent with the appropriations statutes.

The complaint does not do so. The closest Plaintiffs come is an assertion contained in paragraph 111. There, after recounting facts about one Plaintiff's terminated funding, Plaintiffs write: "But Congress' command did not change, and Congress' command left Defendants no leeway to simply pocket the money." Compl. ¶ 111. That statement, however, is a "bare assertion[]" of fact and is "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. Nowhere else does the complaint provide the "factual enhancement" necessary to support Plaintiffs' spending-related constitutional claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Accordingly, the court will dismiss them.

33

**167a**

C.        Equitable *Ultra Vires*

That leaves Plaintiffs' *ultra vires* claim.  The court disposes of it quickly.

*Ultra vires* review is a type of nonstatutory review and is available where "an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute."  *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1776 (2025) (quoting *Railway Clerks v. Ass'n for Benefit of Non-contract Employees*, 380 U.S. 650, 660 (1965)).  Additionally, *ultra vires* review is "unavailable if . . . a statutory review scheme provides aggrieved persons 'with meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review."  *Id.* (quoting *Board of Governors, FRS v. McCorp Financial, Inc.*, 502 U.S. 32, 43 (1991)).

Plaintiffs' *ultra vires* claim fails at these thresholds.  They do not allege that Defendants acted "entirely in excess of" their delegated powers and contrary to a specific prohibition in any appropriations statute.  *See Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) ("[U]*ltra vires* claimants must demonstrate that the agency has plainly and openly crossed a congressionally drawn line in the sand.").  Further, the *ultra vires* claim is simply a variant of their other claims, for which there are adequate forms of judicial review both in this court and the Court of Federal Claims.  *See* Compl. ¶ 102 (alleging that Defendants "lacked constitutional, statutory, and regulatory authority to issue or implement the *en masse* termination of the Plaintiffs' and putative class members' grant awards").  Accordingly, their *ultra vires* claim is dismissed.

VI.    CONCLUSION

There is no doubt in the court's mind that OJP's award terminations were unfair and indiscriminate.  When a government agency, especially the Department of Justice, agrees to fund

34

**168a**

private organizations to carry out a public purpose, such organizations expect regularity and respectful treatment. That is not what occurred here. The court laments that the limits of its own power prevent it from helping Plaintiffs and similarly situated grantees. But the court cannot cure an injustice by exceeding its own authority.

Accordingly, Plaintiffs' Motion for Preliminary Injunction, ECF No. 3, is denied, and Defendants' Motion to Dismiss, ECF No. 27, is granted. Plaintiffs' Motion for Class Certification, ECF No. 2, is denied as moot. A final, appealable order accompanies this opinion.

Dated:  July 7, 2025

Amit P. Mehta
United States District Judge

**169a**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| **VERA INSTITUTE OF JUSTICE, et al.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 25-cv-1643 (APM)** |
| | ) | |
| **U.S. DEPARTMENT OF JUSTICE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## <u>ORDER</u>

For the reasons set forth in the court's Memorandum Opinion, ECF No. 47, Plaintiffs'

Motion for Preliminary Injunction, ECF No. 3, is denied and Defendants' Motion to Dismiss, ECF

No. 27, is granted.  Plaintiffs' Motion for Class Certification, ECF No. 2, is denied as moot.

This is a final, appealable order.

Dated:  July 7, 2025

Amit P. Mehta
United States District Judge

**170a**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

VERA INSTITUTE OF JUSTICE, et al.,

*Plaintiffs*, *on behalf of themselves and all
others similarly situated,*

v.                                          Case No. 25-cv-1643 (APM)

UNITED STATES DEPARTMENT
OF JUSTICE;
PAMELA J. BONDI, in her official capacity
as United States Attorney General;

OFFICE OF JUSTICE PROGRAMS,

MAUREEN A. HENNEBERG, in her official
capacity as Acting Head of the Office of
Justice Programs,

*Defendants.*

---

## <u>EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL</u>

Defendants terminated more than $820 million in grants to Plaintiffs and hundreds of other

nonprofits in Plaintiffs' putative class. ECF 47 at 1. This Court's July 7 Order denied Plaintiffs'

motions for preliminary injunction and class certification and granted Defendants' motion to

dismiss. ECF 48. But the Court's Memorandum Opinion suggested that Plaintiffs had shown all

the factors warranting an injunction pending their appeal of the Order. Now Plaintiffs seek that

injunction under Federal Rule of Civil Procedure 62(d).[1]

---

[1] Defendants are opposed to this Motion.

Rule 62(d) "necessarily envisions situations in which a district court that has denied an injunction still grants an injunction pending appeal"—"even if the court that just denied injunctive relief 'believe[s] its analysis' in denying relief 'is correct.'" *United States v. Facebook*, 2024 WL 291739, at *1 (D.D.C. Jan. 12, 2024) (alteration in original) (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844–45 (D.C. Cir. 1977)). An injunction pending appeal is proper, for instance, where the "threat of irreparable harm" is "grave"; the balance of the equities "decisively" favors relief; and the movant "establishes a 'serious legal question' on the merits and shows that 'the other three factors tip sharply' in its favor." *Id.* (citations omitted). Those criteria are all met here.

*Grave threat of irreparable harm.* Plaintiffs' Complaint and briefing showed that Plaintiffs and the communities they serve have been and will continue to be devastated by Defendants' precipitous grant terminations. ECF 8-1, 11-1, 37. This Court's Memorandum Opinion agreed that the terminations would likely cause enormous harm. And everything that has happened since this litigation began—attested to by the declarations attached to this Motion—only reinforces Plaintiffs' irreparable harm showing.

As Plaintiffs' preliminary injunction briefing and the attached declarations showed, Defendants' terminations are inflicting precisely the kinds of irreparable harms that warrant an emergency injunction and cannot be remedied by retrospective financial payments. ECF 11-1. Defendants' terminations have forced "the layoff of specialized staff that is presently jeopardizing their operations and services, the elimination of critical programs that serve victims and law enforcement alike, and deep harms to Plaintiffs' reputations in communities that were painstakingly built up over years and decades." ECF 37 at 43. The effects of those layoffs and cutbacks resonate throughout communities. Plaintiffs, among many other vital services, provide

2

**172a**

interpretation for Deaf crime victims; relief for victims of violent crime in 23 different hospitals; interventions in active armed conflicts; and support to youth at risk of gun and gang violence. ECF 37 at 43-44 (citing declarations). When Plaintiffs are forced to cut back, people get hurt. As this Court already concluded: Defendants' actions, if not enjoined, are "likely to harm communities and individuals vulnerable to crime and violence." ECF 47 at 2.

The new declarations attached to this Motion only underscore the immediacy of the harm, which no post-litigation payments can remedy. For instance, since this litigation started:

- Homicides in King County, Washington, where Plaintiff Center for Children & Youth Justice operates, continue to increase at an "astronomical" pace with thirteen deaths by firearm since May 21, 2025. Sottile Decl. ¶¶ 8, 6. But CCYJ has had to lay off gang outreach specialists who specialize in working with many of the youth who fall precisely in these populations. *Id*. ¶ 3-4.

- In Detroit, thirteen teenagers and children were shot between June 27 and July 7. Kennedy Decl. ¶ 3. A four-year-old boy was murdered. *Id*. This kind of eruption of violence often happens around block parties and firework displays on the Fourth of July weekend—at least, absent the kinds of interventions that Plaintiff FORCE Detroit was funded to provide. Because of OJP's termination of grant funding, though, FORCE Detroit was unable to intervene to help prevent this summer's violence. *Id*. ¶ 6.

- In communities across the country, gun violence skyrockets when hot weather hits and schools close for the summer. Ridni Decl. ¶ 4. During that risky period, the violence interruption work of Plaintiff Health Resources in Action (HRiA) is particularly important. But Defendants' terminations robbed HRiA of the resources that support frontline intervention workers: one HRiA community partner, for instance, had to lay off staff and

triage violence interventions. *Id.* ¶ 3. The long term-impact of the termination is being felt both by the impacted communities and by HRiA itself: when the organization and its partners cannot show up at critical moments despite promising that they would do so, that absence inflicts irreparable reputational harm. *Id.*

- Reported threats of violence against Asian-Americans are skyrocketing—but, because of Defendants' terminations, Plaintiff Stop AAPI Hate could not be there to help victims of such violence by providing them with support and healing. For instance: threats to South Asian communities jumped by 40% in May compared to the previous six months. Choi Decl. ¶ 7. Meanwhile, Stop AAPI Hate had to accelerate layoffs; cut back work with consultants who help victims; and halve its healing support programs. Id. ¶ 3-4.

*The public interest and equities decisively favor relief.* Plaintiffs amply showed that the public interest and equities weigh heavily in their favor. ECF 37 at 47-51. This Court again agreed, concluding that Defendants' terminations are "likely to harm communities and individuals vulnerable to crime and violence." ECF 47 at 2. Speaking directly to the equities, the Court concluded that Defendants' abrupt and unexplained termination of Plaintiffs' grant awards was "unquestionably arbitrary," "shameful," "unfair and indiscriminate." *Id.* at 1-2, 34.

*Serious legal questions on the merits.* At a minimum, Plaintiffs raised serious legal issues for the reasons explained in their prior briefing. ECF Nos. 8-1, 11-1, 37, 38. And here too, this Court's opinion shows that Plaintiffs met their burden. The Court suggested that Plaintiffs' APA claims likely have merit—that Defendants' actions were "arbitrary, at least in lay terms" and "indiscriminate." ECF 47 at 2, 34. The Court denied a preliminary injunction because it concluded that it lacked jurisdiction. *Id.* at 27. But it recognized that its conclusion was far from obvious. For instance: while finding that the Supreme Court decision in *California III* forecloses relief on

Plaintiffs' arbitrary-and-capricious APA claim, *id*. at 22, the Court recognized that other district courts in this Circuit have read *California III* quite differently. *See id*. at 17-18 ("The Supreme Court's sparse reasoning in *California III* has sown confusion in this jurisdiction. . . . Nor have judges in this District been uniform in their application of *California III*."). A difference of opinion among district courts in this Circuit on the meaning and interpretation of an emergency order from the Supreme Court is precisely the kind of serious merits question that—taken together with the harms and the equities—warrants injunctive relief pending appeal.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion and enjoin OJP's terminations of Plaintiffs' grants pending Plaintiffs' appeal. This Court should not require Plaintiffs—organizations seeking to protect the public from violence and whose missions are already gravely suffering from cuts to their grant funding—to post a bond. Imposing a bond requirement would undermine their right to judicial review. ECF 11-1 at 48.

Dated: July 10, 2025                          Respectfully submitted,

*/s/ Joshua Stanton*
JOSHUA STANTON (D.C. Bar No. 90010653)
JOSHUA PERRY*
E. DANYA PERRY*
PERRY LAW
445 Park Avenue, 7th Floor
New York, NY 10022
(212) 251-2619
jperry@danyaperrylaw.com

LISA NEWMAN
JENNIFER FOUNTAIN CONNOLLY (D.C. BAR NO. 1019148)
CORTNEY ROBINSON (D.C. BAR NO. 1656074)
SOMIL TRIVEDI (D.C. BAR NO. 1617967)
BRIAN D. NETTER (D.C. BAR NO. 979362)
SKYE L. PERRYMAN (D.C. BAR NO. 984573)
DEMOCRACY FORWARD FOUNDATION

P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
lnewman@democracyforward.org

*Counsel for Plaintiffs*
*Admission pro hac vice pending

6

**176a**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th of July, 2025, I filed the foregoing papers using the Court's

CM/ECF system, which served the foregoing on all counsel of record.


*/s/ Joshua Stanton*
JOSHUA STANTON

**177a**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VERA INSTITUTE OF JUSTICE, et al., <br><br> *Plaintiffs, on behalf of themselves and all others similarly situated,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE, et al., <br><br> *Defendants.* | Case No. 1:25-cv-01643 |

**DECLARATION OF NICHOLAS TURNER**

I, Nicholas Turner, declare as follows:

1.      My name is Nicholas Turner.  I am a resident of Kings County in the state of New York.  I am over the age of eighteen.  I am the President and Director of the Vera Institute of Justice.  This declaration is based upon my personal knowledge and the knowledge I have acquired in the course of my duties.  If called as a witness, I could and would testify competently to the matters set forth below. I provide this additional declaration in support of the motion for an injunction pending appeal.

3.      Since the commencement of this litigation, Vera continues to suffer from serious and irreparable harm as result of the termination of Vera's awards.

4.      Although Vera is a relatively large organization, we cannot absorb the blow of losing the OJP grant funding at issue over the long-term; as a consequence Vera initiatives will cut their budgets and lay off staff members in the next few months.

5.      We have already lost staff.  One of Vera's lead staffers, working on our Transforming Prison Cultures, Climates, and Spaces: Designed for Dignity program, resigned after

1

**178a**

the awards were terminated. Had the awards remained in place, along with the partnerships and work they supported, Vera would have restaffed this position, but ithout funding Vera cannot fill her position despite its necessity and importance.

6.      Other organizations—prospective members of the class—have reported to Vera that the termination of their OJP awards has had a significant and irreparable impact.  One organization lost approximately $3.84 million in OJP funding.  Despite being a well-established institution (one of the most prominent in the field) the organization cannot survive the loss of funding.  They have already laid off almost a dozen staff members and are now planning to lay off the remaining staff and cease operations.  Absent an injunction pending appeal, they will have to imminently shut down their organization because they cannot continue to effectively provide community safety programming on a skeleton budget.

*Signature on following page.*

Date: July 10, 2025

_____
Nicholas Turner
President and Director of Vera Institute of Justice
Kings County, New York

**180a**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VERA INSTITUTE OF JUSTICE, et al., <br><br> *Plaintiffs, on behalf of themselves and all others similarly situated,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE, et al., <br><br> *Defendants.* | Case No. 1:25-cv-01643 |

## DECLARATION OF STEVEN RIDINI

I, Steven Ridini, declare as follows:

1. My name is Steven Ridini. I am a resident of Suffolk County in the State of Massachusetts. I am over the age of eighteen. This declaration is based upon my personal knowledge and the knowledge I have acquired in the course of my duties. If called as a witness, I could and would testify competently to the matters set forth below. I provide this additional declaration in support of Plaintiffs' motion for an injunction pending appeal.

2. I am the President and CEO of Health Resources in Action (HRiA). In this role, I lead the organization and partner with the HRiA Board and staff to develop a vision and strategic direction rooted in addressing critical public health issues through a health and racial equity framework. This includes building strategic partnerships with key individuals and organizations to advance HRiA's mission and maximize our community impact. I started as President and CEO on March 1, 2016, and have served in the position for nine years.

181a

3.    Since the commencement of this litigation, HRiA continues to suffer immediate and irreparable harms as a result of OJP's termination of HRiA awards.

a.    HRiA has had to lay off employees due to the termination of these funds.

b.    Several community partners who rely on HRiA for funding and financial support have laid off employees and have been forced to judiciously deploy violence intervenors due to staffing layoffs and limitations.

c.    Because of the loss of grant funding, HRiA and its partners continue to face irreparable reputational harm: the halting of critical programs and hiring, and failure to follow through on promises made to communities has severely damaged HRiA and its partners relationships with their communities, law enforcement, and local mental health agencies.

d.    For one of HRiA's community partners that works in prisons, hiring freezes and a lack of access to the infrastructure and expertise HRiA offered has slowed their work; the organization had delayed onboarding new staff and is under immense stress to find and fundraise enough money to pay consultants, uphold commitments, and keep their program afloat.

e.     Another community partner is scrambling to find funding to meet a $25,000 salary shortfall to maintain a critical staff member, and their employees are going above and beyond to maintain trust with, and commitments to, the young people they serve—even resorting to using their personal vehicles to transport the young people they work with as a result of cuts.

4.    Further, because warm weather increases community violence, HRiA's grant funding was terminated at the time in which CVI work is desperately needed in the communities

**182a**

it serves.  For example, HRiA's community partners in two communities have reported an increase in gun cases among youth under the age of 17, including possession charges and guns being brought into schools.  In another city, community partners have seen increased incidents of violence, particularly among women, that experience shows may be the tip of the iceberg because a rise in aggravated assaults can and will lead to gun violence, and is typically a sign of more violence to come.  Absent an injunction pending appeal, it will be nearly impossible for HRiA's partners to prevent this increase in violence in their communities without the financial and infrastructural support of HRiA's grants.

*Signature on following page.*

Date: July 10, 2025

_____

Steven Ridini
President and CEO of HRiA
Suffolk County, Massachusetts

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

VERA INSTITUTE OF JUSTICE, et al.,

*Plaintiffs, on behalf of themselves and all others similarly situated,*

v.

UNITED STATES DEPARTMENT
OF JUSTICE, et al.,

*Defendants.*

Case No. 1:25-cv-01643

## <u>DECLARATION OF DUJUAN KENNEDY</u>

I, Dujuan Kennedy, declare as follows:

1.      My name is Dujuan Kennedy.  I am a resident of Detroit, Michigan.  I am over the age of eighteen.  I am the executive director of FORCE Detroit.  This declaration is based upon my personal knowledge and the knowledge I have acquired in the course of my duties.  If called as a witness, I could and would testify competently to the matters set forth below.  I provide this additional declaration in support of Plaintiffs' motion for an injunction pending appeal.

2.      Since the start of this litigation, FORCE Detroit has seen a significant increase in community violence that, because of the termination of FORCE Detroit's awards, it has not been able to prevent.

3.      Local news outlets reported that at least 13 teenagers and children were shot in Detroit between June 27 and July 7,[1] including a four-year-old boy who was shot and killed in

---

[1] Andrea May Sahouri, *Detroit Cracks Down on Curfew Violations After Several Teens, Children Shot,* Detroit Free Press (July 7, 2025), https://www.freep.com/story/news/local/michigan/detroit/2025/07/07/detroit-police-department-curfew-violations/84494108007/.

**185a**

Detroit's Skinner park.[2]  FORCE Detroit previously funded an organization—Team Pursuit—that worked to prevent violence in the zip code where these shootings occurred.  But since its award was terminated, FORCE Detroit could not implement its summer strategy to continue supporting organizations like Team Pursuit in their efforts to prevent devastating community violence.

4.  In a recent statement, Detroit's Mayor Duggan remarked that the city has "had 20 shootings involving juveniles, either victims or shooters" in June, and the city has issued "curfew tickets for minors as young as 12, 13, 9 out at 3, 4 in the morning."[3]

5.  Over the Fourth of July holiday specifically, a two-year old was struck by a bullet while watching fireworks in a Detroit neighborhood,[4] and one shooting left three teenagers in critical condition,[5] prompting further enforcement of the city's teen curfews.[6]

6.  In our experience, at least some of these incidents of violence could have been prevented if FORCE Detroit and its community partners had been able to execute engagement strategies around block parties and firework displays during the holiday weekend, which is the very sort of work that FORCE Detroit was carrying out in Detroit prior to the termination of its

---

[2]Joseph Buczek, *2 Teens Charged with Murder in Detroit Park Shooting that Killed 4-year-old*, CBS News Detroit (July 5, 2025), https://www.cbsnews.com/detroit/news/2-teens-charged-murder-detroit-park-shooting-that-killed-4-year-old-teen/.

[3] *City of Detroit Outlines Plan to Step Up Enforcement of Teen Curfews Following Rash of Violence*, WXYZ Detroit (July 7, 2025), https://www.wxyz.com/news/city-of-detroit-outlines-plan-to-step-up-enforcement-of-teen-curfews-following-rash-of-violence.

[4]*2-year-old struck by bullet while watching fireworks in Detroit neighborhood*, CBS News (July 7, 2025), https://www.cbsnews.com/detroit/video/2-year-old-struck-by-bullet-while-watching-fireworks-in-detroit-neighborhood/#x.

[5] Natalie Davies, *Shooting Leaves 3 Teens Critically Injured in Detroit*, Detroit Free Press (July 5, 2025), https://www.freep.com/story/news/local/michigan/detroit/2025/07/05/detroit-shooting-saturday-july-5-acacia-bentler/84478442007/.

[6] Anna Liz Nichols, *Detroit Police Chief Implores Parental Vigilance Amid Juvenile Shootings*, Michigan Advance (July 7, 2025), https://michiganadvance.com/2025/07/07/detroit-police-chief-implores-parental-vigilance-amid-juvenile-shootings/. *See also* Sara Powers, *Detroit to Step Up Curfew Enforcement to Curb Violence Involving Minors. Here's What's Changing*, Click on Detroit (July 7, 2025), https://www.clickondetroit.com/news/local/2025/07/07/detroit-to-step-up-curfew-enforcement-to-curb-violence-involving-minors-heres-what-to-expect/.

funding.  But FORCE Detroit was not able to engage in this critical work because of the termination of its grant funding.  Absent an injunction pending appeal to reinstate FORCE Detroit's grant funding, these tragic but preventable deaths will continue to ravage our community.

*Signature on following page.*

Date: July 10, 2025

Dujuan Kennedy
Executive Director of FORCE Detroit
Detroit, Michigan

**188a**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VERA INSTITUTE OF JUSTICE, et al.,

*Plaintiffs, on behalf of themselves and all others similarly situated,*

v.

UNITED STATES DEPARTMENT
OF JUSTICE, et al.,

*Defendants.*

Case No. 1:25-cv-01643

## <u>DECLARATION OF CYNTHIA CHOI</u>

I, Cynthia Choi, declare as follows:

1.      My name is Cynthia Choi.  I am a resident of Los Angeles Country in the State of California.  I am over the age of eighteen.  I am the Co-Founder of Stop AAPI Hate and the Co-Executive Director of Chinese for Affirmative Action, the fiscal sponsor for Stop AAPI Hate. This declaration is based upon my personal knowledge and the knowledge I have acquired in the course of my duties.  If called as a witness, I could and would testify competently to the matters set forth below.  I provide this additional declaration in support of Plaintiffs' motion for an injunction pending appeal.

3.      Since the commencement of this litigation, Stop AAPI Hate's ability to respond to and prevent incidents of hate against AAPI communities continues to be hampered by the termination of Stop AAPI Hate's award.

4.      After conducting an organization-wide budget assessment to determine where staff layoffs and other budget cuts can be made, we accelerated our timeline for staff layoffs.  Instead of

1

**189a**

estimating that layoffs will happen sometime this year, layoffs will occur this fall unless Stop AAPI Hate's grant funding is restored.

5.      Stop AAPI Hate also scaled back our healing support programs from two states to one, reduced the scope of work with consultants with expertise on healing support, paused plans to conduct evaluations of healing support programs, and limited the scope of Stop AAPI Hate's annual national survey on how AAPI communities experience hate.

6.      Meanwhile, firsthand accounts of in-person anti-Asian hate acts continue to be reported and online anti-Asian hate has risen. In May alone, threats of violence and slurs made in extremist online spaces against Asian communities reached the third highest monthly count since Stop AAPI Hate began tracking in partnership a private research organization.  This includes 996 anti-Asian threats of violence and 60,950 anti-Asian slurs.

7.      The same month, there was a 40% increase in threats in extremist online spaces towards South Asian communities compared to the previous six months—the highest level of threats against South Asians observed since this January.

8.      This May, a husband of a Malaysian woman reported that his neighbor called him and his wife various racial slurs, making remarks about immigration, and threatening to get his gun to "sort out" the couple.  The neighbor eventually punched the husband in the face before leaving to retrieve his gun.

9.      June has been no better.  Stop AAPI Hate received reports of various hate acts and threats against Asian communities in June.

10.      For example, a Koren woman in New Jersey was "harassed by a group of boys who chased after her with bikes and were yelling at her."  The boys continued to harass the woman to the point of a panic attack, necessitating hospital care.

2

**190a**

11.     Another report detailed the harassment of an Indian woman in Texas, who was harassed at work by a customer who yelled "I am glad Trump is deporting you b-tches, and I hope you have a green card" while repeatedly calling the woman and her colleague "tramps" and "trolls."

12.     Another Asian woman in California reported that she was harassed and called racial slurs while trying to register for a class and being denied.  The employees gestured their middle finger toward her, and made a remark about Indians being "smelly, poor and subhuman."

13.     Absent an injunction pending appeal, Stop AAPI Hate will not be able to provide the support or resources to help combat these incidents of hate, or engage in culturally relevant healing efforts in response to them, without the critical funding from their terminated grant.

*Signature on following page.*

**191a**

Date: July 10, 2025

_____
Cynthia Choi
Co-Founder of Stop AAPI Hate & Co-Executive Director of
Chinese for Affirmative Action
Los Angeles, California

4

**192a**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VERA INSTITUTE OF JUSTICE, et al., <br><br> *Plaintiffs, on behalf of themselves and all others similarly situated,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE, et al., <br><br> *Defendants.* | Case No. 1:25-cv-01643 |

## <u>DECLARATION OF RACHEL SOTTILE</u>

I, Rachel Sottile, declare as follows:

1.     My name is Rachel Sottile.  I am a resident of King County in the State of Washington.  I am over the age of eighteen.  I serve as the President & CEO of the Children and Youth Justice Center, which does business as the Center for Children & Youth Justice (CCYJ). This declaration is based upon my personal knowledge and the knowledge I have acquired in the course of my duties, except to those matters stated upon information and belief; as to the latter, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.  I provide this additional declaration in support of Plaintiffs' motion for an injunction pending appeal.

2.     Since the commencement of this litigation, CCYJ continues to suffer immediate and irreparable harm as a result of OJP's termination of CCYJ's awards.

3.     As a result of these terminated awards, our contracted providers have had to reduce staff working directly with youth.  Across CCYJ's subrecipients/contracted organizations, at least six employees have been let go.  In one instance, the organization's staff was reduced from six members to just two.

**193a**

4.      Another organization completely stopped providing Street Outreach services to LINC youth.  Prior to termination, LINC had 19 Street Outreach workers from contracted partner organizations serving youth.  Following termination, LINC has only 4 Street Outreach workers from contracted partner organizations serving youth.  Due to this loss of capacity, LINC has had to contract program services and is serving about 30% fewer young people.  Street outreach workers are a core component of the Office of Juvenile Justice and Delinquency Prevention's Comprehensive Gang Model; this reduction is the most critical connection with gang involved youth.

5.      These organizational harms coincide with an increase in gun violence and shooting deaths King County, Washington, the community CCYJ serves.

6.      According to the King County Medical Examiner's Office decedent list,[1] since May 21, 2025, there have been 13 homicide deaths by gunshot in King County.  Of the 13 homicide deaths by gunshot, about 69% of the victims were under the age of 25, which is the demographic served by CCYJ.

7.      According to the 2025 Q1 King County Quarterly Shots Fired Report,[2] from January 1 through March 31 of this year, there were 13 fatal shootings and 47 non-fatal shooting victims in King County.  Out of the 60 total shooting victims (fatal and non-fatal), 11.67% were under the age of 18 and 28% were 18 to 24 years old.  Since March 31, those numbers have increased.  From the beginning of the year through July, King County reported 56 total homicide deaths, with 41 homicide deaths caused by a firearms.  Based on these figures, subtracting the 13 fatalities reported in Q1 suggests there were 28 fatal shooting victims between April and July 2025, (during the period

---

[1] *King County Medical Examiner's Office decedents lists by day*, King County, https://kingcounty.gov/en/dept/dph/health-safety/medical-examiner/decedents (last visited July 10, 2025).
[2] *2025 Q1 King County Quarterly Shots Fired Report*, King County, https://perma.cc/KDC8-TQY4 (captured July 10, 2025).

**194a**

in which CCYJ was no longer able to provide essential services to its community) representing a twofold increase from the first quarter of the year when CCYJ was operating in this County at full capacity.

8.    The 2025 Q1 King County Shots Fired Report states that the county saw a 41% decrease in the overall number of shooting victims compared to Q1 2024, and that overall shots fired incidents were the lowest they have been since QI 2021, which CCYJ believes can be attributed to the implementation of CVI protocols in the county.  However, despite this positive trend, our research tells us that after the termination of the OJP grants, in the seven weeks since the commencement of this litigation, (from May 21, 2025 to July 8, 2025) the county saw the *same* number of homicide victims by gunshot as all of the 12.5 weeks of Q1 2025.  This is an astronomical increase in homicide victims, positioning the county to see an increase in fatal shooting victims, and more specifically youth and young adult victims, during the rest of 2025 compared to 2024.

*Signature on following page.*

**195a**

Date: July 10, 2025

DocuSigned by:

Rachel Sottile
President & CEO of the Children and Youth Justice Center
Seattle, Washington

**196a**