**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 25-5248**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

VERA INSTITUTE OF JUSTICE ET AL.,
Plaintiffs-Appellants,

v.

DEPARTMENT OF JUSTICE, ET AL.,
Defendants-Appellees,

---

On Appeal from the United States District Court
for the District of Columbia
No. 25-cv-1643
The Hon. Amit P. Mehta, U.S. District Judge

---

### OPENING BRIEF OF PLAINTIFFS-APPELLANTS

---

Joshua Perry                          Lisa Newman
Joshua Stanton                        Joshua Salzman
E. Danya Perry                        Simon C. Brewer
Perry Law                             Jennifer Fountain Connolly
445 Park Avenue, 7th Floor            Cortney Robinson
New York, N.Y. 10022                  Somil Trivedi
(212) 251-2619                        Brian Netter
jperry@danyaperrylaw.com              Democracy Forward Foundation
                                      P.O. Box 34553
                                      Washington, D.C. 20043
                                      (202) 448-9090
                                      lnewman@democracyforward.org

*Counsel for Plaintiffs-Appellants*

August 11, 2025

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ iv

GLOSSARY OF ABBREVIATIONS .................................................. ix

INTRODUCTION ............................................................................... 1

STATEMENT OF JURISDICTION .................................................... 3

STATEMENT OF THE ISSUES ......................................................... 4

PERTINENT STATUTES AND REGULATIONS ............................ 4

STATEMENT OF THE CASE ............................................................ 4

    A.    Legal background ................................................................ 4

    B.    Defendants' abrupt grant terminations and the resulting harms to plaintiffs and their communities ............ 5

    C.    District court proceedings ................................................ 11

SUMMARY OF ARGUMENT ........................................................... 14

STANDARD OF REVIEW ................................................................. 16

ARGUMENT ...................................................................................... 16

I.    The District Court Erred in Concluding That It Lacked Jurisdiction Over Plaintiffs' APA Claims ............................................ 16

    A.    The Tucker Act divests district courts of jurisdiction only over clearly disguised contract claims, not suits seeking to enforce non-contract rights and obtain non-contract remedies .................................................... 18

    B.    The district court had jurisdiction over Plaintiffs' APA claims .................................................................................. 24

        1.    Plaintiffs' contrary-to-law claims belong in district court .............................................................. 24

# TABLE OF CONTENTS (continued)

      2.    Plaintiffs' arbitrary-and-capricious claims belong in district court..........................................31

      3.    Tucker Act preclusion does not apply for the additional reason that Plaintiffs' grant agreements are not contracts enforceable in the CFC ....................................................................35

II.   Plaintiffs Are Likely To Prevail On Their APA Claims ...................40

    A.    The grant terminations are contrary to law.............................40

      1.    OJP cannot terminate grants based on new agency priorities identified after the grants were awarded...............................................42

      2.    Section 200.340(a)(4) cannot be used to terminate grant awards where that provision is not clearly and unambiguously specified in the award terms and conditions...............................46

    B.    The grant terminations are arbitrary and capricious............48

III.  The District Court Erred In Dismissing Plaintiffs' Constitutional Claims, Which Are Likely To Succeed On The Merits...............................................................54

    A.    Plaintiffs have a protected property interest in the awarded and accepted grants.......................................54

    B.    OJP's failure to provide pre-deprivation notice and a hearing violated due process .......................................59

IV.  This Court Should Grant A Preliminary Injunction........................60

    A.    Plaintiffs and the other putative class members are suffering ongoing irreparable harm from the illegal grant terminations.......................................60

    B.    The grant terminations are having a devastating impact on the public ...................................................66

## TABLE OF CONTENTS (continued)

Page

CONCLUSION ................................................................................68

CERTIFICATE OF COMPLIANCE

CORPORATE DISCLOSURE STATEMENT

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Am. Pub. Health Ass'n v. NIH*, No. 25-1611, 2025 WL 2017106
(1st Cir. July 18, 2025) .............................................................. 18, 35

*Armour & Co. v. Freeman*, 304 F.2d 404 (D.C. Cir. 1962) ..................... 65

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) ................... 55

*Biden v. Nebraska*, 600 U.S. 477 (2023) .................................................. 46

*Boaz Hous. Auth. v. United States*, 994 F.3d 1359 (Fed. Cir.
2021) ...................................................................................... 35, 39

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ........... 17, 19, 22, 23, 29, 33

*Boyd v. United States*, 134 F.4th 1348 (Fed. Cir. 2025) ......................... 37

*C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310
F.3d 197 (D.C. Cir. 2002) ............................................................. 58

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290
(D.C. Cir. 2006) ............................................................................ 64

*City of Houston v. HUD*, 24 F.3d 1421 (D.C. Cir. 1994) ........................ 66

*Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90
(D.D.C. 2025) ............................................................................... 62

*Cmty. Legal Servs. in E. Palo Alto v. HHS*, 137 F.4th 932 (9th
Cir. 2025) ..................................................................................... 18

*Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330
(Fed. Cir. 2021) ................................................................ 37, 38, 39

*Crowley Gov't Servs. v. GSA*, 38 F.4th 1099 (D.C. Cir.
2022) .................................................................... 18, 19, 20, 21, 27

*Department of Education v. California*, 145 S. Ct. 966 (2025) ......... 13, 34

*DHS v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020) ............................... 52

# TABLE OF AUTHORITIES (continued)

Page(s)

*Esparraguera v. Dep't of the Army*, 101 F.4th 28 (D.C. Cir. 2024) ...................................................................... 56, 59

*Farrar v. Nelson*, 2 F.4th 986 (D.C. Cir. 2021) ........................................ 16

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .............. 52, 53

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ..................................................... 60

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) ............................................................................... 34

*Higbie v. United States*, 778 F.3d 990 (Fed. Cir. 2015) .......................... 40

*Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985) .................................................................... 29, 30, 31

*Jones v. Hendrix*, 599 U.S. 465 (2023) .................................................... 57

*Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994) ..................................... 40

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279 (D.C. Cir. 1995) ................................................................ 20, 23

*Kisor v. Wilkie*, 588 U.S. 558 (2019) ........................................................ 45

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .............................................................. 16, 61, 67

*Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313 (Fed. Cir. 2017) .................................................... 39, 40

*Lynch v. United States,* 292 U.S. 571 (1934) .......................................... 58

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .............................................. 58

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982).. 20, 22, 25, 26, 27

*Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978).............. 56

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) .................................................................. 49

**TABLE OF AUTHORITIES (continued)**

Page(s)

*Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604
(D.C. Cir. 1980) .................................................................. 63

*Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196 (Fed. Cir.
1997) ................................................................................. 22

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999
(D.C. Cir. 2014) .................................................................. 40

*Nat'l Urban League v. Trump*, No. 25–cv–471, 2025 WL
1275613 (D.D.C. 2025) ...................................................... 57

*NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31 (D.C.
Cir. 2015) .................................................................... 55, 57

*Ohio v. EPA*, 603 U.S. 279 (2024) ................................... 32, 49

*Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) ............. 19, 21

*Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634 (D.C. Cir.
2020) ........................................................................... 49, 50

*Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296
(D.C. Cir. 2014) ......................................................... 58, 59

*Sandpiper Residents Ass'n v. HUD*, 106 F.4th 1134 (D.C. Cir.
2024) ................................................................................. 43

*Shawnee Tribe v. Mnuchin*, 984 F.3d 94 (D.C. Cir. 2021) ............... 60, 67

*Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C.
Cir. 1985) .................................................................... 29, 30

*Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247 (D.C. Cir. 2021) ............ 53, 54

*St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730 (2017) ...... 38, 40

*Tootle v. Sec'y of Navy*, 446 F.3d 167 (D.C. Cir. 2006) ............................ 22

*Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005) ............................ 55

**TABLE OF AUTHORITIES (continued)**

Page(s)

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967
    F.2d 598 (D.C. Cir. 1992) .............................................................. 19

*Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32 (D.C.
    Cir. 1997) .................................................................................... 55

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C.
    Cir. May 3, 2025) .................................................................... 20, 65

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.C.
    Cir. May 28, 2025) ........................................................................ 21

*Yorktown Sys. Grp., Inc. v. Threat Tec LLC*, 108 F.4th 1287
    (11th Cir. 2024) ............................................................................ 64

**STATUTES**

5 U.S.C. § 702 ................................................................................. 19

5 U.S.C. § 706 ...................................................................... 3, 18, 24

28 U.S.C. § 1331 ............................................................................... 3

28 U.S.C. § 1291 ............................................................................... 3

28 U.S.C. § 1491 ........................................................... 17, 19, 22, 35

31 U.S.C. § 6303 ............................................................................. 36

31 U.S.C. § 6304 ....................................................................... 29, 36

31 U.S.C. § 6305 ................................................................. 29, 36, 38

**RULES AND REGULATIONS**

2 C.F.R. Part 200 .......... 5, 15, 17, 24, 36, 39, 41, 42, 43, 46, 56, 57, 59, 60

2 C.F.R. § 2800.101 .......................................................................... 5

48 C.F.R. §§ 1.101 *et seq* ............................................................... 36

85 Fed. Reg. 49,506 (Aug. 13, 2020) ................................. 42, 44, 45, 47

**TABLE OF AUTHORITIES (continued)**

Page(s)

*Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30,046
(Apr. 22, 2024) ....................................................................5, 47, 48

## OTHER AUTHORITIES

Office for Victims of Crime, *OVC FY25 Services for Victims of
Crime*, https://perma.cc/45TK-YAYH (captured Aug. 10,
2025)...............................................................................................27

U.S. Dep't of Justice, *DOJ Grants Financial Guide* (updated
Oct. 2024), https://perma.cc/9KMP-XC6C.....................................36

## GLOSSARY OF ABBREVIATIONS

AAPI                    Asian American and Pacific Islander

APA                     Administrative Procedure Act

CFC                     Court of Federal Claims

HRiA                    Health Resources in Action

OJP                     Office of Justice Programs

OMB                     Office of Management and Budget

**INTRODUCTION**

In April 2025, the Department of Justice's largest grantmaking component, the Office of Justice Programs, abruptly terminated 376 multi-year grant and cooperative agreements to organizations that provide services to crime victims and develop and implement strategies for crime control and prevention. The total value of these awards exceeded $820 million. OJP identified no deficiency in the performance of any of the terminated grantees but rather asserted the novel theory that it had regulatory authority to terminate grants based on nothing more than unexplained changes in agency priorities, announced for the first time in termination notices.

The loss of promised funds has had devastating impacts on the grantees, who have laid off critical staff, paused or terminated programs, and broken commitments to their communities and partner organizations, damaging hard-earned reputations that took years to establish. Some grantees face the imminent risk of closure. This interruption in services has also caused vulnerable communities to experience preventable gun violence and caused crime victims, including disabled victims of sex and labor trafficking, to lose access to critical

1

interpretation services that help them communicate with law enforcement and victim services.

Plaintiffs, five non-profit organizations whose grants were terminated, challenged OJP's mass terminations on behalf of themselves and a putative class of other affected grantees. Plaintiffs alleged that the grant terminations violated the Administrative Procedure Act because the regulation invoked by OJP does not authorize mass terminations based on changed agency whims. Plaintiffs also explained that the terminations, which were implemented through barebones form letters, effective immediately, were arbitrary and capricious because they were neither reasonable nor reasonably explained. Plaintiffs further alleged that the terminations unconstitutionally denied them due process.

The district court recognized that OJP's actions were "unquestionably arbitrary," "shameful" and "likely to harm communities and individuals vulnerable to crime and violence." JA547. But it nonetheless denied Plaintiffs' motion for a preliminary injunction and granted Defendants' motion to dismiss. As to the APA claims, the court ruled solely on the belief that it lacked jurisdiction because, in its view, Plaintiffs' challenge to unlawful and arbitrary agency action was a

2

disguised claim for breach of contract within the exclusive purview of the Court of Federal Claims. But the grants at issue are not contracts and, in any case, this suit asserts statutory and regulatory (not contractual) rights and seeks the classic APA remedy of vacatur of unlawful agency action, and thus belongs in district court. The district court's merits-based dismissal of the due process claim was similarly erroneous, failing to appreciate the protected property interest that grantees have in their awards.

Once these errors are corrected, preliminary injunctive relief is plainly warranted to prevent the ongoing harm to Plaintiffs, the putative class, and their communities. This Court should itself provide the urgently needed relief.

## STATEMENT OF JURISDICTION

Plaintiffs asserted claims under the APA, 5 U.S.C. § 706, and the U.S. Constitution and invoked the district court's jurisdiction under 28 U.S.C. § 1331. JA10. On July 7, 2025, the district court dismissed the case and entered final judgment. JA581. The next day, Plaintiffs filed a timely notice of appeal. JA582. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in concluding that the Tucker Act deprived it of jurisdiction over APA claims that seek to enforce rights under statutes and regulations and which ask the court to award the classic APA remedy of setting aside unlawful agency action.

2.  Whether Plaintiffs are likely to prevail on their APA claims.

3.  Whether Plaintiffs have stated a viable due process claim and are likely to prevail on that claim.

4.  Whether, in light of the ongoing irreparable harm to Plaintiffs and the communities they serve that has resulted from the grant terminations, the Court should enter a preliminary injunction.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Legal background

The Office of Justice Programs is responsible for awarding grants to private organizations for purposes such as violence prevention, criminal justice reform, and support for crime victims.  Detailed regulations govern OJP's administration of federal grant funding and

specify the grounds on which grants may be terminated. 2 C.F.R. § 200.340 (OMB's Uniform Administrative Requirements); *id.* § 2800.101 (adopting these requirements for DOJ). Relevant here, OJP may terminate grants only under certain circumstances and pursuant to specific procedures, including "pursuant to the terms and conditions of the … award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(4). If OJP wishes to terminate a grant based on the failure to effectuate agency priorities, it can do so only if that basis for termination is itself in the terms and conditions of the award. *Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024).

### B.   Defendants' abrupt grant terminations and the resulting harms to plaintiffs and their communities

The five named Plaintiffs Vera, CCYJ, Stop AAPI Hate, FORCE Detroit, and HRiA are organizations that received OJP grants for purposes such as training and assisting law enforcement and correctional facilities, working with vulnerable populations who are victims of crime, and for funding and working at the community level to successfully

interrupt gun crime for juveniles and adults.  JA9.  They also provide

lifesaving assistance for violently injured victims and their families.  *Id.*

In April 2025, OJP sent termination notices to Plaintiffs and

hundreds of other grantees.  These notices took the form of identical

emails with the following boilerplate "explanation" as to why the grants

were being immediately terminated:

> These awards are being terminated because they "no longer
> effectuate[] the program goals or agency priorities." 2 C.F.R.
> § 200.340(a)(4). The Department has changed its priorities
> with respect to discretionary grant funding to focus on, among
> other things, more directly supporting certain law
> enforcement operations, combatting violent crime, protecting
> American children, and supporting American victims of
> trafficking and sexual assault, and better coordinating law
> enforcement efforts at all levels of government. These awards
> demonstrate that they no longer effectuate Department
> priorities.

JA20–21.

The resulting loss of funding had immediate repercussions for the

terminated grantees.  At least one grantee will shutter its doors in

August, JA585.  Services to many vulnerable populations abruptly

ceased.  JA45; JA48; JA51; JA75–76; JA113; JA115–16; JA147–48;

JA151; JA156; JA159.  Specialized staff have been laid off.  JA45; JA48;

JA51; JA75–76; JA113; JA115–16; JA147–48; JA151; JA156; JA159.  As

a result, the grantees have sustained deep harms to reputations that

were painstakingly built up over years and decades, JA83–84; JA114–15; JA149; JA156.

Grants to HRiA, FORCE Detroit, and CCYJ funded critical and effective community violence intervention programs. JA13; JA16–19. The terminations have resulted in immediate harm in neighborhoods that now lack grant–funded staff to intervene in active conflicts and retaliations, or to respond to flare ups in violence. JA588–89; JA591–93. Given the success with which these programs were interrupting violence, the abrupt termination of funding for these services has already resulted in the tragic—but predictable—loss of life. JA151.

FORCE Detroit experienced an immediate breakdown of the backbone of its violence intervention work, which included daily, in-the-field support for young adults who are most at risk of gun violence. JA114. The grant-funded program funded reduced fatal and non-fatal shootings, enhanced opportunities for individuals who have experienced gun violence to secure employment or start small businesses, and provided critical communal support. JA111. These terminations "abruptly removed trusted support systems for individuals at the highest risk of involvement in violence," including "assistance to victims of

violence in Detroit," who relied on them for "safety planning, relocation assistance, employment support, or therapy referrals." JA116–117.

HRiA is no longer able to provide critical assistance to 23 hospital-based violence intervention programs. JA147–148; JA151. These hospitals now lack assistance for their violence prevention professionals who support victims and their families, while also mitigating retaliation from victims of gun violence when they leave the hospital. JA148; JA154. As a result, "in some cases, members in the community will lose their lives because of the disruption of services." JA151.

CCYJ had to reduce funding for a critical program, which annually serves an estimated 200 youth who are involved with, or at risk of involvement with, gangs and violence. JA46–47. Young people may lose access to these services, including 13- to 24-year-olds who carry weapons or self-identify as being in a gang. JA48.

Recipients of funding, including subrecipients of Plaintiffs' grants, are often the sole source of community-violence intervention work in their communities; some of these organizations have had to close their doors completely, and many have been forced to reduce or completely halt

their work, which has had a devastating impact on the communities who rely on these organizations.  JA148; JA156; *see also* Dkt. 37 at 41–42.

That harm has only worsened since this lawsuit was filed.  Dkt. 52 at 2–4.  FORCE Detroit and HRiA were unable to intervene in active, known conflicts that they otherwise would have mediated but for their loss in funding.  JA591–593; JA588–89.  This void tragically but predictably resulted in the gun deaths of children and members of their community over the July 4 weekend and will continue unless and until Plaintiffs' grant funding is reinstated.  JA476–77; JA588–89; JA591–593.

Vera, Stop AAPI Hate and FORCE Detroit can no longer provide crucial assistance to victims of crime.  As a direct result of OJP's termination of Vera's grants, Deaf and hard-of-hearing victims of crimes lost access to free sign language interpretation services that allow those victims to communicate with law enforcement and victim services.  JA257–60.  This program served more than 4,000 individuals, and Vera was forced to turn away individuals who needed access to these interpretation services.  JA259.  Similarly, the needs of human trafficking survivors with disabilities will go unmet after Vera was forced

to abruptly cancel training to help law enforcement identify and serve the unique needs of this population.  JA266–67.

At least 40 victims of hate crimes will lose the opportunity to participate in Stop AAPI Hate's programs, assistance that is critical when threats of violence against Asian-Americans are skyrocketing. JA78.  Stop AAPI hate will no longer be able to substantially assist communities who are dealing with the aftermath of large-scale incidents of hate and violence (like mass shootings), JA76–77, and it terminated its work to ensure safer public transit systems, JAA74; JA82–83.

Cities lost funding to modernize their 911 call systems and train civilian specialists to respond to mental and behavioral health crises. JA260–61.  Five states will no longer benefit from programs to help prosecutors address the underlying drivers of criminal conduct in their communities and focus on prosecuting the most violent crimes.  JA262– 64.  Two state Department of Correction facilities withdrew from a project to support data collection, policy development, training and monitoring for correctional facilities to increase safety in prisons. JA264–66.

### C.    District court proceedings

1.    Plaintiffs brought suit against the agencies and officials responsible for the mass grant terminations, suing on behalf of themselves and as representatives of a putative class composed of all entities whose OJP awards were terminated on identical bases in April 2025.  JA26.  Plaintiffs asserted that the terminations violated the APA because they were not authorized by Section 200.340(a)(4) and, thus, were contrary to law.    JA33–35.    Plaintiffs also challenged the terminations as arbitrary and capricious.  JA35–36.  In addition to the APA claims, Plaintiffs challenged the terminations as violative of due process.    JA28–30.[1]  Plaintiffs sought declaratory and injunctive relief and for the court to "vacate, and set aside OJP's decision to conduct an *en masse* termination of the putative class members' grants."    JA36. Plaintiffs did not request money damages or specific performance of OJP's grant obligations.

Plaintiffs promptly moved for class certification, Dkt. 10, and sought to preliminarily enjoin "Defendants from implementing their

---

[1] The complaint also challenged the terminations as usurpations of Congress's appropriations authority and ultra vires.  Plaintiffs do not press those arguments in this Court.

decision in April 2025 to terminate grants issued by [OJP]," Dkt. 11. Defendants, in turn, moved to dismiss, arguing that the district court lacked jurisdiction over Plaintiffs' APA claims and that the constitutional claims failed on the merits.  Dkt. 27.

OJP stipulated that, prior to the district court's resolution of the preliminary injunction motion, it would not re-obligate Plaintiffs' funding, that it would consider and process reimbursements for allowable pre-termination expenditures, and that it would not closeout any grant awards without the consent of the grantee.  JA447–48.

2.  The district court granted Defendants' motion to dismiss and denied Plaintiffs' motion for a preliminary injunction.  The court recognized that the decision to terminate the awards "was unquestionably arbitrary" and "shameful."  JA547.  The court also observed that the grant terminations were "likely to harm communities and individuals vulnerable to crime and violence."  *Id.*  It held, however, that it could not "cure [the] injustice" here because it lacked jurisdiction over Plaintiffs' APA claims and because the constitutional claims failed on the merits.  JA578.

12

The court first concluded that *Department of Education v. California*, 145 S. Ct. 966 (2025), "forecloses the exercise of jurisdiction over Plaintiffs' arbitrary-and-capricious claim." JA567. It next concluded that one of Plaintiffs' contrary-to-law claims was in essence, a contract claim seeking to enforce Plaintiffs' rights under their grants. It concluded that claim belonged in the CFC pursuant to the Tucker Act. JA570. The court, however, failed to analyze Plaintiffs' second contrary-to-law claim, that an agency may never terminate a grant under Section 200.340 based on a change in agency priorities. JA568–72.

The court recognized that it had jurisdiction over Plaintiffs' due process claim. JA557–59. But it concluded that Plaintiffs failed to establish the existence of protected property interest. JA572–76.

3. Plaintiffs appealed, JA582, then sought an injunction pending appeal from the district court, arguing that their organizations, and the communities they serve, would face irreparable harm even during the time it would take to resolve the appeal. The district court largely denied that motion but, with the government's consent, entered a limited injunction that bars Defendants from re-obligating the grant funds of the five named Plaintiffs prior to October 1, 2025. JA603. Given the

impending deadline, a motions panel of this Court agreed to expedite the appeal but found there to be an insufficient showing of irreparable harm to warrant additional interim injunctive relief.

## SUMMARY OF ARGUMENT

Defendants issued identical barebones notices terminating 376 OJP grants without warning. Plaintiffs, proceeding on behalf of a putative class of grantees, have challenged that agency action as unlawful, arbitrary, and unconstitutional. The district court dismissed Plaintiffs' APA claims based on a misunderstanding of its own jurisdiction and rejected the due process claim on the merits. This Court should reverse and, in light of the significant ongoing harms resulting from the terminations, should award preliminary relief to all members of the putative class.

**I.** The district court had jurisdiction to hear the APA claims. Because this case involves grant agreements, the district court believed this dispute was a disguised breach of contract case, and thus within the exclusive jurisdiction of the CFC, leaving the court powerless to cure the "injustice," in OJP's terminations of Plaintiffs' grants. JA580. But Plaintiffs are seeking to enforce rights that come from statutes and

regulations, not their grant agreements, and are seeking equitable remedies like vacatur of the unlawful terminations, not contract damages. Moreover, Plaintiffs' grant and cooperative agreements are not contracts otherwise subject to the Tucker Act.

**II.** Plaintiffs are likely to prevail on their APA claims. As the district court recognized, the mass terminations were "unquestionably arbitrary." JA547. They were also contrary to law because the regulation relied upon by Defendants, 2 C.F.R. § 200.340(a)(4), does not authorize terminations based on post-award changes in agency priorities, particularly when, as here, no such termination authority was incorporated into Plaintiffs' grant agreements.

**III.** Plaintiffs were also constitutionally entitled to pre-termination process, but had their grants abruptly terminated without that process.

**IV.** The terminations have had devastating impacts on Plaintiffs, the putative class, and their communities. Grantees have already had to shutter their doors, lay off staff, and terminate essential grant-funded services in their communities. Preliminary relief is urgently needed and appropriate. Given the nature of the services provided by the grantees,

it is profoundly in the public interest to provide injunctive relief that would allow this work to continue.

## STANDARD OF REVIEW

This Court reviews de novo the district court's grant of the motion to dismiss.  *Farrar v. Nelson*, 2 F.4th 986, 988 (D.C. Cir. 2021).  In reviewing the denial of a preliminary injunction, this Court reviews the district court's legal conclusions de novo and where (as here) the district court has denied relief without considering all the factors, the Court "can independently grant an injunction after considering the proper factors." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016).

## ARGUMENT

### I.    The District Court Erred in Concluding That It Lacked Jurisdiction Over Plaintiffs' APA Claims

District courts routinely decide APA cases brought by participants in government programs seeking vacatur of adverse governmental actions because the government acted unlawfully or arbitrarily and capriciously.  It is not unusual for plaintiffs to act with a financial motivation, expecting that if they prevail, the government will be required to pay them money pursuant to the terms of some agreement or program.  But it has long been settled that there is no resulting

16

jurisdictional obstacle to district court review because to "the extent that the District Court's judgment engenders this result, this outcome is a mere by-product of that court's primary function of reviewing the [government's] interpretation of federal law." *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988).

This case falls well within that standard template. Invoking a federal regulation, 2 C.F.R. § 200.340(a)(4), OJP terminated grants that were awarded to Plaintiffs and hundreds of other recipients, citing changed agency priorities as the sole ground for these terminations. JA20. Plaintiffs sued, arguing that Section 200.340(a)(4)—the regulation that Defendants invoked—does not allow terminations based on post-award changes in agency priorities and that the abrupt termination of some 376 awards was neither reasonable nor reasonably explained.

The district court mistook this classic APA case for a disguised contract action that falls within the exclusive jurisdiction of the CFC pursuant to the Tucker Act, 28 U.S.C. § 1491. But the substantive law that Plaintiffs rely on is not found in their grant agreements. It instead comes from the APA's guarantee against adverse agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law," 5 U.S.C. § 706(2)(A), and the limitations supplied by Section 200.340.  Plaintiffs accordingly sought classic APA remedies: asking the court to "[d]eclare unlawful, vacate, set aside Defendants' terminations of the putative class members' grants" and "[d]eclare that OJP's terminations on the basis of Section 200.340(a)(4) are unlawful, including its interpretation that 2 C.F.R §200.340(a)(4) allows OJP to terminate a grant based on a 'change' in agency priorities."  JA36–37.

As explained below, because neither the claimed source of rights nor the relief sought is contractual nature, this suit belongs in district court.  *See Crowley Gov't Servs. v. GSA*, 38 F.4th 1099, 1106–07 & n.6 (D.C. Cir. 2022); *see also Cmty. Legal Servs. in E. Palo Alto v. HHS*, 137 F.4th 932, 938 (9th Cir. 2025) (rejecting Tucker Act defense in APA challenge to grant terminations); *Am. Pub. Health Ass'n v. NIH*, No. 25–1611, 2025 WL 2017106, at *4–8 (1st Cir. July 18, 2025) (same), *application for stay filed,* No. 25A103 (U.S. July 24, 2025).

**A.    The Tucker Act divests district courts of jurisdiction only over clearly disguised contract claims, not suits seeking to enforce non-contract rights and obtain non-contract remedies**

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within

the meaning of a relevant statute, is entitled to judicial review thereof."
5 U.S.C. § 702. This broad waiver of sovereign immunity is subject to a
limited exception in cases where another "statute that grants consent to
suit expressly or impliedly forbids the relief which is sought." *Id.* This
Court has interpreted the Tucker Act, 28 U.S.C. § 1491, as conferring on
the CFC exclusive jurisdiction over breach of contract claims against the
United States in suits seeking more than $10,000. *E.g.*, *Crowley*, 38 F.4th
at 1106.[2] Accordingly, the APA has been understood not to waive
sovereign immunity for contract actions brought against the government
in a federal district court. *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619
(D.C. Cir. 2017).

If this rule applied only to express breach of contract claims, it
would easily be circumvented through "creative drafting." *Kidwell v.
Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir.

---

[2] No "language in the Tucker Act" makes CFC's jurisdiction over
contract claims "exclusive." *Bowen*, 487 U.S. at 910 n.48. And there is a
"strong case" that, in fact, "the Tucker Act should not be read to 'impliedly
forbid'" district courts from considering "contract actions for specific
relief." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d
598, 612 (D.C. Cir. 1992), *overruled in part on other grounds*, *Perry Cap.*,
864 F.3d at 620. Plaintiffs reserve the right to seek reconsideration of
this Court's contrary precedent.

1995). Accordingly, this Court has extended the jurisdictional bar to instances where a claim "so clearly presents a disguised contract action that jurisdiction over the matter is properly limited to the Court of Claims." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). But the Court has also cautioned that this inquiry cannot be allowed to "deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Id.*

To determine whether a suit is a clearly disguised contract action, this Court considers both "the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse,* 672 F.2d at 968. For the first prong of this inquiry, the Court examines whether the plaintiff is seeking to enforce a duty imposed on the government by a source of law such as a statute, or whether the suit ultimately seeks to enforce a contractual duty. *See Crowley*, 38 F.4th at 1107. "If a plaintiff's claim depends on interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties, the claim is not in essence contractual." *Widakuswara v. Lake*, No. 25–5144, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting); *see also Widakuswara*

*v. Lake*, No. 25–5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (en banc) (endorsing the reasoning of Judge Pillard's panel-stage dissent). For the second prong, the court asks whether the plaintiff is seeking a contractual remedy. The "crux of this inquiry … boils down to whether the plaintiff effectively seeks to attain monetary damages in the suit." *Crowley*, 38 F.4th at 1107. Even if the complaint contemplates monetary relief, the district court has jurisdiction so long as "declaratory and injunctive relief sought has considerable value apart from and is not negligible in comparison to any potential monetary recovery." *Id.* at 1113.

Decisions of this Court and the Supreme Court limit Tucker Act preclusion in several ways. *First*, this Court has repeatedly emphasized that the Tucker Act is not implicated merely because a dispute arises against the backdrop of a contractual relationship. Even when a contractual relationship is an essential ingredient in a claim, the Tucker Act does not apply if the plaintiff asserts rights and seeks remedies external to the contract. *See, e.g.*, *Perry Cap.*, 864 F.3d at 619 (concluding Tucker Act preclusion did not apply to claims for breach of fiduciary duty "[a]lthough any fiduciary duty allegedly owed … arose from [defendant's]

21

purchase of shares pursuant to the Stock Agreements"). Indeed, "the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform" an action into one subject to the Tucker Act. *Megapulse*, 672 F.2d at 968.

*Second*, the Court has "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006). This limitation has significant implications because the CFC's jurisdiction is circumscribed, available only (as relevant here) for contract actions seeking money "damages." 28 U.S.C. § 1491(a)(1). If a suit seeks equitable relief, such as a prospective remedy against an unlawful agency action or policy, it must be brought in district court. *See Bowen*, 487 U.S. at 904–05 (recognizing that the "Claims Court does not have the general equitable powers of a district court to grant prospective relief" and, on that basis, determining that suit seeking review of agency action belonged in district court); *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 197 (Fed. Cir. 1997) (holding that suit seeking performance of obligations under a

cooperative agreement was outside the jurisdiction of the CFC and was properly asserted under the APA).

*Third*, the prospect that plaintiff's "success on the merits may obligate the United States to pay the complainant" does not make a claim one for "money damages" within the exclusive jurisdiction of the CFC. *Kidwell*, 56 F.3d at 284. That monetary gain by the plaintiff will often be a downstream consequence or "by-product" of judicial review of agency action does not render the APA unavailable. *Bowen*, 487 U.S. at 909. Thus, in *Bowen*, the Supreme Court rejected the notion that a State's challenge to the disallowance of certain claims for reimbursement under the Medicaid program would need to be brought in the CFC, where reversal of the disallowance was not itself an "order that the [contested] amount be paid." *Id.* at 909. This was true even though a "judgment tell[ing] the United States that it may not disallow the reimbursement on the grounds given" would make "it is likely that the Government will abide by this declaration and reimburse Massachusetts the requested sum." *Id.* at 910.

**B.    The district court had jurisdiction over Plaintiffs' APA claims**

Applying those principles here, Plaintiffs' APA claims, which assert that the challenged grant terminations were contrary to law and arbitrary and capricious, belong in district court.

**1.    Plaintiffs' contrary-to-law claims belong in district court**

a.  The complaint alleges that Section 200.340(a)(4), the regulatory authority Defendants invoked when terminating Plaintiffs' grants, "does not authorize OJP's terminations of Plaintiffs' grants," and accordingly, "those terminations are 'not in accordance with law.'"  JA35 (quoting 5 U.S.C. § 706(2)(A)).  Section 200.340(a) delineates the circumstances in which a federal award can be terminated by the government.  The provision invoked by the Defendants in terminating Plaintiffs' grants, subsection (a)(4), provides that a federal agency can terminate an award "pursuant to the terms and conditions of the Federal award, including … if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).  The complaint alleges that the grant terminations here violated that provision in two separate respects.  First, the terminations were not authorized because "OJP's terminations were predicated on a change in agency priorities, but Section 200.340(a)(4)

24

does not allow OJP to terminate a grant based on a 'change' to an agency's priorities." JA34. Second, the complaint alleges that whatever grounds for termination might be theoretically available under Section 200.340(a)(4), any authority under that provision is only available when it has been incorporated into the "terms and conditions" of an award, and the OJP did not specify in "Plaintiffs' award documents that it could terminate an award because an award no longer effectuates program goals or agency priorities." *Id.*

For both of these legal theories, Section 200.340(a)(4)—not any contractual provision—is "the source of the rights" being asserted. *Megapulse,* 672 F.2d at 968. This is particularly clear with respect to Plaintiffs' argument that Section 200.340(a)(4) never authorizes terminations based on changed agency priorities. Resolving this claim would not require consultation of Plaintiffs' grant agreements. Rather, as Defendants have forthrightly acknowledged, this claim turns entirely on "the 'plain meaning' of the regulation." Resp. to Emergency Mot. for Inj. Pending Appeal at 16 (D.C. Cir. July 21, 2025). Either the provision allows for terminations based on changed agency priorities or it does not. The content of Plaintiffs' grant documents is irrelevant.

But Plaintiffs' second contrary-to-law claim, which contends that no authority to terminate for changed priorities was incorporated into their grant agreements, also asserts regulatory, rather than contractual, rights. Plaintiffs allege that Section 200.340 imposes a requirement above and beyond any principle of contract law, mandating that any termination authority must be "clearly and unambiguously" reflected in an award agreement and that Plaintiffs' awards do not contain the requisite authorization. JA34. Here, too, the relevant source of rights is found in Section 200.340(a)(4) and subsection (b). To be sure, resolving this claim would require review of Plaintiffs' awards to confirm whether those documents in fact incorporate the relevant termination authority. But resolution of non-contract claims often requires consultation of contractual agreements. *Megapulse*, 672 F.2d at 968. And as explained below, the term itself is undisputed; the question is whether that term satisfies the regulation. *See infra* at 47. The dispositive fact is that the source of the right being asserted is found in Section 200.340, a regulation, rather than any contractual provision.

As to both theories, the "type of relief sought" is also equitable, not the sort of contractual money damages available in the CFC. *See*

26

*Megapulse,* 672 F.2d at 968.  The contrary-to-law claim asserts that "OJP's terminations on the basis of Section 200.340(a)(4) must be declared unlawful, including its interpretation that 2 C.F.R. § 200.340(a)(4) allows OJP to terminate a grant based on a 'change' in agency priorities" and that "OJP's terminations must be vacated and 'set aside' under 5 U.S.C. § 706(2)(B)."  JA35.  These types of declaratory and set-aside relief are quintessential APA remedies.

If more were needed, the relief sought—vacatur of the termination decisions—has "considerable value" to the Plaintiffs "apart from and is not negligible in comparison to any potential monetary recovery." *Crowley,* 38 F.4th at 1113.  Grant terminations adversely affect Plaintiffs in ways beyond the immediate financial loss of the outstanding balance of their awards.  For one thing, terminations can adversely affect an organization's ability to compete for *future* awards.  One factor that OJP considers when awarding grants is "past performance."  *See, e.g.*, Office for Victims of Crime, *OVC FY25 Services for Victims of Crime*, https://perma.cc/45TK-YAYH (captured Aug. 10, 2025).  Accordingly, a past award termination—and the concurrent loss of ability to perform that prior award—could adversely impact an organization in future

27

funding cycles.  Loss of status as a federal grantee can also deprive an organization of access to the professional networks and credibility that flow from the status of being an OJP grant recipient.  The terminations have also resulted in the loss of additional partnerships.  To take one example, the Bureau of Prisons approached Vera about implementing one of its successful programs to improve prison safety in federal prisons, but Vera was not able to expand the scope of its work to federal prisons because of the termination.  JA265–66.[3]

Moreover, the proper construction of Section 200.340(a)(4) has implications for Plaintiffs far beyond the specific grants at issue here.  That provision is not specific to OJP grants—it was promulgated by OMB and applies to a wide array of federal awards.  Thus, declaratory relief establishing that the provision does not authorize terminations based on changed agency whims would be of considerable value to Plaintiffs.  This is particularly true for an entity like Plaintiff Vera, which "regularly responds" to and has been repeatedly awarded OJP grants.  JA254–55;

---

[3] Indeed, OJP's enthusiasm for the success of this project was such that it approved a supplemental award of an additional $1.25 million before the first grant award was fully performed.  JA264.

*see also* JA19 (HRiA has "received direct federal awards under 10 programs from three federal agencies").

Finally, it bears emphasizing that cooperative and grant agreements like those at issue in this case are statutorily intended to "transfer a thing of value to the … recipient to carry out a public purpose of support." 31 U.S.C. §§ 6304(1); 6305(1). By definition, the grants are awarded because they offer something of "considerable value" to the broader public. There is more at stake here than the value of the terminated grants themselves.

b.   The district court nonetheless concluded that Plaintiffs' contrary-to-law claim was a disguised contract claim. JA568–72. The district court believed that this result was compelled by two of this Court's decisions, *Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985), and *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985). Both pre-date the Supreme Court's clarification in *Bowen* that "orders … for specific relief … rather than for money damages … are within the District Court's jurisdiction under § 702's waiver of sovereign immunity." 487 U.S. at 910. In any case, both decisions are distinguishable.

29

In *Spectrum Leasing*, a government contractor sought "an injunction requiring the government to pay monies owed" when the "right to these payments [wa]s created in the first instance by the contract." 764 F.2d at 894. Unsurprisingly, this Court held that a suit "seek[ing] an order compelling the government to pay money owed in exchange for goods procured under an executory contract" belonged in the CFC, a remedy that the court compared to a "seller's action for the price of goods against a private buyer." *Id.* While the *Spectrum Leasing* plaintiff asserted that the government had violated the Debt Collection Act in withholding certain payments due under the contract, that statute was not the source of plaintiff's right to payment and the remedy sought (a lump sum payment of money due for past performance) was plainly contractual. That case is thus inapposite where, as here, the Plaintiffs assert non-contractual rights and seek non-contractual remedies.

*Ingersoll-Rand* is similarly off point. There, the government terminated a contract pursuant to a Federal Acquisition Regulation "which was incorporated into the contract." 780 F.2d at 75. It was therefore "possible to conceive of th[e] dispute as entirely contained within the terms of the contract." *Id.* at 78. Moreover, "the issues raised

by plaintiff's complaint [were] within the unique expertise of the Court of Claims" and resolution of the case "call[ed] for knowledge of the government contracting process." *Id.* The Court made clear that it was not announcing a categorical rule and that it was leaving open the possibility of district court jurisdiction in cases more within the competence of district courts, such as cases involving "a complaint based, for example, on a violation of the civil rights of the contractor." *Id.*

Here, for purposes of at least one of Plaintiffs' contrary-to-law theories (that termination based on changed priorities is never permissible), it is irrelevant whether Section 200.340(a)(4) was incorporated into the grant agreements. What is relevant is whether, and how, that regulation constrains government action. Interpreting that regulation falls within the heartland of district court expertise. Accordingly, the district court had jurisdiction to hear Plaintiffs' contrary-to-law claims.

## 2. Plaintiffs' arbitrary-and-capricious claims belong in district court

a. The complaint separately alleges that the grant terminations violated the APA because they "are arbitrary and capricious because they are 'not reasonable' nor 'reasonably explained.'" JA35 (quoting *Ohio v.*

*EPA*, 603 U.S. 279, 292 (2024)).  Specifically, the "termination notices sent to all named Plaintiffs included identical, three-sentence boilerplate explanations for the basis of the termination," failed to "explain why any individual grant no longer served the agency's changed priorities," and wholly ignored reliance interests of Plaintiffs and stakeholders.  JA35–36.  The complaint alleges that as a result of these deficiencies, the "OJP's terminations must be vacated and 'set aside' under 5 U.S.C. § 706(2)(B)."  JA36.

This classic APA claim also belongs in district court.  Under the first prong of the *Megapulse* test, the rights being asserted come from the APA's substantive guarantee against arbitrary and capricious exercises of agency authority, found in Section 706(2), not any provision of any grant agreements.  This claim turns not on the extent of the government's termination authority under the agreements, but rather, on the way in which that authority was exercised.  To resolve it, the district court will focus solely on the reasoning (or lack thereof) contained termination notices, rather than on any contractual provision.  Moreover, a key aspect of the claim focuses not on the ways in which the termination authority was exercised as to any one grantee, but the government's broader act of

engaging in *mass* terminations of 376 grants using *identical* boilerplate termination notices. The APA, not any provision of contract law, governs this type of government policymaking.

The second *Megapulse* prong also weighs decisively in favor of district court jurisdiction. As was true of the contrary-to-law claims, the arbitrary-and-capricious claim seeks the quintessential APA remedy of vacatur of unlawful agency action. *See supra* at 27. Any obligation to pay money or to perform contractual duties is a byproduct of judicial review of the lawfulness of the terminations. *See Bowen*, 487 U.S. at 909–10.

b. The district court believed that dismissal of the arbitrary-and-capricious claim was compelled by the Supreme Court's decision in *California*, which stayed pending appeal a district court order setting aside grant terminations based on an arbitrary-and-capricious claim. As an initial matter, that decision—issued in response to an emergency application without full briefing and argument—did not purport to definitively resolve the Tucker Act question even in *California* itself, let alone to establish a rule of general applicability for all cases involving challenges to grant terminations. This Court can and must continue to

33

apply its precedent to resolve this case (which has the salutary benefit of allowing for further percolation of the issue, facilitating any future Supreme Court review of the issue on the merits). The Court also must continue to follow *Bowen*, which remains binding precedent.

In any case, *California* is distinguishable. There, the Supreme Court considered an order that (among other things) "require[d] the Government to pay out past-due grant obligations," and the Court determined that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." 145 S. Ct. at 968. The Court's focus on the retrospective aspect of the district court order under review is confirmed by its reliance on *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002), a non-APA case that distinguished *Bowen* on the basis that *Bowen* "did not deal with specific performance of a contractual obligation to pay past due sums" and, thus, *Bowen* does not authorize "an injunction to enforce a contractual obligation to pay money past due." *Id.* at 212.

Here, by contrast, Plaintiffs' arbitrary-and-capricious claim seeks vacatur of unlawful agency action, not an injunction compelling the government to pay past sums. And it does so not on the basis of the terms

34

of any contract, but based on the arbitrary and capricious nature of the grant-termination notices. *Bowen*, not *California*, applies in a circumstance, like this one, where the district court "did not award past due sums, but rather provided declaratory relief that is unavailable in the Court of Federal Claims" and Plaintiffs' claims do not "depend on the terms or conditions of any contract." *Am. Pub. Health Ass'n*, 2025 WL 2017106, at *6. The district court thus had jurisdiction to hear the arbitrary-and-capricious claim.

### 3. Tucker Act preclusion does not apply for the additional reason that Plaintiffs' grant agreements are not contracts enforceable in the CFC

The Tucker Act could not divest the district court of jurisdiction for an additional reason: no jurisdiction would lie in the Court of Federal Claims. Plaintiffs' agreements are not "contracts" that give rise to Tucker Act jurisdiction. *See* 28 U.S.C. § 1491(a)(1) (granting jurisdiction over claims based "upon any express or implied contract with the United States").

When carrying out a federal subsidy program, an agency has a choice of legal instruments. *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021) ("The government may implement statutorily

mandated subsidy programs without employing contracts as a vehicle for doing so."). An agency may use a procurement contract when "the principal purpose of the instrument is to acquire … property or services for the direct benefit or use of the United States Government." 31 U.S.C. § 6303(1). Alternatively, the agency can use a grant agreement or cooperative agreement when the principal purpose is instead "to transfer a thing of value to the … recipient to carry out a public purpose of support." *Id.* §§ 6304(1); 6305(1). Distinct regulatory schemes also apply, reflecting the differences in purpose between contracts, on the one hand, and grants and cooperative agreements on the other. Contracts are governed by the Federal Acquisition Regulations, *see* 48 C.F.R. §§ 1.101 *et seq.* Grants and cooperative agreements are governed by the Uniform Administrative Requirements, as discussed above, *see* 2 C.F.R. Part 200. Federal law itself thus distinguishes between contracts and other legal instruments used to carry out federal subsidy programs, and OJP's own practice reflects that distinction. *See* U.S. Dep't of Justice, *DOJ Grants Financial Guide* at 142 (updated Oct. 2024), https://perma.cc/9KMP-XC6C (the term "contract" "does not include a legal instrument … when

the substance of the transaction meets the definition of a Federal award" and defining "award" as including "grants or cooperative agreements").

Given this statutory distinction, cases concerning a grant or cooperative agreement only fall within the CFC's jurisdiction "when the standard conditions for a contract are satisfied." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021). As particularly relevant here, a government contract requires "mutuality of intent to contract" and "consideration." *Id.* at 1339. Both are lacking here.

*First*, the grant agreements do not manifest "contractual intent." *Boyd v. United States*, 134 F.4th 1348, 1352 (Fed. Cir. 2025). As explained above, "there is no contractual language in the statutory provision" regarding grants or cooperative agreements from which contractual intent could be inferred, because Congress separately provided for contracts. *Id.* at 1353. Nor do the written cooperative agreements themselves manifest contractual intent. As with other subsidy programs, "the government must identify eligible recipients, notify them of their statutory rights, and ensure they are willing to accept gratuitous payment." *Id.* at 1354. That does not demonstrate contractual intent.

37

*Second*, the cooperative agreements at issue do not provide the necessary consideration. Supporting a "worthy project" with grant money may provide a "generalized benefit" to the government because it promotes the public welfare, but it fails to demonstrate contractual consideration. *St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730, 736 (2017), *aff'd on other grounds,* 916 F.3d 987 (Fed. Cir. 2019). The use of cooperative agreements here reflects OJP's intention to "transfer a thing of value" to the recipients rather than to receive a direct benefit for the agency itself. 31 U.S.C. § 6305(1). The government has not shown, and cannot show, that it received a direct benefit from the awards, as is the case with typical government procurement contracts.

The district court reached a contrary conclusion because it believed that the recipients' promise "to collect, maintain, and provide data to OJP about program performance and effectiveness" constituted consideration. JA566. But the case the district court relied upon, *Columbus Regional Hospital*, does not support that proposition. There, the Federal Circuit held that the particular "terms" of an agreement between the Federal Emergency Management Agency and a State constituted a contract in light of the particular obligations imposed on the recipient. 990 F.3d at

38

1940. That case did not hold—and cannot plausibly be read as holding—that ministerial reporting obligations constitute consideration. Such reporting obligations are basic features of grants and cooperative agreements. 2 C.F.R. § 200.201(b)(1) ("Accountability must be based on performance and results, which can be communicated in performance reports or through routine monitoring."). If that sufficed to form a contract, then it would be nigh impossible for an agency to "implement statutorily mandated subsidy programs without employing contracts as a vehicle." *Boaz Hous. Auth.*, 994 F.3d at 1368; *see also Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313, 1319 (Fed. Cir. 2017) (holding that a claim for "strings-attached" grants subject to agency "supervision" was outside the CFC's jurisdiction). The district court's reading of *Columbus Regional Hospital* would make the Federal Circuit's precedent self-defeating.

In any event, *Columbus Regional Hospital* is inapposite for another reason: the plaintiff "sought only a money judgment" based on a breach-of-contract theory. 990 F.3d at 1355. Plaintiffs do not seek that relief here. Indeed, there is no affirmative indication that the agreements at issue even create a right to money damages, as is necessary to establish

39

jurisdiction in the CFC.  *See Higbie v. United States*, 778 F.3d 990, 993 (Fed. Cir. 2015) (holding that a contract supports Tucker Act jurisdiction only if it "can be fairly interpreted as mandating compensation"). Because cooperative agreements are designed to assist the recipient, "damages cannot be implied" and "the agreement is not money-mandating" absent "a specific provision mandating a monetary recovery." *St. Bernard Par.*, 134 Fed. Cl. at 735.  Neither the government nor the district court has identified such a provision here.

At bottom, Plaintiffs' APA claims do not sound in contract.  They are equitable claims, based on OJP's erroneous interpretation and application of the termination regulations, seeking equitable relief unavailable in the CFC.  *See Lummi Tribe*, 870 F.3d at 1318–19; *Katz v. Cisneros*, 16 F.3d 1204, 1208 (Fed. Cir. 1994) ("That a payment of money may flow from a decision that HUD has erroneously interpreted or applied its regulation does not change the nature of the case.").  The district court erred in dismissing them on jurisdictional grounds.

## II.    Plaintiffs Are Likely To Prevail On Their APA Claims

### A.    The grant terminations are contrary to law

An agency is "bound by its own regulations," *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014), and an

agency's failure to follow them is contrary to the law, *see* 5 U.S.C. § 706(2)(A).

Defendants rest their termination authority on a provision specifying that grants may be terminated only if two conditions are met: (1) "an award no longer effectuates the program goals or agency priorities," and (2) the agency included in the "terms and conditions of the award" that an award may be terminated if it no longer effectuates agency priorities. 2 C.F.R. § 200.340(a)(4).

OJP's terminations of Plaintiffs' grants based on a post-award "change" in agency priorities is inconsistent with Section 200.340 in two ways. *First*, Section 200.340(a)(4) does not allow OJP to terminate a grant based on new agency priorities identified after it awarded the grant. OJP's interpretation of the termination provision is counter to the text and purpose of Section 200.340(a)(4), and its novel interpretation has, prior to 2025, never been adopted by any agency or court as a permissible reading of the termination provision.

*Second*, Section 200.340(b) requires that OJP "clearly and unambiguously specify all termination provisions" in the terms and conditions of an award, including that an award may be terminated if it

41

no longer effectuates the agency priorities.  2 C.F.R. § 200.340(b).  OJP did not do so and therefore was not permitted to rely on subsection (a)(4) as the basis for termination of Plaintiffs' grants.

### 1.    OJP cannot terminate grants based on new agency priorities identified after the grants were awarded

OJP's interpretation of Plaintiffs' grants based on Section 200.340 is contrary to both the text and regulatory history of that provision.  OJP may not terminate grants based on new agency priorities not identified at the time of the award.  Section 200.340 allows for termination of existing grants in the limited circumstance in which the grant no longer effectuates the program goals or priorities—*i.e.*, agency priorities identified when the award was first made.  That may occur where "additional evidence reveals that a specific award objective is ineffective at achieving program goals" or where "additional evidence may cause the Federal awarding agency to significantly question the feasibility of the intended objective of the award."  85 Fed. Reg. 49,506, 49,507–08 (Aug. 13, 2020).  And while agencies may, consistent with applicable law, change their priorities going forward and use those new priorities to determine whether to award new grants, allowing agencies to terminate

42

existing grants based on new "priorities" identified after a grant is awarded would improperly permit federal funding to be pulled back at any moment based on an agency's whim.

a. The text of Section 200.340(a)(4) does not allow OJP to terminate a grant based on a post-award "change" in agency priorities. The provision permits termination of a grant if it "no longer effectuates *the* program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (emphasis added). *Sandpiper Residents Ass'n v. HUD*, 106 F.4th 1134, 1144 (D.C. Cir. 2024) ("It is a rule of law well established that the definite article 'the' particularizes the subject which it precedes." (internal quotation marks omitted)). So, "the program goals or agency priorities" means not just "any" program goals or agency priorities that OJP later identifies, but the specific program goals and agency priorities in place at the time of the initial award. Moreover, "program goals" are necessarily forward looking and are established at the time a grant is awarded. The parallel provision governing "agency priorities" naturally incorporates the same reference point. The text thus references circumstances in which an award previously effectuated agency priorities set at the time of award but may "no longer" do so. The agency priorities thus must have existed

43

previously—at the time of the award—when the agency assessed the match between the award and its priorities. It makes little sense to apply the "no longer effectuates" language to new priorities that did not exist at the time of the grant award. A grant cannot effectuate program goals or agency priorities that did not exist when the grant was awarded.

While efficacy of the grant should certainly be evaluated as of the time of the termination decision, the baseline against which it must be judged is the one set when the grant was made, not some arbitrary new baseline established mid-award. Any other reading would strip the provision of any limiting principle. It effectively renders much of Section 200.340(a) superfluous, as it would effectively give the government a right to terminate any grant at will.

b. Plaintiffs' interpretation comports with the provision's regulatory history. OMB explained section 200.340 was intended "to ensure that Federal awarding agencies prioritize ongoing support to Federal awards that meet program goals." 85 Fed. Reg. at 49,507. OMB then identified two scenarios where an award would no longer do so: where "additional evidence reveals that a specific award objective is ineffective at achieving program goals" or where "additional evidence

44

may cause the Federal awarding agency to significantly question the feasibility of the intended objective of the award." *Id.* at 49,507–08. Much like the phrase "no longer effectuates," the term "additional evidence" implies that the agency's original goals and priorities hold steady. What changes is new evidence indicating that the award does not serve those original goals and priorities. There would be no need for "additional evidence" if an agency could simply change its priorities and cancel all grants deemed to be out of step with those new priorities. To the contrary, OMB stated that the termination provision would *not* allow agencies "to terminate grants arbitrarily," and OMB disagreed with those who feared that the "language [could] provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient cause." *Id.* at 49,509.

Finally, prior to 2025, no agency had ever terminated a grant under Section 200.340 on the grounds that an agency "changed" its priorities after a grant was awarded. *See Kisor v. Wilkie*, 588 U.S. 558, 579 (2019) (courts should not defer to an agency's new interpretation of a regulation if it creates unfair surprise or upsets reliance interests). This novel exercise of authority and lack of historical practice in interpreting Section

45

200.340 to allow for a post-award change in agency priorities greatly undercuts OJP's interpretation of its termination provision. *See Biden v. Nebraska*, 600 U.S. 477, 501 (2023).

There is obvious danger in allowing an agency to interpret the termination provision in a manner that would allow it to award grants worth millions or billions of dollars and then retroactively change its priorities midstream and terminate grants with no notice. Unfortunately, the harms present in this case amply demonstrate the instability and chaos prompted by such an interpretation and that will undoubtedly continue if OJP's interpretation is blessed.

> **2.    Section 200.340(a)(4) cannot be used to terminate grant awards where that provision is not clearly and unambiguously specified in the award terms and conditions**

Section 200.340 also makes clear that OJP cannot use this provision to terminate a federal grant award where "the terms and conditions of the Federal award" do not "clearly and unambiguously specify" that the grant can be terminated if it no longer effectuates the program goals or agency priorities. 2 C.F.R. § 200.340(b).

This conclusion is confirmed by OMB's rulemaking, which is unequivocal that "Federal awarding agencies must clearly and

unambiguously articulate the conditions under which a Federal award may be terminated in their applicable regulations and in the terms and conditions of Federal awards." 85 Fed. Reg. at 49,507; *accord* 89 Fed. Reg. at 30,089 ("Provided that the language is included in the terms and condition of the award, the revised termination provision at section 200.340 continues to allow Federal agencies and pass-through entities with authority to terminate an award in the circumstances described in paragraph (a)(2) in the prior version of the guidance.").

OJP does not dispute that Plaintiffs' award letters include the following language: that "[t]he Uniform Administrative Requirements, Cost Principles, and Audit Requirements in 2 C.F.R. Part 200, as adopted and supplemented by DOJ in 2 C.F.R. Part 2800 … apply to this award from OJP." Dkt. 26 at 30. OJP contends, however, that this incorporation by reference of the entirety of Part 200 into the award provides "clear and unambiguous notice" of the terms upon which an award can be terminated. But, under the plain terms of Section 200.340(b), OJP is not permitted to rely on the existence of regulations as providing notice of the basis for terminating a grant; rather an agency "may" include "a" term or condition "if an award no longer effectuates the

47

program goals or agency priorities." 89 Fed. Reg. at 30,089. OJP's incorporation by reference does not satisfy the requirement that an agency "clearly and unambiguously" communicate termination conditions. Nor could the incorporation of a large swath of federal regulations conceivably be considered "a" term, *i.e.*, a specific term and condition of the award, that clearly and unambiguously provides a grantee with notice of the circumstances in which its grant could be terminated. OJP's failure to include a specific condition that grants could be terminated on this basis and its subsequent termination of Plaintiffs' grants on that basis is therefore contrary to law.

### B.   The grant terminations are arbitrary and capricious

On the merits, OJP's simultaneous, unreasoned terminations of Plaintiffs' grants are arbitrary and capricious. Under the APA, grantees are entitled to reasoned decision-making before the government terminates nearly a billion dollars in vital grant funding with no notice, based on priorities it identified for the first time in its termination notices. OJP failed to provide any explanation as to why each grant award no longer "directly" served its newly identified policies, a discussion of the alternatives, or a discussion of grantee reliance

interests.  OJP's *en masse* termination of 376 grants using the same cursory and unspecific rationale, represents nearly every hallmark of arbitrary and capricious agency action.

1.  OJP's terminations are arbitrary and capricious because the terminations are neither "reasonable" nor "reasonably explained." *Ohio*, 603 U.S. at 292.  When terminating a grant, OJP must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).  OJP's explanation cannot rely "on factors which Congress has not intended it to consider, entirely fail[] to consider an important aspect of the problem, offer[] an explanation for its decision that runs counter to the evidence before the agency, or [be] so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*  "This foundational precept of administrative law is especially important where, as here, an agency changes course." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020). "Reasoned decision-making requires that when departing from precedents or practices, an agency must offer a reason to distinguish

them or explain its apparent rejection of their approach." *Id.* (internal quotation marks omitted). While agencies "remain free to change their existing policies," the APA requires that they must still "provide a reasoned explanation for the change." *Id.* at 646.

OJP's mass termination of Plaintiffs' grants fails nearly all of these benchmarks of reasoned decision-making. The termination emails include identical language and state summarily, without analysis or individualized assessment specific to each grant, that OJP has determined that the awards "no longer effectuate[] the program goals and the Department's priorities." JA20–21.

The district court recognized that the unreasoned boilerplate terminations were "unquestionably arbitrary." JA547. OJP claimed its priorities had shifted, but the "monies awarded to the[] Plaintiffs, however, were for th[e] very purposes" the government claimed to be newly prioritizing. *Id.* Defendants could not explain how Plaintiffs' grants were inconsistent with OJP's new priorities, JA547, which the district court rightly observed is "the hallmark of arbitrary and capricious decision-making," JA504.

50

The district court was correct. OJP admits that each notice was identical in reasoning. JA401. The termination notice does not include any explanation specific to the grantee; nor does any notice explain why that grant no longer serves the agency's changed priorities. Rather, OJP declared that it wished to "more directly" focus its funding and asserted with no elaboration or factual support that "these awards demonstrate that they no longer effectuate Department priorities."

Not only did OJP fail to provide a rational connection between the facts found and the choices made, but it failed to supply *any* connection to support its conclusory assertion that the "awards demonstrate" that they did not effectuate Department priorities. OJP offers no workable, sensible, or meaningful basis for its termination of the awards that would allow Plaintiffs to ascertain what elements of their program no longer supported OJP's newly articulated priorities. Why, for example, is Vera's program to support disabled victims of human trafficking not considered support for "victims of trafficking and sexual assault"? Why is FORCE Detroit's work, which successfully prevents gun violence not considered to be "combatting violent crime"? The termination notices supply no answer.

51

OJP's unreasoned terminations are arbitrary and capricious.

2.   Compounding the lack of any grant-specific explanation, OJP terminated 376 grants based on a post-award change in the Department's priorities, announced for the first time when it abruptly terminated the grants.   OJP's failure to explain its departure from its previous priorities and acknowledge grantee reliance interests or reasonable alternatives renders these terminations arbitrary and capricious.

"When an agency changes course," as OJP did here in asserting a change in its priorities, it must consider the "serious reliance interests" of stakeholders, including grantees.   *DHS v. Regents of Univ. of Cal.,* 591 U.S. 1, 30 (2020) (internal quotation marks omitted).   OJP "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," and it is "arbitrary and capricious to ignore such matters."   *Id.* at 30.   Indeed, as was the case here, when an agency makes a decision that "rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests," it must offer a "more detailed justification" than usual.   *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).   As part of this analysis, OJP must "consider

responsible alternatives to its chosen policy" and "give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (internal quotation marks omitted). "This principle goes to the heart of reasoned decisionmaking." *Id.*

OJP's terminations included no such explanations. All Plaintiffs relied on their understanding that OJP would fulfill its commitments and would not arbitrarily and unlawfully terminate their multi-year grant funding. JA44; JA73; JA113; JA148; JA258. They hired employees, developed relationships with community organizations and residents who depend on grant-enabled services, and entered into contracts with vendors. Plaintiffs entered into multi-year subcontract awards with other organizations, correctional facilities, and cities worth millions of dollars, only to have to abruptly terminate those awards. JA148-49; JA159; JA257; JA261.

OJP did not explain why it was shifting its priorities. OJP did not mention, much less discuss, the grantees' reliance interests or the impact of terminations. *Cf. Fox Television*, 556 U.S. at 515. Nor did OJP explain whether it considered alternatives to wholesale termination. *Spirit*

*Airlines, Inc.*, 997 F.3d at 1255.  OJP's failure to explain its departure from the priorities articulated when the grants were awarded, and its failure to consider or explain the grantees' substantial reliance interests and reasonable alternatives to wholesale termination, renders the terminations arbitrary and capricious.

## III.    The District Court Erred In Dismissing Plaintiffs' Constitutional Claims, Which Are Likely To Succeed On The Merits

Plaintiffs have also plausibly alleged OJP's cancellations violate the Fifth Amendment's Due Process Clause and are likely to prevail on that issue.  The district court correctly held that it had jurisdiction over this constitutional claim, but it erroneously held that the claim could not succeed on the merits.  JA572.  Plaintiffs have a protectable property interest in awarded and accepted grants, and OJP failed to provide the requisite pre-deprivation notice or hearing before their cancellations.

### A.    Plaintiffs have a protected property interest in the awarded and accepted grants

Plaintiffs have a protectable property interest in the awarded and accepted grants.  The "essential condition of a protected property interest" is that Plaintiffs have a "legitimate claim of entitlement" to the benefits.  *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C.

Cir. 2015) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).  Here, Plaintiffs had entitlement to the unexpired grant awards that they had received and accepted.  *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 767 (2005) (explaining that "the withdrawal of 'direct benefits'" in the form of federal financial assistance "trigger[s] due process protections").

A claim of entitlement "is 'legitimate' if award of the benefit would follow from satisfaction of applicable eligibility criteria."  *NB ex rel. Peacock*, 794 F.3d at 41.  Here, OJP awarded grants to each of the plaintiff organizations, JA13, which demonstrates that they met the applicable eligibility criteria.  And, critically, the federal government's "implementing regulations place 'substantive limitations on official discretion' to withhold award of the benefit" once those eligibility criteria are met.  *NB ex rel. Peacock*, 794 F.3d at 41–42 (quoting *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 36 (D.C. Cir. 1997)).

As explained above, the OMB Uniform Guidance substantively limits the reasons a federal agency may terminate an awarded grant. The regulations specify that, absent the recipient's consent, a federal grant award may be terminated in two situations: if the recipient fails to

comply with its terms and conditions, or "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(1), (4). Those two conditions establish that OJP may not terminate the grant based on the agency's mere "whim." *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 34 (D.C. Cir. 2024). Instead, the agency must find that factual circumstances warrant termination under one of the regulatory criteria. *See id.* Because OJP "may terminate" the grants "only 'for cause,'" Plaintiffs "assert a 'legitimate claim of entitlement' within the protection of the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 11–12 (1978).

In reaching its contrary holding, the district court misapprehended the relevant regulations. The district court observed that 2 C.F.R. § 200.340(a) "lists four circumstances in which a government agency 'may' terminate a federal award," and it observed that the word "may" is "permissive." JA575. But the district court did not appreciate the negative implication of the regulatory language: an agency may not terminate the award except under the identified circumstances. *See, e.g.*,

56

*Jones v. Hendrix*, 599 U.S. 465, 477–78 (2023) (where a law enumerated "two—and only two—conditions" in which an action is authorized, "the straightforward negative inference" is that the action "is not authorized unless one of those two conditions is met"). That reading is confirmed by other regulatory language forbidding the withholding of payments for allowable costs during the award's performance period except in specified circumstances. *See* 2 C.F.R. § 200.305(b)(6); *cf. NB ex rel. Peacock*, 794 F.3d at 42 (holding that the plaintiff had a protectable property interest where Medicaid regulations required reimbursement of claims absent an applicable exception).

The district court also suggested that Plaintiffs lack a protectable property interest because there are "'millions of government contracts in effect at any point in time' to which courts seldom apply 'due-process principles.'" JA575 (quoting *Nat'l Urban League v. Trump*, No. 25–cv–471, 2025 WL 1275613, at *18 (D.D.C. 2025)). To the extent that the court was concerned that recognizing a property interest "would risk transmogrifying virtually every dispute involving an alleged breach of contract by the government into a constitutional case," that concern was misplaced. *Nat'l Urban League*, 2025 WL 1275613, at *18. Plaintiffs'

57

claims do not concern contracts at all.  *See supra* at 35–40.  That aside, the gravamen of Plaintiffs' claim is not a breach of the award's terms, but the lack of process prior to grant termination.  That kind of claim is plainly susceptible to due-process analysis even if it may affect many adjudications.  *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319 (1976) (social security disability payments).

In any event, Plaintiffs have a valid due process claim even if the grant awards were properly treated as mine-run government contracts. "Valid contracts are property under the Fifth Amendment, whether the obligor be a private individual, a municipality, a state, or the United States." *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296, 316 (D.C. Cir. 2014) (brackets omitted) (quoting *Lynch v. United States,* 292 U.S. 571, 579 (1934)).  Accordingly, this Court has recognized "a Fifth Amendment-protected property interest arises ... upon award" of a government contract under D.C. law.  *C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 200 (D.C. Cir. 2002).  There is no basis for a different result here where the federal government's own regulations likewise restrict the circumstances in which a grant can be terminated.

Because Plaintiffs had protectable property interest in the grant awards, the district court erred in dismissing their due process claim.

## B.   OJP's failure to provide pre-deprivation notice and a hearing violated due process

OJP failed to provide Plaintiffs with due process prior to terminating the grant awards.  "[A]bsent exigent circumstances not implicated here, the Due Process Clause requires, at minimum, that the government provide notice and some kind of hearing *before* final deprivation of a property interest."  *Esparraguera*, 101 F.4th at 40 (internal quotation marks omitted).  That notice and hearing must provide "the factual basis for the action and the opportunity to rebut the evidence supporting that action."  *Ralls Corp.*, 758 F.3d at 318.  OJP failed to meet that minimal standard: it offered "no advance notice" of the grant terminations and "no opportunity to respond to the purported basis of the terminations" before they took effect.  JA21.

The possibility of post-hoc appeals of grant terminations, *see* 2 C.F.R. § 200.342, is no substitute for pre-deprivation process. Notwithstanding the possibility of appeal, Plaintiffs "immediately stopped receiving funds" upon termination of their grants.  JA21.  That had immediate adverse effects on Plaintiffs' operations.  *See* infra at 60–

59

65. Post-termination administrative appeals cannot cure those injuries. To the extent they are relevant at all, the regulatory provisions regarding appeal procedures are "cogent evidence that the [government] recognizes the primacy of the public interest in correct eligibility determinations and therefore in the provision of procedural safeguards." *Goldberg v. Kelly*, 397 U.S. 254, 266 (1970); *see also* 2 C.F.R. § 200.339 (allowing the government to terminate for non-compliance only if the noncompliance "cannot be remedied").

## IV. This Court Should Grant A Preliminary Injunction

In addition to reversing the dismissal of this suit, this Court should grant the preliminary injunction denied by the district court. As explained above, Plaintiffs are likely to prevail on the merits of their claims. And given "the urgency of the matter," this Court should grant immediate preliminary relief in light of the lopsided balance of the equities. *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (directing entry of a preliminary injunction).

### A. Plaintiffs and the other putative class members are suffering ongoing irreparable harm from the illegal grant terminations

The factual record is undisputed: Plaintiffs are suffering ongoing significant and irreparable harms. Because of OJP's terminations, at

60

least one grantee will shutter its doors in August. The terminations have also forced Plaintiffs to pause or terminate critical programs central to their missions, to lay off specialized staff, and to endure significant reputational harms.

1. OJP's terminations have caused harm that is "'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'" *League of Women Voters*, 838 F.3d at 7–8.

OJP's terminations "unquestionably make it more difficult for the [Plaintiffs] to accomplish their primary mission" in a way that cannot be redressed absent injunctive relief. *Id.* at 9. All Plaintiffs have been forced to eliminate or severely restrict critical, often life-saving services in their communities that were funded by terminated grants. JA45; JA48; JA51; JA75–76; JA113; JA115–16; JA151; JA147–48; JA156; JA159. At least one grantee will shutter its doors in August. JA585. This has had "devastating" impacts on the communities that Plaintiffs serve who rely on these services. JA156. For example, "in 23 hospitals across the country, individuals who directly benefitted from these intervention programs in the hospital are no longer going to have life-

saving assistance, and in some cases, members in the community will lose their lives because of the disruption of services." JA151.

These profound harms are presently occurring. Because grant funding deployed to prevent gun violence was abruptly terminated, communities have predictably seen an "increase in violence," JA588–89, including an "astronomical" increase in firearm deaths in the county served by CCYJ, JA600–01. FORCE Detroit was unable to intervene in active, known conflicts that they would have mediated but for the lost funding, resulting in the gun deaths of children and members of their community over the July 4 weekend. JA592; JA476. More people will continue to die if Plaintiffs cannot provide essential violence interruption services. JA591–93, JA588–89; *see also Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 117 (D.D.C. 2025) ("Obviously, when an organization is created to fulfill the objectives of a grant and its existence relies on grant money, harm is certain once the grant funds are withdrawn.").

Ongoing public health risks, like those caused by the precipitous termination of Plaintiffs' grant funding, is irreparable harm that "would not be eliminated even if plaintiffs ultimately were to win on the merits."

62

*Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 613–14 (D.C. Cir. 1980) (irreparable harm to plaintiffs' clients who would be harmed by challenged agency action). These terminations have led to an abrupt discontinuation of vital services to some of the most vulnerable in our communities, making individuals and the communities in which they live less safe.

Not only are these terminations leading to a loss of life, but the termination of funding also impacts essential services for victims. The termination of Vera's grants forced the organization "to turn away Deaf victims of crime who were seeking interpretive services to help them communicate with law enforcement and victims' services." JA259. The interruption of HRiA's work to advance hospital-based victim services diminishes hospitals' "capacity to address the comprehensive needs of victims of crime, thereby leading to less coordinated, more fragmented victim services and increased risks at hospital emergency departments." JA154. At least forty victims of hate-based violence will lose the opportunity to participate in Stop AAPI's program that includes mental health and other resources. JA78. Other examples of the disruption to

critical services abound. *See, e.g.*, Br. of Amici Local Gov'ts. (July 18, 2025).

2. Additionally, the ongoing loss of employees with valuable expertise and relationships within their communities causes irreparable harm to Plaintiffs. An organization that loses "skilled employees" with the "institutional knowledge and experience" to fulfill its obligations experiences an irreparable harm, *Yorktown Sys. Grp., Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1296 (11th Cir. 2024), because "compensatory or other corrective relief" cannot restore their lost human capital, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

All Plaintiffs have been forced to lay off specialized staff, with more layoffs impending. JA44; JA75; JA114; JA584; JA588; JA600. FORCE Detroit had to lay off three "violence interrupters," who provide "daily, in-the-field support for individuals most at risk of gun violence," JA114, including de-escalation of known conflicts. These employees not only have specialized skillsets, but "deep community ties," and had spent years building "trust with high-risk participants." *Id.*, JA588.

64

3.    The sudden termination of vital programs in Plaintiffs' and putative class members' communities erodes their reputations and relationships with longstanding partners that they spent years building in their communities.  Those harms, too, are irreparable.  *Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962); *Widakuswara*, 2025 WL 1288817, at *14 (Pillard, J., dissenting) (recognizing irreparable harm stemming from "[t]he blight on [the plaintiff's] reputation").

These reputational harms are severe and ongoing.  Plaintiffs must build trust with contractors, subrecipients, and other community partners over multiple years.    When Plaintiffs cannot keep their commitments to those other individuals and entities due to a sudden loss in funding, those trust-based relationships erode.  JA83–84; JA114–15; JA149; JA156.

4.  Finally, OJP stated that it will "reobligate any remaining funds which had previously been allocated under the terminated grant agreements."  JA402.  That re-obligation could occur as soon as October 1 for Plaintiffs, JA605, and at any moment for the putative class members.  OJP's impending re-obligation of funds raises the troubling possibility that relief would be unavailable for Plaintiffs and putative

65

class at the conclusion of this suit. *See City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) ("[O]nce the relevant funds have been obligated, a court cannot reach them in order to award relief."); *see also Climate United Fund*, 2025 WL 1131412, at *17 (holding that "re-obligation of [the disputed] funds would be an irreparable loss" to the plaintiffs based on *City of Houston*).

For these reasons, preliminary injunctive relief is urgently needed.

## B.    The grant terminations are having a devastating impact on the public

The public is suffering due to the terminations. As the district court noted, the grant terminations are "likely to harm communities and individuals vulnerable to crime and violence." JA547. Plaintiffs provide critical grant-funded services to at-risk individuals in their communities and, in some places, individuals previously benefiting from Plaintiffs' services have already and will continue to lose their lives as a result of the grant terminations. As noted above, profound harms, including deaths that could have been prevented with Plaintiffs' interventions, will continue until their grant awards are restored and they can resume their critical work.

The public interests served by hundreds of other putative class members are likewise being harmed by OJP's terminations. As amici detail, there are multiple putative class members who have been forced to shut down their businesses as the result of OJP's terminations of their grants. In the State of Washington, for example, an organization supporting court-appointed special advocates and guardians ad litem "had to suspend all services and support," leaving children without essential support to navigate the legal system. Dkt. 20 at 9; *see also* Dkt. 37 at 41–42. Likewise, because of OJP's terminations, "community-based violence intervention programs have ceased operations," Br. of Amici Local Gov'ts at 7, including a class member, JA585.

On the other side of the ledger, OJP has no countervailing interest in the unlawful allocation of public funds. *See Shawnee Tribe*, 984 F.3d at 102–03 (citing *League of Women Voters*, 838 F.3d at 12). That is particularly true here, where OJP itself previously determined that the grant awards would further the public interest in providing critical services to reduce violence and help crime victims. As a result, the balance of the equities decisively favors Plaintiffs, and this Court should direct the entry of a preliminary injunction.

## CONCLUSION

The Court should reverse the district court's entry of dismissal and should preliminarily enjoin the unlawful grant terminations.

Dated: August 11, 2025                    Respectfully submitted,

                                          */s/ Lisa Newman*
                                          Lisa Newman

Joshua Perry                              Lisa Newman*
Joshua Stanton                            Joshua Salzman
E. Danya Perry                            Simon C. Brewer*
Perry Law                                 Jennifer Fountain Connolly
445 Park Avenue, 7th Floor                Cortney Robinson
New York, NY 10022                        Somil Trivedi
(212) 251-2619                            Brian Netter
jperry@danyaperrylaw.com                  Democracy Forward Foundation
                                          P.O. Box 34553
                                          Washington, D.C. 20043
                                          (202) 448-9090
                                          lnewman@democracyforward.org

                                          *Not admitted in the District of
                                          Columbia; practicing under the
                                          supervision of Democracy
                                          Forward lawyers who are
                                          members of the D.C. Bar.

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface and type-volume limitations in Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,975 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: August 11, 2025                    */s/ Lisa Newman*
                                          Lisa Newman

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, I state that no Plaintiffs have any parent company and that no publicly held company has a 10% or greater ownership interest in any Plaintiffs.

Dated: August 11, 2025                    */s/ Lisa Newman*
                                        Lisa Newman

## CERTIFICATE OF SERVICE

I certify that on August 11, 2025, a true and correct copy of this Brief was filed with the Clerk for the United States Court of Appeals for the District of Columbia Circuit via the Court's electronic filing system, which will forward a copy to all counsel of record.

Dated: August 11, 2025                    */s/ Lisa Newman*
                                          Lisa Newman

# ADDENDUM

# TABLE OF CONTENTS

Page

5 U.S.C. § 702 ........................................................................1a

5 U.S.C. § 706 ........................................................................2a

2 CFR § 200.340........................................................................3a

**5 U.S.C. § 702.  Right of Review**

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States:  *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.  Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

## 5 U.S.C. § 706.  Scope of Review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—

    (1)    compel agency action unlawfully withheld or unreasonably delayed; and

    (2)    hold unlawful and set aside agency action, findings, and conclusions found to be—

        (A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

        (B)    contrary to constitutional right, power, privilege, or immunity;

        (C)    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

        (D)    without observance of procedure required by law;

        (E)    unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

        (F)    unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 2 CFR § 200.340.  Termination

(a)  The Federal award may be terminated in part or its entirety as follows:

  (1)  By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;

  (2)  By the Federal agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions.  These conditions include the effective date and, in the case of partial termination, the portion to be terminated;

  (3)  By the recipient or subrecipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination, the effective date and, in the case of partial termination, the portion to be terminated.  However, if the Federal agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal agency or pass-through entity may terminate the Federal award in its entirety; or

  (4)  By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

(b)  The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.

(c)  When the Federal agency terminates the Federal award prior to the end of the period of performance due to the recipient's material failure to comply with the terms and conditions of

3a

the Federal award, the Federal agency must report the termination in *SAM.gov*. A Federal agency must use the Contractor Performance Assessment Reporting System (CPARS) to enter information in *SAM.gov*.

(1) The information required under paragraph (c) of this section is not to be reported in *SAM.gov* until the recipient has either:

    (i) Exhausted its opportunities to object or challenge the decision (see § 200.342); or

    (ii) Has not, within 30 calendar days after being notified of the termination, informed the Federal agency that it intends to appeal the decision to terminate.

(2) If a Federal agency, after entering information about a termination in *SAM.gov*, subsequently:

    (i) Learns that any of that information is erroneous, the Federal agency must correct the information in the system within three business days;

    (ii) Obtains an update to that information that could be helpful to other Federal agencies, the Federal agency is strongly encouraged to amend the information in the system to incorporate the update in a timely way.

(3) The Federal agency must not post any information that will be made publicly available in the non-public segment of *SAM.gov* that is covered by a disclosure exemption under the Freedom of Information Act (FOIA). When the recipient asserts within seven calendar days to the Federal agency which posted the information that a disclosure exemption under FOIA covers some of the information made publicly available, the Federal agency that posted the information must remove the posting within seven calendar days of

receiving the assertion.  Before reposting the releasable information, the Federal agency must resolve the issue in accordance with the agency's FOIA procedures.

(d)     When the Federal award is terminated in part or its entirety, the Federal agency or pass-through entity and recipient or subrecipient remain responsible for compliance with the requirements in §§ 200.344 and 200.345.