**[ORAL ARGUMENT SCHEDULED OCTOBER 21, 2025]**

**No. 25-5248**

───────────────────────────

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

───────────────

VERA INSTITUTE OF JUSTICE, et al.,
                              *Plaintiffs-Appellants,*

v.

U.S. DEPARTMENT OF JUSTICE, et al.,
                              *Defendants-Appellees.*

───────────────

On Appeal from the United States District Court
for the District of Columbia

───────────────

**BRIEF FOR APPELLEES**

───────────────

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant*
  *Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.      Parties and Amici

Plaintiffs-appellants are Vera Institute of Justice; Center for Children & Youth Justice; Chinese for Affirmative Action; Force Detroit; and Health Resources in Action.

Defendants-appellees are U.S. Department of Justice; Pamela J. Bondi, in her official capacity as U.S. Attorney General; Office of Justice Programs; and Maureen Henneberg, in her official capacity as Acting Head of the Office of Justice Programs.

Amici in this Court are the State of Arizona; the State of California; the State of Colorado; the State of Connecticut; the State of Delaware; the District of Columbia; the State of Illinois; the State of Maine; the State of Maryland; the State of Massachusetts; the State of Michigan; the State of Minnesota; the State of Nevada; the State of New Jersey; the State of New Mexico; the State of New York; the State of North Carolina; the State of Oregon; the State of Rhode Island; the State of Vermont; the State of

Washington; Mark Gergen; Gregory Klass; Daniel Markovits; and Tobias

Barrington Wolff.

Amici who appeared in district court and/or in this Court in support of

plaintiffs' motion for injunction pending appeal are City of Baltimore,

Maryland; City of Chicago, Illinois; City of Columbus, Ohio; City of

Evanston, Illinois; Harris County, Texas; King County, Washington; City of

Minneapolis, Minnesota; Montgomery County, Maryland; City of Newark,

New Jersey; City of New York, New York; City of Pittsburgh, Pennsylvania;

City of Sacramento, California; City of Santa Monica, California; John Clark,

Mayor, Town of Ridgway, Colorado; Kara Davis, District Attorney, Wasco

County, Oregon; Matt Ellis, District Attorney, City of Hood River, Oregon;

Ramin Fatehi, Commonwealth's Attorney, City of Norfolk, Virginia; Delia

Garza, County Attorney, Travis County, Texas; Jose Garza, District

Attorney, Travis County, Texas; Sarah George, State's Attorney, Chittenden

County, Vermont; Jeff Getting, Prosecuting Attorney, Kalamazoo County,

Michigan; Melesa Johnson, Elected Prosecutor, Jackson County, Missouri;

Lawrence Krasner, District Attorney, City of Philadelphia, Pennsylvania;

Quinton D. Lucas, Mayor, City of Kansas City, Missouri; Ryan Mears,

Prosecutor, Marion County, Indiana; Steve Mulroy, District Attorney,

ii

County of Shelby, Tennessee; Eric Rinehart, District Attorney, County of Shelby, Tennessee; Jeff Rosen, District Attorney, Santa Clara County, California; Eli Savit, Prosecuting Attorney, Washtenaw County, Michigan; and Eric Sparr, District Attorney, Winnebago County, Wisconsin.

Amici who appeared in district court are The BRidge Agency; Brightside Child & Family Advocacy; Carter's Crew; In The Streets; Just Us Family Group Home – Forever Takes A Village; Justice Information Resource Network; Latino Coalition – Struggle of Love Foundation; Moms on A Mission; Mute the Violence D.C.; Silence Is Violence; Social and Environmental Entrepreneurs (SEE), Inc. – Beyond Harm; Youth MOVE National; and America First Legal Foundation.

### B.    Rulings Under Review

The rulings under review were entered in *Vera Institute of Justice v. U.S. Department of Justice*, No. 25-cv-1643 (D.D.C.), by the Honorable Amit P. Mehta.  They are the July 7, 2025, order and opinion denying plaintiffs' motion for preliminary injunction and granting the government's motion to dismiss (Dkt. Nos. 47, 48).  The district court's opinion is available at *Vera Institute of Justice v. U.S. Department of Justice*, No. 25-cv-1643, 2025 WL 1865160 (D.D.C. July 7, 2025).

iii

### C.    Related Cases

This case was not previously before this Court.  This Court denied plaintiffs' motion for injunction pending appeal and expedited this appeal on August 1, 2025.  Related issues are pending before this Court in *Amica Center for Immigrant Rights v. U.S. Department of Justice*, No. 25-5254 (D.C. Cir.), in which this Court set a similarly expedited schedule and set oral argument for October 14, 2025.


 */s/ Brian J. Springer*
Brian J. Springer

iv

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION ................................................ 2

STATEMENT OF THE ISSUES ..................................................... 2

PERTINENT STATUTES AND REGULATIONS ........................ 3

STATEMENT OF THE CASE ........................................................ 3

     A.    Statutory and Regulatory Background ...........................3

     B.    Factual and Procedural Background ...............................5

SUMMARY OF ARGUMENT ........................................................ 9

STANDARD OF REVIEW ............................................................14

ARGUMENT ..................................................................................15

I.    The District Court Lacked Jurisdiction over Plaintiffs'
Challenges to the Termination of Their Grant Agreements..................15

     A.    The District Court Correctly Concluded that Plaintiffs'
APA Claims Are Barred by the Tucker Act. .................................15

     B.    Plaintiffs' Counterarguments Are Unpersuasive..........................23

II.    In Any Event, Plaintiffs' Claims Fail As a Matter of Law.....................34

     A.    The Challenged Grant Funding Decisions Are Committed
to Agency Discretion by Law. .........................................................34

     B.    The Agency's Grant Funding Decisions Were Reasonable
and Reasonably Explained...............................................................41

    C.    Plaintiffs' Due-Process Claim Lacks Merit. ...................................45

III.    Plaintiffs' Remaining Arguments Should Be Rejected. .........................52

CONCLUSION.......................................................................................55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                              **Page(s)**

*A.A.R.P. v. Trump,*
    145 S. Ct. 1364 (2025) ....................................................................... 54

*Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv.*
    *Emp. Benefits Sys.,*
    357 F.3d 62 (D.C. Cir. 2004) .......................................................... 16

*American Public Health Ass'n v. National Insts. of Health,*
    145 F.4th 39 (1st Cir. 2025) ........................................................... 24

*Boaz Hous. Auth. v. United States,*
    994 F.3d 1359 (Fed. Cir. 2021) ................................................. 33, 34

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) ................................................................. 28, 29

*Boyd v. United States,*
    134 F.4th 1348 (Fed. Cir. 2025) ..................................................... 31

*C&E Servs., Inc. of Washington v. District of Columbia*
    *Water & Sewer Auth.,*
    310 F.3d 197 (D.C. Cir. 2002) ....................................... 47, 48, 49, 52

*Caldwell & Santmyer, Inc. v. Glickman,*
    55 F.3d 1578 (Fed. Cir. 1995) ........................................................ 47

*California v. U.S. Dep't of Educ.,*
    132 F.4th 92 (1st Cir. 2025) ........................................................... 17

*Climate United Fund v. CitiBank, N.A.,*
    No. 25-5122 (D.C. Cir. Sept. 2, 2025) .......................... 22, 26, 31, 47

*Columbus Reg'l Hosp. v. United States,*
    990 F.3d 1330 (Fed. Cir. 2021) ...................................................... 32

*Crowley Gov't Servs., Inc. v. GSA,*
    38 F.4th 1099 (D.C. Cir. 2022) ...................................................... 15

*Department of Com. v. New York,*
    588 U.S. 752 (2019) ....................................................................... 40

*Department of Educ. v. California,*
    145 S. Ct. 966 (2025) ............................................ 8, 10, 17, 18, 31, 53

*Department of Homeland Sec. v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) ................................................................. 45

*Esparraguera v. Department of the Army,*
    101 F.4th 28 (D.C. Cir. 2024) ......................................... 51

*Federal Commc'ns Comm'n v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ....................................................... 41

*Hall v. McLaughlin,*
    864 F.2d 868 (D.C. Cir. 1989) ........................................ 44

*Heckler v. Chaney,*
    470 U.S. 821 (1985) .....................................................12, 35

*Higbie v. United States,*
    778 F.3d 990 (Fed. Cir. 2015) ........................................ 33

*Ingersoll-Rand Co. v. United States,*
    780 F.2d 74 (D.C. Cir. 1985) .............................. 11, 19, 20, 21, 26

*Judicial Watch, Inc. v. Kerry,*
    844 F.3d 952 (D.C. Cir. 2016) ........................................ 52

*Kidwell v. Department of the Army, Bd. for Corr. of Mil. Recs.,*
    56 F.3d 279 (D.C. Cir. 1995) .......................................... 26

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ................................. 12, 34, 35, 36, 39

*Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of
    the Town of Huntington,*
    31 F.3d 1191 (2d Cir. 1994) .......................................... 46

*Lujan v. G & G Fire Sprinklers, Inc.,*
    532 U.S. 189 (2001) .................................................. 49, 50

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians
    v. Patchak,*
    567 U.S. 209 (2012) .............................................. 15-16, 16

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ............................................................ 11, 16, 26

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) ............................................................ 36

*National Insts. of Health v. American Pub. Health Ass'n*,
    No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025) ........... 10, 17, 18, 30, 53

*NB ex rel. Peacock v. District of Columbia*,
    794 F.3d 31 (D.C. Cir. 2015) ............................................................ 45, 51

*Ralls Corp. v. Committee on Foreign Inv. in the U.S.*,
    758 F.3d 296 (D.C. Cir. 2014) ............................................................ 51

*Ravi v. United States*,
    104 F.4th 1359 (Fed. Cir. 2024) ............................................................ 33

*Rhea Lana, Inc. v. United States*,
    925 F.3d 521 (D.C. Cir. 2019) ............................................................ 43

*San Juan City Coll. v. United States*,
    391 F.3d 1357 (Fed. Cir. 2004) ............................................................ 33

*Spectrum Leasing Corp. v. United States*,
    764 F.2d 891 (D.C. Cir. 1985) ............................................................ 11, 19

*Stanley v. City of Sanford*,
    145 S. Ct. 2058 (2025) ............................................................ 40

*Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec.*,
    980 F.3d 109 (D.C. Cir. 2020) ............................................................ 14

*Suburban Mortg. Assocs. v. U.S. Dep't of Hous. & Urban Dev.*,
    480 F.3d 1116 (Fed. Cir. 2007) ............................................................ 21

*Tarpeh-Doe v. United States*,
    904 F.2d 719 (D.C. Cir. 1990) ............................................................ 46

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) ............................................................ 54

*Tucson Airport Auth. v. General Dynamics Corp.*,
    136 F.3d 641 (9th Cir. 1998) ............................................................ 29

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,
  770 F. Supp. 3d 155 (D.D.C. 2025) ............................................ 22, 27

*Widakuswara v. Lake*,
  No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025),
  *vacated in part*, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc) ..... 30

**Statutes:**

Administrative Procedure Act (APA):
  5 U.S.C. § 701(a)(2) ......................................................... 34
  5 U.S.C. § 702 ......................................................... 27, 28, 29
  5 U.S.C. § 704 ......................................................... 28

Consolidated Appropriations Act, 2024,
  Pub. L. No. 118-42, div. C, tit. II, 138 Stat. 25 .................................3, 4, 37, 38

Tucker Act:
  28 U.S.C. § 1491(a) ......................................................... 2
  28 U.S.C. § 1491(a)(1) ......................................................... 16

28 U.S.C. § 1291 ......................................................... 2

28 U.S.C. § 1331 ......................................................... 2

34 U.S.C. § 10101 ......................................................... 3

34 U.S.C. § 10102(a) ......................................................... 3

34 U.S.C. § 10110 ......................................................... 3

34 U.S.C. § 20101(b)(1) ......................................................... 4

34 U.S.C. § 20101(b)(3) ......................................................... 4

34 U.S.C. § 20101(c) ......................................................... 4, 37

34 U.S.C. § 20101(d) ......................................................... 37

34 U.S.C. § 20103(c) ......................................................... 4, 37

34 U.S.C. § 20103(c)(1)(A)-(B) ................................................................. 38

34 U.S.C. § 20109(a) ....................................................................... 4, 37, 38

## Regulations:

2 C.F.R. § 200.340 ........................................................................ 25, 46

2 C.F.R. § 200.340(a) ............................................................................ 5

2 C.F.R. § 200.340(a)(4) ..................................... 5, 26, 39, 40, 41, 42, 44, 46, 47

2 C.F.R. § 200.340(b) ...................................................................... 5, 40

2 C.F.R. § 2800.101 ........................................................................... 4

28 C.F.R. § 0.90 ............................................................................... 3

**GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| J.A. | Joint Appendix |
| OJP | Office of Justice Programs |
| OMB | Office of Management and Budget |

**INTRODUCTION**

Following a careful, individualized review, the Department of Justice elected to terminate 376 discretionary grant agreements made by the Office of Justice Programs (OJP)—a tiny fraction of its over 11,000 open awards—and redirect the funds to new projects that better advance current agency priorities.  Plaintiffs are grant recipients who challenged the terminations of their funding agreements in district court under the Administrative Procedure Act (APA).

In a thorough and reasoned decision, Judge Mehta determined that plaintiffs' claims challenging the termination of their funding agreements present contractual disputes that must be brought in the Court of Federal Claims, not in district court.  That conclusion comports with recent rulings from the Supreme Court—which has now twice made clear that such grant termination claims may not be brought through the APA—and applies settled decisions from this Court.

Plaintiffs provide no sound basis for distinguishing the Supreme Court and circuit precedent that dictates the outcome here.  Instead, they press the precise arguments that the Supreme Court rejected in a decision rendered

after plaintiffs filed their opening brief.  That decision reaffirms the district court's disposition of plaintiffs' case.  The judgment should be affirmed.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, J.A. 10, but the district court concluded that it lacked jurisdiction because plaintiffs' claims were contract claims that should have been pursued in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a). The district court granted the government's motion to dismiss and denied plaintiffs' motion for preliminary injunction on July 7, 2025.  J.A. 581. Plaintiffs filed a timely notice of appeal on July 8, 2025.  J.A. 582.  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The issues presented are:

1.  Whether plaintiffs' claims challenging the agency's decision to terminate their grant agreements are barred by the Tucker Act; and

2.  Whether the agency's termination decisions are committed to agency discretion by law or otherwise consistent with the APA.

2

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

The Office of Justice Programs is a component of the Department of Justice that performs various functions related to law enforcement and criminal justice.  *See* 34 U.S.C. §§ 10101, 10102(a); 28 C.F.R. § 0.90.  The Attorney General "may make grants, or enter into cooperative agreements and contracts, for [OJP] and [its] component organizations" and has "final authority over all functions, including any grants, cooperative agreements, and contracts made, or entered into, for [OJP] and [its] component organizations."  34 U.S.C. § 10110.

In general, the Department of Justice funds OJP grant agreements through two sources.  First, Congress appropriates money directly to OJP.  For example, in the Consolidated Appropriations Act of 2024, Congress appropriated a total of nearly $2.5 billion "[f]or grants, contracts, cooperative agreements, and other assistance" related to state and local law enforcement assistance "to remain available until expended."  Pub. L. No. 118-42, div. C, tit. II, 138 Stat. 25, 145.  Within that top-line appropriation, sums are

3

earmarked for certain broad purposes or initiatives.  For instance, that appropriations act provided that "$10,000,000 is for a grant program for State and local law enforcement to provide officer training on responding to individuals with mental illness or disabilities," *id.* at 146, and that "$50,000,000 is for a community violence intervention and prevention initiative," *id.* at 149.

Second, the Department of Justice awards grants using money permanently appropriated to OJP from the Crime Victims Fund.  The money deposited into that Fund includes, among other things, certain "fines that are collected from persons convicted of offenses against the United States" and "proceeds of forfeited appearance bonds, bail bonds, and collateral collected." 34 U.S.C. § 20101(b)(1), (3).  The money "shall remain in the Fund and be available for expenditure . . . for grants under [the] subchapter without fiscal year limitation."  *Id.* § 20101(c).  The grant programs cover a wide range of topics from providing financial and other services to victims of crime, *see id.* § 20103(c), to supporting victims of sexual assault, *see id.* § 20109(a).

The Department of Justice has adopted regulations promulgated by the Office of Management and Budget (OMB) that provide standardized administrative requirements for federal awards.  *See* 2 C.F.R. § 2800.101.

4

Those regulations provide that an agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." *Id.* § 200.340(b). The regulations list four circumstances under which a "Federal award may be terminated in part or its entirety." *Id.* § 200.340(a). Most relevant here, an agency may terminate "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(4).

### B.    Factual and Procedural Background

1. In February 2025, agency leadership began a careful review of open OJP grant awards to determine if they aligned with and advanced agency priorities. *See* J.A. 401. At that time, there were more than 11,000 open awards. *Id.* Based on an "individualized review," the agency reduced "the number of awards under active focus . . . to approximately 2,200" within a few weeks. *Id.* Between April 4 and April 22, the agency "terminate[d] 376 individual, specifically identified discretionary grant awards." *Id.*

OJP sent termination notices to the 219 affected grant recipients. *See* J.A. 401. Quoting 2 C.F.R. § 200.340(a)(4), the notices explained that the "award is being terminated because it 'no longer effectuates the program

5

goals or agency priorities.'" J.A. 59. The notices indicated that the agency had "changed its priorities with respect to discretionary grant funding" in this area. *Id.* In particular, the agency plans to focus on "more directly supporting certain law enforcement operations, combatting violent crime, protecting American children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts at all levels of government." *Id.* The notices also cited the regulatory provisions governing administrative appeal and closeout procedures. J.A. 60.

2. Plaintiffs are five organizations whose OJP awards were terminated in April 2025. *See* J.A. 9-11. For example, lead plaintiff Vera Institute of Justice received an award of $1 million to "increase access to victim services to Deaf victims by providing free sign language interpretation services through virtual technology." J.A. 271-72. The written agreement signed by Vera's authorized representative detailed the amount the government agreed to pay, the work that Vera was to perform in exchange for the payment, the performance period for the work, and all applicable policies and procedures. *See* J.A. 271-96. The award expressly incorporated as terms of the award OMB's standardized requirements "in 2 C.F.R. Part 200," as adopted by the Department of Justice. J.A. 277.

Plaintiffs brought a putative class action in district court challenging the grant terminations as contrary to law or arbitrary and capricious under the APA.  *See* J.A. 26, 33-36.  Plaintiffs also claimed that the government was required to provide notice and a hearing before terminating the grants.  *See* J.A. 28-29.  Plaintiffs moved for a preliminary injunction, and the government moved to dismiss.

The district court granted the government's motion to dismiss.  *See* J.A. 581.  Although the court expressed disapproval of the government's termination of the grants, the court recognized that it lacked jurisdiction to hear the case.  In particular, the court explained that an "action against the United States which is *at its essence* a contract claim" must be brought in the Court of Federal Claims under the Tucker Act, not in district court under the APA.  J.A. 559 (quotation omitted).  Applying this Court's precedent, the court held that plaintiffs' claims in this case "are essentially contractual in nature and belong in the Court of Federal Claims."  J.A. 560.

The district court reasoned that the grant agreements at issue constitute "the type[s] of contract[s] that can give rise to Tucker Act jurisdiction."  J.A. 564.  Plaintiffs "accepted the awards" and "agreed to comply with an array of requirements attached to the receipt, use, and

7

distribution of the grant money," and the government "received some direct benefit from the agreements" in return.  J.A. 566 (quotation omitted).

The district court concluded that plaintiffs' claims were based on those contracts.  The court explained that the arbitrary-and-capricious claims are materially "identical to those asserted" in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), where the Supreme Court ruled that jurisdiction over cases involving grant terminations likely lies in the Court of Federal Claims.  J.A. 560-62.  The court reached the same conclusion on the contrary-to-law claim, explaining that any asserted right to payment "arose only upon creation and satisfaction of its grant award from the government" and did not "exist independently of that award."  J.A. 570 (alterations and quotations omitted).  Moreover, plaintiffs' claim presented "a classic contract question" about whether "the agreements contain a term permitting OJP to terminate the award for no longer effectuating agency priorities."  *Id.*  And the remedy that plaintiffs sought—namely, "continued payment of the grants"—was "essentially contractual."  *Id.*

The district court further concluded that plaintiffs' due-process claim was subject to dismissal.  J.A. 576.  The court noted that, to the extent plaintiffs contend that "the grant agreements" constrain the agency's "ability

8

to terminate grants," plaintiffs' due-process claim "is substantively indistinguishable from a breach of contract claim."  J.A. 575 (quotation omitted).  Plaintiffs failed to identify any case from this Court holding "that a contractor has a property interest in expected payments."  J.A. 574.  And the court emphasized that "with scores of millions of government contracts in effect at any point in time, it is unimaginable that all government agencies would be required to provide a hearing before they take any action that is arguably inconsistent with a contract."  *Id.* (quotation omitted).

The district court therefore dismissed the case and denied plaintiffs' motion for a preliminary injunction.  J.A. 580.

3.  Plaintiffs moved for an injunction pending appeal.  With the government's consent, the district court entered a limited injunction preventing re-obligation of the sums awarded under plaintiffs' grant agreements through October 1.  *See* J.A. 605.  This Court expedited the appeal but denied plaintiffs' motion on the ground that they had "not substantiated their claims of irreparable harm."  Order (Aug. 1, 2025).

## SUMMARY OF ARGUMENT

I.  This case arises out of the decision to terminate discretionary OJP grant agreements to redirect funds to new projects that better advance

9

current agency priorities. As the district court correctly recognized, it lacked jurisdiction over plaintiffs' claims challenging the agency's decisions to terminate their grant agreements because those claims are contract claims that must be brought in the Court of Federal Claims. The APA's waiver of sovereign immunity does not apply when another statute impliedly precludes review. Where a party seeks funding that it believes the government is obligated to pay under a contractual instrument, the proper remedy is suit under the Tucker Act, not the APA.

The Supreme Court has twice recently stayed district-court orders that purported to void grant terminations in analogous circumstances, concluding that the government was likely to succeed in demonstrating that the district court lacked jurisdiction over claims seeking such relief. *National Insts. of Health v. American Pub. Health Ass'n* (*NIH*), No. 25A103, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025); *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). The Supreme Court's reasoning applies with full force in this case, and the later decision—which issued after the district court's judgment in this case and plaintiffs' opening brief on appeal—rejected the arguments and alleged distinctions that plaintiffs have raised here.

10

Similarly, this Court has long held that plaintiffs may not transform the contractual nature of their dispute—and thus avoid the jurisdictional and remedial limitations of the Tucker Act—by recasting their claims as involving arbitrary-and-capricious decisionmaking or as involving agency action that is contrary to statute or regulation. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77-80 (D.C. Cir. 1985); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 & n.34 (D.C. Cir. 1982). Here, as in those cases, plaintiffs have brought claims to enforce a contractual obligation to make payments, and the only source of plaintiffs' asserted rights to the funds are the various contractual interests in question. Plaintiffs highlight the propriety of that outcome by presenting archetypal issues of contract interpretation about whether the agreements incorporated a regulation specifying bases for termination and whether the agency could validly terminate under the regulation. At bottom, their claims are in essence contractual and belong in the Court of Federal Claims.

II. A. Although the district court had no occasion to reach the issue, plaintiffs' claims also could not proceed because the agency's decisions to discontinue discretionary OJP funding to plaintiffs and to redirect those

funds to different activities or grantees are committed to agency discretion by law.  In deciding how to allocate resources, an agency must engage in "a complicated balancing of a number of factors" that are uniquely within the agency's "expertise," including "whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'"  *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

In this case, plaintiffs have failed to demonstrate that any statute or regulation meaningfully constrains the agency's discretion regarding how to allocate appropriated funds among different potential objectives, projects, and recipients.  To the contrary, the relevant statutory and regulatory provisions provide broad discretion to allocate appropriated funds in the manner that the agency determines will most efficiently and effectively accomplish broad statutory goals and agency priorities.  Plaintiffs cannot challenge the exercise of that discretion through the APA.

B.  Even if the agency's discretionary grant termination decisions were subject to review, they satisfy the APA's reasoned-decisionmaking

12

requirements as a matter of law.  The agency terminated the grants in question after conducting an award-by-award review of open awards, through which it identified a small subset of the existing grants that, in the agency's judgment, no longer effectuated program goals or agency priorities. Those decisions were both reasonable and reasonably explained.

Plaintiffs suggest the grant termination decisions are unreasonable because, in plaintiffs' view, their grants do still effectuate the program goals and agency priorities.  But the allocation of grant money amongst activities and organizations based on an assessment of program goals and agency priorities is an assessment for the agency, not plaintiffs, to make.  The fact that the agency terminated only a small percentage of open awards further supports the reasonableness of the termination decisions here, as does the fact that the agency identified and terminated grants on the basis of common characteristics.

C.  Plaintiffs' due-process claim is also meritless.  The substance of this claim is not meaningfully distinct from their contract claims, and plaintiffs can raise arguments about the procedures required under the agreements in the Court of Federal Claims.  Regardless, plaintiffs cannot succeed on such a claim in any forum.  The regulation providing authority for the government

13

to terminate grant agreements that no longer effectuate agency priorities does not give rise to a protected property interest in continued grant payments. And the opportunities to pursue an administrative appeal and a breach-of-contract action in the Court of Federal Claims provide all the process that is due. Plaintiffs lack support for their extraordinary view that the government must provide notice and a hearing before invoking the right to terminate a federal grant agreement.

III. In all events, plaintiffs do not support their request for entry of a preliminary injunction on appeal. They have provided no compelling reason for this Court to depart from its general practice of allowing the district court to address any remaining issues in the first instance. Their arguments about the equitable factors do not justify any injunction, and there is certainly no basis for an injunction that runs to putative class members in a case where no class has been certified.

## STANDARD OF REVIEW

The district court's dismissal of plaintiffs' complaint is reviewed de novo. *Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec.*, 980 F.3d 109, 114 (D.C. Cir. 2020).

14

**ARGUMENT**

I.  **The District Court Lacked Jurisdiction over Plaintiffs'
    Challenges to the Termination of Their Grant Agreements.**

    A.  **The District Court Correctly Concluded that Plaintiffs'
        APA Claims Are Barred by the Tucker Act.**

Under the Tucker Act, Congress has assigned the Court of Federal
Claims exclusive jurisdiction to adjudicate the sorts of claims at issue in this
case: that the government has wrongfully terminated contracts. Plaintiffs'
allegations that the agency improperly terminated their grant agreements
and their request for an order compelling the government to resume
payments that would otherwise be due under the agreements fall squarely
within that jurisdictional scheme, as the Supreme Court has recently made
clear on multiple occasions.

1. The federal government is "immune from suit in federal court
absent a clear and unequivocal waiver of sovereign immunity." *Crowley
Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). And although
the APA provides "a limited waiver of sovereign immunity for claims against
the United States" seeking relief other than money damages, *id.*, that waiver
does not apply "if any other statute that grants consent to suit expressly or
impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish
Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quotation

15

omitted).  That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes."  *Id.*

In particular, when a party seeks to require the government to continue to perform its obligations under a contract, the proper remedy is typically suit under the Tucker Act, not the APA.  The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  As this Court has explained, "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court."  *Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted).  In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, this Court has looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)."  *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted).

The Supreme Court has twice recently stayed district-court orders that purported to set aside the termination of grant agreements, concluding

16

that the government was likely to succeed in showing that the Tucker Act provides the Court of Federal Claims jurisdiction over such suits. *See NIH*, No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025); *Department of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam). In *California*, a number of states challenged the Department of Education's termination of various education-related grants, the district court temporarily enjoined the terminations, and the First Circuit denied a motion to stay that injunction. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). The Supreme Court granted the government's request for emergency relief, reaffirming that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *California*, 145 S. Ct. at 968 (quotation omitted).

After the district court's decision in this case and plaintiffs' opening brief in this appeal, the Supreme Court issued a stay in *NIH*, reiterating *California*'s reasoning that the APA "does not provide [district courts] with jurisdiction to adjudicate claims based on [federal] grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *NIH*, 2025 WL 2415669, at *1 (quotation omitted). The Supreme Court has

17

now made doubly clear that challenges to agency "decisions terminating existing" contracts—including challenges brought "under the [APA]"— "belong in the Court of Federal Claims." *Id.* at \*1-2 (Barrett, J., concurring in the partial grant of the application for stay); *see also id.* at \*4 (Gorsuch, J., joined by Kavanaugh, J., concurring in part and dissenting in part) (similar).

2.  As the district court recognized, it lacked jurisdiction over plaintiffs' claims here for the same reasons.  *See* J.A. 567, 572.  As in *California* and *NIH*, plaintiffs in this case allege that the government has violated "a contractual obligation to pay money" assertedly embodied in their grant agreements.  *California*, 145 S. Ct. at 968 (quotation omitted).  Throughout this litigation, plaintiffs have made clear that their primary complaint is that the agency unlawfully terminated the grant agreements that funded their various activities.  *See, e.g.*, J.A. 22 (alleging that "[t]he abrupt termination of [plaintiffs'] grant awards caused immediate harm"); J.A. 24 (alleging that one of the plaintiffs cannot continue assistance "without grant funds").  And as in *California* and *NIH*, the grants here were awarded by OJP to plaintiffs from a generalized appropriation, which means that the source of their purported rights to payment can only be the grant agreements themselves, not any statute or regulation.

18

In this respect, this case is indistinguishable from a pair of this Court's cases applying the *Megapulse* framework. *See* J.A. 568-70. In *Spectrum Leasing Corp. v. United States*, a government contractor encountered difficulties performing the contract; the government invoked a liquidated damages provision and, as a result, withheld payments under the contract. 764 F.2d 891, 892 (D.C. Cir. 1985). The contractor sued, claiming that the government had violated statutory procedures in withholding the payments. *Id.* This Court held that the action belonged in the Court of Federal Claims under the Tucker Act, explaining that the asserted "substantive right" to monetary payments was "created in the first instance by the contract," not by the relevant statute, which "confer[red] no such right in the absence of the contract itself." *Id.* at 894. The contractor's demand for payments presented a "contract dispute" because the contractor sought to enforce a right that "arose only upon creation and satisfaction of its contract with the government; in no sense did it exist independently of that contract." *Id.*

And in *Ingersoll-Rand Co. v. United States*, the government terminated a contract for convenience pursuant to a regulation incorporated into the contract. 780 F.2d 74, 75 (D.C. Cir. 1985). The plaintiff challenged that termination as arbitrary and capricious and as contrary to multiple

19

regulations. *See id.*  This Court determined that, notwithstanding those statutory and regulatory allegations, "the essential rights at stake [were] contractual." *Id.* at 77.  This Court explained that "it [was] possible to conceive of [the] dispute as entirely contained within the terms of the contract." *Id.* at 78.  The fact that "the termination also arguably violate[d] certain other regulations" and that plaintiff "allege[d] only a violation of the regulations" did not "change the essential character of the action." *Id.*  And the plaintiff's request for "an order reinstating the original award of the contract" similarly sounded in contract. *Id.* at 79-80.

Plaintiffs' claims are "on par with *Spectrum Leasing* and *Ingersoll-Rand*," J.A. 570, and plaintiffs only half-heartedly attempt to distinguish those cases, *see* Pls. Br. 30-31; *see also* J.A. 571 (noting that plaintiffs' filings in district court "nowhere cite, let alone seek to distinguish, those cases").  As in *Spectrum Leasing*, the only possible source of plaintiffs' purported right to payments from the government are the grant agreements themselves.  As in *Ingersoll-Rand*, plaintiffs allege that the government's termination of their grant agreements violated a regulation incorporated into the agreements.  Plaintiffs' legal dispute in this case is thus bound up with the contractual terms and seeks to adjudicate a "classic contract question" about

20

whether "the agreements contain a term permitting [the agency] to terminate the award."  J.A. 570.  Plaintiffs cannot evade the Tucker Act's limitations "merely by alleging violations of regulatory or statutory provisions rather than breach of contract."  *Ingersoll-Rand*, 780 F.2d at 77.

Plaintiffs' due-process claim is subject to dismissal for the same reasons.  As the district court correctly recognized, that claim "is substantively indistinguishable from a breach of contract claim" because it turns on the procedures specified in the grant agreements.  J.A. 575 (quoting *Suburban Mortg. Assocs. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1128 (Fed. Cir. 2007)).  These constitutional claims cannot be regarded as truly independent of the contract claims where the claimed property interest allegedly arises from the agreements themselves and where the question of what process is due collapses into whether the government complied with its obligations under those agreements.

Like *Spectrum Leasing* and *Ingersoll-Rand*, the harm that plaintiffs alleged and the relief they sought from the district court underscores that this entire dispute is, at base, contractual.  Plaintiffs' concern is the loss of federal funds.  *See, e.g.*, Pls. Br. 27 (describing "the immediate financial loss of the outstanding balance" on plaintiffs' awards); J.A. 21 ("Plaintiffs

21

immediately stopped receiving funds pursuant to these grant awards.").  To
remedy that asserted harm, plaintiffs sought an order declaring unlawful the
agency's termination of the grant agreements and directing the government
to take steps to "disburse[] funds to [p]laintiffs in the customary manner and
in customary timeframes."  J.A. 36-37.  In other words, plaintiffs seek to
obtain "continued payment of" funds pursuant to the government's
contractual obligations under the grants.  J.A. 570; *see Climate United Fund
v. CitiBank, N.A.*, No. 25-5122, slip op. at 14 (D.C. Cir. Sept. 2, 2025)
(concluding that a suit seeking "an injunction barring [an agency] from
terminating" grants except where legally permitted sought, "in substance,"
the essentially contractual remedy of "specific performance of [plaintiffs']
agreements with the government"); *see also U.S. Conf. of Cath. Bishops v.
U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025) (explaining that an
order directing "the Government to stop withholding the money due under
[certain agreements]" would amount to an improper order for "the
Government to keep paying up").  The district court thus lacked jurisdiction
over these claims.

**B.    Plaintiffs' Counterarguments Are Unpersuasive.**

1.  Plaintiffs do not dispute that, under this Court's precedent, the Tucker Act provides for "exclusive jurisdiction" in the Court of Federal Claims "over breach of contract claims against the United States in suits seeking more than $10,000." Pls. Br. 19.  Plaintiffs also do not dispute that litigants are accordingly precluded from relying on the APA to bring "contract actions . . . against the government in a federal district court." *Id.* Those propositions, recently reaffirmed by the Supreme Court in *California* and *NIH*, dictate the outcome here.

Plaintiffs offer no valid basis to distinguish *California* and *NIH*.  They claim that "the retrospective aspect of the district court order under review" and the fact that the plaintiffs' claims depended on "the terms of [the] contract" were central to the decision in *California*.  Pls. Br. 34-35.  That is the same reasoning that the First Circuit relied on in *NIH*, as to which the Supreme Court subsequently granted a stay.  The First Circuit concluded that the Supreme Court's decision in *California* was distinguishable because the district court "did not award past due sums, but rather provided declaratory relief" and issued relief "under the APA independent of any

23

contractual language." *American Public Health Ass'n v. National Insts. of Health*, 145 F.4th 39, 50, 52 (1st Cir. 2025) (quotation omitted).

In issuing a stay, the Supreme Court thus made clear that the distinction between past and future payments and the mere invocation of the APA, as opposed to contract conditions, make no difference to the applicability of the Tucker Act. That conclusion controls this case. As explained above, plaintiffs have not identified any statutory right to the continued funding of their grant agreements; instead, any right to federal funds—and any obligation to continue making those funds available— necessarily stems from the relevant contractual instruments.

2. Plaintiffs' application of the *Megapulse* framework is misguided. Plaintiffs contend that resolving one of their claims "would not require consultation of [their] grant agreements." Pls. Br. 25. As noted earlier, the First Circuit sought to distinguish *California* on precisely this basis, but the Supreme Court declined to endorse that distinction in *NIH*. The relevant point is that the dispute sounds in contract because the grant agreements create the asserted right to payment in the first instance and any obligation to continue making payments would have to come from the grant terms.

24

In any event, plaintiffs never come to grips with the fact that their claims here *do* depend on the terms of their contracts.  Their contrary-to-law claim invokes a regulation that expressly turns on the terms and conditions of the grant agreement.  Their arbitrary-and-capricious claim cannot be divorced from the rights and remedies embodied in the contract.  And their due-process claim reduces to what the contract promises.  Even on plaintiffs' theory, the district court lacked jurisdiction here.

Plaintiffs concede that one of their claims "would require review of [their] awards to confirm whether those documents in fact incorporate the relevant termination authority."  Pls. Br. 26.  As the district court correctly observed, the legal issue that plaintiffs present is "a classic contract question" about whether "the agreements contain a term permitting OJP to terminate the award for no longer effectuating agency priorities."  J.A. 570. Plaintiffs cannot escape this conclusion by positing that "the source of the right being asserted is found in [2 C.F.R. § 200.340]."  Pls. Br. 26.  That regulatory provision, titled "Termination," does not grant affirmative rights. Rather, it presupposes a federal contractual agreement and specifies circumstances in which an agency may terminate that agreement.  Indeed, the agency expressly invoked § 200.340(a)(4) as the basis for terminating in

25

this case.  J.A. 59.  If plaintiffs believe that the regulation does not apply here—and thus that the government had no valid basis to terminate—they can raise that argument as part of a suit in the Court of Federal Claims.  *Cf. Climate United Fund*, slip op. at 12 (concluding that plaintiffs' claim that the agency "violated 2 C.F.R. § 200.340(a)(4) expressly refers to and incorporates the grant agreements," which means that the "claim turns on the government's rights under the agreements" and is not "based only on the regulation or on truly independent legal grounds" (quotation omitted)).

This Court has resisted efforts to avoid the Tucker Act through "creative drafting."  *Kidwell v. Department of the Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995).  Thus, plaintiffs cannot recast a contractual dispute as a non-contractual one "merely by alleging violations of regulatory or statutory provisions."  *Ingersoll-Rand*, 780 F.2d at 77.  Similarly, any contractual claim could be recharacterized as an arbitrary-and-capricious claim, *Megapulse*, 672 F.2d at 967 & n.34, so a general right to be free from arbitrary-and-capricious decisionmaking is no substitute for a substantive right upon which the claim is premised.  *Cf. Climate United Fund*, slip op. at 16-17 (noting that "this court has expressly and repeatedly rejected attempts to manufacture district court jurisdiction by framing

26

contract claims as violations of the APA's bar on arbitrary and capricious action" and that "the APA's general bar on arbitrary and capricious actions" does not subject "contract terminations to a parallel review scheme in district court"). *Contra* Pls. Br. 32.

Plaintiffs also fail to rebut the district court's conclusion that their request for "continued payment of the grants" was "essentially contractual." J.A. 570. Plaintiffs contend that they may skirt the Tucker Act so long as they seek equitable relief that "has considerable value apart from and is not negligible in comparison to any potential monetary recovery." Pls. Br. 21 (quotation omitted). A request for a declaratory judgment or injunction that effectively requires the government to perform contractual obligations "seeks the classic contractual remedy of specific performance." *U.S. Conf. of Cath. Bishops*, 770 F. Supp. 3d at 163 (quotation omitted). That is exactly what plaintiffs seek here. And in this respect, plaintiffs' requested relief is no different from the relief requested in—and thus cannot provide any basis to distinguish—*California* and *NIH*. The question is not whether the relief sought is monetary or injunctive—an issue in the separate provision of 5 U.S.C. § 702, not at issue here, that limits APA claims to those seeking

27

relief other than money damages—but rather whether the source of rights and the relief sought are contractual, which they plainly are.

In any event, plaintiffs fail to satisfy the independent-value test even on its own terms. In district court, "[p]laintiffs conceded" that "the value of the non-monetary relief was the avoidance of future grant terminations." J.A. 572. As the district court explained, "that non-monetary relief has little, if any, independent value from the future potential of monetary recovery." *Id.* On appeal, plaintiffs speculate that the terminations could affect their "ability to compete for future awards" or could deny them "access to [certain] professional networks and credibility." Pls. Br. 27-28 (emphasis omitted). But they do not identify any case where this sort of conjecture about hypothetical future consequences was deemed sufficient.

3. Plaintiffs repeatedly invoke inapposite cases. They rely heavily on *Bowen v. Massachusetts*, 487 U.S. 879 (1988), *see* Pls. Br. 17, 23, 33, but that case did not involve a contract claim at all, let alone the relevant limitation in the APA. Instead, *Bowen* involved two separate provisions: (1) the provision of 5 U.S.C. § 702 precluding APA claims for "money damages," and (2) the provision of 5 U.S.C. § 704 precluding APA claims where there is another "adequate remedy in a court" for an agency action. *Bowen* held that a State's

28

APA claim that certain services qualified for reimbursement under the
Medicaid program was not a claim for "money damages," 487 U.S. at 891-901,
and that a Tucker Act suit premised on an ostensibly money-mandating
statute was not an alternative "adequate remedy," *id.* at 901-08.  Nothing in
*Bowen* addresses the separate bar at issue here on suits "expressly or
impliedly forbid[den]" by statutes like the Tucker Act.  5 U.S.C. § 702.

Other courts have corrected the same error that plaintiffs make here.
The Ninth Circuit has clarified that because "[t]he APA's waiver of sovereign
immunity . . . contains several limitations," a litigant must satisfy each one:
the litigant must establish that "its claims are not for money damages," that
"an adequate remedy for its claims is not available elsewhere," and that "its
claims do not seek relief expressly or impliedly forbidden by another
statute."  *Tucson Airport Auth. v. General Dynamics Corp.*, 136 F.3d 641,
645 (9th Cir. 1998).  Each condition is a separate and independent limitation
on the cause of action, and a failure to show any one of those conditions is
fatal.  *See id.*  Thus, the Ninth Circuit held that the Tucker Act precluded an
APA claim even though the claim was not for money damages and an
adequate remedy was allegedly unavailable elsewhere.  *See id.* at 645-47.
Plaintiffs here mistakenly conflate distinct limitations.

29

Nor is this case similar to *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) (per curiam), *vacated in part*, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (en banc) (per curiam), in the relevant respect.  Regardless whether the en banc Court's stay decision—which predated the Supreme Court's recent decision in *NIH*—reflected how that case should ultimately come out on the merits, that case involved allegations that the relevant statutes "required allocation of funds to [the] specific, named" plaintiffs.  *Widakuswara*, 2025 WL 1288817, at *11 (Pillard, J., dissenting).  That allowed the plaintiffs there to contend that they had a right to funds that was antecedent to, and independent of, any contract.  In this case, it is only the relevant contractual instruments, not any statute, that entitle any particular plaintiff to receive federal funds.

4.  Plaintiffs' fallback arguments that the grant agreements are not supported by adequate "contractual intent" or "contractual consideration" are unavailing.  Pls. Br. 37-40.  The plaintiffs in *NIH* made nearly identical arguments, *see APHA* Respondents' Opposition to Application for Stay at 25-30, *NIH*, 2025 WL 2415669 (No. 25A103), 2025 WL 2244206, at *25-30, yet the Supreme Court ruled that the research-related grants in that case were subject to the Tucker Act, *see NIH*, 2025 WL 2415669, at *1; *see also*

30

*California*, 145 S. Ct. at 968 (treating education-related grants as contracts);

*Climate United Fund*, slip op. at 11-12 (explaining in an analogous context

that "courts have historically described federal grants as contracts").  There

is no basis to distinguish the grants at issue here.

On their face, the terminated grant agreements bear all the hallmarks

of an ordinary contract.  OJP sent award offers, *see* J.A. 271, that a legally

authorized representative for each plaintiff had to sign and accept, *see*

J.A. 279 ("By signing and accepting this award on behalf of the recipient, the

authorized recipient official accepts all material requirements of the

award . . . .").  The written instruments—to which the government and

plaintiffs both manifested an intent to be bound—detailed the amount the

government agreed to pay, the work each plaintiff would perform in

exchange for the payment, the performance period for the work, and all

applicable policies and procedures, including the conditions where the grant

could be terminated.  *See* J.A. 271-96.  As plaintiffs' own case instructs, *see*

Pls. Br. 37, this type of "documentary evidence" in the form of "written

agreements" can demonstrate the requisite mutual assent to contract, *Boyd*

*v. United States*, 134 F.4th 1348, 1352 (Fed. Cir. 2025).

31

And the government received something of value in return for paying money to plaintiffs—namely, their commitment "to comply with an array of requirements attached to the receipt, use, and distribution of the grant money." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1340 (Fed. Cir. 2021).  Plaintiffs had to perform the project as described in the award. *See* J.A. 275.  For example, lead plaintiff Vera Institute of Justice had to "provide remote interpretation services Monday through Friday, from 9 a.m. to 11 p.m. Eastern time . . . and weekends, as requested." J.A. 276.  Based in part on "quarterly financial status reports" and "semiannual performance reports" submitted by plaintiffs, J.A. 288, the government would "actively monitor the project" and "provide input and re-direction to the project, as needed," J.A. 290.

The "conditions attached to [plaintiffs'] grants" that "imposed a variety of duties" on plaintiffs to perform specific acts for the public and the government constitute consideration on their own. *Columbus Reg'l Hosp.*, 990 F.3d at 1340.  As the district court observed, the grant agreements went further to provide even more "direct benefit" to the government.  J.A. 566. In particular, plaintiffs had affirmative obligations to "collect," "maintain," and "provide[]" to OJP data about "the performance and effectiveness of

32

work under [the] award," J.A. 281, and to report waste, fraud, and abuse, J.A. 288. Plaintiffs can hardly claim that the government received no consideration under this contractual arrangement.

Plaintiffs' contention that the agreements must include an "affirmative indication" to create "a right to money damages," Pls. Br. 39-40, gets matters backwards. "[T]here is a strong general presumption that for a breach of a contract with the government, monetary remedies are available under the Tucker Act." *Ravi v. United States*, 104 F.4th 1359, 1363 (Fed. Cir. 2024); *see also San Juan City Coll. v. United States*, 391 F.3d 1357, 1361 (Fed. Cir. 2004) ("[I]n the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement." (quotation omitted)). Although the contracting parties may displace that presumption if "the agreement itself provides a [nonmonetary] remedy for [a] breach," *Higbie v. United States*, 778 F.3d 990, 994 (Fed. Cir. 2015), plaintiffs do not even purport to identify any such language in the grant agreements here. *See* J.A. 566-67.

In sum, where, as here, the government implements a grant program through "contracts to set the terms of and receive commitments from recipients," *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed.

33

Cir. 2021), a resulting dispute about whether the government had a valid basis to terminate the agreement is plainly contractual in nature. The proper recourse for the asserted violations is a "suit in the [Court of Federal Claims] for damages relating to [the] alleged breach." *Id.* Judge Mehta properly recognized as much, and that alone is sufficient to affirm.

## II. In Any Event, Plaintiffs' Claims Fail As a Matter of Law.

### A. The Challenged Grant Funding Decisions Are Committed to Agency Discretion by Law.

Even if the district court had jurisdiction over plaintiffs' challenges, those challenges would fail at the threshold because the grant funding decisions at issue here are committed to agency discretion by law. *See* 5 U.S.C. § 701(a)(2). As the district court correctly recognized, the relevant statutes earmark funds "for certain broad purposes" but do "not mandate that the funds be awarded to any specific organization" or otherwise constrain the agency's discretion to reallocate funding to a different recipient or activity. J.A. 548. Plaintiffs do not address the agency's broad latitude to make decisions about the optimal distribution of funds.

1. In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs

34

was committed to agency discretion by law and thus not reviewable under
the APA's reasoned-decisionmaking standards. *See id.* at 184-88. The Court
explained that the "allocation of funds from a lump-sum appropriation is" an
"administrative decision traditionally regarded as committed to agency
discretion," because the "very point of a lump-sum appropriation is to give an
agency the capacity to adapt to changing circumstances and meet its
statutory responsibilities in what it sees as the most effective or desirable
way." *Id.* at 192.

　　Thus, "an agency's allocation of funds from a lump-sum appropriation
requires 'a complicated balancing of a number of factors which are peculiarly
within its expertise': whether its 'resources are best spent' on one program or
another; whether it 'is likely to succeed' in fulfilling its statutory mandate;
whether a particular program 'best fits the agency's overall policies'; and,
'indeed, whether the agency has enough resources' to fund a program 'at
all.'" *Lincoln*, 508 U.S. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831
(1985)). "Of course," this discretion is not unbounded because "an agency is
not free simply to disregard statutory responsibilities: Congress may always
circumscribe agency discretion to allocate resources by putting restrictions
in the operative statutes." *Id.* But as long as the agency abides by the

35

relevant statutes (and whatever self-imposed obligations may arise, such as from regulations), courts may not "intrude." *Id.*

Although *Lincoln* addressed lump-sum appropriations, this Court has long made clear that its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly requir[e] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted). And as such, these decisions are no more susceptible to judicial review under the APA's reasoned-decisionmaking framework.

2. Those principles preclude plaintiffs' attempt to seek APA review of the agency's decision to terminate their grant agreements and "re-obligate those funds to other grantees." J.A. 577. In this case, the appropriations statutes take a similar form to the statute at issue in *Lincoln*. Congress appropriated a lump sum of nearly $2.5 billion to OJP "[f]or grants, contracts, cooperative agreements, and other assistance" related to state and local law enforcement assistance "to remain available until expended."

36

Pub. L. No. 118-42, div. C, tit. II, 138 Stat. at 145.  And Congress specified that portions of the money should be used for certain broad purposes or initiatives.  For example, "$10,000,000 is for a grant program for State and local law enforcement to provide officer training on responding to individuals with mental illness or disabilities," *id.* at 146, and "$50,000,000 is for a community violence intervention and prevention initiative," *id.* at 149.

The same is true for the criminal fines and other money deposited into the Crime Victims Fund and permanently appropriated to OJP.  The money "shall remain in the Fund and be available for expenditure . . . for grants under [the] subchapter without fiscal year limitation."  34 U.S.C. § 20101(c). The statute specifies how the funds are divided between different grant programs, *see id.* § 20101(d), which span topics ranging from providing financial and other services to victims of crime, *see id.* § 20103(c), to supporting victims of sexual assault, *see id.* § 20109(a).

Nothing in the text of those statutes constrains the agency's discretion to determine how best to allocate the funds among objectives and recipients to best achieve the broad statutory goals.  It is left to the agency's sound judgment how to divvy up the $10 million for "officer training on responding to individuals with mental illness or disabilities," Pub. L. No. 118-42, div. C,

37

tit. II, 138 Stat. at 146, and how the $50 million is best spent on "a community violence intervention and prevention initiative," *id.* at 149. The statute entrusts the agency to decide what "victim services," "financial support of services to victims of Federal crime," and "notice of applicable rights and policies for sexual assault survivors" are warranted. 34 U.S.C. §§ 20103(c)(1)(A)-(B), 20109(a). The agency is not obligated to provide money to plaintiffs at all, much less to continue funding their activities pursuant to grant agreements that fail to advance agency priorities.

3. Plaintiffs' opening brief does not grapple with these issues at all. And plaintiffs have never identified any statute or regulation that removes the agency's authority over grant funding decisions. On appeal, plaintiffs do not renew their flawed contention made in district court that the mere fact of an appropriation requires OJP to expend the funds. *See* J.A. 577. Even on its own terms, that argument does not undermine the point that the agency is free to redirect funds to other things within the overall purposes of the appropriation, which is what the agency is doing here. Just as the lump-sum appropriation in *Lincoln* did not require the agency to continue a program not mandated by the statute, the lump-sum appropriation here did not require the agency to continue funding plaintiffs' specific grants. Any claim

38

of a statutory violation is particularly weak in this case because there is "no congressionally mandated deadline to identify and pay new grantees" and the record demonstrates that the agency "intend[s] to re-obligate [terminated] funds to other grantees." *Id.*

Nor do plaintiffs advance their case in asserting that 2 C.F.R. § 200.340(a)(4) calls into question the agency's termination decisions. *See* Pls. Br. 40-42. That provision—which was incorporated into plaintiffs' grant agreements along with the other requirements "in 2 C.F.R. Part 200," J.A. 277—authorizes termination "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). Courts lack any "meaningful standard against which to judge" the agency's determination that funding a particular recipient or activity does not effectuate the statute's purposes or the agency's priorities. *Lincoln*, 508 U.S. at 191. The Supreme Court has made clear that these sorts of judgments about whether a program "is likely to succeed in fulfilling its statutory mandate" or "best fits the agency's overall policies" require "a complicated balancing . . . peculiarly within [the agency's] expertise." *Id.* at 193 (quotation omitted).

Plaintiffs fare no better in attempting to impose contrived limits on § 200.340(a)(4).  *See* Pls. Br. 42-48.  Plaintiffs insist that the agency "may not terminate grants based on new agency priorities not identified at the time of the award."  Pls. Br. 42.  But the regulation speaks in the present tense and provides for termination when an award "no longer effectuates . . . agency priorities."  2 C.F.R. § 200.340(a)(4).  The text thus confirms the natural conclusion that "agency priorities" refers to priorities as they exist at the time of the termination decision.  *See Stanley v. City of Sanford*, 145 S. Ct. 2058, 2063 (2025) ("To ascertain a statute's temporal reach, this Court has frequently looked to Congress' choice of verb tense." (alteration and quotation omitted)).  On plaintiffs' view, every new presidential Administration would be bound to follow the funding choices of its predecessor, even though this type of policymaking decision is "routinely informed" by "an Administration's priorities."  *Department of Com. v. New York*, 588 U.S. 752, 781 (2019).

The grant agreements at issue also satisfy the requirement that their terms and conditions "clearly and unambiguously specify all termination provisions."  2 C.F.R. § 200.340(b).  As plaintiffs do not dispute, *see* Pls. Br. 47, the very first condition in their awards expressly stated that the

40

requirements "in 2 C.F.R. Part 200 . . . apply to this . . . award," J.A. 277.

Although plaintiffs feign ignorance about "the circumstances in which its

grant could be terminated" because the agency incorporated "a large swath

of federal regulations," Pls. Br. 48, the natural place to find the permissible

grounds for termination is in § 200.340, which is titled "Termination." And

the applicable subsection in turn put plaintiffs on notice that the agency could

terminate in whole or in part if it determined that the grant award no longer

advances the agency's priorities. *See* 2 C.F.R. § 200.340(a)(4). The agency

acted well within the broad discretion afforded by statute and regulation in

deciding to terminate plaintiffs' grant agreements, and the APA precludes

judicial second-guessing of those agency funding decisions.

**B.     The Agency's Grant Funding Decisions Were Reasonable and Reasonably Explained.**

Even if the agency's discretionary decisions were subject to review,

they complied with the APA as a matter of law. The APA "requires that

agency action be reasonable and reasonably explained." *Federal Commc'ns*

*Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Judicial

review under that standard is deferential, and a court may not substitute its

own policy judgment for that of the agency." *Id.* The grant terminations at

issue here readily satisfy this standard.

41

The agency terminated the grant agreements in question after conducting an "individualized review of open grant awards." J.A. 401. Agency leadership undertook to determine which of the over 11,000 open OJP awards were consistent with agency priorities. *See id.* That review took place over multiple months, and the agency narrowed "the number of awards under active focus . . . to approximately 2,200" within a few weeks. *Id.* Between April 4 and April 22, the agency terminated "376 individual, specifically identified discretionary grant awards" that, in the agency's judgment, were incompatible with program goals or agency priorities. *Id.* In the end, the agency identified only a small fraction of OJP awards—376 out of a total of more than 11,000, or approximately 3%—for termination.

The agency laid out its reasons for its decision in the termination notices sent to the affected grant recipients. *See* J.A. 401. The notices explained that the "award is being terminated because it 'no longer effectuates the program goals or agency priorities.'" J.A. 59 (quoting 2 C.F.R. § 200.340(a)(4)). The notices indicated that the agency had "changed its priorities with respect to discretionary grant funding" in this area. *Id.* In particular, the agency described its plans to focus on "more directly supporting certain law enforcement operations, combatting violent

42

crime, protecting American children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts at all levels of government." *Id.* The notices also cited the regulatory provisions pertaining to closeout procedures. J.A. 60.

These termination decisions were adequately explained—each termination notice indicated that the award was being terminated because it "no longer effectuates Department priorities." J.A. 59. And the agency elaborated on its new "priorities with respect to discretionary grant funding" to "more directly" focus on certain activities. *Id.* The agency also detailed the award-by-award analysis that went into those decisions before they were issued. *See* J.A. 401; *Rhea Lana, Inc. v. United States*, 925 F.3d 521, 524 (D.C. Cir. 2019) (confirming that courts may consider agency declarations that "accurately reflect[] the contemporaneous reasoning of the" agency). Plaintiffs suggest that the grant termination decisions are arbitrary and capricious because, in plaintiffs' view, their grants still effectuate the program goals and agency priorities. Pls. Br. 50-51. However, the agency could rationally decide to fund activities that are more direct than services like "providing free sign language interpretation services" to victim service providers "through virtual technology." J.A. 272. In all events, the allocation

43

of grant money amongst activities and organizations based on an assessment of program goals and agency priorities is an assessment for the agency, not plaintiffs, to make.

The fact that the agency terminated only a small percentage of the open grant awards further supports the reasonableness of the termination decisions here.  So too does the fact that the agency identified and terminated grants on the basis of common characteristics.  These circumstances explain why "each notice was identical in reasoning."  Pls. Br. 51.  Indeed, treating similarly situated grants in similar ways honors the APA, for "[r]easoned decisionmaking requires treating like cases alike." *Hall v. McLaughlin*, 864 F.2d 868, 872 (D.C. Cir. 1989).

Plaintiffs fare no better in asserting that the agency gave inadequate weight to reliance interests.  *See* Pls. Br. 52-54.  The termination notices mentioned administrative processes that allow plaintiffs to challenge the terminations and closeout procedures that allow plaintiffs to request transition funding for an orderly wind-down.  J.A. 60.  Regardless, the grant agreements enshrine the agency's authority to terminate an award that "no longer effectuates the program goals or agency priorities."  2 C.F.R. § 200.340(a)(4).  Whether or not that authority has not been exercised in the

44

past, *see* Pls. Br. 41, any reliance would be objectively unreasonable given the clear contractual terms. *See Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 31 (2020) (explaining that an explicit disclaimer is "pertinent in considering the strength of any reliance interests"). At bottom, the agency considered the relevant factors and articulated its rationale for the decision to terminate plaintiffs' grant agreements. No more is needed.

### C.    Plaintiffs' Due-Process Claim Lacks Merit.

For the reasons explained above, the Court of Federal Claims is the proper forum for plaintiffs to raise any argument that the government was required to provide notice and a hearing before terminating the grant agreements. That question collapses into whether the government complied with its obligations under those agreements. In any event, even if plaintiffs' due-process claim could be disentangled from their other challenges to the grant terminations, the claim would fail on the merits.

Plaintiffs have not demonstrated either that the government deprived them "of a protected liberty or property interest" or that the deprivation occurred "without the process that is due under the Fifth Amendment." *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) (quotation omitted). Plaintiffs have no protected property interest in

continued payments under their grants, which may be terminated at the discretion of the agency.  And even if plaintiffs had such an interest, the opportunity to pursue administrative remedies and a breach-of-contract claim in the Court of Federal Claims satisfies due process.

1.  At the outset, and as the district court properly concluded, plaintiffs fail to identify any constitutionally protected property interest in continued grant payments.  J.A. 576.  Plaintiffs do not identify any case in which this Court has "held that a contractor has a property interest in expected payments."  J.A. 574; *see also Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of the Town of Huntington*, 31 F.3d 1191, 1195 (2d Cir. 1994) (declining to recognize a protected property interest based on "nothing more than a simple contractual right to receive . . . payments").  This Court has explained that a protected interest may arise "from statutes and regulations restricting the exercise of official discretion" but only when the regulations "contain explicitly mandatory language" providing that "a particular outcome must follow" if the "substantive predicates are present."  *Tarpeh-Doe v. United States*, 904 F.2d 719, 722-23 (D.C. Cir. 1990) (quotation omitted).

Plaintiffs contend that the agency's discretion to terminate their grants was substantively constrained by the incorporation of 2 C.F.R. § 200.340 into

46

their grants. *See* Pls. Br. 55-56. Even assuming plaintiffs are correct that
§ 200.340(a)'s grounds for termination are exclusive and enforceable, *but see*
*Climate United Fund*, slip op. at 13 (concluding that 2 C.F.R. § 200.340(a)(4)
"likely do[es] not create enforceable private rights"), that provision does not
substantively constrain the agency's discretion in the relevant sense. Far
from dictating any particular outcome when some substantive requirement is
met, that provision confers broad discretionary authority on the government
to terminate the award if the government determines that the award "no
longer effectuates . . . agency priorities." 2 C.F.R. § 200.340(a)(4). The
Federal Circuit has explained that similar termination provisions provide
broad discretion to the government to terminate save only for cases of "bad
faith" or a "clear abuse of discretion." *Caldwell & Santmyer, Inc. v.*
*Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995) (quotation omitted). And in
any event, as noted, the argument that the government did not comply with
the terms of the grant agreement or regulations incorporated into that
agreement is a contract claim, not a constitutional claim.

Plaintiffs' citation to *C&E Services, Inc. of Washington v. District of*
*Columbia Water & Sewer Authority*, 310 F.3d 197 (D.C. Cir. 2002), only
illustrates the point. Pls. Br. 58. The plaintiff in that case had submitted the

lowest bid for a D.C. government contract, but the agency cancelled the

bidding process rather than award the contract. *See C&E Servs.*, 310 F.3d at

199. The plaintiff contended that it had a protected property interest in the

prospective contract, because applicable law generally required that the

contract be awarded to the lowest bidder and the agency was permitted to

"cancel the bidding process" only if it determined that "cancellation is in the

best interest of the . . . government" and supplied "cogent or compelling

reasons." *Id.* at 198 (quotation omitted).

This Court concluded that the plaintiff had no "legitimate claim of

entitlement to the" contract. *C&E Servs.*, 310 F.3d at 200 (quotation

omitted). In light of the statutory "provision permitting cancellation of the

bid process even after bid opening," which meant that "submitting the lowest

bid does not necessarily translate into winning the contract," the plaintiff had

not "already acquired" a protected interest in the contract. *Id.* (emphasis

and quotation omitted). It did not matter that the agency's authority to

cancel the bidding was constrained by the best-interest and compelling-

reasons requirements. To the contrary, the Court explained that the

agency's "uncontested authority to cancel" in those circumstances

"defeat[ed] [the plaintiff's] claim of a legal entitlement." *Id.* at 201. The

48

plaintiff could pursue administrative and judicial remedies to challenge that exercise of authority but could not leverage restrictions on that authority to turn "every garden variety dispute regarding the D.C. procurement process" into a constitutional claim.  *Id.*  So too here.

2.  Regardless, even if plaintiffs could establish a protected property interest in continued payment of grant funds, plaintiffs' due-process claim would fail because the government has provided plaintiffs all of the process that is due.  Plaintiffs were entitled to challenge the termination of their grants, first through an administrative process and then through a breach-of-contract suit in the Court of Federal Claims.  Those administrative and judicial avenues for relief more than satisfy due process.

The Supreme Court has expressly rejected the argument that pre-deprivation notice and a hearing are required in the context of terminating government contracts.  In *Lujan v. G & G Fire Sprinklers, Inc.*, the State of California withheld payments on public works projects after determining that a subcontractor had violated state law.  532 U.S. 189, 192-93 (2001).  The subcontractor brought suit in federal court, contending that due process required California to "afford the subcontractor a hearing before or after such action is taken."  *Id.* at 191.  The Supreme Court disagreed.  The Court

49

held that, even assuming the contracts in question generated a protected property interest, the subcontractor had a "sufficient opportunity to pursue" a "claim for payment under [the] contract[]" in state court. *Id.* at 195.

The Court distinguished this situation from other situations in which pre-deprivation hearings were required, explaining that the subcontractor had "only a claim that it did comply with [the contract's] terms and therefore that it [was] entitled to be paid in full." *G & G Fire Sprinklers*, 532 U.S. at 196. That interest, the Court concluded, "can be fully protected by an ordinary breach-of-contract suit." *Id.* Thus, because California made "ordinary judicial process available to [the plaintiff] for resolving its contractual dispute, that process is due process." *Id.* at 197. In reaching that conclusion, the Court expressly rejected the argument that such a suit was inadequate because the subcontractor would have to wait a long time to recover the payments at the end of the suit. *Id.*

The Supreme Court's decision in *G & G Fire Sprinklers* establishes the adequacy of the process provided in this case. As the termination notices made clear, plaintiffs can contest the termination of their grants through an administrative process. *See* J.A. 59-60. And if plaintiffs are unable to secure relief through the administrative process, they may bring a breach-of-

50

contract suit in the Court of Federal Claims, where they would be free to contend that the agency's terminations did not comport with § 200.340(a)(4) as incorporated into their grant agreements. That opportunity for ordinary administrative and judicial review, complete with the prospect of damages at the end of any successful suit, satisfies due process.

The amount of "constitutionally adequate process" turns on "the particular situation." *Peacock*, 794 F.3d at 44 (quotation omitted). The cases that plaintiffs cite, *see* Pls. Br. 59, arise in materially different contexts. *See, e.g.*, *Esparraguera v. Department of the Army*, 101 F.4th 28 (D.C. Cir. 2024) (involving plaintiff who was demoted from her Senior Executive Service job with the government); *Ralls Corp. v. Committee on Foreign Inv. in the U.S.*, 758 F.3d 296, 302 (D.C. Cir. 2014) (involving an order prohibiting a commercial transaction and requiring plaintiff to divest). Those cases do not inform whether a pre-deprivation hearing is required in this specific context and certainly cannot override the Supreme Court's decision in *G & G Fire Sprinklers* that squarely controls here.

More broadly, the consequences of plaintiffs' contrary position would be profound. This case implicates a standardized regulation promulgated by OMB that, by plaintiffs' own admission, "applies to a wide array of federal

awards." Pls. Br. 28. As the district court observed, "it is unimaginable that all government agencies would be required to provide a hearing before they take any action that is arguably inconsistent with a contract." J.A. 574 (quotation omitted). Plaintiffs' view would risk flooding the federal district courts with disputes arising from the "millions of government contracts in effect at any point in time," to which courts have not generally applied due process principles. J.A. 575 (quotation omitted); *cf. C&E Servs.*, 310 F.3d at 200-01 (rejecting attempt to transform "every garden variety dispute" regarding agency procurements into a constitutional case).

## III. Plaintiffs' Remaining Arguments Should Be Rejected.

This Court should not entertain plaintiffs' invitation to direct entry of a preliminary injunction. *See* Pls. Br. 60-67. Even if this Court were to find error in the district court's decision to dismiss, this Court's "general practice" is to "remand the case" to give the district court an opportunity to address arguments "in the first instance." *Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 956 (D.C. Cir. 2016). That course would be particularly warranted here because plaintiffs repeatedly rely on declarations submitted in connection with their motion for injunction pending appeal, after the

52

district court had already entered final judgment. *See, e.g.*, Pls. Br. 61-62 (citing various pages from the new declarations at J.A. 584-602).

Even with the benefit of these declarations, the district court and this Court determined that plaintiffs had "not substantiated their claims of irreparable harm" to justify an injunction pending appeal. Order (Aug. 1, 2025); *see also* J.A. 604-05. After all, the gravamen of plaintiffs' asserted injury is monetary, and all the harms they identify stem from the government's purported failure to pay money owed. *See* Pls. Br. 61-65. And plaintiffs give short shrift to the government's and public's countervailing interests in protecting the public fisc. *See* Pls. Br. 66-67. As the Supreme Court has twice reiterated, the government suffers irreparable harm when it is forced to disburse funds that it may be unable to recover. *See NIH*, 2025 WL 2415669, at *1; *California*, 145 S. Ct. at 968-69. That is true here: plaintiffs identify no basis for the government to recoup funds paid out under grant agreements that are later held to have been validly terminated. And they never offer to repay the funds in that event.

Plaintiffs' request is especially unfounded to the extent that they seek relief on behalf of putative class members who are not parties to the suit. The Supreme Court recently made clear that a court can at most grant

"complete relief *to the plaintiffs before the court*," not "to *everyone potentially affected by an allegedly unlawful act*." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2557 (2025). This case is not remotely like *A.A.R.P. v. Trump*, where the Supreme Court deemed temporary injunctive relief necessary "to preserve [its] jurisdiction pending appeal" because the class faced the risk of imminent removal from the United States. 145 S. Ct. 1364, 1369 (2025) (per curiam). Here, plaintiffs are not entitled to any injunction, much less an injunction that extends beyond plaintiffs and inflicts outsized harm on the government and the public.

54

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant*
  *Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney*
  *General*

DANIEL TENNY
SEAN R. JANDA

 */s/ Brian J. Springer*
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*
  *brian.j.springer@usdoj.gov*

September 2025

55

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,049 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ Brian J. Springer*
Brian J. Springer

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*/s/ Brian J. Springer*
Brian J. Springer

**ADDENDUM**

## TABLE OF CONTENTS

5 U.S.C. § 702 ................................................................................A1

28 U.S.C. § 1491 ...........................................................................A1

2 C.F.R. § 200.340 ........................................................................A2

**5 U.S.C. § 702**

**§ 702.  Right of review**

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.


**28 U.S.C. § 1491**

**§ 1491.  Claims against United States generally; actions involving Tennessee Valley Authority**

**(a)**

**(1)** The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.  For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space

A1

Administration shall be considered an express or implied contract with the United States.

> . . .

. . .


## 2 C.F.R. § 200.340

### § 200.340.  Termination

**(a)** The Federal award may be terminated in part or its entirety as follows:

> **(1)** By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;

> **(2)** By the Federal agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions.  These conditions include the effective date and, in the case of partial termination, the portion to be terminated;

> **(3)** By the recipient or subrecipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated.  However, if the Federal agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal agency or pass-through entity may terminate the Federal award in its entirety; or

> **(4)** By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

**(b)** The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.

> . . .

A2